## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROCK SPRING PLAZA II, INC.**, | |
| Plaintiff, | |
| v. | Civil No. **PJM-20-1502** |
| **INVESTORS WARRANTY OF AMERICA, LLC**, *et al.*, | |
| Defendants. | |

### MEMORANDUM OPINION

Rock Spring Plaza II, LLC ("Plaintiff"), the landlord of an office building located at 6560 Rock Spring Drive in Bethesda, Maryland, has filed suit against its previous tenant Investors Warranty of America, LLC ("IWA" or "Defendant"), who it alleges fraudulently conveyed a leasehold interest in a 99-year Ground Lease to Defendant Rock Springs Drive, LLC ("RSD" or "Co-Defendant") and several "Jane Does."[1]  Plaintiff has filed a Motion for Partial Summary Judgment, ECF No. 127, contending that it has a right to receive basic information from Defendants regarding RSD's origination, ownership (including the names of its principals), and its structure, to the end of determining RSD's ability to perform IWA's obligations under the

---

[1] This skirmish appears to be another battle between familiar opponents on familiar terrain in the Rockledge Drive area of Bethesda, Maryland.  In *Rockledge Associates, LLC v. Transamerica Life Insurance Company*, No. PWG-16-710, 2017 WL 1239182 (D. Md. Feb. 3, 2017), *aff'd*, 717 F.App'x 222 (4th Cir. 2018), the battlefield in question was 6610 Rockledge Drive; here it is 6560 Rock Spring Drive.  The landlord there, Rockledge Associates (which the Court judicially notices appears to have an office in the Rockledge Drive area of Bethesda) was suing Transamerica Life Insurance Company (the Court also judicially notices that Transamerica Corporation, joined as a Defendant in the current proceeding, is a holding company for various life insurance companies and investment firms, including Transamerica Life Insurance Company).  Counsel for plaintiff and counsel for defendant in the earlier litigation appear to be essentially the same counsel here.  While the core issue in the earlier case was different from the core issue here, there are a few features of the earlier case that will bear mentioning in the course of this Opinion.

Ground Lease and agreements appurtenant to same.  Defendants oppose the Motion.  For the reasons set forth below, Plaintiff's Motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.

### A.

On November 14, 1990, Anne Camalier (Plaintiff's predecessor-in-interest as landlord) and Rock Spring II Limited Partnership ("Original Tenant"), entered into a Ground Lease governed by Maryland law, set to expire in November 2089 (the "Ground Lease").[2]  Compl. ¶¶ 10–12.  *See also* ECF No. 136-3 ("Ground Lease").  The property covered by the Ground Lease was undeveloped land located at 6560 Rock Spring Drive, in Bethesda, Maryland (the "Property").  Compl. ¶¶ 10–12.  Original Tenant agreed to pay Camalier an escalating annual ground rent, in monthly installments.  *Id.* ¶ 13.  In addition, the Original Tenant was required to construct an office building on the Property.  *See* Ground Lease.  In fact, a 180,000 square-foot office building was completed in 1992.  *Id.*  On September 1, 2002, the Ground Lease was amended pursuant to an

---

[2] Ground leases are "still common in Maryland, although little known elsewhere in the United States." *Rockledge Assocs. LLC. v. Transamerica Life Ins. Co.*, No. PWG16-710, 2017 WL 139182, at *1 (D. Md. Feb. 3, 2017), *aff'd*, 717 F.App'x 222 (4th Cir. 2018) (citing *State v. Goldberg*, 85 A.3d 231, 234 (Md. 2014) (internal citations and quotation marks omitted).

"A ground rent lease ... is a renewable 99 year lease where the fee simple owner of a property receives an annual or semi-annual payment ('ground rent') and retains the right to re-enter the property and terminate the lease if the leaseholder fails to pay. The fee simple owner retains a real property right in the land, but the leaseholder's interest is governed by the law of personalty."  *Muskin v. State Dep't of Assessments & Taxation*, 30 A.3d 962, 965 (Md. 2011) (citing *Kolker v. Biggs*, 99 A.2d 743, 745 (Md. 1953)).

"Under this mutually beneficial scenario, the tenant "acquire[s] a perpetual interest in the leased premises, which would justify his making permanent improvements thereon, and enable him to avail himself of the value of the property thus enhanced," while the fee simple owner/landlord "secure[s] the prompt payment in perpetuity of the interest on a sum of money, equivalent to the value of the property."  *Rockledge*, 2017 WL 139182, at *2 (citing *Goldberg*, 85 A.3d at 237).

agreement entitled "First Amendment to Amended and Restated Ground Lease Indenture."  ECF No. 13-2.

