**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROCK SPRING PLAZA II, LLC | |
| Plaintiff, | |
| v. | Civil Action No. 8:20-cv-01502-PJM |
| INVESTORS WARRANTY OF AMERICA, LLC, et al., | |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO DEFENDANT INVESTORS WARRANTY OF
AMERICA, LLC'S BRIEF SEEKING RECONSIDERATION OF
THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION**

# TABLE OF CONTENTS

Page

I.     SUMMARY OF ARGUMENT .................................................................... 1

II.    ARGUMENT ........................................................................................... 5

    A.    The Court's In Camera Review and Isolation of Three Documents Suggestive of Fraud Was Entirely Proper ........................................................... 5

        1.    Applying the crime-fraud exception to the attorney-client privilege promotes a just and fair resolution ........................................... 5

        2.    The documents reviewed in camera provided the requisite prima facie evidence to apply the crime-fraud exception ............................ 6

        3.    IWA invites error when it suggests that Plaintiff must prove fraud for the crime-fraud exception to apply ............................................. 8

        4.    The Court has ample evidentiary support for applying the crime-fraud exception in the exercise of its discretion ............................ 9

        5.    IWA has been given all process that is due before the documents may be disclosed to Plaintiff ......................................................... 10

    B.    Witness Testimony After the Feb. 16th Hearing Belies IWA's Argument that the Crime-Fraud Exception Should Not Apply ........................ 13

        1.    The Assignment was negotiated with the intention that IWA would walk away, leaving Plaintiff to chase an empty shell once the statute of limitations ran on a fraudulent conveyance claim ............... 13

        2.    IWA, through RSD, intended to hinder, delay, or frustrate Plaintiff's rights under the Ground Lease .................................................. 16

        3.    Key parts of the exit strategy were designed to keep Plaintiff in the dark about the assignment until the SOL had run. ............................ 18

        4.    The lawyers clearly were involved in structuring this fraudulent conveyance ........................................................................... 20

        5.    The reason Defendants are hiding behind privilege is because there was never any intention for RSD to honor the Tenant's long-term obligations under the Ground Lease ................................................. 23

    C.    The Court has Discretion to Order the Three Documents to be Released ................. 26

    D.    Any Relief Sought by IWA From the Court's Order Should Occur within a Reasonable Time ....................................................................... 27

III.   CONCLUSION ...................................................................................... 28

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ardrey v. United Parcel Service*,
  798 F.2d 679 (4th Cir. 1986) ................................................................26

*Chaudhry v. Gallerizzo*,
  174 F.3d 394 (4th Cir. 1999) ..................................................................8

*Clark v. United States*,
  289 U.S. 1 (1933)................................................................................5, 6, 7

*ContraVest Inc. v. Mt. Hawley Ins. Co.*,
  No. 20-1915, 2021 WL 4782687 (4th Cir. Oct. 13, 2021) ....................27

*Fed. Election Comm'n v. Christian Coal.*
  178 F.R.D. 456 (E.D. Va 1998) ............................................................12

*Gutter v. E.I. Dupont De Nemours*,
  124 F. Supp. 2d 1291 (S.D. Fla. 2000) .................................................11

*Haines v. Liggett Grp. Inc.*,
  975 F.2d 81 (3d Cir. 1992)....................................................................11

*In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*,
  401 F.3d 247 (4th Cir. 2005) ........................................................8, 9, 26

*In re Grand Jury Subpoena*,
  642 Fed. Appx. 223 (4th Cir. 2016)................................................11, 12

*In re Grand Jury Subpoena*,
  884 F.2d 124 (4th Cir. 1989) .........................................................11, 26

*In re Grand Jury Subpoenas*,
  144 F.3d 653 (10th Cir. 1998) ..............................................................11

*In re Napster, Inc. Copyright Litig.*,
  479 F.3d 1078 (9th Cir. 2007) ..............................................................11

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009)........................................................................27, 28

*Rowland v. Am. Gen. Fin., Inc.*,
  340 F.3d 187 (4th Cir. 2003) ................................................................27

*United Bank v. Buckingham*,
301 F.Supp.3d 547 (D. Md. 2018) ...........................................................................9

*United States v. Zolin*,
491 U.S. 554 (1989) ................................................................................. passim

Statutes and Codes

United States Code
Title 28, Section 1292(b) ....................................................................................28

Rules and Regulations

Federal Rules of Evidence
Rule 503 ...........................................................................................................5, 6

Other Authorities

Christopher B. Mueller, et al., EVIDENCE §5.22 (6th ed. 2018) ....................................7

John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16 (Spring Ed. 2023) .............7

Lynn McLain, 6 MARYLAND EVIDENCE, § 503:17 (Aug. 2022) ....................................5

**PLAINTIFF'S RESPONSE TO DEFENDANT INVESTORS WARRANTY OF
AMERICA, LLC'S BRIEF SEEKING RECONSIDERATION OF
THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION**

In accordance with the Court's March 28, 2023, Memorandum Order (ECF No. 297),
Plaintiff Rock Spring Plaza II, LLC ("Plaintiff") hereby submits this Response to Defendant
Investors Warranty of America, LLC's ("IWA") Brief, by which IWA seeks "Reconsideration of
the Applicability of the Crime-Fraud Exception" (ECF No. 294) (the "Brief").

The Court has broad discretion in how it resolves the crime-fraud issues presented in this
case, which extends not only to deciding whether the documents at issue should continue to be
withheld from discovery on privilege grounds but also to the process by which documents are
disclosed. Plaintiff hereby requests that the Court order IWA to release the three documents in
question within ten (10) calendar days of the order, which should allow more than sufficient time
for IWA to request a stay and to pursue whatever relief it may seek from the U.S. Court of
Appeals for the Fourth Circuit.

## I.     SUMMARY OF ARGUMENT

After the in-depth hearing on February 16, 2023 (the "Feb. 16th Hearing"), the Court
issued its Order (ECF No. 286), by which the Court exercised its discretion to conduct an in
camera review of a subset of 190 documents of the more than 1,190 documents IWA has
withheld on privilege grounds. The sheer volume of privileged documents, in the context of what
IWA and Rock Springs Drive LLC ("RSD," collectively with IWA, "Defendants") contend was
a good faith, "ordinary course" assignment, is preposterously large.

From Plaintiff's perspective, what followed the Court's review is opaque given IWA's
exchange of ex parte communications with the Court (ECF Nos. 288, 289). What is clear,
however, as manifested in the Court's March 15, 2023, Memorandum (ECF No. 290), is that
IWA is trying to avoid the disclosure of at least three attorney-client "exchanges" that "might be

1

relevant to Plaintiff's fraud theory."[1] Plaintiff does not know what these three documents reveal, but Defendants should not be permitted to hide evidence of a fraudulent conveyance behind tenuous assertions of privilege.

