**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** |  |
| **Plaintiff,** |  |
| **v.** | **Civil Action No. 8:20-cv-01502-PJM** |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** |  |
| **Defendants.** |  |

**DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY
IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023
ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY
OF THE CRIME-FRAUD EXCEPTION**

## <u>TABLE OF CONTENTS</u>

ARGUMENT ................................................................................................................. 2

I.       Plaintiff's Arguments Rely on Proposed Rules and Purposefully
         Ambiguous Legal Standards ................................................................................ 3

II.      Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud............ 5

         A.       Plaintiff Did Not Establish a Prima Facie Case of Fraud in its
                  Motion or at the Hearing. ................................................................... 6

         B.       An Assignment Made Pursuant to Two Different Contracts
                  Negotiated and Executed by Plaintiff is Not Fraud. .................................. 6

         C.       Plaintiff Cannot Rely on RSD's Election Not to Record the
                  Assignment as Evidence of Fraud............................................................ 11

         D.       There Was No Fraudulent "Exit Strategy" ............................................... 13

                  1.       Consideration of an "Exit Strategy" and Trying to Find a
                           Profitable Solution for an Underperforming Asset is not
                           Fraudulent. ................................................................... 13

                           a.       RSD is not a sham.......................................................... 14

                           b.       An "Exit Strategy" is simply a disposition strategy
                                    to obtain a positive result. .................................................. 15

         E.       Plaintiff's Explanations of the Deposition Testimony Are False. ............ 16

III.     If the Court has Determined that Plaintiffs Have Made a Prima Facie
         Showing, IWA is Entitled to an Ex Parte Hearing.................................................. 17

CONCLUSION............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n*,
   No. 2451, Sept. term, 2014, 2017 WL 1788465 (Md. Ct. Spec. App. May 5,
   2017) ..................................................................................................................12

*Clark v. United States*,
   289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) .................................................3, 4

*In re Gen. Motors Corp.*,
   153 F.3d 714 (8th Cir. 1998) ...............................................................................19

*In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*,
   401 F.3d 247 (4th Cir. 2005) .................................................................................4

*In re Grand Jury Proc.*,
   417 F.3d 18 (1st Cir. 2005) ..............................................................................4, 18

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*,
   33 F.3d 342 (4th Cir. 1994) .................................................................................19

*In re Grand Jury Subpoena*,
   642 Fed. Appx. 223 (4th Cir. 2016)......................................................................18

*Haines v. Liggett Group, Inc.*,
   975 F.2d 81 (3d Cir. 1992).....................................................................................19

*In re Napster Inc. Copyright Litig.*,
   479 F.3d 1078 (9th Cir. 2007) ..............................................................................19

*In re Richard Roe, Inc.*,
   168 F.3d 69 (2d Cir. 1999).......................................................................................4

*Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore
   City*,
   215 Md. App. 133, 79 A.3d 960 (2013)..................................................................13

*United Bank v. Buckingham*,
   301 F. Supp. 3d 547 (D. Md. 2018) ...............................................................3, 5, 6

*United States v. Zolin*,
   491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989)............................. *passim*

**Statutes**

Maryland Code, § 3-101(a)............................................................................................11

Maryland Code, § 3-101(d)...............................................................................11, 12, 13

Md. Code Ann., Cts. & Jud. Proc. § 9–108 ...................................................................3

**Other Authorities**

FRE 501 ...........................................................................................................................3

FRE 502 ...........................................................................................................................3

FRE 503 ...........................................................................................................................3

John W. Gergacz, ATTORNEY-CORPORATE CLIENT PRIVILEGE § 4:16
    (Spring Ed. 2023)......................................................................................................17

Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) ............3

iii

Supreme Court precedent provides a narrow crime-fraud exception, which is that the attorney-client privilege protection "does not extend to communications made for the purpose of getting advice *for* the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989) (quotations omitted). IWA did not seek advice *for* a fraud but instead sought to avoid any inkling of fraud by strictly adhering to the governing contract terms, in prudent consultation with its counsel. IWA has never hidden why it made the Assignment and has never hidden behind its lawyers.[1] IWA assigned the Ground Lease to RSD, and then immediately provided proper notice to Plaintiff about the Assignment. Plaintiff ignores that the Assignment was openly made pursuant to two separate contracts, and instead asserts the extraordinary allegation that an  established lending institution and well-regarded real estate experts hid behind multiple lawyers from at least four different law firms to commit fraud.

Plaintiff's contrived characterization of facts does not make the crime-fraud exception any more applicable, nor is it a basis for obtaining the three *privileged* communications (identified by the Court). Obtaining legal advice about what a party may do under a contract and what claims may be filed by parties whose affiliates are already engaged in litigation is not fraudulent. Attorneys are hired to give just that advice. If Plaintiff is able to obtain privileged communications on no more than a standard of "relevance," this Court will essentially be holding a client cannot evaluate a *compliant* and *legal* course of action to *avoid* falling victim to

---

[1] Plaintiff argues the number of documents on IWA's privilege log indicates that IWA is trying to hide behind its attorneys. Plaintiff produced 1,723 documents and withheld an additional 434 documents as privileged. IWA produced 4,713 documents, and IWA identified 1,192 documents as privileged. Both Plaintiff and IWA claim 20% of their documents are privileged. The Court has now reviewed approximately 16% of IWA's privileged documents and determined that just three are even "relevant".

its adversary's litigious antics without risking losing its attorney-client protections.  That's a problematic precedent to set.

