## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Rock Spring Plaza II, LLC,**<br><br>   **Plaintiff,**<br><br> **v.**<br><br>**Investors Warranty of America, LLC, et al.,**<br><br>   **Defendants.** | **Civil Action No. 8:20-cv-01502-PJM** |

## DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS MOTION TO QUASH NON-PARTY SUBPOENAS, OR IN THE ALTERNATIVE, MOTION FOR PROTECTIVE ORDER

Plaintiff Rock Spring Plaza II, LLC's ("Plaintiff") response to Defendant Investors Warranty of America, LLC's ("IWA") Motion to Quash is replete with inaccurate "facts." It also disregards that the Court has already ruled that Plaintiff cannot obtain these accounting information and other financial documents. Further still, Plaintiff's response omits that Plaintiff has for more than two years already possessed information confirming that Non-Parties Transamerica Financial Life Insurance Company, Transamerica Corporation, and Transamerica Life Insurance Corporation (collectively, the "Transamerica Entities") had nothing to do with the Assignment.

### I.  <u>ARGUMENT</u>

#### A. **Plaintiff's Purported Facts Are Neither Proportionate to the Needs of the Case Nor Relevant.**

Plaintiff should not be allowed to rely on false statements and fabricated "facts" to support its claims that it needs discovery from three nonparties. Moreover, neither IWA's financial documents nor Transamerica's financial documents relating to IWA are discoverable

because the Court has ruled that IWA's financial records "need not be produced.  Period." February 16, 2023 Motions Hr'g Tr. 40: 21-22, cited portions of which are attached hereto as Exhibit A.  Further still, the requests to the Transamerica Entities are not proportionate to the needs of this case.  IWA has already provided responsive information that is relevant to the claims and defenses in this case and any productions by the Transamerica Entities would be duplicative of prior discovery.  And Plaintiff has already served Transamerica Corporation with two prior requests for the exact same documents.

     1.  <u>Plaintiff has asserted false and unsupported "facts" to support its argument.</u>

As a starting point, Plaintiff's recitation of purported facts are heavily disputed and Plaintiff cites no evidence to support the claims on which this argument rests.[1]  Many of Plaintiff's false statements are addressed, *in seriatim*, below:

(1)     After almost three years of discovery, and after reviewing over 50,000 pages of documents produced by Rock Springs Drive, LLC ("RSD") and IWA (collectively, "Defendants") and taking eight depositions, Plaintiff cannot cite to any documents or testimony to support its bold allegation that the Transamerica Entities "may well be the real parties in interest given their financial and operational control of IWA and RSD."  Similarly, there is no evidence to support that AEGON N.V. even knows about the Property, let alone ever controlled it.  Moreover, Gregg Snitker does not, as Plaintiff alleges, represent the ambiguous "Aegon"

---

[1]Plaintiff has also served IWA with a separate motion to compel production of all documents relating to a supposed consolidation analysis (which again would include financial documents that the Court has excluded from this case), and IWA's response to that motion includes an explanation of keys facts relevant to that motion and this reply brief.  Since the Motion to Quash (ECF-321), the Motion to Compel the Transamerica Entities (ECF-332) and the separate motion to compel documents relating to a consolidation analysis (not yet filed) all relate to the same documents, IWA respectfully requests that the Court consider all motions at once.

entity Plaintiff references,[2] and there are no emails sent by any person with a "@transamerica.com" domain name who had decision-making authority over the Property or that controlled the Assignment.

To the contrary, it is undisputed that David Feltman was the head of the asset management unit of AURA, and he had ultimate responsibility for the Ground Lease.  IWA 30(b)(6) Dep. Tr. Vol. 1 ("IWA Dep.") 16:4-15, Mar. 16, 2023, excerpts of which are attached hereto as Exhibit B.  Mr. Feltman and Scott Cote, also an employee of AURA, were the sole individuals that authorized the Assignment of the Ground Lease from IWA to RSD.  *Id.* at 56:11-57:11; *see also* IWA Dep. Ex. 9, attached hereto as Exhibit C; *see also* August 24, 2017 memorandum, attached hereto as Ex. D (filed under seal).  Mr. Feltman further confirmed that it was his idea, along with one of Algon's principals, to form a joint venture structure that became RSD.  *Id.* at 227:2-12.  Transamerica Life Insurance Company's sole involvement with the Assignment related to an accounting team that is a shared service across all Transamerica companies, including IWA.  *Id.* at 199:12-200:14.