The terms of the Ground Lease authorized Original Tenant to assign the Lease and to mortgage its leasehold interest.  Ground Lease § 5.2.  In 2006, pursuant to those terms, Original Tenant took out a $30 million mortgage loan from Monumental Life Insurance Company ("MLIC" or "Lender"), secured by its leasehold interest in the Property.  In connection with the mortgage loan, Plaintiff (the current landlord on the Ground Lease), Original Tenant, and MLIC entered into what they termed a "Ground Lessor Estoppel and Non-Disturbance Agreement" (the "Estoppel Agreement").  *See* 2006 Estoppel Agreement, ECF No. 13-3.  Section 12 of the Estoppel Agreement provides, in relevant part:

> *Lender may, without further consent of Landlord, sell and assign the leasehold estate in the Premises. Lender shall notify Landlord in writing of such sale or assignment within ten (10) days of such sale or assignment. Provided any defaults by the Tenant have been cured to the extent required by the terms of the Lease any assignee of the leasehold estate following a foreclosure of the Deed of Trust by power of sale or judicial foreclosure (or transfer by deed in lieu thereof) shall be liable to perform the obligations imposed upon Tenant by this Lease only during the period such person has ownership of said such leasehold estate.*

MLIC subsequently assigned its interest as Lender to IWA.  On August 31, 2017, IWA informed Plaintiff that it had assigned its interest as Tenant in the Ground Lease to Rock Springs Drive, LLC (again, "RSD").  Mem. in Supp. of Mot. for Summ. J., ECF No. 127-1, at 1.  RSD, it appears, was formed the very day of the attempted assignment.  Plaintiff states that it pressed both IWA and RSD for information regarding RSD—its origination, ownership, and structure—in order

to determine whether RSD had the ability to fulfill IWA's obligations under the Ground Lease. However, says Plaintiff, it was given little to no information in response.[3]  *Id.*

From that date forward, Plaintiff says, while RSD has dutifully paid the monthly rent on the Ground Lease, Defendants and their representatives have repeatedly refused to identify the ownership and management of RSD or to share their intentions with respect to the future of the Property.  Compl. ¶¶ 18–23.  *See also* ECF Nos. 127-10, 127-11, 127-12, and 127-13.  Plaintiff alleges that since IWA's 2017 purported conveyance of the lease, the Property has "languished in vacancy," while RSD has repeatedly "refused to explore numerous opportunities to sublease the Property to commercially viable tenants." Compl. ¶¶ 24–25.

Plaintiff further states that IWA is a subsidiary of Transamerica Financial Life Insurance Company ("Transamerica"), a large, well-established insurance company.  *Id.* ¶¶ 13, 26–29.  RSD, on the other hand, is a limited liability company that was formed on August 25, 2017, as indicated, the very day that IWA attempted to make it the assignee of its interest in the lease. *Id.*  ¶ 14. Plaintiff alleges that IWA "conveyed its interest in the Ground Lease to the defendant [RSD] for the sole purpose of shielding Transamerica and [IWA] from their obligation to pay ground rent." *Id.* ¶ 17.  As of the date this suit was filed, Plaintiff also stated its belief that RSD "intends to stop paying rent after August 31, 2020, which is the date that Maryland's three-year statute of limitations for a fraudulent conveyance claim would expire." *Id*. ¶ 33.   However, as of the date of this Opinion, July 2022, RSD has apparently continued to pay the monthly rent.

---

[3] The Court has noted that counsel in the present case appear to be essentially the same counsel in the earlier Rockledge Drive litigation before Judge Grimm.  Judge Grimm went out of his way to praise counsel for their extensive cooperation in his case.  *See Rockledge Associates,* 2017 WL 1239182, at *12 (fn. 1).  One wonders – Has the Era of Good Feelings between counsel cooled this time around?

4

**B.**

On June 5, 2020, Plaintiff filed this suit. ECF No. 1. On June 29 and July 6, respectively, IWA and RSD filed separate motions to dismiss. ECF Nos. 13, 20.  On December 1, 2020, following a hearing on the motions, the Court rendered an oral opinion denying both motions to dismiss. ECF Nos. 29, 30.