IWA asks the Court to "reconsider and reverse its preliminary determination" and dedicates the first half of its Brief to arguing the evidence in a way that does nothing to aid the Court in resolving the procedural questions presented.[2] For example, IWA continues to ignore Plaintiff's fraud evidence and what the burden of proof is at this preliminary stage (e.g., by contending that "the Court did not find tortious or criminal activity," and thus "IWA is left with the conclusion that the Court is proceeding to review IWA's privileged documents only on a contract-based theory"). Brief at 3. The fact that the Court already has identified three "privileged" documents that appear to support Plaintiff's fraud theories and the incredible lengths to which IWA is going to prevent disclosure — including threatening to pursue mandamus relief — undermine Defendants' continued refrain that "there's nothing to see here."

RSD is plainly a manufactured construct, designed by IWA in concert with its lawyers to facilitate an "exit" from the worthless Ground Lease it needed to get off its books. The more evidence Plaintiff discovers that IWA intended to hinder, delay, and defraud Plaintiff by walking away from the Ground Lease after the statute of limitations ran on its fraudulent conveyance to

---

[1]  Although it clearly is seeking reconsideration, IWA does not style its submission as a "motion for reconsideration," and the Court did not invite such a motion in its March 15, 2023, Memorandum (ECF No. 290). If IWA is requesting "reconsideration" of the Court's prior rulings through its Brief, that request is untimely, given that the Court made its ruling on February 16, 2023, and issued its order directing IWA to produce to the Court its privileged documents for in camera review on February 21, 2023 (ECF No. 286).

[2]  IWA in several instances argues in circles. For example, IWA contends "there is nothing in the documents that demonstrates any fraud on the part of IWA or the advice or assistance by IWA's counsel in furtherance of the fraud," Brief at 7, but then complains that "placing such communications in the hands of Plaintiff would be highly prejudicial" and would "further advantage [Plaintiff] in this case."  Brief at 5, 7.

RSD, the more furtive and obstructionist Defendants become.[3] Fraudulent intent is inherently difficult to prove, and Plaintiff is building its case. IWA, for its part, should not be allowed to hide the evidence of its fraudulent intent behind privilege, as that is precisely why the crime-fraud exception exists.

When IWA finally reaches its "Argument," IWA repeats the mistake it made with its ex parte submission, where IWA evidently "devoted only a small section of [its] submission to the actual documents" (ECF No. 290), by again using its Brief to chastise the Court and trumpet cherry-picked, mischaracterized precedent. The gist of IWA's argument is that the Court's exercise of its discretion in reviewing a subset of documents that IWA withheld on privilege grounds was an "outcome determinative analysis" based "only on a contract-based theory" that "disregarded" sworn testimony and would lead to an "increased probability of reversible error." Brief at 3-6.

But the only thing evidently "outcome determinative" about the disclosure of these documents is that they will help establish that the assignment to RSD was a fraudulent conveyance. Defendants offer nothing specific to refute the Court's assertion that the three documents in question support Plaintiff's fraud theory and are properly disclosed under the crime-fraud exception. Protesting that the documents help Plaintiff prove its case is not a legal argument against disclosure under the crime-fraud exception. If that were so, disclosure would *never* be permitted under the crime-fraud exception.

---

[3] Just last week, for example, Plaintiff learned that RSD is relying on the *accountant-client privilege* to withhold evidence that its auditors are delaying issuance of RSD's 2022 financial statements (which are months overdue) because of changes to reporting standards that would show RSD is a worthless shell under generally accepted accounting principles ("GAAP").

IWA's due process concerns similarly have no basis in law or fact. Plaintiff has made both a threshold and a prima facie showing sufficient to invoke the crime-fraud exception, and Defendants now have had three occasions to attempt to rebut this showing.[4] They have not done so because they cannot do so. For example, IWA props up its corporate witness, David Feltman, as "evidence" against fraud but tellingly fails to cite *any* of his testimony. Even though Plaintiff has already met its burden for the Court to apply the crime-fraud exception, Plaintiff will share some of Mr. Feltman's testimony in this responsive Brief, as it not only validates the Court's initial decision to conduct the in camera review but also provides a compelling evidentiary basis for applying the crime-fraud exception to *more* than just the three documents already identified by the Court.

Furthermore, threatening mandamus (which is granted only in the most extraordinary circumstances, not present here) merely confirms that Defendants know their assertions that IWA made a bona fide assignment to a third party in good faith are demonstrably false. Indeed, the issue here is not whether disclosure of the three documents in question will vitiate the attorney-client privilege. Rather, it is whether Defendants can hide documents supporting Plaintiff's contention that IWA worked in concert with its lawyers to perpetrate a fraudulent conveyance as part of IWA's efforts to get out from under its financial obligations to Plaintiff when the documents are not privileged as a matter of Maryland law *in the first place*. The Court is certainly acting well within its discretion, on the record already before the Court, to disclose at least the three documents that support Plaintiff's fraud theories.

---

[4]  At the Feb. 16th Hearing, Defendants' counsel feigned ignorance about Plaintiff's fraud claims and clung to the "badges of fraud" alleged in the complaint. Even now, after Plaintiff has several times laid out in detail its theories and evidence supporting its fraudulent conveyance claim, Defendants refuse to address straight on what this case is about.

## II.     ARGUMENT

### A.     The Court's In Camera Review and Isolation of Three Documents Suggestive of Fraud Was Entirely Proper

Despite appearing at the Feb. 16th Hearing, communicating with the Court ex parte, and citing the seminal case in its Motion,[5] IWA misses the fact that that the Court has already found that Plaintiff made a prima facie showing sufficient to trigger the crime-fraud exception to the attorney-client privilege. The Court has broad discretion in resolving questions pertaining to discovery and privilege, including application of the crime-fraud exception. IWA has not pointed and cannot point to anything even remotely constituting an abuse of discretion by the Court.

### 1.     Applying the crime-fraud exception to the attorney-client privilege promotes a just and fair resolution

The attorney-client privilege is not absolute. As expressed by the Supreme Court in 1933, "[a] client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933). The crime-fraud exception, as it is known, is not codified in the Federal Rules of Evidence but is governed by common law. Lynn McLain, 6 MARYLAND EVIDENCE, § 503:17 (Aug. 2022).

Rule 503 of the Federal Rules of Evidence, proposed by the Supreme Court in the early 1970's, provides that "there is no privilege under this rule…if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." *Id*. While Congress did not adopt the rule, when it was proposed it "was declarative of common law" and still "provides a useful summary and starting point for federal courts, which look to it for guidance." *Id*. The Advisory Committee

---

[5]  *United States v. Zolin,* 491 U.S. 554 (1989).