## ARGUMENT

Plaintiff has not established a prima facie case of fraud, and there are no factual or legal grounds for ordering the production of IWA's privileged communications to Plaintiff.  However, if the Court remains inclined to find that Plaintiff should obtain three of IWA's privileged communications, IWA should be given a fair opportunity to explain that evidence through an *ex parte* hearing.

The Court believes there are three privileged documents that are "relevant" to Plaintiff's fraud claim, yet the Court (i) has not given IWA any insight into why the Court believes the speculative argument of Plaintiff's counsel and gives no credit to the testimony of multiple witnesses and other documentary evidence, which fully refute Plaintiff's fraud claims; (ii) has not explained why it believes that the legal advice of IWA's attorneys as to compliance with contracts (which allow the Assignment) is "relevant;" and (iii) did not at the hearing give IWA an opportunity to respond to Plaintiff's speculative theories about its purported fraud evidence (which theories have been disproven).  Indeed, as to the third point, counsel for RSD even raised concerns at the hearing that Plaintiff's counsel had over an hour to argue about the meaning of IWA's documents that neither IWA nor RSD had an opportunity to address.  *See* February 16, 2023 Hearing Transcript ("Hr'g Tr.") at 85:1-94:6, attached as Exhibit A.  IWA tried to address both that evidence and the privileged documents in its *ex parte* letter, but that letter is not being considered.  Now, IWA cannot address the communications without disclosing their content.

Nevertheless, for the reasons set forth below, even if Plaintiff did have some credible evidence on which it could base its fraud claim (and it does not) Plaintiff's legal arguments are still fatally flawed and erroneous.

I.     **Plaintiff's Arguments Rely on *Proposed* Rules and Purposefully Ambiguous Legal Standards**

Plaintiff's chief argument in opposition is premised on *proposed* Federal Rule of Evidence ("FRE") 503, which Congress never enacted and this Court has never relied on to support a crime-fraud exception.  (Pl.'s Br. at 5).  *Proposed* FRE 503 is neither instructive nor controlling in this case, or in any other case.  Yet even if it had been enacted, it is not relevant here because (i) there has been no crime or fraud and (ii) any legal advice was given to interpret a legal contract so that a client could understand its contractual rights and obligations in light of anticipated litigation.  See IWA's Brief at 2 (ECF-294).  IWA thought it would be sued, and that is exactly what happened.[2]

As it stands, FRE 501 and 502 control privilege.  Rule 501 states that common law governs the claim of privilege, except if rules prescribed by the Supreme Court provide otherwise.  "The common law privilege has been codified under Maryland law."  *United Bank v. Buckingham*, 301 F. Supp. 3d 547, 552 (D. Md. 2018) (citing Md. Code Ann., Cts. & Jud. Proc. § 9–108 ("A person may not be compelled to testify in violation of the attorney-client privilege.")).  Common law also does not recognize the crime-fraud exception in cases, like here, where the communications relate to compliance, rather than avoidance, of the law.  *See Buckingham*, 301 F. Supp. 3d at 552 (recognizing that '[a] communication is not privileged if it was made for the purpose of seeking advice or aid in furtherance of a crime or fraud.").

No rule or case suggested by Plaintiff supports divergence from upholding IWA's privilege.  First, Plaintiff's reliance on the ambiguous prima facie standard set forth in *Clark v.*

---

[2] Plaintiff also relies on other purported authority that is not relevant.  For example, Mueller, et al., Federal Evidence § 5.22 Shareholder litigation (4th Ed. 2022) actually discusses the crime-fraud exception from the context of derivative actions and the relevance to the to *Garner* rule, which is a different standard.

*United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) is fatal.  Specifically, Plaintiff suggests that "no preliminary finding … aside from the communication" itself is necessary to warrant implication of the crime-fraud exception.  Pl.'s Br. at 6.  But, the Supreme Court criticized this standard set forth in *Clark* due to the confusion and ambiguity that it created, as critiqued by legal scholars.  *Zolin*, 491 U.S. at 563 n. 7 (1989).  In *Zolin*, the Court ultimately concluded that the vague standard set by Clark "remains subject to question."  *Id*. at 563; *see also In re Grand Jury Proc*., 417 F.3d 18, 22 (1st Cir. 2005) ("The process of development is far from over" with respect to the standard.)

Second, *Zolin* did not clarify the "quantum of proof necessary ultimately needed to establish the applicability of the crime-fraud exception."  *Zolin*, 491 U.S. at 564.  However, *Zolin* also did not give unbridled discretion to courts to disregard the importance of attorney-client privilege, well-grounded in common law, and to allow scant evidence to pierce this protection. Indeed, the importance of the attorney-client privilege is difficult to overstate, and it is for this reason that the crime-fraud exception "should not be framed so broadly as to vitiate much of the protection [it intends to afford]."  *In re Richard Roe, Inc*., 168 F.3d 69, 71 (2d Cir. 1999).