Mr. Feltman decided to form RSD, which is a joint venture between IWA and another limited liability company called Longshore Ventures LLC because IWA "had been unsuccessful at leasing [the Property] up. [IWA] thought that the Algon folks could do, frankly a better job." IWA Dep. 127:16-22.  "[T]he creation of a joint venture was a way to add more resources." *Id.* at 128:1-6.  Furthermore, IWA:

---

[2] Gregg Snitker was during the negotiation and formation of RSD in-house counsel for Aegon USA Realty Advisors, LLC ("AURA").  Plaintiff intentionally conflates the various entities by identifying AURA and AEGON, N.V., and then a third amorphous "Aegon" as Mr. Snitker's employer, feigning ignorance to try to link Mr. Snitker to AEGON, N.V.  Yet Plaintiff knows exactly who Mr. Snitker is.  Hundreds, if not thousands, of documents sent or received by Mr. Snitker have been produced to Plaintiff from Defendants; Mr. Snitker is included on IWA's privilege log; and Mr. Feltman provided testimony regarding Mr. Snitker's role and employment.

> [W]anted a party who was incentivized properly to add value. And [IWA] knew that that skill set existed within Algon. And that Algon also had strong capital markets relationships so that, to the extent we were able -- they were able to identify a tenant and tenant the property, that they could, through their capital markets relationships, find ways to finance the cost associated with that. And ultimately sell the property, once it had been leased up and improved.

IWA Dep. 128:13-22; *see also* Ex. D.

(2)     The Assignment at issue in this case is not an improper or fraudulent "exit strategy," and not a single witness provides testimony that the "'exit strategy' involved the formation of a new entity, RSD, to accept the Assignment."  But even if the Assignment was an "exit strategy," that would not have been considered a negative event, but rather a positive outcome.  An "exit strategy" is simply a disposition, and IWA views it as "the sale of a property."  IWA Dep. 142:4-8.  As Mr. Feltman further explained, IWA was always thinking about exit strategies because:

> IWA wasn't in the business of being a long-term owner of real estate. And generally in real estate the benefits, the economic benefits, are both cash flow during the term of ownership but also the residual value and benefiting ultimately from the sale of the property, appreciation of the property and residual value. So when we talk about exit, you know, we're really talking about disposition of a property at the end of its -- whatever its appropriate life cycle is based on maximizing value at that time.

IWA 30(b)(6) Dep. Tr. Vol. 2, 684:8-22, Mar. 17, 2023, cited portions of which are attached hereto as Exhibit E.

There was no exit strategy being considered before the Assignment, beyond leasing up and then selling the Property.  IWA Dep. 222:1-223:4.  In fact, IWA never had a disposition strategy, or "exit strategy" for the Property, and the Assignment was not in itself an "exit strategy."  *Id*. at 182:4–186:15.  Rather, "to the extent [the Assignment] was a disposition by IWA . . . it was just one step in what needed to occur to execute what we would think of as a disposition exit strategy, so that RSD could then sell the property and monetize the proceeds."

4

*Id*. at 186:8-15.  Thus, although an "exit strategy" would be a positive outcome, it has not been achieved.

(3)     Plaintiff simultaneously argues that the Transamerica Entities control RSD and that IWA is a fictional entity, and that IWA controls all major decisions of RSD.  Each of these arguments are patently false.  The RSD Operating Agreement clearly sets forth the obligations of the members of RSD, and Defendants have produced thousands of documents demonstrating that RSD is in possession of and controls the Property.  All of Plaintiff's manufactured claims as to control and sham entities are completely refuted by Mr. Feltman, who provided clear testimony about his intentions regarding the formation of RSD.  As Mr. Feltman testified, the intent was that RSD would lease up the Property with highly skilled experts, and then the Property would be sold when profitable.