On February 25, 2021, the Court granted Plaintiff leave to amend its Complaint to join Transamerica as a defendant. ECF No. 58. Transamerica thereafter filed its own motion to dismiss, which the Court denied.  ECF No.  100.

On July 2, 2021, IWA submitted a letter informing the Court of a discovery dispute with Plaintiff.  ECF No. 99.  On August 6, 2021, the parties filed additional correspondence with the Court regarding the discovery dispute, ECF No. 111, and on August 12, 2021, the Court held a telephone conference with counsel pursuant to Guideline 1 of the Local Rules, ECF No. 116. Following the telephone conference, the Court issued a Memorandum Order staying all discovery and directing Plaintiff to file a Motion for Partial Summary Judgment addressing the legal issue of the entitlement *vel non* of an obligor under a contract to learn from the proposed assignor who the proposed assignee of a contract is and other relevant other information with respect to the proposed assignee.  ECF No. 117.

On September 13, 2021, Plaintiff filed the present Motion for Partial Summary Judgment. ECF No. 127.  On October 13, 2021, IWA and RSD responded, ECF Nos. 132, 136.[4] On October 28, 2021, Plaintiff replied, ECF No. 139, and on November 21, 2021, Defendants filed a joint

---

[4] Transamerica also filed a Response, ECF No. 137, stating that it "does not intend to respond substantively to Plaintiff's Motion because: (1) the Court's Order framing the issue on which it requested a motion for summary judgment does not involve any claim against Transamerica; and (2) Plaintiff's Motion does not seek any relief on its claims against Transamerica, inasmuch as Transamerica was not a party to the assignment that is the subject of the Plaintiff's Motion."

Surreply, ECF No. 146.  On January 13, 2022, the Court held a hearing and took Plaintiff's Motion

under advisement.  The Court now rules on Plaintiff's Motion.

## II.

Under Federal Rule of Civil Procedure 56, the Court will grant a motion for summary

judgment, in whole or in part, if the moving party demonstrates that there is no genuine issue as to

any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the motion, the court is obliged to view

the facts in the light most favorable to the nonmoving party, drawing all justifiable inferences in

its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court relies only on facts

supported in the record, not merely assertions the parties make in their pleadings.  *Bouchat v. Balt.

Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is deemed "material" if it

"might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A

dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party

exists for the trier of fact to return a verdict in favor of that party.  *Id.* at 248–49.

As to summary judgment motions regarding matters of contract interpretation, the Fourth

Circuit has explained:

> A court faces a conceptually difficult task in deciding whether to grant summary
> judgment on a matter of contract interpretation. Only an unambiguous writing
> justifies summary judgment without resort to extrinsic evidence, and no writing is
> unambiguous if susceptible to two reasonable interpretations. The first step for a
> court asked to grant summary judgment based on a contract's interpretation is,
> therefore, to determine whether, as a matter of law, the contract is ambiguous or
> unambiguous on its face. If a court properly determines that the contract is
> unambiguous on the dispositive issue, it may then properly interpret the contract as
> a matter of law and grant summary judgment because no interpretive facts are in
> genuine issue.  Even where a court, however, determines as a matter of law that the
> contract is ambiguous, it may yet examine evidence extrinsic to the contract that is
> included in the summary judgment materials, and, if the evidence is, as a matter of
> law, dispositive of the interpretative issue, grant summary judgment on that basis.
> If, however, resort to extrinsic evidence in the summary judgment materials leaves

> genuine issues of fact respecting the contract's proper interpretation, summary
> judgment must of course be refused and interpretation left to the trier of fact.
> *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir.1993) (internal
> citations and quotations omitted).

*Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234–35

(4th Cir. 2007).

Ultimately, if "there is a *bona fide* ambiguity in the contract's language or legitimate

doubt as to its application under the circumstances ... the contract [is] submitted to the trier of the

fact for interpretation." *Bd. of Educ. of Charles Cty. v. Plymouth Rubber Co.*, 82 Md. App. 9, 25,

569 A.2d 1288, 1296 (1990).  Otherwise, the Court interprets the contract as a matter of law.

## III.

In its Motion, Plaintiff asks the Court to enter partial summary judgment in its favor, (a)

declaring IWA's assignment of the Ground Lease to RSD void and setting it aside; or (b) declaring

that IWA's assignment of the Ground Lease conveyed only a possessory interest to RSD (what

Plaintiff calls "privity of estate") but that it did not establish privity of contract between Plaintiff