Notes to Fed. R. Evid. 503 cite *Clark* when speaking to the showing required, stating: "No preliminary finding that sufficient evidence aside from the communication has been introduced to warrant a finding that the services were sought to enable the commission of a wrong is required." 56 F.R.D. 183, 239-40.

Over 50 years after *Clark* was decided, the Supreme Court further expounded upon the crime-fraud exception and the limits of the attorney-client privilege in *United States v. Zolin*, stating:

> The attorney-client privilege is not without its costs. Cf. *Trammel v. United States*, 445 U.S. 40, 50 (1980). "[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice— "ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." 8 Wigmore, § 2298, p. 573 (emphasis in original); *see also Clark v. United States*, 289 U.S. 1, 15, (1933). **It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the "seal of secrecy," *ibid*., between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime**. *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.).

*Zolin*, 491 U.S. at 562-63 (1989) (emphasis added). Here, there is no question that IWA is hiding evidence of its lawyer-guided strategy behind privilege to hinder, delay, or defraud Plaintiff.

## 2. The documents reviewed in camera provided the requisite prima facie evidence to apply the crime-fraud exception

Courts have broad discretion to determine whether a privilege is properly asserted. *Zolin*, 491 U.S. at 569-70 ("This Court has approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for in camera inspection ... and the practice is well established in federal courts."). In *Clark*, the Supreme Court held that a prima facie showing was necessary to invoke the crime-fraud exception:

> The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth. In saying this we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in …. It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud…To drive the privilege away, there must be something to give colour to the charge; there must be prima facie evidence that it has some foundation in fact….When that evidence is supplied, the seal of secrecy is broken.

289 U.S. 1, 14-15 (1933) (internal citations and quotations omitted).

In *Zolin*, the Supreme Court held that "in camera review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception," after the moving party meets a threshold showing. 491 U.S. 554, 574 (1989). The threshold showing requires less than the prima facie showing, of "evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *Id.* at 574-75. To meet the threshold showing necessary for in camera review, a party may offer any relevant evidence that has been "lawfully obtained" and that has not already been adjudicated to be privileged. *Id.* at 575.

*Zolin* "integrated an in camera inspection of materials with an initial showing that would be less than that required to establish the crime-fraud exception." John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16 (Spring Ed. 2023). "Thus a communication can be found within the exception **based on the content of the communication itself**": after a threshold showing, *in camera* review of the purportedly privileged materials may be used to establish the prima facie showing sufficient to invoke the crime-fraud exception. Christopher B. Mueller, et al., EVIDENCE §5.22 (6th ed. 2018) (emphasis added).

The Fourth Circuit has "held that the party invoking the crime-fraud exception must make a prima facie showing that (1) the client was engaged in or planning a criminal or

fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)). When the Court examines in camera "the actual documents for which privilege is claimed" to meet the prima facie showing, *Zolin* controls. *Id. at* 252.

Here, the Court determined that Plaintiff met the threshold showing to proceed to in camera review at the Feb. 16th Hearing (Feb. 16 Hr'g Tr. 81: 16-18) ("I think there's enough that a reasonable person could conclude that possibly there's been a fraud exception"). After reviewing the selected documents in camera, the Court isolated three documents "that it determined might be relevant to Plaintiff's fraud theory." ECF No. 290. Plaintiff has neither seen the three documents nor was it privy to the ex parte communications with IWA that led to the current briefing. Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff, or it could have denied the applicability of the crime-fraud exception. Instead, and consistent with *Zolin*, the Court isolated three documents that evidently bear a close relationship to IWA's existing or future scheme to commit a fraud and gave IWA multiple opportunities to respond. The Court clearly has exercised its discretion and may properly rule now that the documents must be disclosed under the crime-fraud exception.

### 3.   IWA invites error when it suggests that Plaintiff must prove fraud for the crime-fraud exception to apply

IWA simply gets it wrong when it contends "Plaintiff cannot make a showing of fraud under Maryland law, and thus cannot meet the crime-fraud exception." Brief at 9. At this stage, to invoke the crime-fraud exception and require production of the three documents identified by

the Court, the Plaintiff "does not have to conclusively prove the elements of the purported crime

or fraud." *United Bank v. Buckingham*, 301 F.Supp.3d 547, 555 (D. Md. 2018) (citation omitted).

The Court explained this to IWA at the Feb. 16th Hearing:

> I don't think you – maybe we misapprehend what happens at this point. **I don't
> make a finding that there's fraud based on what I review in your documents.**
> I mean, I might find some further questionable practices let's say. I don't make
> that finding. All I say is it's out there to be argued. Plaintiffs get a chance to see it,
> you get a chance to oppose it. But I don't make that finding as a finder of fact. I
> suppose **it's a tentative finding that I make in my discretionary authority that
> there's a reason to pierce the privilege because there looks like there's some
> badge of fraud here.** That's all I'm making, but it's not definitive. It's not final.
> **It's just a matter of putting it out there in the pool for discovery.** So I think
> there's a subtle, but important difference here that I am not finding finally that
> there's fraud.

Feb. 16 Hr'g Tr. 93: 5-19 (emphasis added). The stakes are high, but that is no excuse for

ignoring established law under the Supreme Court's *Zolin* decision, the Fourth Circuit authority

of *Chaudry* and *Grand Jury Proc. #5,* and this Court's proper application of that law during the

Feb. 16th Hearing.

#### 4.     The Court has ample evidentiary support for applying the crime-fraud exception in the exercise of its discretion

 IWA argues that its documents withheld on privilege grounds do not demonstrate fraud,

claiming that "no attorney advised IWA to engage in any conduct that the Court has identified as

questionable." Brief at 10. IWA continues to feign ignorance of Plaintiff's evidence that the

assignment of the Ground Lease from IWA to RSD was a fraudulent conveyance and was more

than "sharp dealing." The Court saw through the same argument at the Feb. 16th Hearing[6] and is

now well aware of documentary evidence that the purported assignment is a fraudulent exit

strategy by IWA to get a worthless ground lease with long-term obligations off its books by

assigning it to a sham entity:

---

[6] Feb. 16 Hr'g Tr. 141:18-19 ("Now I don't think you don't know what's going on. You do.").

> Right now it is clear to me from what you have said, Mr. Bosch, that there was some -- a lot of hidden dealing going on on defendants' side and clearly they were trying to hide information from the landlord about what they were trying to accomplish. Presumably, I don't know that this is absolutely the inference, but presumably to think they could walk away unscathed from this which I don't think they could.