Finally, the Fourth Circuit has interpreted the crime-fraud exception to mean that it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege.  *In re Grand Jury Proc. #5 Empanelled Jan . 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (finding that the district court abused its discretion because the district court simply could not have concluded that any sort of relationship exists between the allegedly privileged documents and the alleged crime.)  That is, the court cannot single-handedly look at the communication and the discovery-seeking party's interests in the privileged documents.  Indeed, "[i]t is the court's duty to consider all of the circumstances in determining whether a sufficient

showing of intent has been made." *Buckingham*, 301 F. Supp. 3d at 557.

Here, only Plaintiff's speculative arguments, which are based on the cherry-picking of language from various emails (including from individuals who are not even parties to this case) serve as a basis for IWA's alleged "sharp trading."  However, as expressed in both briefing and oral argument to date, and further summarized herein, IWA, acknowledges that it consulted with its counsel before making any decisions about the Assignment at issue and has been transparent about its intentions, none of which include engaging in a fraud.  Setting aside the public policy interest to allow an attorney an unencumbered ability to provide pre-litigation advice, if IWA is ordered to produce the documents, it would be irreparably harmed by providing attorney work product and privileged communications regarding the defenses that have arisen in this lawsuit. Pairing these facts against the common law and Supreme Court framework set forth above, Plaintiff has not overcome the protections afforded by the attorney-client privilege.

## II.     Plaintiff Has Not and Cannot Demonstrate a Prima Facie Case for Fraud.

Regardless of what standard the Court decides Plaintiff must follow to demonstrate a prima facie case of fraud, Plaintiff has not met its burden and cannot use contested documents only to meet it.  In *Zolin*, the Supreme Court held that the documents at issue in a claim for the crime-fraud exception cannot be used as the sole basis for applying the exception.  *See Zolin*, 491 U.S. at 568–72.  In other words, Plaintiff cannot rely on the confidential documents themselves to open the door to a fraud claim— the prima facie showing must exist independently of the contested documents.  *See id.*  "A blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk."  *Id*. at 571.  It follows that a cause of action for fraud by itself is insufficient to establish the crime-fraud exception.  "There is no reason to permit opponents of the privilege to engage in

groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Id*.  Thus, the test is not whether there may be documents that may be "relevant to" or that would bolster a fraud theory.  Rather, the test is whether the evidence presented by the Plaintiff can independently establish a fraud claim without use of the privileged documents.  Moreover, this Court has established that "[f]or an alleged conveyance deemed fraudulent" under Maryland statute or another basis, "to trigger application of the [crime-fraud] exception, the allegations must present sufficient evidence of deception, dishonesty, misrepresentation, falsification, or forgery." *Buckingham*, 301 F. Supp. 3d at 554.  Plaintiff has utterly failed to make such a showing.

### A.  Plaintiff Did Not Establish a Prima Facie Case of Fraud in its Motion or at the Hearing.

As a starting point, Plaintiff falsely argues that IWA has not responded to its purported evidence, and in response IWA incorporates and reasserts all of its arguments already presented in its Response in Opposition to Plaintiff's Motion to Compel and Request for In Camera Review of Privileged Documents (ECF-238-2).  Although the explanation of Plaintiff's purported fraud evidence in that brief alone sufficiently refuted Plaintiff's speculative theories, so now has the testimony of the witnesses. To ignore such case evidence is of course not justice – it is advocacy.

### B.  An Assignment Made Pursuant to Two Different Contracts Negotiated and Executed by Plaintiff is Not Fraud.

Plaintiff has now deposed eight witnesses, and each witness confirmed exactly what IWA and RSD have been arguing for three years:  IWA foreclosed on a leasehold interest and then assigned that leasehold interest to RSD.  The Ground Lease and Estoppel Agreement – which both expressly authorized the Assignment – were negotiated and executed by Plaintiff.  Upon the Assignment, IWA was released from all obligations under the Ground Lease.  There is nothing

fraudulent about doing exactly what two different contracts authorized IWA to do.  *See* Deposition of Paul Rubin dated April 7, 2023 ("Rubin Dep") at 291:16-17, excerpts of which are attached as Ex. 1 to Declaration of Rebecca Davis, which is attached as Ex. B ("The Estoppel Agreement permits the assignment."); Deposition of Robert Barron dated April 14, 2023 ("Barron Dep.") at 38:7-10, excerpts of which are attached as Ex. 2 to Ex. B  ("And in this situation, the landlord agreed that the lender had the absolute right to assign to a third party and be automatically released."); Deposition of Troy Taylor dated April 6, 2023 ("Taylor Dep.) at 80:11-22, excerpts of which are attached as Ex. 3 to Ex. B  ("I don't understand how there could be a fraud claim when in the Estoppel Agreement . . . it says, the absolute right to transfer to any third-party."); *see also* Barron Dep. 23:15-22.

A number of these witnesses were asked, and denied, that they ever committed *nor intended to* commit any act of fraud.  *See*, *e.g,*, Rubin Dep. 293:6-9 ("I can tell you that Longshore[, the joint venture partner,] had no intent to defraud the landlord when it entered into the joint venture with Rock Springs Drive.").  To the contrary, each of these witnesses explained how they complied with Plaintiff's contracts, and relied on Plaintiff's promises to allow the Assignment.  As Robert Barron, counsel for RSD explained (and one of three attorneys that Plaintiff seeks to depose, Plaintiff:

> [A]greed with the lender in order to induce them to make the loan – if you look at the recital B [of the Estoppel Agreement], the lender said, I will not make the loan unless you let the landlord sign this document. So [Plaintiff] signed this document. And in paragraph 19 [of the Estoppel Agreement], [Plaintiff] said, lender, and I quote, you have the absolute right to assign this lease if you foreclose. Absolute right to any third party. Any third party is what [Plaintiff] agreed to.