IWA disputes that RSD has no individual ability to perform tenant obligations.  Indeed, there has been no tenant default for the last six years, so RSD is performing.  Yet as to funding, even if RSD has a limited or no ability to obtain funding, and even if IWA is currently the sole funding source, the Court has already said:  "What difference does that make? What does it matter? That's the question.  They're operating along.  They're an entity that's your ground tenant and where they go and how they get their funding as long as they're adequately capitalized today, what difference does it make?" Hr'g. Tr. 48:9-13.  The Court has made clear that further discovery about RSD's funding source is not relevant.

(4)     Neither IWA nor any of the Transamerica Entities has provided any inconsistent information to Plaintiff regarding any relationship among them, and Plaintiff is fully aware of any relationship between and among IWA, RSD and the Transamerica Entities.  At the outset of this case, IWA filed a disclosure stating that its sole member was RCC North America LLC, and

that IWA was a subsidiary of AEGON, N.V. (ECF-18)  IWA has further stated in interrogatory

responses that:

> IWA is an Iowa domestic corporation that was originally formed on December 12, 1980. Investors Warranty of America, Inc. was converted to Investors Warranty of America, LLC on September 21, 2015. The member of IWA is RCC North America LLC. RCC North America LLC is a Delaware limited liability company formed on February 26, 2002. RCC North America LLC's sole member is Transamerica Corporation. Transamerica Corporation is a Delaware corporation formed on August 15, 2003. The sole shareholder of Transamerica Corporation is the AEGON Trust, which is located in The Hague, The Netherlands. The AEGON Trust is owned by AEGON International B.V., which is owned by AEGON N.V., both of The Hague, The Netherlands.  AEGON N.V. is a publicly traded entity.

(ECF-333-7 at 3)  IWA's corporate witness was also questioned about the relationship of IWA to

the Transamerica Entities, and he confirmed that Transamerica Life Insurance Company shared

an upstream parent, Transamerica Company, but that IWA's immediate parent is RCC North

America, LLC.  IWA Dep. 96:14-20.

  (5) Plaintiff's statement that IWA intended to stop paying rent after the expiration of

a three-year statute of limitation period is no more than supposition and is not supported by any

evidence.  First, IWA is not the tenant under the Ground Lease, and it is RSD that has paid rent

for the last six years.  Second, both IWA and RSD have already refuted Plaintiff's allegations.

IWA's corporate witness testified that the Assignment was not done so IWA could avoid

responsibility for fulfilling any obligations under the Ground Lease.  IWA Dep. 127:8-15.

RSD's corporate witness testified that he understood that RSD would be funded "until we had a

successful resolution" which is the exact opposite of a belief that the parties orchestrated this

transaction as a walk away.  *See* Troy Taylor Dep. Tr., 179:6-8, April 6, 2023, cited portions of

which are attached hereto as Exhibit F.  Third, documents created contemporaneously with the

Assignment made clear that Defendants did not intend to walk away from any investment in the

asset, but instead that IWA would try something new if the joint venture did not work.  (*See*

Exhibit C)  Fourth, six years have passed, all ground rent has been paid, RSD has complied with the Ground Lease and there has never been any default.

2.  <u>The Court has decisively ruled that IWA's financial documents are not part of this case.</u>

Even if any of Plaintiff's above purported facts were true (and they are not), they are not relevant.  Again, the Court has already ruled that Plaintiff cannot obtain IWA's financial documents, which includes IWA's accounting records and any documents relating to any consolidation analysis.  "Period."  Hr'g Tr. 40: 21-22.

On February 8, 2023, Plaintiff filed a motion to compel against IWA for financial documents (ECF-261) and made the same arguments that it makes now.  Among the documents sought through that first motion were "[a]ll documents sufficient to identify amounts, sources and payment obligations on any debt in connection with the Property"; all "balance sheets, general ledgers, profit and loss statements, operating budgets, capital expenditure budgets and tax returns;" and "documents referencing or reflecting the valuation of [IWA's] interest in the Property".[3]

---

[3] The documents requested included:

> Document request No. 12 states in relevant part "[a]ll documents reflecting Your balance sheets, general ledger, profit and loss statements, operating budgets, capital expenditure budgets and tax returns."
> Document Request No. 13 states in relevant a part "[a]ll documents constituting, referencing, reflecting , or regarding the location (i.e. bank accounts) and sources of all funds in connection with the operation, maintenance, and payment of ground rent for the Property."
> Document Request No. 14 states in relevant part "[a]ll documents sufficient to identify amounts, sources and payment obligations on any debt in connection with the Property."
> Document Request No. 21 in relevant part states "[a]ll documents referencing or reflecting the valuation of Your interest in the Property."