(the landlord) and RSD, which would presumably release IWA (the tenant) from its obligations

under the Ground Lease.  Mem. in Supp. of Mot. for Partial Summ. J., ECF No. 127-1, at 4.  In

the alternative, Plaintiff asks the Court to grant it partial summary judgment declaring that IWA's

assignment is voidable as a matter of law and shifting the burden to Defendants to demonstrate

that the assignment complies with the Restatement (Second) of Contracts § 317(2) or under

established Maryland law or, alternatively, whether the assignment constitutes a fraudulent

conveyance.  *Id.*

Plaintiff's Motion ventures beyond the specific question posed by the Court in August

2021, which was: What is the entitlement of an obligor under a contract to know who a proposed

assignee of the other party to contract (i.e., the assignor) is and other relevant information about

the assignee?  For the reasons set forth below, the Court agrees with Plaintiff that an obligor is entitled to receive at least some cursory information regarding a proposed assignee.  The Court denies without prejudice Plaintiff's Motion in all other respects.

### A.

Since this case is based on the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, the Court considers the core issues in accordance with the substantive law of the State of Maryland.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).  Under Maryland choice of law rules, "it is generally accepted that the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *National Glass, Inc. v. J.C. Penney Properties, Inc.,* 336 Md. 606, 610, 650 A.2d 246 (1994) (quotations omitted). Here, both the Ground Lease and Estoppel Agreement contain choice of law provisions which provide that each agreement will be construed and interpreted in accordance with Maryland law.  No question, then, as to the applicability of Maryland substantive law.

In Maryland, leases are considered to be contracts and are construed according to the rules of contract interpretation.  *Middlebrook Tech, LLC v. Moore*, 849 A.2d 63, 78 (Md. Ct. Spec. App. 2004).  Maryland courts apply the objective theory of contract interpretation, looking first to the language of the contract itself.  *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (internal citations omitted).  Thus, "a contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (internal citations omitted).  The court must therefore seek to

"determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.*

IWA and RSD argue, and Plaintiff does not dispute, that the language of the lease documents govern the permissibility of assignment.  *See CB Structures, Inc. v. Potomac Elec. Power Co.*, 122 F. Supp. 3d 247, 251–52 (D. Md. 2015); *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 23 (Md. 2013).   Defendants contend that the relevant contractual language[5] clearly permits IWA's purported assignment to RSD, an entity, as it happens, is controlled by IWA.  In addition, Defendants point out that the modern approach of contract law favors a liberal assignment policy.  *See* Hunter, *Assignable property interests*, Modern Law of Contracts § 21:8.  *See also Julian v. Christopher*, 575 A.2d 735, 738 (Md. 1990) (Maryland law "favor[s] the free and unrestricted right to alienate interests in property.").

Defendants are also correct that both the Ground Lease and Estoppel Agreement in fact clearly indicate that assignment of the Ground Lease is permitted.  Section 5.2 of the Ground Lease states: "Tenant may assign this Lease and may mortgage its leasehold estate."  The Ground Lease places just one apparent limitation on assignment, which is to limit the tenant's ability to assign the Lease "prior to the substantial completion of the office building described in Section 7.1."  This restriction, however, is no longer operative since the office building has been completed for a number of years.  Nor does the Ground Lease require that the obligor has the absolute right to approve of the assignment in advance.

Similarly, the Estoppel Agreement permits assignment.   Section 19 provides: "If the Lender acquires the Tenant's [IWA's predecessor] interest in the Lease or the Lender acquires a

---

[5] *See* p. 2, *supra*.

new lease pursuant to any provision of the Lease, the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party."

At first blush, the language of the agreements contemplates and permits essentially unhampered assignment by the Tenant.  However, at this juncture, the issue is not whether the Ground Lease and Estoppel Agreement permit the purported assignment by IWA to RSD.  The question before the Court is what information regarding RSD, if any, is Plaintiff, as party to the original contract (obligor), entitled to receive about the assignment at the time of the proposed assignment?