Feb. 16 Hr'g Tr. 78:18-24.

In both its briefing and hearing testimony, Plaintiff presented evidence that IWA was exploring with counsel how to walk away from the Ground Lease as early as July 2016 (Feb. 16 Hr'g Tr. 56:1-10), was aware of the risk of a fraudulent conveyance claim (Feb. 16 Hr'g Tr. 61:4 - 65:6), created a new entity and did not commit to fund it even though it had no income and no source of funding apart from IWA (Feb. 16 Hr'g Tr. 58:9 - 59:6), and not only dodged Plaintiff's inquiries for months but prohibited communication with Plaintiff until the statute of limitations had run. Feb. 16 Hr'g Tr. 71:20 -72: 8. This is a far cry from the "three documents" to which IWA seeks to reduce Plaintiff's evidence establishing a threshold showing (Brief at 8). The Court also recognized that IWA, with its attorney's blessing, tried to cover its tracks by failing to record the deed reflecting the purported transfer of ownership.[7] Tellingly, both Defendant's argument that Plaintiff "has offered only three documents in support of its fraud claim" and its bald assertion the Assignment was done in good faith are made without citation to record evidence.

### 5.   IWA has been given all process that is due before the documents may be disclosed to Plaintiff

The Court offered IWA a fair opportunity at the Feb. 16th Hearing to refute the threshold showing made by Plaintiff and then gave IWA an opportunity to specifically address the Court's

---

[7] *See also* Feb. 16 Hr'g Tr. 80:7-9 ("The fact that you say, Ms. Kropf, you've got an explanation for not recording the deed, it is questionable. I mean, I've been doing appellate law and judging for many years now and it's questionable. You don't see that very often, why a deal doesn't get recorded.").

preliminary finding that there are three documents that bear a close relationship to the alleged

fraudulent conveyance and therefore establish a prima facie basis for applying the crime-fraud

exception. The Fourth Circuit has expressly held that in camera review "of evidence supporting

applicability of the crime-fraud exception" does not violate due process. *In re Grand Jury*

*Subpoena*, 884 F.2d 124, 126 (4th Cir. 1989). Even now, with its third bite at that apple, IWA

does not and cannot rebut Plaintiff's showing. Nor can it establish any genuine due process

violation.

Once the Court exercises its discretion to conduct an in camera review, the question then

becomes what process is due before documents may be disclosed. Despite IWA's threats to seek

a writ of mandamus, the Fourth Circuit has made clear that "the determination of whether a

privilege applies [is] reserved for the trial judge." *In re Grand Jury Subpoena*, 642 Fed. Appx.

223, 227 (4th Cir. 2016); *see also In re Grand Jury Subpoena*, 884 F.2d at 127.[8]

An earlier decision by the Eastern District of Virginia confirms that the Court has

properly and reasonably exercised its discretion here by giving IWA many opportunities to

specifically address the three documents the Court evidently believes are not privileged under the

---

[8] The Tenth Circuit has discouraged the district courts from "allow[ing] the determination of the applicability of the crime-fraud exception to turn into mini-trials that would waste resources and delay the [] proceedings." *In re Grand Jury Subpoenas*, 144 F.3d 653, 661 (10th Cir. 1998). On the other side of the spectrum, the Third Circuit has recognized the right in civil cases of the non-moving party to be heard after the prima facie showing has been established. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 96-97 (3d Cir. 1992), as amended (Sept. 17, 1992). In practice, courts have interpreted *Haines* to require a burden-shifting process. *See, e.g., Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1307 (S.D. Fla. 2000) (explaining that the party opposing disclosure must submit evidence sufficient to rebut the prima facie showing or the privilege is lost). While the Ninth Circuit agreed that "the party seeking to preserve the privilege has the right to introduce countervailing evidence," it clarified that it was "not convinced that in all cases it is necessary for the district court to conduct a live hearing with oral argument; in appropriate cases, the court may decide the matter on the papers." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1093 (9th Cir. 2007).

crime-fraud exception. In *Fed. Election Comm'n v. Christian Coal.*, the court reviewed a magistrate judge's **unsolicited** order in a subpoena enforcement action that the defendant produce certain documents withheld as privileged. The court found that, even though "it may be unusual for a court to conduct an in camera review of documents other than those specifically objected…once a court makes a determination that it will conduct an in camera review, it must be afforded a certain degree of leeway and discretion." 178 F.R.D. 456, 462 (E.D. Va. 1998). After it submitted the purportedly privileged documents, the defendant requested "to file an ex parte explanatory declaration under seal for in camera review" to provide "an amplified explanation regarding the grounds for characterization of each document as protected by the attorney client privilege and/or the work product doctrine." *Id.* at 263. The magistrate judge permitted this submission, which led the reviewing district court to find that allowing the defendant "multiple opportunities to be heard" satisfied the defendant's due process rights. *Id.*

Here, the Court has provided IWA "a chance to rebut Plaintiff's evidence" at the Feb 16th Hearing, through ex parte communications, and now through its Brief. Brief at 9. The Court's identification of three documents that "might be relevant to Plaintiff's fraud theory" and invitation for IWA to "respond to the Court's tentative view by filing an appropriate ex parte pleading" (ECF No. 290) (emphasis added) was a "fair opportunity to address the Court's concerns." Brief at 6. If the three documents do not indicate fraud and Plaintiff's claim is so "frivolous," IWA has had ample opportunity to explain why. Brief at 3.

Of course, Plaintiff presently has no way of directly responding, as the contents of the three documents are known only to the Court and to IWA. But IWA does not and cannot establish that it is entitled to an ex parte hearing so it can present an argument it failed to present at the Feb. 16th Hearing or in its ex parte written submissions to the Court. Brief 9-10. The Court

asked IWA for authority to support this contention when it was first raised at the Feb. 16th

Hearing, but IWA has come up empty.

**B.    Witness Testimony After the Feb. 16th Hearing Belies IWA's Argument that the Crime-Fraud Exception Should Not Apply**

What neither the Court nor Plaintiff had available at the time of the Feb. 16th Hearing,

and which ultimately renders any challenge by IWA to the application of the crime-fraud

exception futile, was the compelling and ultimately damning deposition testimony of the two

business principals who negotiated the transaction (David Feltman for the IWA Member of RSD

and Troy Taylor for the Algon Member of RSD) and of the lawyer who represented the Algon

Member in that transaction (Robert Barron, Esq., who also became RSD's mouthpiece when the

Ground Lease was assigned in August 2017 and then, in March 2018, was officially retained as

RSD's lawyer). As the Court (1) has already determined that Plaintiff has met the threshold

showing, (2) evidently has concluded that the three documents in question satisfy the prima facie

showing required under *Zolin,* and (3) has given Defendants a chance to rebut such showing,

Plaintiff now provides additional evidence gathered since the Feb. 16th Hearing. The purpose of

submitting this additional evidence is not to try the case in this briefing but rather to confirm that

the Court is on **extremely strong grounds** in applying the crime-fraud exception.