Barron Dep. 24:1-11.  Based on Plaintiff's express promises, IWA and RSD, and their respective counsel, negotiated and closed on the Assignment.  IWA notified Plaintiff of the Assignment

after it was made, pursuant to the Estoppel Agreement, and Plaintiff's response was to immediately begin setting up its litigation strategy.[3]

As explained by Mr. Barron—a business attorney with significant experience with real estate asset and financing transactions, corporate acquisition and disposition transactions, and business and debt restructurings—neither the assignment rights in the Estoppel Agreement nor the Assignment itself were wrong or unusual.[4]   Rather, it was Plaintiff's response that was atypical.  Mr. Barron exchanged multiple communications with Plaintiff's counsel, William Bosch, prior to the filing of the Complaint, and during the deposition noted, "I've been doing this for 30 years.  And for an officer of the court to tell another officer of the court that it's fraudulent conduct, when your client absolutely agreed to permit this transaction, I'm – you know, I'm disappointed.  I'm just disappointed."  Barron Dep. 27:5-11.  Mr. Barron also testified:

> So it is very common in my practice for a lender to foreclose. They either put the loan in a shell and have the shell foreclose.  Or, you know, if they look at the document and say, look, the landlord has agreed that after we foreclose, we have the absolute right to assign to a third party. And the lease says, this estoppel, you are automatically released from any further liability, except, of course, the liability that you had when you were lender and you were the tenant for that period of time, which I totally get. This is very common in my world, that the landlord, in order to get financing, will tell the lender, look, if this fails, we won't go after you, lender. And so this structure is very common.  And what I don't understand is we have -- this provision says they have the absolute right to assign to any third party, and they are automatically released. And in all your correspondence to me, you throw around the "fraud" word in a way that is very odd for a lawyer of your stature, when you have a right given to this borrower, this lender -- that's from the -- from your client that says absolute, and automatically released.  So, yes, sir, I have seen this before. I have never seen a landlord renege on such a clear covenant. It's so clear. I've never seen that before in my career. I've done this for 30 years. I've never seen that before.

---

[3] Again, the Estoppel Agreement provides that IWA was only required to provide notice of an assignment to Plaintiff within ten days after the assignment was made, thus again confirming that Plaintiff had no right to object to evaluate any assignee or object to the Assignment.  *See* Estoppel Agreement at ¶12.

[4] Mr. Barron's professional and community activities and accomplishments (of which there are many), are presented in Ex. 4 to Ex. B.

Barron Dep. 25:1 - 26:13.  Mr. Barron also then explained his responses to Mr. Bosch's demands for information, which are the same communications that Plaintiff has repeatedly argued are evidence of fraud and subterfuge, stating, "[O]ne of the disagreements that you and I had is that you assume that if someone does not answer a question that you ask, it is by definition either in bad faith or fraud."  Barron Dep. 345:18-22.

As to Mr. Bosch's own conduct and Plaintiff's demands for information, which Plaintiff had no right to request or receive, Mr. Barron noted:

> One of the sad things about this engagement, this interaction that I had with you with letters is that you presuppose that if I exercise that discretion and choose not to answer, you call it fraud. And with respect, I bet if I followed you around every day and watched lawyers ask you questions, with respect, I could bet you a dollar that you'd choose, in your discretion, not to answer questions. And with respect, if those lawyers called your conduct fraudulent, you might get a little aggravated.  So with respect, just because you have the right to ask a question doesn't mean you have the right to require an answer.

Barron Dep. 257:1-16.  *See also* Barron Dep. 362:1-8 (stating that the communications from Mr. Bosch were "litigation setup letters[s]."  Mr. Barron also testified:

> [L]ife does not happen in a vacuum, and we're dealing with letters written by the head of a major, big law firm, the head of litigation, from a landlord whose affiliate has been in years in litigation with this same company.  And so is it reasonable for the parties to not trust and be concerned with litigator letters? Absolutely. It's reasonable to be concerned and not to give them anything that you don't have to because we've already gone through -- not we. But they've already gone through litigation with you. I think it's incredibly reasonable. In fact, if you were counsel, you would be giving the same legal advice. That's what so sad about this.

Baron Dep. 346:22 - 347:15.

Mr. Barron's testimony is consistent with IWA's concerns dating back to at least 2016, that Plaintiff was litigious and would file a lawsuit no matter what course of action IWA took to find a profitable solution for the Ground Lease.  Accordingly, IWA sought legal counsel to interpret and comply with the contracts.  Moreover, consistent with what the documents, and also the privilege log, reflect, IWA sought counsel to evaluate the potential claims that IWA felt

Plaintiff would inevitably bring, including an obvious claim for fraudulent conveyance.