7

IWA opposed that first motion to compel and demonstrated that IWA's financial documents are not relevant to this case because, *inter alia*, they cannot be a basis for any fraud claim when Plaintiff never before had a right to review or rely on them.  Furthermore, IWA argued that if the Court did invalidate the Assignment, then the Ground Lease would return to IWA and the status quo as it existed in 2016 would simply be restored.  When IWA was the tenant, Plaintiff had no ability to evaluate IWA's finances to determine whether IWA could perform under the Ground Lease, and Plaintiff had no ability to understand IWA's debts, assets or income.  IWA purchased the Property out of foreclosure after the Camalier family walked away without repaying a $30 million loan and Plaintiff had to accept IWA as the tenant regardless of its balance sheet.  The only circumstance where IWA's balance sheet may in the future become relevant would be if (i) IWA again became the tenant; (ii) IWA breached the Ground Lease; and (iii) Plaintiff then pursued default remedies under the Ground Lease against IWA.  That has not happened, and if it did, it would be a separate, future case.  To allow Plaintiff to pursue discovery against IWA based on default remedies under the Ground Lease when a default has never occurred is putting the cart way before the horse.  During the motions hearing on February 16, 2023, the Court agreed with IWA's arguments and the Court denied the motion to compel the financial documents in its entirety.

But in that same hearing, the Court went a step further when . it considered another motion to compel filed against IWA regarding requests for admissions, which included admissions relating to IWA's financial information (ECF-229).  Regarding those requests, the Court recognized the neither RSD nor IWA had defaulted under the Ground Lease, and therefore nothing had happened to open up any inquiry into IWA's finances.  Hr'g Tr. 45:21-22.  The Court then admonished both parties, stating:

The feel that I have about this case is there's a great desire, largely on plaintiff's side, but partly on defendants' side, let's probe everything we can about these guys that we have a deal with and make sure that there's no wiggle room now or in future with what they're going to do. That's just a sense I have about this. And this, you know, there was a ground lease in effect before the assignment. Could you have gone then and asked about IWA's financials at that point because why? Why would you? They hadn't done anything at that point before the assignment that was even questionable.  You're waiting for -- it's like any kind of contract between parties where suddenly you think hey, I'm not sure the other guy is going to perform here. Let's find out about their financials. I don't think that's quite how it works in the commercial world.

Hr'g. Tr. 29:5-19.

Here, the Court, in decisive and unequivocal terms, has already held that Plaintiff is not entitled to IWA's financial documents.  Seeking those same documents now from a different source does not change that the Court has already ruled that Plaintiff cannot have them. Accordingly, Plaintiff's subpoenas should be denied as they relate to any consolidation analysis, documents supporting a consolidation analysis, or any other financial records.

### B. IWA is Prejudiced by Plaintiff's Late Subpoenas

Plaintiff argues that the subpoenas do not create an undue burden or hardship for IWA, but ignores that the late subpoenas do prejudice IWA.  The parties have been litigating this case for over three years and have been engaged in discovery since December 2020.  Defendants completed their document productions in the Summer of 2021, and Defendants contend that Plaintiff has yet to complete its own productions.  Nevertheless, even without Plaintiff's full productions, Defendants deposed Plaintiff's corporate witness on April 16 and 17, 2023.  RSD's counsel specifically asked Plaintiff to identify all Jane Doe defendants and Plaintiff would not do so.  Plaintiff 30(b)(6) Dep. Tr., 333:1-336:3, March 21, 2023, cited portions of which are attached hereto as Exhibit G.  Now, Plaintiff is asking the Court to compel documents based on a theory that the Transamerica Entities "have been directly and materially involved in the conduct

at issue in this fraudulent conveyance action, and which very well may be the real parties in interest given their financial and operational control over IWA and [RSD]." This statement is completely inconsistent with the testimony of Plaintiff's corporate witness (not to mention case evidence). To countenance Plaintiff's new arguments after Plaintiff refused to answer questions on this very same topic during depositions will prejudice Defendants.[4] Accordingly, the Court can and should disregard these arguments and any attempt to obtain documents based on them. On this basis, Plaintiff's subpoenas should be denied.