**B.**

To rephrase the inquiry slightly: If assignment is permitted under a contract, is the party to the original contract, against whom the assignment is made, i.e., the obligor, entitled to know the identity of a proposed assignee and at least some basic information as to the proposed assignee's ability to perform under the contract before the assignment becomes effective?  This, as the Court sees it, presents a pure unambiguous legal question for the Court to decide, not an ambiguous clause in the contract deferrable for resolution to a trier of fact.  The Court holds that the answer must be in the affirmative.  To interpret even the most liberal assignment provision as permitting an assignor to withhold from an obligor any and all information relevant about a proposed assignee would be contrary to common sense as well as to the inherent concept of good faith and fair dealing.[6]

Defendants say that, because the language of the agreements permits assignment with virtually no restrictions, Plaintiff is not entitled to the information about RSD that it requests.  *See* Defs. Joint Surreply, ECF No. 146.  They insist that the Ground Lease and Estoppel Agreement

---

[6] As the Court posed the hypothetical to counsel at oral argument, without in the least intending to be invidious: Could the assignment be made to a homeless person?

alone define their obligation to provide information to Plaintiff and that no documents require them to provide Plaintiff with anything beyond notice the assignment. *Id.* at 3. Plaintiff, on the other hand, submits that it is entitled to obtain sufficient information regarding who the proposed assignee is, to the end of verifying the assignee's ability to meet the assignor's obligations, consistent with principles outlined in the Restatement (Second) of Contracts, § 317.

The Court is unaware of, nor have the parties submitted, any Maryland law addressing the right of an obligor under a contract to receive information about an assignee in advance of the assignment. No cases from other jurisdictions, nor articles appear to address the issue. Nevertheless, Maryland courts have often applied the principles of contract law embodied in the Restatement (Second) of Contracts. *See, e.g., Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*, 825 A.2d 462, 469 (Md. 2003). The Court, therefore, considers the parties' arguments within the framework of the Restatement.

Section 317(2) of the Restatement (Second) of Contracts, *Assignment of a Right*, provides:

A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

Plaintiff argues that IWA's assignment to RSD is invalid (or perhaps just voidable) primarily based on § 317(2)(a) because, potentially at least, given Plaintiff's current lack of knowledge, the proposed assignment might change its duty as obligor, might materially increase its burden or risk, might materially impair its chance of obtaining return performance, or might

materially reduce the value of the Ground Lease to it.  In short, in order to be able to determine whether an assignment is invalid, a party cannot do so without at least some knowledge of the assignee's identity and ability to perform.

Comment d to § 317 further explains, in relevant part:

> What is a material variation, an increase in burden or risk, or an impairment of the obligor's expectation of counter-performance under paragraph (2)(a) depends on the nature of the contract and on the circumstances. Both assignment of rights and delegation of performance are normal and permissible incidents of many types of contracts . . . The clause on material impairment of the chance of obtaining return performance operates primarily in cases where the assignment is accompanied by an improper delegation under § 318 or § 319: if the obligor is to perform in exchange for the promise of one person to render a return performance at a future time, substitution of the return promise of another impairs the obligor's expectation of counter-performance. **_But in cases of doubt, adequate assurance of due performance may prevent such an impairment._**

(Emphasis added).

According to Plaintiff, § 318 of the Restatement must also be considered because IWA's purported assignment to RSD seeks to delegate from IWA to RSD the contractual obligations of the Tenant under the Ground Lease.  The Court engages with § 318.

Section 318, _Delegation of Performance of Duty_, provides:

(1) An obligor[7] can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise.

(2) Unless otherwise agreed, a promise requires performance by a particular person only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised.

(3) Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.

---

[7] There may be some confusion over the use of the term "obligor" in § 318 of the Restatement.  In § 318, the "obligor" is actually a proposed "assignor," and the "obligee" is the other party to the original contract.  In the present case, the term "obligor" has been used to refer to the party to the contract against whom the proposed assignment is made, i.e., the Plaintiff, but in the sense of § 318 Plaintiff would be the "obligee."

Thus, says Plaintiff, to give effect to §§ 317 and 318, the party to a contract against whom an assignment is proposed to be made must have some ability to obtain adequate assurances that the proposed assignee has the ability to perform.  Although the Restatement does not define "adequate assurance," Plaintiff argues that knowledge of RSD's identity (its origination, ownership, and structure), as well as its intentions for the property, and ultimately its ability to perform is critical to determine whether the assignment to RSD is valid, especially given the long-term nature of the Ground Lease.  ECF No. 127-1 (citing *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 128 A. 280 (Md. 1925).  Defendants, on the other hand, argue that §§ 317 and 318 do not apply because the agreements do not require IWA to provide Plaintiff with any information about an assignment beyond giving notice to Plaintiff that an assignment has occurred.  *See* Responses in Opp'n, ECF Nos. 132, 136.  The Court finds Defendants' position untenable.