**1.    The Assignment was negotiated with the intention that IWA would walk away, leaving Plaintiff to chase an empty shell once the statute of limitations ran on a fraudulent conveyance claim**

IWA's corporate representative David Feltman, who was the primary architect of the

RSD transaction, said out loud in the very first deposition in this case what Defendants' attorneys

have been adamantly (and falsely) denying:

> **Q. (By Mr. Bosch)** Did IWA ever develop an exit
> strategy that would stop monthly losses and any
> future liability, Mr. Feltman?
> **MS. DAVIS**: Objection as to form.

13

> **THE WITNESS**: We developed the concept
> together with Algon and the JV.
> \* \* \*
> **Q.** So your understanding is that one of the reasons
> for assigning the ground lease for this newly formed
> entity, RSD, was to stop any future liability of IWA
> under the ground lease?
> **MS. DAVIS**: Objection as to the form.
> **THE WITNESS**: I would phrase it differently. I
> would say the effect was to stop future liability
> under the ground lease.

Feltman Dep. 246:8-247:10 [Danial Decl. Ex. A].[9]

The testimony from Defendants' key principals confirms that IWA had no intention of having RSD exist indefinitely (much less for the remaining term of the Ground Lease, if necessary). IWA was only looking to get past the statute of limitations ("SOL") on a fraudulent transfer claim. The formation of RSD was a sham transaction to give IWA leverage over Plaintiff after the SOL expired by leaving Plaintiff with an undercapitalized single-purpose entity to chase for ground rent that RSD had no independent ability to pay without "voluntary" funding from IWA.

For example, IWA's Mr. Feltman was focused on trying to get past the SOL on a fraudulent conveyance claim, at which point IWA could "force" a sale or consider alternative exit strategies:

> **Q. (By Mr. Bosch)** At any time, had there been
> discussions about the statute of limitations on a
> fraudulent transfer claim?
> **A.** I believe so.
> **Q.** What do you understand the term statute of
> limitations to mean?
> **A.** The period of time following a transfer when a
>  claim can be made as to a fraudulent transfer.
> \* \* \*

---

[9] Citations in the form "Danial Decl. __" are to the accompanying declaration of Katherine T. Danial.

**Q.** Do you recall having any discussions with Mr. Taylor about the statute of limitations?
**A.** Probably.
**Q.** Why would you probably have discussed the statute of limitations with Mr. Taylor on a fraudulent conveyance claim?
**A.** Because if I was -- if we were having a discussion about fraudulent conveyance, we probably would have had also a discussion about the statute of limitations. But I don't recall that specifically.
**Q.** Did you keep notes of your discussions with Mr. Taylor?
**A.** I don't think so.
**Q.** Do you recall, as you sit here today, what period of time the statute of limitations is for a fraudulent conveyance claim?
**A.** No.
**Q.** Did you, at any point, know the statute of limitations period for a fraudulent conveyance claim?
**A.** I have a vague recollection. 36 months, 3 years.

Feltman Dep. 360:16-363:15 [Danial Decl. Ex. A]. On the Algon side of the transaction, attorney

Robert Barron confirmed that when he initially heard Mr. Feltman outline the structure and

purpose of the transaction, it was clear that IWA was looking for an exit and needed to get past

the SOL:

**Q.** All right. You understood from the beginning, based on your initial conversation with Mr. Feltman, that IWA's objective, in forming this new entity and assigning the ground lease to the new entity was to get IWA off the hook?
**MS. KROPF**: Objection as to form.
**THE WITNESS:** That was part of the mission. That was part of the plan, because -- based upon the terms of the lease. The other part of the plan was the reason why Algon was involved, was the hope that the landlord would negotiate at some point with the tenant, and they would actually make it economically viable.
Because they were in the business to make money. So if you could make the asset economically viable,

15

that's why Algon was involved as people that have done that in the past.

…

**Q.** So, Mr. Barron, do you recall there being any discussion as to when Algon would begin having these discussions with the landlord?

**A.** I knew there was a -- there was a discussion of a delay, to delay negotiations for a time period.

**Q.** Do you recall what that time period was?

**A.** I went back and looked at the documents. I think the term sheet had something like 36 months or 38 months. It was some "month" time period.

**Q.** Do you recall there being any discussion as to why Mr. Feltman and IWA wanted to delay Algon from having discussions with the landlord for 36 months or so?

**MS. KROPF**: Objection as to form.

**THE WITNESS**: My understanding was a combination of the lack -- severe lack of trust with the landlord based upon this other litigation, concern that the landlord would not honor the terms of the lease. And so the concept of getting beyond the time period for -- to try to attack the agreement based upon transfer.

Barron Dep. 64:2-66:12 [Danial Decl. Ex. B].

2.     **IWA, through RSD, intended to hinder, delay, or frustrate Plaintiff's rights under the Ground Lease**

Mr. Feltman's testimony indicates that once Defendants got past the SOL, they were planning to put the screws to the landlord, perhaps by having RSD (which IWA controls and funds at its discretion) walk away, as an IWA affiliate (Transamerica) had done at the 6610 Rockledge Drive property owned by a Camalier-family affiliate:

**Q.** And if you didn't get it done in three years, then what?

**A.** Then we would have the opportunity to revisit the arrangement.

**Q.** And what does that mean?

**A.** Well, it means either force the sale of the property or find some other exit plan for the property.

16

Feltman Dep. 373:21-374:6 [Danial Decl. Ex. A].