David Feltman, IWA's corporate witness, testified that IWA analyzed fraudulent conveyance concerns with respect to the Ground Lease as a litigation concern well in advance of conceiving of the Assignment, and then again at the time of the Assignment.  Feltman Dep. 290:3-291:22.  Seeking such advice was a reasonable business decision because IWA anticipated litigation, and the risk of litigation with the Camalier family was a real concern that was discussed with IWA's joint venture partner.  *See* Deposition of David Feltman dated March 16, 2023 ("Feltman Dep.") 350:1-22, excerpts of which are attached as Ex. 5 to Ex. B. ("I discussed that with Troy [Taylor], and the fact that the Camaliers were litigious and that this was clearly a possibility. . . generally, I was just looking at what had happened on [Rockledge] and saying, hey, you know, these guys were litigious, and there's a possibility that they're going to sue.")

 As IWA has also repeatedly explained, it is beyond dispute that Plaintiff's litigious behavior also had an impact on IWA's willingness to share information.  *See* Barron 66:5-12.  "My understanding was a combination of the lack -- severe lack of trust with the landlord based upon this other litigation, concern that the landlord would not honor the terms of the lease. And so the concept of getting beyond the time period for -- to try to attack the agreement based upon transfer."  Troy Taylor further testified:

> One of the things -- when we first got brought into this, we were told that the Camaliers were very litigious. I knew there was existing litigation going on. Didn't know anything about the specifics. I knew there was existing litigation and I knew that there was -- that at least IWA's perception was that the Camaliers were very litigious I took that to say, okay. And after the assignment, what happened was that Mr. Bosch, you were the one that initially reached out to Robert Barron. And in my 25-plus years of experience, I've never seen any first chair litigator be the first person to respond in what should be a commercial business situation.  So it made me basically say, okay, I understand now why my joint venture partner thinks that these folks are litigious in nature, because why would the litigator be responding? I mean, you know, it kind of muddied the waters. So it made me think that basically that the Camaliers were not interested in a real conversation; otherwise, they would

have called directly, they would have had maybe one of your real estate partners call, but the fact that it was a litigator reaching out, that sent red flags to me. So in the back of my mind, it gave more credence to the fact of what IWA had been telling me. But I didn't -- but just to finish, I didn't know any specifics, I didn't know -- but it made me understand that, okay, these guys approach everything from a litigation angle versus from what I call a business angle. I said it reinforced to me that basically what my joint venture partner was saying had some credence. I typically have partners and clients that have preconceived notions that are often conspiracy theories that they've worked up in their minds that tend not to be reality, but in this particular case, it reinforced what their reality was telling me.

(Taylor Dep. 74:6-78:16). Ultimately, the litigation concerns that multiple witnesses testified about is exactly what transpired. Barron testified:

[N]otwithstanding that [Plaintiff] coveted it, to let [IWA] do this, [Plaintiff is] now going to sue [] for fraudulent conveyance, which is exactly what everyone was concerned, that these people do not operate in good faith. They will not honor the covenant they have in the plain language of the lease. But instead, they're litigious. And bingo, on June 6th, 2019, you came out and did it. And here we go.

Barron Dep. 380:20 - 381:7.

In summary, IWA anticipated litigation and the potential claims that Plaintiff would file, which formed its decision-making before and after the Assignment. Disclosure of that analysis, or communications relating to the possibility of those claims, including any steps taken to avoid or defendant against such claims, is not contemplated under the crime-fraud exception or Maryland law.

## C.    Plaintiff Cannot Rely on RSD's Election Not to Record the Assignment as Evidence of Fraud

Plaintiff's argument that IWA's election not to record the Ground Lease is evidence of fraud is completely without merit. Maryland Code, § 3-101(a) provides that no "estate above seven years . . . may pass or take effect unless the deed granting it is executed and recorded." However, Maryland Code, § 3-101(d) then goes on to spell out the following:

If a lease required to be executed and recorded under the provisions of subsection (a) of this section is executed but not recorded, the lease is valid and fully effective both at law and in equity (i) between the original parties to the lease and their

11

personal representatives, (ii) against their creditors, and (iii) against and for the benefit of any other person who claims by, through, or under an original party and who acquires the interest claimed with actual notice of the lease or at a time when the tenant, or anyone claiming by, through, or under the tenant, is in such actual occupancy as to give reasonable notice to the person.

Md. Code Ann., Real Prop. § 3-101(d) (West).  In other words, pursuant to Section 3-101(d), an executed, unrecorded ground lease interest for a duration of more than seven years is "valid and fully effective both at law and in equity" between the parties to the ground lease interest, against their creditors, and against any other person who has actual notice of the ground lease interest, or reasonable notice of the ground lease interest based upon the circumstances.  As such, it is not uncommon for parties to forego assigning subsequent conveyances.

In this particular situation, the original Ground Lease was already recorded in the Land Records - IWA's purchase of the Leasehold was also recorded in the Land Records through the Trustee's Deed of Assignment.  *See* Ex. C.  Thus, any potential third party would be put on notice that the land was subject to the 99-year Ground Lease and that IWA acquired the Leasehold in 2012.  In addition, Plaintiff was specifically advised of the Assignment through a notice sent on the exact date of the Assignment, and thus would not be impacted by any election not to record.  *See* Barron Dep. 232:1-7.  Also, the Assignment was not hidden from Montgomery County, and in fact RSD called Montgomery County to discuss whether the tax bill could be changed without recording the Assignment.  Rubin Dep. 265:3-22.