### C. The Parties Did Confer Regarding the Motion to Quash

Although IWA denies that it was obligated to meet and confer before filing a motion to quash for a subpoena served on third parties, the parties did indeed meet and confer, and specifically discussed the motion to quash. *See* email correspondence dated June 29, 2023 from IWA's counsel to Plaintiff's counsel, attached hereto as Exhibit H. ("Katie, per our call today, I needed to file the motion to quash today because it involves third parties, but I am happy to agree to or enter into a stipulation extending the response time to be more consistent with the other briefing schedules we discussed today.")

### D. IWA Has Standing to Quash the Non-Party Subpoenas and is Entitled to a Protective Order

For purposes of establishing a personal right for purposes of quashing a subpoena, IWA need only show that it has only a "minimal or exceedingly small interest" in the information sought. *CineTel Films, Inc. v. Does 1-1,052*, 853 F. Supp. 2d 545, 554 (D. Md. 2012) (citing

---

[4] To be clear, Plaintiff is also not making any arguments based on any new information. Plaintiff had the SEC ruling when it filed the Complaint in June 2020. Plaintiff also has known IWA's corporate structure since 2020, and knew that IWA was an affiliate of the Transamerica Entities. Plaintiff has been aware of emails form accountants using an "@transamerica.com" email address since at least March 2021.

*Third Degree Films, Inc. v. Does 1-108*, No. DKC 11-3007, 2012 WL 669055, at *2 (D. M.d

Feb. 28, 2012).  Undoubtedly, IWA has a personal right in its own financial documents,

including any accounting documents or records shared with, or even consolidated with, a

subsidiary.  IWA also has a personal right in the enforcement of a Court order stating that IWA's

financial records, such as any documents relating to a consolidation analysis or disposition

strategy, are not to be produced.  IWA also has a personal right and interest in the treatment and

possible production of its proprietary business records.  Accordingly, IWA has standing to move

to quash the subpoenas.

For the same reasons as above, IWA is also entitled to a protective order ordering that

none of IWA's financial or business information be produced in response to the subpoenas.

## II.    <u>CONCLUSION</u>

For the reasons set forth herein, IWA request that the Court grant IWA's Motion to

Quash and deny Plaintiff's Motion to Compel against the Transamerica Entities.

Dated:  August 16, 2023                     Respectfully Submitted,

                                            ARNALL GOLDEN GREGORY LLP

                                            */s/Rebecca A. Davis*
                                            Rebecca A. Davis, Bar No. 23183
                                            Rebecca.davis@agg.com
                                            171 17th Street NE, Suite 2100
                                            Atlanta, Georgia 30363
                                            Telephone:  (404) 873-8768
                                            Facsimile:  (404) 873-8769

                                            Counsel for Defendant Investors Warranty
                                            of America, LLC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**Rock Spring Plaza II, LLC,**

          **Plaintiff,**

   **v.**

**Investors Warranty of America, LLC,**
**et al.,**

          **Defendants.**

**Civil Action No. 8:20-cv-01502-PJM**

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2023, I served the foregoing DEFENDANT INVESTORS WARRANTY OF AMERICA, LLC'S REPLY IN SUPPORT OF ITS MOTION TO QUASH NON-PARTY SUBPOENAS, OR IN THE ALTERNATIVE, MOTION FOR PROTECTIVE ORDER via the Court's CM/ECF system, which will automatically provide electronic service copies to all counsel of record.

Dated:  August 16, 2023         */s/Rebecca A. Davis*
                                      Rebecca A. Davis