The gist of Defendants' position is that IWA has an unfettered right to assign the Ground Lease to any person or entity without disclosing any information regarding the assignee's identity, let alone anything about its origination, ownership, structure, capitalization, i.e., its overall ability to perform under the Ground Lease.  But, as the Court sees it, Defendants' argument cuts too far. While RSD may not be the exact hypothetical analog of the homeless person that the Court mused upon at oral argument, its logic surely would apply to a homeless person as assignee.[8]

What if RSD in the present case, like Transamerica Life Insurance Company in the earlier case, simply declares that it will stop paying Plaintiff rent as of some date?  RSD was apparently formed in a day.  Why couldn't it declare bankruptcy in a day?  Or simply dissolve itself?  Legal

---

[8] There is a far more realistic and compelling example than the hypothetical homeless person as assignee that the Court mentioned and it comes from very close to home. The litigation before Judge Grimm involved a different issue between parties related if not identical to those here, but the fact is that the earlier litigation came about because the tenant there, Transamerica Life Insurance Company, simply announced that it was going to stop paying rent on the Ground Lease, asserting that any obligation it might have had to the landlord was extinguished.

principles aside, the immediate common sense inquiry of any reasonable person would most certainly be – who is RSD?  Why were they just formed?  Are they able to perform under the Ground Lease?  But then, of course, there is § 317(2) of the Restatement (Second) of Contracts, a legal principle which gives the common sense concern legal force.

The record shows that Plaintiff raised its concern with IWA regarding the apparent lack of commercial activity on the Property, as well as its concern over deferred maintenance, waste, and abandonment.  *See* ECF No. 127-13. In addition, Plaintiff expressed concern regarding RSD's ability to continue to meet its financial obligations under the Ground Lease.  *Id.*  Plaintiff accuses IWA of creating a "sham" entity in effect to shield itself from both its short and long-term obligations under the Ground Lease and Estoppel Agreement.[9]  Plaintiff further contends that information regarding RSD is necessary for Plaintiff to determine whether the assignment was valid.  In other words, Plaintiff says, if it is not able to obtain *any* information regarding RSD upon request, it has no way to determine whether an assignment was valid and/or whether there would be, among other things, a material impairment of likelihood of receiving appropriate performance by RSD.

---

[9] Defendants appear to believe that if, as and when their proposed assignment is effectuated, they will be off the hook for any and all liability under the Ground Lease.  ECF No. 132 at 26; ECF No. 136 at 20.  The Court invites Defendants' attention to Restatement (Second) of Contracts § 318(c). *See supra* text accompanying Note 7.

Interestingly, IWA itself suggests that the Ground Lease would not permit an assignment to an insolvent person or entity, since such an assignment "would raise the specter of bad faith."[10] ECF No. 132 at 29.  According to IWA, the assignment to RSD was made in good faith, such that IWA had no duty to provide Plaintiff with the information it demanded.  *Id.* at 29–30.  Trust us, say Defendants.[11]

Defendants' stance poses serious problems.  Maryland courts have recognized that allowing the transfer of rights and duties under a contract can place significant burdens upon the obligor under a contract.  *See, e.g., Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588 (1925).  In the event of an assignment, an obligor may find itself in a situation presenting entirely different risks and costs than it initially bargained for.  This is not to say that an obligor, after entering into an agreement allowing assignment, may simply block or void an assignment. But implicit in Section 317(2)(a), which prohibits assignments that "materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him," is that the obligor, <u>in good faith</u>, may seek appropriate information as to whether its duties, burdens, or risk might in fact be materially impacted by the assignment of its contract to a proposed assignee.

---

[10] Plaintiff asserts that the covenant of good faith and fair dealing requires Defendants to act reasonably and in good faith.  ECF No. 139 at 12.  While breach of the covenant of good faith and fair dealing is not a standalone cause of action in Maryland, it nevertheless inheres in every contract case.  *See Abt Assocs., Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000), *aff'd*, 9 F.App'x 172 (4th Cir. 2001) (internal citations omitted); *Abt Assocs., Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000), *aff'd*, 9 F. App'x 172 (4th Cir. 2001) (internal citations omitted).  *See also* 30 *Williston on Contracts* § 77:11 (4th ed.) ("A promisor may be at fault when it breaches its duty to deal in good faith with the other parties or known beneficiaries to a contract.  A covenant of good faith is implied in all contracts . . . The covenant imposes on a party both the duty to refrain from rendering performance impossible, and to do everything that the contract presupposes should be done by a party to accomplish the contract's purpose.").  Defendants counter that the covenant of good faith and fair dealing does not obligate a party to take any affirmative action not required under the contract.  ECF No. 146. at 7–8.  There may be circumstances where Defendants' point is well taken.  But it is not well taken here.