On the Algon side of the transaction, Attorney Robert Barron's testimony confirms that "walking away" or "giving back" the Ground Lease was contemplated from the very beginning of the RSD transaction:

> **Q.** Was there any discussion of what would happen if the market didn't turn and if the landlord did not agree to modify the terms of the ground lease?
> **A.** Not in great detail. But I think at some point, there may be a situation where we have to give back the interest to the landlord, which is frankly what the prior tenant, the Camalier entity did when they were tenant.
> **Q.** What do you mean by "give back the interest to the landlord"?
> **A.** You basically say that we can't make this a going concern -- I don't know. Whatever --it's the same thing that the Camalier tenant did on the original loan, that they -- they couldn't make a go of it. They defaulted, and they gave back the interest through foreclosure. They would -- they would, I assume, talk to the landlord and say, it's not working. You are not renegotiating. The market is not turning, so tell us what you want to do with your interest.
> **Q.** I want to understand more of what you mean by giving it back to the landlord. I don't understand that. Can you explain what that, what -- how -- as a sophisticated lawyer, what does that mean to give the ground lease interest back to the landlord?
> **A.** Yeah. So -- well, I mean, you're sophisticated. Your client did this in connection with the predecessor to the lender; right? It was a joint venture between the Camaliers and -- it's written down here. It's Lockheed Martin. Lockheed Martin and the Camaliers were joint ventures as the tenant. They borrowed money, and they were unable to make it work for whatever reason. And they effectively gave back the interest. And now the landlord didn't take it back, because I guess it was encumbered by a mortgage. So the lender foreclosed it. So here we have a situation where it's free and clear. There's no third-party mortgage. So

17

> if there's no third-party mortgage, the tenant would
> say, landlord, if you're not going to renegotiate and
> we cannot find tenants, we need to negotiate a -- an
> orderly turning over the keys. I mean, that's just --
> that's one of the options in a workout situation
> when the parties can't reach a win-win situation.
> **Q.** Meaning that ground lease tenant would walk
> away from its obligations under the ground lease?
> **A.** Correct. Or the landlord could get a judgment
> against the entity. They could sue in court and get a
> judgment against the entity.

Barron Dep. 79:21-82:9 [Danial Decl. Ex. B].

### 3. Key parts of the exit strategy were designed to keep Plaintiff in the dark about the assignment until the SOL had run.

The witnesses confirmed that there were several terms of the transaction that were driven

by the objective of getting past the SOL. For example, IWA's Mr. Feltman specifically

contemplated that the new entity (RSD) would make no efforts to sell the ground lease interest

until they got past the SOL:

> **Q.** Directing your attention to paragraph 4D, which
> is the disposition agreement. You see there, there
> was an insertion for after 38 months if the Algon
> member opts to sell the property?
> **A.** Yes.
> \* \* \* \* \*
> **Q.** And do you know how 38 months was
> determined as the appropriate period of time for
> Algon to consider a disposition?
> **A. I think at that point, the litigation risk would
> go away because we'd be beyond the fraudulent
> transfer date, and also our expectation was that
> there would be leasing activity, and by then the
> property would be in a position to be sold.**

Feltman Dep. 406:7-22 (emphasis added) [Danial Decl. Ex. A]. This is also the reason why no

one from IWA's new sham entity (RSD) would be allowed to even communicate with Plaintiff:

> **Q. (By Mr. Bosch)** Why not have Algon
> communicate with the landlord on behalf of RSD
> for three years?

18

**MS. DAVIS**: Objection as to form.

**MS. KROPF**: Misstate -- well, misstates the facts.

**THE WITNESS**: One, we knew there was this risk of a fraudulent transfer claim.

**Q. (By Mr. Bosch)** And so why would communicating between Algon and landlord give rise or increase the risk of a fraudulent transfer?

**A.** I was concerned that Algon might disclose things to the landlord that we didn't think the landlord needed -- information the landlord didn't need and wasn't entitled to.

**Q.** All right. So what was the consideration? What was it that Algon might say to the landlord that you thought the landlord had no right to know that could give rise to a fraudulent transfer claim?

**THE WITNESS**: Mostly surrounding Algon to disclose, for example, IWA's interest in the Partnership.

**MS. DAVIS**: Objection as to form. Misstates evidence.

**Q. (By Mr. Bosch)** That was one of the considerations?

**A.** And other factors.

**Q.** Yeah, so one of -- one of the factors for restricting Algon's discussions with the landlord, is you were concerned that Algon would disclose IWA's interest in RSD, correct?

**MS. DAVIS**: Objection as to form. Misstates evidence.

**THE WITNESS**: A factor, yes.

**Q. (By Mr. Bosch)** And another factor was you were concerned that Algon would disclose the capitalization of RSD?

**A.** Yes.

**Q.** Which was limited to $3.9 million?

**A.** Yes. In a short capitalization, yes.

Feltman Dep. 384:15-387:20 [Danial Decl. Ex. A].

The testimony of the two Algon business principals (Troy Taylor and Paul Rubin), who David Feltman brought in to execute on his exit strategy, confirms that IWA drove the transaction and that Defendants had no expectation that they would need to do anything for the first three years while the SOL ran; their 'expertise' as restructuring professionals would not

19

become relevant until they got past the three-year SOL – and then would be used only to permit Defendants to walk away from the Ground Lease, not to exert bona fide efforts to perform. *See* Taylor Dep. 177-180; 281-284 [Danial Decl. Ex. C].

### 4. The lawyers clearly were involved in structuring this fraudulent conveyance

The lawyers were directly and materially involved in structuring and executing on this fraudulent conveyance, and thus there is now even more than ample evidence to support application of the crime-fraud exception. Mr. Feltman's testimony confirms that Defendants' in-house and outside counsel not only were aware of but actively participated in formulating and executing the fraudulent conveyance:

> **Q:** And do you recall there being any discussion among the business principals involved in making decisions for IWA's interest with respect to what they needed to avoid in connection with pursuing a transaction over this – for this ground lease to avoid a fraudulent conveyance claim?
> **A.** Discussion with outside counsel and in-house counsel, but I don't recall any discussion among the business people.

Feltman Dep. 293:4-12 [Danial Decl. Ex. A].

Mr. Barron confirmed that IWA's in-house counsel, Gregg Snitker, was involved in discussing and planning this exit strategy:

> **Q.** But who raised this possibility of walking away if the ground lease was not modified or if the market didn't improve?
> **A**. Well, it's just logic. I don't remember if there's a -- you know, if there's a who, but that's the options when you go forward in a distressed asset.
> **Q.** Yes, I understand. But you said that there were conversations, and I want to know who participated in those conversations.
> **MS. KROPF**: And I'll caution you if they are conversations with your clients, then you should not reveal them. But if they're conversations with Mr.

> Feltman or IWA or somebody else, you can talk
> about them.
> **THE WITNESS**: I don't -- I don't recall
> conversations -- it would be really with
> Mr. Snitker -- on long-term, at the end of the day.

Barron Dep. 83:2-21 [Danial Decl. Ex. B].