Nevertheless, IWA considered whether recording the Assignment was legally required. RSD's counsel investigated the requirement to record the Assignment, and determined that recording assignments was not customary in Maryland, and that larger commercial owners typically do not record an assignment of a ground lease because it attributes a tax.  Barron Dep 325:1-327:9; *see, e.g., CBM One Hotels, L.P. v. Maryland State Dep't of Assessments & Tax'n,*

No. 2451, Sept. term, 2014, 2017 WL 1788465, at *1 (Md. Ct. Spec. App. May 5, 2017) (noting in tax dispute the recorded documents, included *inter alia* the Memorandum of Lease, but did not include assignment of ground lease between affiliated parties, Marriott Corporation and Courtyard by Marriott); *see also Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore City*, 215 Md. App. 133, 145, 79 A.3d 960, 967 (2013) (distinguishing that recorded documents establish title or record ownership, while unrecorded documents show a contractual ownership of the property interests). Further still, the decision not to record the Assignment was implicitly approved by Wilkes Artis, Chtd. ("Wilkes Artis"), a law firm in the Washington, DC region that focuses on real estate tax issues (and is the firm at which Plaintiff's representative, Charles A. Camalier, III is a Shareholder). Wilkes Artis represented RSD after the Assignment in a tax appeal, and knowing RSD was the tenant and that IWA was still identified as the taxpayer, it never advised RSD to record the Assignment. *See* Taylor Dep. 258-261.

But again, any indicia of *fraud* is belied by IWA providing notice of the Assignment on the same day that the Ground Lease was conveyed, thereby satisfying any notice considerations of Section 3-101(d). And deciding not to record a document (in this case, an Assignment of an already recorded Ground Lease) that is not *legally* required to be recorded, is not fraudulent.

      **D.**    **There Was No Fraudulent "Exit Strategy"**

           **1.**    **Consideration of an "Exit Strategy" and Trying to Find a Profitable Solution for an Underperforming Asset is not Fraudulent.**

Plaintiff has consistently relied on rhetoric it has created by combining cherry-picked language from multiple emails to argue that RSD is a sham entity created as an exit strategy for a worthless asset. There is no merit to these allegations. What IWA did is create a partnership that it hoped would lease up an underperforming asset so that it could sell it.

a.    RSD is not a sham.

As a starting point, the inflammatory allegation that RSD is a "sham" was dispelled long ago.  IWA has repeatedly explained the purpose of RSD - RSD was NOT formed "so that IWA would no longer have responsibility for fulfilling tenant's financial obligations under the Ground Lease."  Feltman Dep. 127:8-12.  Rather, it was formed because IWA "had been unsuccessful at leasing it up. [IWA] thought that the Algon folks could do, frankly a better job."  Feltman Dep. 127:16-22.  Moreover, "by 2017 IWA's resources were constrained and IWA was cutting staff, and the creation of a joint venture was a way to add more resources."  Feltman Dep. 128:1-6.  Furthermore, IWA:

> [W]anted a party who was incentivized properly to add value.  And [IWA] knew that that skill set existed within Algon.  And that Algon also had strong capital markets relationships so that, to the extent we were able -- they were able to identify a tenant and tenant the property, that they could, through their capital markets relationships, find ways to finance the cost associated with that. And ultimately sell the property, once it had been leased up and improved.

Feltman Dep. 128:13-22.[5]

Witness after witness has confirmed what Defendants have been saying for three years.  Nevertheless, if the Court remains inclined to rely on Plaintiff's disproven "sham" argument as a basis for allowing Plaintiff to review privileged communications, IWA again asserts that it is entitled to an *ex parte* hearing to address the meaning of any documents that are relevant to this unsupportable sham theory.

---

[5] Barron 60:17-61:1 ("Algon – Troy Taylor and Paul Rubin, Algon is – has the – a lot of experience trying to work out situation and try to find win-win situations for transactions that need that professional input.  And he's got-they have tremendous experience in troubled assets."

b.   <u>An "Exit Strategy" is simply a disposition strategy to obtain a positive result.</u>

Plaintiff has relied heavily on an email sent on July 8, 2016, more than a year before the Assignment, in which an accountant asked whether IWA had an "exit strategy" for the Ground Lease.  First, the person who sent the email is irrelevant to the transaction at issue, as he was not an employee of IWA, and was instead an employee of a third party.  Moreover, he was an accountant that had no decision-making power with respect to the Property.  Second, an "exit strategy" is not a negative event, but is a positive outcome.  It is simply a disposition, and IWA views it as "the sale of a property."  Feltman Dep.  142:4-8.  *See also* Deposition of Matt Pithan Dep. 38:18-22, attached as Ex. 6 to Ex. B ("My understanding of exit strategy is the plan to sell an asset.").  As Mr. Feltman further explained, IWA was always thinking about exit strategies because:

> IWA wasn't in the business of being a long-term owner of real estate. And generally in real estate the benefits, the economic benefits, are both cash flow during the term of ownership but also the residual value and benefiting ultimately from the sale of the property, appreciation of the property and residual value. So when we talk about exit, you know, we're really talking about disposition of a property at the end of its -- whatever its appropriate life cycle is based on maximizing value at that time.

Feltman Dep. 684:8-22.

There was no exit strategy being considered in 2016, beyond leasing up and then selling the Property.  Feltman Dep. 222:1-223:4.  In fact, IWA never had a disposition strategy, or "exit strategy" for the Property, and the Assignment was not in itself an "exit strategy."  *See* Feltman Dep. 182:4–186:15.  Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was just one step in what needed to occur to execute what we would think of as a disposition exit strategy, so that RSD could then sell the property and monetize the proceeds."  186:8-15.