[11] Worth noting is a relevant proverb popularized if not created by President Reagan: "Trust, but verify."

And the same requirement of good faith applies to the assignor under a contract.  It must provide appropriate responses.  The Court cannot ignore the obligation of good faith and fair dealing that Maryland courts have held inherent in all contracts, which, the Court would add, cannot simply be renounced at the whim of the parties to a contract.

Accordingly, the Court holds that an obligor under a contract—even a contract permitting assignment subject to no specific limitations—is, upon request, entitled to at least some basic information regarding a proposed assignee by the proposed assignor and proposed assignee—such as the identity of the assignee; if an entity, who the owners and principals of the assignee are; when the assignee, if an entity, was formed and for what purpose, and cursory information about an assignee entity's organization and structure.  To be clear: An obligor is not entitled to whatever information it demands, nor is it necessarily entitled to block an assignment based on the information received, although it may, in good faith, delay assignment until a court, if necessary, is able to judge the impact of the proposed assignment on the obligor.

To repeat: The obligor may only seek basic information about the proposed assignee and must do so and the proposed assignor's and proposed assignee's response to its inquiry must proceed – in good faith – and without question, this should occur expeditiously, presumably in a matter of days or a few weeks at most. So, it should be clear that any overreach by the obligor in seeking the relevant information as well as any hard-nosed stonewalling on the part of the proposed assignor or assignee (or their counsel) in response, can and should be subject not only to a court order compelling or denying production of relevant information but also to possible sanctions of the sort contemplated by Federal Rule of Civil Procedure 11.

This particular dust-up in this case causes one to wonder why the issue has not come up in the case law or the legal literature in the past.  The answer may well be that parties to a contract

16

ordinarily have no reason to object to an assignment or are usually able to come to arrangements agreeable to everyone. Clearly, the concept of good faith and fair dealing inherent in all contracts and, especially in the context of commercial cases, informs the concept of "adequate assurances" when a proposed assignment raises concerns, see UCC § 2-609. But the apparent unique resistance of the assignor and, indeed, assignee (as well as their counsel) in this case have forced the issue.

## C.

Given that the Court has determined that Plaintiff is entitled to receive basic information about RSD so that Plaintiff may determine whether RSD has the ability to satisfy IWA's ongoing obligations under the Ground Lease, the question becomes whether Defendants have in fact already satisfied that obligation. The Court finds that they have not.

Plaintiff's counsel have appended to Plaintiff's Motion a copy of their communications with RSD's counsel regarding IWA's purported assignment to RSD. *See* ECF Nos. 127-9, 127-11, 127-12, 127-13, 127-14 and 127-17. In Plaintiff's view, the responses it has received have been insufficient to provide adequate assurance that RSD can perform under the Ground Lease and Estoppel Agreement. ECF No. 127-1 at 20–21. Defendants, on the other hand, continue to emphasize that RSD is not and never has been in default of the Ground Lease and state that Plaintiff's letters were met with detailed responses. *See* ECF No. 132 at 8. Defendants insist that the notice of assignment and responsive communications have been sufficient to alleviate any concerns Plaintiff might have had about RSD's ability to perform. *See* ECF No. 136 at 8.

In a letter dated February 22, 2018 from Plaintiff's counsel to RSD's counsel, Plaintiff's counsel noted that Plaintiff had not received certain requested information and was "growing increasingly concerned about the financial and structural viability of the Property, given that there evidently is and has been no commercial activity there." ECF No. 127-9 at 1. The letter further

17

noted that Plaintiff had received no information from IWA or RSD regarding the identity of RSD's principals or appropriate contact information. *Id.* Bottom line, however: The letter also stated that Plaintiff harbored "reasonable insecurity with respect to Assignee's ability to perform under the Ground Lease." *Id.* at 2.