Algon's Troy Taylor confirmed that his lawyers (Robert Barron and Jori Guso) were

directly involved in negotiating the term sheets with IWA that included not only restrictions on

communications and funding but also contemplated "burying the entity" (RSD) before it was

even formed.[10] When asked why RSD did not record the assignment, which is evidence of

Defendants' fraudulent intent, Mr. Taylor and Mr. Rubin hid behind privilege (and their

counsel's instructions not to answer).[11]

Even the decision to have Attorney Robert Barron serve as the mouthpiece for RSD after

the assignment was directed by IWA's in-house counsel Mr. Snitker, who evidently wanted to

---

[10] **Q.** All right. And do you see the term there, "How do we bury
the entity?"
**A.** Uh-huh.
**Q.** Yes?
**A.** Yes. Yes, sir.
**Q.** What does that meant to you?
**A.** I think the – what I – in our terminology, we'd use that to
mean what do we do at the end of the day if it doesn't work out.
You know, if we can't lease it out, if the landlord will not
negotiate, how do we resolve this?
**Q.** And why were you considering burying the entity before the
entity was even formed?
**Ms. Kropf**: so objection to the extent that gets to this
conversations with his clients about what they were doing on
their side. If you want to talk about IWA requirement
negotiations, that's fine. But to the extent you're asking about his
communications with his we object on privilege grounds.

Barron Dep. 202:2-203:1 [Danial Decl. Ex. B].

[11] Plaintiff refers to and incorporates herein its Reply to RSD's Letter to the Court (ECF No.
303), which lays out several of RSD Counsel's improper instructions.

control the disclosure of information about IWA's involvement until the SOL ran. As Mr. Barron

testified:

> **Q.** All right. And is it your understanding that the
> only reason you were identified as the person to
> whom questions should be directed is because you
> were going to be the lawyer for RSD?
> **A.** Well, I was the lawyer for the managing
> member. Managing member runs the entity. So I
> was – at that point, I was lawyer for the managing
> member. And I would also be legal counsel for our
> company – our Firm, of the legal entity itself.
> **Q.** Who decided that you would be the person to
> whom questions should be directed?
> **A.** I believe it was probably Snitker.
> **Q.** Gregg Snitker, the in-house counsel for IWA?
> **A.** Correct.

Barron Dep. 239:5-21 [Danial Decl. Ex. B].

When asked why RSD never responded to the Landlord's inquiries concerning the names

of RSD's principals and its wherewithal to satisfy Tenant's financial obligations under the

Ground Lease, and not once responded favorably to Landlord's repeated requests to meet with

RSD's business principals, RSD and attorney Robert Barron hid behind privilege:[12]

> **Q.** On August 30, 2017, as the person to whom
> questions were to be directed, what did you
> understand you were authorized to disclose?
> **Ms. Kropf**: Let me just – Mr. Bosch, I'm sorry to
> be frustrating here, but I need to interpose an
> objection. Because he's stated repeatedly that he's
> the lawyer for the entity who can only be authorized
> by his clients. And to the extent any authority

---

[12] The only non-privileged explanation given is that Landlord reached out through a litigator.
Obviously prepped to offer this "excuse," Defendants are seemingly oblivious to the fact that
RSD knew how to contact Mr. Camalier, but Mr. Camalier's only point of contact with RSD
up to the date this lawsuit was filed almost three (3) years after the Assignment was a lawyer
(Mr. Barron). Defendants' refusal to allow Mr. Barron to provide any substantive testimony on
the facts (and factual omissions) in his correspondence on behalf of RSD will be addressed in
a forthcoming motion, as anticipated by the Court. *See* April 13, 2023, Order, ECF No. 309.

comes from your clients, I instruct you not to answer.

**The Witness**: Okay.

**Ms. Kropf**: Whoever the client is, that would be privileged. We'd object to it. And I instruct you not to answer.

**The Witness**: Okay. Thank you.

**Mr. Bosch**: So were you advised by your client as to what information you could disclose?

**Mr. Kropf**: Objection. And I instruct you not to answer.

**The Witness**: Understood.

**Mr. Bosch**: So you can't say what information you were permitted to disclose or were not permitted to disclose without you divulging attorney-client communications?

**Ms. Kropf**: You can – object to form. You can answer.

**The Witness**: I don't know how I could

**Ms. Kropf**: Yes. Object to form. You can answer.

**The Witness**: I don't know to answer that question without discussing communication with my client.

**Mr. Bosch**: And Ms. Kropf, so it's clear, you're saying all communications with his client about the information that he could or could not disclose is privileged?

**Ms. Kropf**: Yes.

Barron Dep. 247:16-249:14 [Danial Decl. Ex. B].

5.   **The reason Defendants are hiding behind privilege is because there was never any intention for RSD to honor the Tenant's long-term obligations under the Ground Lease**

The reason Defendant's witnesses are all hiding behind privilege is obvious from the terms of the RSD Operating Agreement, which reveal that the parties to that agreement never intended that RSD would continue to keep, perform, and observe all of Tenant's obligations for the remaining term of the Ground Lease. Indeed, they had already agreed to dissolve the entity no later than nine (9) years after its formation if the exit strategy failed (or even sooner if IWA so elected as the 98% member). RSD attorney Robert Barron confirmed that at the time of

formation, the parties not only contemplated but contracted to leave the landlord high and dry by

no later than August 1, 2026, with more than six decades left on the Ground Lease:

> **Q.** Mr. Barron, I want to go back to the discussions
> you recall having with IWA concerning what to do
> if RSD, this Newco, could not lease up the property
> or get the landlord to modify the terms of the
> ground lease. Do you recall that discussion we had
> earlier?
> **A.** Yes, sir.
> **Q.** You talked about the possibility of walking away
> from the ground lease. Do you recall that?
> **A.** Yes.
> **Q.** And you recall also, you refer to that as maybe
> giving back the ground lease to the landlord?
> **A.** Yes.
> **Q.** By which you meant that the landlord would
> have nobody to look to for the payment of rent?
> **A.** Or they would get a judgement against the –
> RSD.

Barron Dep. 212:4-213:1 [Danial Decl. Ex. B].

***

> **Q.** All right. Well, let's go back to the operating
> agreement that you negotiated.
> **A.** Uh-huh.
> **Q.** …. Just scroll down to page 33. There we go.
> Right there. Do you see Article 10?
> **A.** Yes.

***

> **Q.** So at the time of its formation, RSD
> contemplated dissolving and winding up just under
> nine years after the date of the assignment, did it
> not?
> **A.** That was the earliest date, yes. Yes.
> **Q.** So this was an entity that already contemplated
> its dissolution at the time of its formation; isn't that
> right?
> **A.** It contemplated a date that it would be dissolved.
> **Q.** Right. Which was just nine years after the date
> of its formation; right?
> **A.** I haven't counted the years, but, it's, what --
> yeah, nine years.

Barron Dep. 215:4-216:17 [Danial Decl. Ex. B].

24

***

> **Q:** All right. So that's not my question. You recall
> under the assignment provision – under the
> assignment, the assignee agreed to keep, perform,
> and observe all of the terms, conditions of the
> ground lease, do you not?
> **A.** I do.
> **Q.** And yet here, as of the date of the formation of
> that assignee, it already contemplated it would be
> dissolved years before the ground lease expired;
> isn't that right?
> **A.** That's correct.