There is simply nothing about any "exit strategy" referenced in any communication that was wrong, and certainly nothing fraudulent.

**E.      Plaintiff's Explanations of the Deposition Testimony Are False.**

Despite Plaintiff's attempts to recharacterize witness testimony in this case, each witness confirmed that there was no fraud, and certainly no fraudulent intent related to the Assignment. Yet, Plaintiff still asserts a litany of false statements in its Opposition that if, the full transcript is considered, are easily disproven.  These false statements are identified below, and the actual testimony of the witnesses, in context, is attached hereto.[6]  The testimony speaks for itself, and Plaintiff's attempts to restate that testimony should be disregarded.

i.      No witness confirmed that the Assignment was for purposes of a simple "walkaway" and there has never been any discussion as to using RSD as an "exit strategy" to walk away from the Ground Lease.  Indeed, Mr. Feltman testified that the Assignment was not done so IWA could avoid responsibility for fulfilling any obligations under the Ground Lease. Feltman Dep. 127:8-15.  Mr. Barron actually testified that he could see a hypothetical scenario where RSD would have to give back the interest in the Ground Lease to the Camalier entity, but he also testified that he never had any discussions with  IWA or anyone else about that.  *See* Barron Dep. 78:11-85:4.  Mr. Taylor has testified that he understood that RSD would be funded for as long at it took to get a resolution, which is the exact opposite of a belief that the parties orchestrated this transaction as a walkaway.  *See* Taylor Dep. 223:2-21.

ii.      The three-year statute of limitations had no bearing on the formation of RSD, nor has it had any relevance to RSD's ownership of the Property.  Also, Mr. Feltman did not testify that he was trying to get past the three-year statute of limitations to force a sale, or that he planned on "putting the screws to the landlord."  Rather Mr. Feltman testified that there was actually, in a draft term sheet, a partnership term of three years, and Mr. Feltman believed it was

---

[6] If the Court requests, IWA will also provide full transcripts of all depositions taken in the case.

sufficient time to get the Property leased up and sold.  Feltman Dep. 273:10-22.  Mr. Feltman

also testified: "I [thought] at that point, the litigation risk would go away because we'd be beyond

the fraudulent transfer date, and also our expectation was that there would be leasing activity,

and by then the property would be in a position to be sold."  Feltman Dep. 406:15-22.  Nowhere

does Mr. Feltman's statement suggest he intended for RSD to walkaway form the Ground Lease

after the statute of limitations period.  Mr. Feltman's testimony also mirrors the testimony of Mr.

Barron, who did not know the statute of limitations was three years for fraudulent conveyance

but knew that there was distrust with landlord, which is why certain provisions were in the first

draft of the term sheet, but were ultimately removed by IWA anyway.  Barron Dep. 197:8-198:8.

> iii.     Also, as discussed above, RSD did not share information that it was not

required to share with Plaintiff because Plaintiff made clear very quickly that it was setting up a

lawsuit.  IWA did not want to share information with Plaintiff because it was already in a lawsuit

with Plaintiff's affiliate and it also anticipated getting sued by Plaintiff.

> iv.     Finally, IWA has never denied that it retained counsel to review and draft

documents, which is established by the thousands of documents already produced and the

parties' privilege logs.  Obtaining legal advice through attorneys is not fraud.  Similarly,

asserting attorney client privilege over conversations between attorneys and clients does not

demonstrate fraud.

## III.     If the Court has Determined that Plaintiffs Have Made a Prima Facie Showing, IWA is Entitled to an Ex Parte Hearing

Plaintiff incorrectly states that "Courts have broad discretion to determine whether a

privilege is properly asserted."  Pl's Br. at 6.  Seemingly, Plaintiff has confused the lower

threshold for the in camera review of privileged documents and the standard for determining

whether to uphold that privilege.  *See* John W. Gergacz, ATTORNEY-CORPORATE CLIENT

PRIVILEGE § 4:16 (Spring Ed. 2023) (*Zolin* "integrated an in camera inspection of materials with an initial showing that would be *less than* that required to establish the crime-fraud exception.") (emphasis added).  The standards are not the same, nor are they similar because the intrusion upon the confidentiality of the attorney-client relationship is much greater in the latter. *Zolin*, 491 U.S. at 572.   A lesser evidentiary showing is needed to trigger an in camera review than is required to ultimately overcome the privilege.  *Id.*; *see also In re Grand Jury Proceedings*, 417 F.3d at 22 (Noting that the standard for in camera review requires a lesser evidentiary showing than what is ultimately needed to pierce the privilege).  Thus, while the Court has more discretion in determining whether to conduct an in camera review, which it exercised in this case, it does not have the same liberal discretion in its determination to apply the crime-fraud exception.[7]

What is exceptionally troubling here is that IWA has not been afforded an opportunity to refute Plaintiff's assertions of fraud or the Court's determination that the contested documents "might be relevant."  ECF No. 290.  There remains a due process concern in this case, including as to how the evidence was addressed at the February 16, 2023, hearing.  *See* Ex. A.  Indeed, even then the Court did not give either IWA or RSD an opportunity to address Plaintiff's spin on purported evidence, and the Court has thus far not given any weight to what the actual authors of that purported evidence have said Plaintiff's purported evidence means.