RSD's counsel responded on March 30, 2018. ECF No. 127-11. RSD disagreed with the assertion that no commercial activity was taking place at the Property, stating that it had entered into various contracts with certain vendors related to the Property and that it was continuing to evaluate the rental market. *Id.* at 1–2. It further explained that RSD had continued performing its obligations under the Ground Lease, paying monthly rent obligations in a timely fashion. *Id.*

Plaintiff then took the position that the assignment to RSD was invalid. ECF No. 127-12. It explained that it had yet to receive contact information as to who the principals of RSD were. *Id.* Furthermore, says Plaintiff, it discovered through Montgomery County tax records that property tax bills on the Property were still being paid by IWA. *Id.* Plaintiff clarified that it was not seeking any strategic information but was "simply asking Assignee to provide basic identifying information, including the name of a principal of Rock Springs Drive, LLC, who understands what is happening operationally at the building." *Id.* at 3.

From all that appears, no communication occurred between Plaintiff's counsel and RSD's counsel for over a year. ECF No. 127-13. Then, on June 6, 2019, Plaintiff's counsel sent correspondence to RSD's counsel, warning RSD that if it failed to engage in communications with Plaintiff regarding the Property, Plaintiff would challenge the entire validity of the assignment. *Id.* In email correspondence sent later the same month, RSD, apparently for the first time, began to express a willingness to meet with Plaintiff. *See* ECF No. 127-17.

Defendants again asserted that Plaintiff had already received the information that Plaintiff had requested, including contact information for the entity managing the Property. ECF No. 132 at 27–28; ECF No. 136 at 32. In particular, IWA cited two communications with Plaintiff, i.e., the notice of assignment and an email chain involving Charles Camalier, who was described as a point of contact for Plaintiff. *See* ECF No. 136-3, DX-11 *and* DX-13. However, the notice of assignment provided only contact information for RSD's legal counsel, which was not the information sought by Plaintiff. ECF No. 136-3, DX-11. In addition, Charles Camalier on behalf of Plaintiff was given information for contacts with entities who were managing the Property, but not about the principals who owned and operated RSD itself. ECF No. 136-3, DX-13.

The Court returns to the guiding principle: If "the substitution of the right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his change of obtaining return performance, or materially reduce its value to him," an assignment may be at least voidable. Restatement (Second) of Contracts § 317. Clearly Plaintiff has continuously expressed its concern that the assignment by IWA to RSD would materially increase its risk and/or impair its change of obtaining return performance and/or materially reduce the value of the Ground Lease to it. That may or may not be so. But in its communications with RSD's counsel, Plaintiff's counsel has explained the circumstances that gave rise to Plaintiff's doubt. The fact that RSD may have paid the monthly rent does not suffice to provide Plaintiff with adequate assurance of due performance, especially given Plaintiff's claims that the Property continues to languish in vacancy.

In sum, Defendants have not, consistent with the requirements of § 317 of the Restatement (Second) of Contracts, met their obligation to provide information sufficient to give Plaintiff adequate assurance that RSD can fulfill IWA's obligations under the Ground Lease and Estoppel

Agreement.  It is unclear to the Court why Defendants want to withhold information as seemingly straightforward as the names and contact information of the proposed assignee's principals.  But, for whatever reason, they may do so no longer.  Defendants and defense counsel, in particular, are therefore forewarned. The Court is not prepared to tolerate any gamesmanship that might impede the already delayed progress of this case. As the Court has indicated, depending on how discovery develops, with good faith and fair dealing always in play, the Court will not hesitate, if need be, to impose appropriate sanctions.

As RSD points out in its Opposition, certain factual issues remain to be explored in discovery.  Although Plaintiff claims that the conveyance to RSD was fraudulent and improper, the parties have yet to explore what information, if any, may go to that issue.  Importantly, discovery would also be appropriate to determine whether the purported assignment would materially change Plaintiff's duties or risks under the contracts, would materially impair Plaintiff's chance of obtaining return performance, or would materially reduce its value to Plaintiff.

**IV.**

Accordingly, the Court **GRANTS IN PART** the Motion for Partial Summary Judgment insofar as it holds that Defendants have a duty to disclose basic information regarding RSD, consistent with the Restatement (Second) of Contracts, § 317, as set forth in this Opinion so that Plaintiff may obtain adequate assurance that RSD is able to perform IWA's obligations under the Ground Lease and Estoppel Agreements.

The Motion is **DENIED WITHOUT PREJUDICE** in all other respects.

Counsel for the parties **SHALL AGREE** upon a scheduling order within thirty (30) days.

A separate Order will **ISSUE.**

**August $\underline{3}$, 2022**

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

21