Barron Dep. 217:7 – 217:17 [Danial Decl. Ex. B].

***

> **Q.** Right. **So let's say after the dissolution event,
> when the company is wound up, after the
> winding-up process, what happens to the
> company's ability to keep, observe and perform
> the tenant's obligations under the ground lease?
> A. At that point, they would be turning the keys
> over to the landlord.**

Barron Dep. 219:14 – 219:20 (emphasis added) [Danial Decl. Ex. B].

IWA can no longer deny what happened, what the documents show, and what the

testimony proves – that the attorneys were directly involved in the initial creation and

perpetuation of the fraudulent scheme to assign the Ground Lease to RSD so that Plaintiff would

have nothing to chase but a shell when (inevitably) IWA decided not to continue to fund this

"worthless" Ground Lease interest. There is no other plausible explanation for why, even now,

IWA refuses to commit to fund RSD for as long as necessary for RSD to become self-sufficient.

The evidence demonstrates that it was never anticipated or intended that RSD **independently**

would be able to fulfill Tenant's obligations under the Ground Lease. Accordingly, the crime-

fraud exception applies, not just plausibly but compellingly.

**C.       The Court has Discretion to Order the Three Documents to be Released**

The Court has broad and well-established discretion to determine how and when any documents are released. *See Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986) ("The latitude given the district court extends as well to the manner in which it orders the course and scope of discovery."). Despite this settled law, IWA complains about the "prejudice" that will occur if the Court releases on its own the three documents it has identified from its in camera inspection, arguing that "placing such communication in the hands of Plaintiff would be highly prejudicial to Defendants, and would do irreparable harm," and that the Court is "stripping IWA of its attorney-client privilege." Brief at 5. IWA's efforts to sway the Court's approach to disclosure has no legal support – prejudice cannot be a basis for gutting the crime-fraud exception, *especially* where that prejudice arises because the documents tend to substantiate Plaintiff's allegations of fraud.

On the record before this Court, IWA's threatened challenge is futile. The Fourth Circuit has already established that a district court's determination that there is a prima facie basis for applying the crime fraud exception will be upheld "absent a clear showing of abuse of discretion." *In re Grand Jury Proceedings #5*, 401 F.3d at 254. Weighing prejudice is an evidentiary consideration for trial, not a consideration where, as here, the Court is determining if these documents should be disclosed in discovery. Furthermore, IWA's assertion that the Court would "strip" IWA of the attorney-client privilege by disclosing the three documents also manifests a misapprehension of the law; under the crime-fraud exception, the privilege never existed. *See In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir.1989) ("The crime-fraud exception to the attorney-client privilege provides that a client's communications with an attorney will not be privileged if made for the purpose of committing or furthering a crime or

26

fraud."). Plaintiff is entitled to these documents because they are not privileged and should have been produced in discovery.[13]

Once the Court determines that documents withheld on privilege grounds are subject to the crime fraud exception, it is also squarely within the Court's discretion to determine how and when the three documents are disclosed to Plaintiff. *See Rowland v. Am. Gen. Fin., Inc.,* 340 F.3d 187, 195 (4th Cir. 2003) (recognizing the court's "wide latitude in controlling discovery and ... its rulings will not be overturned absent a showing of clear abuse of discretion."); *ContraVest Inc. v. Mt. Hawley Ins. Co.,* No. 20-1915, 2021 WL 4782687, at *3 (4th Cir. Oct. 13, 2021). While IWA may not like the outcome, its continued cries of prejudice at the pre-trial stage cannot and should not limit the Court's "wide latitude in controlling discovery." *See Rowland,* 340 F.3d at 195.

**D.    Any Relief Sought by IWA From the Court's Order Should Occur within a Reasonable Time**

This lawsuit has been in the throes of protracted discovery for over two and a half years, and it is in the interest of everyone to continue moving this case toward final resolution. If IWA chooses to appeal an Order to release the three documents, it should do so promptly.

The United States Supreme Court has made it abundantly clear that "collateral order appeals are not necessary to ensure effective review of orders adverse to the attorney-client privilege." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009). The Supreme Court explained that "[p]ermitting piecemeal, prejudgment appeals . . . undermines efficient judicial administration and encroaches upon the prerogatives of district court judges, who play a special role in managing ongoing litigation." *Id*. at 106. Nor is there any genuine concern here that

---

[13] Plaintiff's access to the relevant documents also is essential to the parties' ability to fully and fairly brief the issue to the Court of Appeals if that is how Defendants elect to proceed.

disclosure would have a chilling effect on attorney-client communications, as the *Mohawk* Court noted that "in deciding how freely to speak, clients and counsel are unlikely to focus on the remote prospect of an erroneous disclosure order, let alone on the timing of a possible appeal." *Id.* at 110.

Consistent with this binding precedent, IWA has two options if it wishes to avoid facing sanctions and being held in contempt if faced with an order to disclose the three documents: it may seek permission to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b); or it may seek mandamus review. *Id* at 110-111. Either path is likely futile, but it is IWA's decision to make.

In an effort to maintain the current schedule, Plaintiff respectfully requests that if the Court decides to release the documents, whether it does so directly or orders IWA to do so, that its order should also direct IWA – if it so chooses – to pursue a stay and seek relief within ten (10) calendar days of the Court's order. While Plaintiff is confident that the Court's crime-fraud application is proper, IWA's stated desire to challenge any such determination should not be allowed to delay the lawsuit unnecessarily.

## III.   CONCLUSION

For the above reasons, and without waiving the right to seek additional disclosures of documents under the crime-fraud exception, Plaintiff respectfully requests that the Court deny IWA's untimely request for reconsideration and order the disclosure of the three documents identified during the Court's in camera inspection under the crime-fraud exception.

Dated: April 18, 2023

Respectfully submitted,

*/s/ William M. Bosch*
William Bosch
Anthony Cavanaugh
Alvin Dunn
Katherine Danial
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: 202-663-8000
Facsimile: 202-663-8007
william.bosch@pillsburylaw.com
alvin.dunn@pillsburylaw.com
katherine.danial@pillsburylaw.com

*Attorneys for Plaintiff Rock Spring Plaza II, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2023, I caused a copy of the foregoing Plaintiff Rock Spring Plaza II, LLC's Response in Opposition to Defendant Investor's Warranty of America, LLC's Brief Seeking Reconsideration of the Applicability of the Crime-Fraud Exception to be served via email on all counsel of record.

Respectfully submitted,

*Katherine T. Danial*