To ignore the explanations of the evidence by the very individuals that drafted, reviewed, or used the actual evidence invites error.  This is in part because if the Court concludes that Plaintiffs have made a prima facie showing, then the burden shifts to IWA to refute such showing.

---

[7] Even the authority cited by Plaintiff makes clear that the discretion the trial judge has as to whether privilege applies is still limited by the framework of binding Supreme Court and Fourth Circuit precedent.  *See In re Grand Jury Subpoena*, 642 Fed. Appx. 223, 227 (4th Cir. 2016).

*In re Grand Jury Proc., Thursday Special Grand Jury Sept. Term, 1991*, 33 F.3d 342, 351 (4th Cir. 1994).  This burden shifting standard contemplates the opportunity for rebuttal.  *Id*.  ("The crime-fraud standard does seem to contemplate the possibility that the party asserting the privilege may respond with evidence to explain why the vitiating party's evidence is not persuasive"); *see also In re Gen. Motors Corp*., 153 F.3d 714, 716 (8th Cir. 1998) ("This being a civil case, the district court may not, however, compel production without permitting the party asserting the privilege, to present evidence and argument"); *Haines v. Liggett Group, Inc*., 975 F.2d 81, 97 (3d Cir. 1992) ([the] "importance of the privilege, … as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege."); *see also In re Napster Inc. Copyright Litig*., 479 F.3d 1078, 1093 (9th Cir. 2007) ("[I]n civil cases where outright disclosure is requested[,] the party seeking to preserve the privilege has the right to introduce countervailing evidence").  Even Plaintiff admits the Court should allow for a process for the Parties to submit additional information for the Court to make a determination that a prima facie case has been shown. Pl.'s Br. at 8. ("Notably, if the Court determined that the documents reviewed in camera did not make the prima facie showing, it could have requested additional evidence from Plaintiff").

Given the forgoing, and the need to address Plaintiff's "prima facie case" against the documents the Court has selected, if the Court concludes that Plaintiff has met its burden, IWA is entitled to an ex parte hearing to present evidence to the contrary.  Moreover, to the extent that Plaintiff is arguing that IWA has had an opportunity to address the three documents that the Court is considering releasing, IWA asserts that it attempted to do so, and that such attempt was rejected by the Court.  The Court instead directed the parties to brief the issue to give Plaintiff a chance to respond, which altogether eliminated IWA's ability to address the documents at all.

## **CONCLUSION**

IWA did only what Plaintiff agreed it could do, in not one, but two different contracts. Adhering to the terms of a negotiated contract is not fraud, and absent fraud, there is no basis for ordering that Plaintiff is entitled to review IWA's privilege documents under the crime-fraud exception. Accordingly, given the absolute irreparable harm that the Court's release to Plaintiff of IWA's privileged documents will have on Defendants, given the absence of substantive and procedural due process in the Court's manner of stripping IWA of its attorney-client privilege, and given the increased probability of reversible error embedded in the Court's proposed release of IWA's attorney-client privileged documents, IWA respectfully requests that the Court reconsider and reverse its position as to the release of IWA's privileged communications.

However, if the Court remains intent on allowing Plaintiff to obtain the three documents containing IWA's privileged information, then the Court should order the release of the three documents rather than release the documents itself, as not even the cases cited by Plaintiff allow or even suggest such a result, and give IWA _sufficient_ time, as allotted by established procedures, to pursue whatever relief IWA may seek from the U.S. Court of Appeals for the Fourth Circuit. IWA requests that the Court not limit IWA's right to any of its remedies, as to timing or election.

DATE:  April 25, 2023                              Respectfully submitted.

SEYFARTH SHAW LLP

By: _/s/Rebecca Davis_
Rebecca A. Davis, Bar No. 23183
1075 Peachtree St., N.E., Ste 2500
Atlanta, GA  30209
Telephone:  (404) 885-1500
rdavis@seyfarth.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **ROCK SPRING PLAZA II, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 8:20-cv-01502-PJM** |
| **INVESTORS WARRANTY OF AMERICA, LLC, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2023, I electronically filed the foregoing **DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS BRIEF, PURSUANT TO THE COURT'S MARCH 15, 2023 ORDER, IN SUPPORT OF RECONSIDERATION OF THE APPLICABILITY OF THE CRIME-FRAUD EXCEPTION** via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

| | |
|---|---|
| William Bosch, Esq. | Sara E. Kropf, Esq. |
| Alvin Dunn, Esq. | Kropf Moseley PLLC |
| Katherine Danial, Esq. | 1100 H Street NW, Suite 1220 |
| Pillsbury Winthrop Shaw Pittman LLP | Washington, DC  20005 |
| 1200 Seventeenth Street, N.W. | sara@kmlawfirm.com |
| Washington, DC  20036 | |
| william.bosch@pillsburylaw.com | *Counsel for Defendant Rock Springs* |
| alvin.dunn@pillburylaw.com | *Drive LLC* |
| katherine.danial@pillsburylaw.com | |
| | |
| *Attorney for Rock Springs Plaza II, LLC* | |

Dated: April 25, 2023

By: */s/ Rebecca A. Davis*
   Rebecca A. Davis, Bar No. 23183