Exhibit A



# Transcript of Troy Taylor

**Date:** April 6, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

181

1    A    If there were prospects and they
2  could get a deal done, they wouldn't have
3  brought us in.  Did I know that basically
4  that this was an asset that had issues?
5  Yes.
6    Q    But my question is specific.
7        Did you understand at the time you
8  were negotiating this transaction with Mr.
9  Feltman that there were no prospects for the
10 sale of this ground lease?
11   A    Not specifically.
12   Q    Did you understand from Mr. Feltman
13 whether there were any prospects for leasing
14 up the building?
15   A    Not specifically.
16   Q    Were you aware that there had been
17 efforts by IWA to sell the ground lease?
18   A    I was not.
19   Q    When was the first you learned of
20 that?
21   A    From the brokers.
22   Q    From the brokers.  Which brokers?

182

1    A    The C.B. Richards brokers that we
2  visited with that grilled us.
3    Q    Was that Mr. Hood?
4    A    No.  That was --
5    Q    Mr. Cahill?
6    A    Mr. Cahill.
7    Q    And Mr. Silverberg?
8    A    Yes.
9    Q    When do you recall meeting with Mr.
10 Cahill and Mr. Silverman?
11   A    Probably two to three weeks after
12 the assignment.  Sometime probably
13 mid-September-ish.  Maybe.
14       Right after the lease, I flew up --
15 and I don't remember if Paul flew up or Joe
16 flew down from Philly -- and we met with
17 them at the project and they had been the
18 leasing brokers for IWA.
19       They took us around, showed us some
20 of the competitive buildings and also spent
21 several hours grilling us on kind of who we
22 were and our intentions and things like

183

1  that.
2        And I think from them we gleaned
3  that some previous group had been offered or
4  asked for a payment from IWA to do a
5  transaction and that was the first we
6  learned that there had been some discussions
7  with some -- some party like that.
8    Q    You said that the brokers were
9  grilling you as to who we were, meaning you
10 and Paul?
11   A    Yes.
12   Q    And what do you recall telling
13 them?
14   A    I think we gave them our business
15 cards.  We told him we're the managing
16 member.
17       The thing that struck us as odd,
18 leasing brokers are incredible relationship
19 type guys.  They know the marketplace, they
20 know all the players, and in the good old
21 days you'd say they were good old boys and
22 days drink beer and play golf.  The level of

184

1  questions and specificity they were asking
2  us was sort of like we were sitting in
3  almost like in a deposition.  And candidly,
4  it made Mr. Rubin and I think that basically
5  someone -- I don't know if it was Mr.
6  Camalier or someone from your law firm --
7  almost that they had been fed, you know, get
8  the answers to these six questions.
9        And I remember when we left and we
10 looked at each other and we said "wow."
11   Q    What were the six questions?
12   A    Who are you?  What's your
13 intention?  What's your capitalization?
14 Exactly what percentage do you own?
15       And just really in-depth questions
16 beyond that, which I don't remember now, but
17 at a level of sophistication that candidly,
18 in my 25 years of experience, a typical
19 leasing broker doesn't remotely know to ask.
20   Q    A typical, beer-drinking leasing
21 broker?
22       MS. KROPF:  Objection as to

185

1      form.
2  BY MR. BOSCH:
3      Q     So did you have any experience with
4  Mr. Cahill --
5      A     I had not, and he may -- this may
6  have been the exception to the rule and
7  these guys may have been, you know, a bunch
8  of University of Virginia graduates that
9  were uber sophisticated and that -- and we
10 made an error, but basically my experience
11 was that leasing brokers with the level of
12 questions they were asking was very odd.
13     Q     Did you answer any of their
14 questions?
15     A     I'm sure we answered some.
16           I think I heard the testimony of
17 one of them who seemed to have substantially
18 incorrect remembrance of our discussion.  He
19 said that we said we were subtenants.  I
20 don't know where he could have gotten that
21 concept from.
22           We did tour with them and we looked

186

1  at several other buildings and it made us
2  understand that basically our building
3  wasn't the top candidate necessarily in the
4  marketplace.  You know, we had issues with
5  the lobby, we weren't near any kind of
6  walking distance to places to get lunch.
7           And you know, it helped us
8  understand exactly what we had, which was
9  helpful.
10     Q     After the fact that you had already
11 had it?
12     A     Which is the case of every
13 situation we've been involved with for 20
14 years, no different.
15     Q     Because you are typically
16 restructuring advisers, right?
17     A     We're typically advisers and -- we
18 looked at this as a situation to accommodate
19 IWA that this was the structure that they
20 wanted to do and that basically as long as
21 it was legal and ethical, we were happy to
22 accommodate their structure.

187

1      Q     At the time you met with Mr. Cahill
2  of CBRE, you understood that CBRE had
3  previously worked with IWA as a broker?
4      A     Yes, sir, I did.
5      Q     Did you disclose to Mr. Cahill that
6  IWA remained involved with this property?
7      A     I don't remember if that came up
8  but there would be no reason to specifically
9  tell him.  And especially once they started
10 grilling us, you know, again, this was a
11 very -- brokers are brokers.  Brokers tend
12 to want to be friendly and
13 relationship-oriented, and this was anything
14 but.
15           This was a -- it was almost like
16 they were reading from a script:  "Please
17 tell us X, Y and Z and A, B, C."
18           So there was necessarily no reason
19 to tell them that.
20     Q     But you knew these were experienced
21 brokers that had already worked with IWA to
22 lease up this building?

188

1      A     So what?
2      Q     And you understood they were asking
3  "who are you" to figure out are you a
4  credible --
5      A     No, they were asking --
6           MS. KROPF:  Let him finish.
7      Q     So to try to figure out who you
8  are?
9           MS. KROPF:  Objection as to
10 form.
11     A     That's a possibility.
12 BY MR. BOSCH:
13     Q     And so when you were asked "who you
14 are," you don't recall telling them that "I
15 am the managing member of RSD"?
16     A     I'm sure I told them that.
17     Q     And you didn't recall telling them
18 that "Oh, IWA, the entity that you'd
19 previously been working with is that -- also
20 has an interest in RSD"?
21           MS. KROPF:  Objection as to
22 form.

# Exhibit B

**To:** Camalier, Charles A.[ccamalier@wilkesartis.com]; Jody Rice (jody.rice@rsplimited.com)[jody.rice@rsplimited.com]
**Cc:** Thau, Larry @ Bethesda[Larry.Thau@cbre.com]; Cahill, Jim @ Bethesda[Jim.Cahill@cbre.com]; Silverberg, Steve @ Bethesda[Steve.Silverberg@cbre.com]
**From:** Stabb, Alden @ Bethesda[Alden.Stabb@cbre.com]
**Sent:** Tue 2/6/2018 6:04:30 PM Eastern Standard Time
**Subject:** RE: 6610 & 6560 Follow Up

Chris and Jody,

Contacts for Total Wine & More:

Tom Haubenstricker - CFO
thaubenstricker@totalwineandmore.com

Deborah Kasmir – Director of Facilities Management
dkasmir@totalwineandmore.com

We do not have their direct dials, however, the main number for their corporate office in Rock Spring Park is **(301) 795-1000** and the dial by name directory is
extension **"3"**. Just say their names when you are prompted and it will automatically connect you to their direct dial.

Best Regards,
Alden

Alden Stabb | Associate
CBRE | Advisory & Transaction Services
7501 Wisconsin Avenue | Suite 820E | Bethesda, MD 20814
T +1 301 215 4126 | F +1 301 654 7848 | C +1 301 785 8985
alden.stabb@cbre.com | www.cbre.com/alden.stabb

Follow CBRE: Facebook | @cbre | Google+

Please consider the environment before printing this email.

This message and any attachments may be privileged, confidential or proprietary. If you are not the intended recipient of this email or believe that you have received this correspondence in error, please contact the sender through
the information provided above and permanently delete this message.

**From:** Silverberg, Steve @ Bethesda
**Sent:** Tuesday, February 06, 2018 3:58 PM
**To:** Camalier, Charles A. <ccamalier@wilkesartis.com>; Jody Rice (jody.rice@rsplimited.com) <jody.rice@rsplimited.com>
**Cc:** Thau, Larry @ Bethesda <Larry.Thau@cbre.com>; Cahill, Jim @ Bethesda <Jim.Cahill@cbre.com>; Stabb, Alden @ Bethesda <Alden.Stabb@cbre.com>
**Subject:** 6610 & 6560 Follow Up

| **Koluch, Nick**<br>Aegon USA Realty Advisors, LLC<br>Vice President<br><br>(212) 953-6230 Work<br>847) 542-3783 Mobile<br>nkoluch@aegonusa.com<br>90 Park Avenue, 28th Floor<br>New York, NY 10016 | **Paul Rubin**<br>Algon Group<br><br>(215) 370-3716 Mobile<br>prubin@algongroup.com<br>www.algongroup.com | **Troy Taylor**<br>Algon Group<br><br>(404) 423-8098 Mobile<br>troy@algongroup.com |
| --- | --- | --- |

1. Requested contact info above for AEGON and Algon
2. Marriott parking requirement is 100 spaces now and may need up to 200 total at some point

We are working on getting you the additional info we discussed.

Steven Silverberg | First Vice President
CBRE | Brokerage Services
7501 Wisconsin Avenue, Suite 820E | Bethesda, MD 20814
T 301 215 4122 | C 240 447 6515
steve.silverberg@cbre.com | www.cbre.com

Please consider the environment before printing this email.

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended
recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete this transmission. Delivery of this message is
not intended to waive any applicable privileges.

Exhibit C

| Date: | Fri, 13 Oct 2017 10:25:20 AM -0400 |
| Sent: | Fri, 13 Oct 2017 10:25:16 AM -0400 |
| Subject: | RE: Request for proof of tax payment |
| From: | Cyndi Kunze <Cyndi@rsplimited.com> |
| To: | prubin@algongroup.com; |
| CC: | Diggs, Lady @ Washington DC <Lady.Diggs@cbre.com >; Dow, Valerie @ Washington DC <Valerie.Dow@cbre.com >; |
| Attachments: | SKMBT_C364e17100215141.pdf |

Good morning,

We are still looking for the request for proof of payment on Montgomery County property tax per the attached. Please provide so we can meet our lender request.

Best Regards,

Cyndi

---

**From:** Cyndi Kunze
**Sent:** Friday, October 06, 2017 8:53 AM
**To:** 'prubin@algongroup.com'  <prubin@algongroup.com>
**Cc:** 'Diggs, Lady @ Washington DC' <Lady.Diggs@cbre.com >; Dow, Valerie @ Washington DC <Valerie.Dow@cbre.com>
**Subject:** RE: Request for proof of tax payment

Yes, this is for 6560 Rock Spring Drive.

Thank you!

Cyndi

---

**From:** Diggs, Lady @ Washington DC [mailto:Lady.Diggs@cbre.com ]
**Sent:** Friday, October 06, 2017 8:40 AM
**To:** Cyndi Kunze <Cyndi@rsplimited.com >; Dow, Valerie @ Washington DC <Valerie.Dow@cbre.com >
**Subject:** RE: Request for proof of tax payment

Hi Cyndi,

I was trying to figure out which property this is for but it does not state the information on the letter.  If it is for 6560 Rock Spring, it can be sent to Paul Rubin at prubin@algongroup.com .

Thanks,

Lady Diggs | REM
CBRE, Inc | Asset Services
T +1 202 585 5501 | C +1 703 400 9893

---

**From:** Cyndi Kunze [mailto:Cyndi@rsplimited.com ]
**Sent:** Thursday, October 05, 2017 11:37 AM
**To:** Diggs, Lady @ Washington DC <Lady.Diggs@cbre.com >; Dow, Valerie @ Washington DC <Valerie.Dow@cbre.com >
**Subject:** RE: Request for proof of tax payment

Good morning, Lady.

RSD-012894

Just circling back on this request. Do you know who might be best able to assist us with this?

Thanks,
Cyndi

---

**From:** Cyndi Kunze
**Sent:** Monday, October 02, 2017 4:18 PM
**To:** Diggs, Lady @ Washington DC <Lady.Diggs@cbre.com>; Dow, Valerie @ Washington DC (Valerie.Dow@cbre.com) <Valerie.Dow@cbre.com>
**Subject:** Request for proof of tax payment

Good afternoon!

I am hoping you might be able to help us with the attached request for proof of payment on Montgomery County property tax. Please let me know if this is something you can help with or if you know who might be able to assist.

Thank you,

Cyndi Kunze
Rock Spring Properties
6500 Rock Spring Drive, Suite Five
Bethesda, MD  20817
Office:  (301) 564-1500

RSD-012895

Exhibit D

**To:** Jody Rice (jody.rice@rsplimited.com)[jody.rice@rsplimited.com]; Camalier, Charles A.[ccamalier@wilkesartis.com]
**Cc:** Silverberg, Steve @ Bethesda[Steve.Silverberg@cbre.com]
**From:** Cahill, Jim @ Bethesda[Jim.Cahill@cbre.com]
**Sent:** Tue 1/30/2018 2:36:22 PM Eastern Standard Time
**Subject:** FW: GSA Update

Here is the update on GSA , (1) 6610 is OASH  have a offer from us balls in their court      (2)    Be nice to figure out how we can respond to 6560 ,( waiting on RFP) ,   because we don't believe Aegon/Algon is capable of responding

James G. Cahill | Senior Vice President
CBRE | Brokerage
7501 Wisconsin Avenue | Suite 820E | Bethesda, Maryland 20814
T +1 301 215 4111 | F +1 301 654 7848 | C +1 301 943 2843
jim.cahill@cbre.com

Follow CBRE: Facebook | @cbre | Google+
........................................................................................................................................................................
Please consider the environment before printing this email.

This message and any attachments may be privileged, confidential or proprietary. If you are not the intended recipient of this email or believe that you have received this correspondence in error, please contact the sender through the information provided above and permanently delete this message.

The 90,000 footer is OASH (Office of Assistant to the Secretary of Health) and GSA is claiming it still intends to award to whomever submitted the lowest bid in their initial offer back in September but I gotta think they will ask for another round of bidding due to so much time elapsing.

The 190,000 footer is the consolidation that was advertised and we responded to for 6560.  Its been the Governments intention from the get go to not start that procurement until March or even April.  They needed to advertise before the end of the last fiscal year in order to keep the funding for the deal but they were not ready to actually start the procurement then.

Camalier0004830

Exhibit E

To: Camalier, Charles A.[ccamalier@wilkesartis.com]; Cahill, Jim @ Bethesda[Jim.Cahill@cbre.com]
Cc: Hood, Paul @ Fed Gov Leasing[Paul.Hood@cbre.com]; Thau, Larry @ Bethesda[Larry.Thau@cbre.com]; Stabb, Alden @ Bethesda[Alden.Stabb@cbre.com]; Jody Rice [jody.rice@rsplimited.com]
From: Silverberg, Steve @ Bethesda[Steve.Silverberg@cbre.com]
Sent: Mon 2/5/2018 5:48:04 PM Eastern Standard Time
Subject: RE: Can we do 215 for a call , I send out a call in
Attachment: Conf Call 2.6.18.pdf

_____

Discussion items (active tenants) attached for tomorrow's call

Steven Silverberg | First Vice President
CBRE | Brokerage Services
7501 Wisconsin Avenue, Suite 820E | Bethesda, MD 20814
T 301 215 4122 | C 240 447 6515
steve.silverberg@cbre.com | www.cbre.com


Please consider the environment before printing this email.
This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable privileges.

-----Original Message-----
From: Camalier, Charles A. [mailto:ccamalier@wilkesartis.com]
Sent: Monday, February 05, 2018 4:33 PM
To: Cahill, Jim @ Bethesda <Jim.Cahill@cbre.com>
Cc: Silverberg, Steve @ Bethesda <Steve.Silverberg@cbre.com>; Hood, Paul @ Fed Gov Leasing <Paul.Hood@cbre.com>; Thau, Larry @ Bethesda <Larry.Thau@cbre.com>; Stabb, Alden @ Bethesda <Alden.Stabb@cbre.com>; Jody Rice <jody.rice@rsplimited.com>
Subject: Re: Can we do 215 for a call , I send out a call in

2:15 good can you also include Jody on call thx

Charles A. Camalier

> On Feb 5, 2018, at 4:07 PM, Cahill, Jim @ Bethesda <Jim.Cahill@cbre.com> wrote:
>
>
>
> _____
> From: Camalier, Charles A. [mailto:ccamalier@wilkesartis.com]
> Sent: Monday, February 05, 2018 3:42 PM
> To: Cahill, Jim @ Bethesda
> <Jim.Cahill@cbre.com<mailto:Jim.Cahill@cbre.com>>; Silverberg, Steve @
> Bethesda
> <Steve.Silverberg@cbre.com<mailto:Steve.Silverberg@cbre.com>>; Hood,
> Paul @ Fed Gov Leasing
> <Paul.Hood@cbre.com<mailto:Paul.Hood@cbre.com>>; Thau, Larry @
> Bethesda <Larry.Thau@cbre.com<mailto:Larry.Thau@cbre.com>>
> Subject: RE: Can we do 215 for a call , I send out a call in
>
> Can you send me a copy of our proposal to 3M and their response  thx
>
> From: Cahill, Jim @ Bethesda [mailto:Jim.Cahill@cbre.com]
> Sent: Monday, February 05, 2018 2:40 PM
> To: Camalier, Charles A.; Silverberg, Steve @ Bethesda; Hood, Paul @
> Fed Gov Leasing; Thau, Larry @ Bethesda
> Subject: Can we do 215 for a call , I send out a call in
>
> 330 could work also but would be in my car
>
> James G. Cahill | Senior Vice President CBRE | Brokerage
> 7501 Wisconsin Avenue | Suite 820E | Bethesda, Maryland 20814 T +1 301
> 215 4111 | F +1 301 654 7848 | C +1 301 943 2843
> jim.cahill@cbre.com<mailto:terri.fenwick@cbre.com>
>
>
> Follow CBRE:
> Facebook<https://urldefense.proofpoint.com/v2/url?u=https-3A__www.face
> book.com_pages_CBRE_85277065893&d=DwMF-g&c=jozbAXBGpZCeJmn-Q9SThA&r=Ue
> fAFgYbgYnYHXBTqpzKwDEb7v8ikzfchu8WZHh3MkE&m=n6T7NQrGh2F_HUYpasrABOic4g
> jJQ1kIgDwlzQr49i4&s=W9TDkCmBHQjLc4ZRGCMNrcMRNL4scUONRi4uPRct-RQ&e=> |
> @cbre<https://urldefense.proofpoint.com/v2/url?u=https-3A__twitter.com
> _cbre&d=DwMF-g&c=jozbAXBGpZCeJmn-Q9SThA&r=UefAFgYbgYnYHXBTqpzKwDEb7v8i
> kzfchu8WZHh3MkE&m=n6T7NQrGh2F_HUYpasrABOic4gjJQ1kIgDwlzQr49i4&s=AnXyNt
> vTgir-cddyVnM8HrM-VwOFu4Xw8tAYrjZ_4sY&e=> |
> Google+<https://urldefense.proofpoint.com/v2/url?u=https-3A__plus.goog
> le.com_110640413332542089478&d=DwMF-g&c=jozbAXBGpZCeJmn-Q9SThA&r=UefAF
> gYbgYnYHXBTqpzKwDEb7v8ikzfchu8WZHh3MkE&m=n6T7NQrGh2F_HUYpasrABOic4gjJQ
> 1kIgDwlzQr49i4&s=AkJU9-STQ-6ool-er3ubT6Kc_aulvnvRdFPs-CWjg8c&e=>
> _____

Camalier0004831

>
> Please consider the environment before printing this email.
>
> This message and any attachments may be privileged, confidential or proprietary. If you are not the intended recipient of this email or believe that you have received this
correspondence in error, please contact the sender through the information provided above and permanently delete this message.
>
> The information transmitted is intended only for the person to whom or entity to which it is addressed and may contain confidential and/or privileged material. Any review,
retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient, or an
employee of agent responsible for delivering this message to the intended recipient, is prohibited. If you received this in error, please contact the sender and then delete
and destroy all copies of the material. Thank you.
> <meeting.ics>
The information transmitted is intended only for the person to whom or entity to which it is addressed and may contain confidential and/or privileged material. Any review,
retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient, or an
employee of agent responsible for delivering this message to the intended recipient, is prohibited. If you received this in error, please contact the sender and then delete
and destroy all copies of the material. Thank you.

Camalier0004832

Exhibit F

# Arnold & Porter

William M. Bosch
+1 202.942.5501 Direct
William.Bosch@arnoldporter.com

February 22, 2018

<u>*Via Federal Express*</u>

Robert W. Barron, Esq.
Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301

> *Re:*   **Amended and Restated Ground Lease Indenture dated November 14, 1990 (the "Ground Lease") between Anne D. Camalier ("Landlord") and Investors Warranty of America, LLC (formerly known as Investors Warranty of America, Inc.), as successor-in-interest to Rock Spring II Limited Partnership ("Tenant")**

Dear Mr. Barron:

I am writing on behalf of the Landlord in connection with the above-referenced Ground Lease for the property located at 6560 Rockledge Drive, Bethesda, Maryland (the "Property"). It has been almost six months since we last communicated, and we have heard nothing further about your client's identity or intentions for the Property. Landlord is growing increasingly concerned about the financial and structural viability of the Property, given that there evidently is and has been no commercial activity there.

As you may recall, I contacted you by telephone in September 2017 following Landlord's receipt of notice from the above-referenced Tenant, dated August 31, 2017. That notice, a copy of which is attached to this letter, advised that Tenant's interest in the Ground Lease had been assigned to and assumed by Rock Springs Drive, LLC, a Maryland limited liability company (the "Assignee"). Because you were identified as the point of contact for Assignee, I reached out to inquire as to the identity and intentions of the Assignee.

You agreed to contact your clients about brokering an introduction. In the interim, you requested that I identify a point of contact with the Ground Lessor and confirmation of identity, which I did by letter dated September 29, 2017 (also attached). Since then, we have received no further communication from you, from Assignee or from Tenant. Nor have we been able to confirm that the assignment of the Ground Lease was recorded in the land records of Montgomery County, Maryland, much less that recordation taxes have been paid. Furthermore, there has been no business activity at the Property (as noted) since notice of the assignment was provided approximately six (6) months ago.

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW | Washington, DC  20001-3743 | www.arnoldporter.com

Camalier0000964

# Arnold & Porter

Robert W. Barron, Esq.
February 22, 2018
Page 2

The lack of communication and activity from Assignee is giving Landlord reasonable insecurity with respect to Assignee's ability to perform under the Ground Lease, including without limitation its financial ability to pay rent, taxes, insurance, utilities, and to maintain the Property in first class operating condition and repair. In addition, there is a genuine and realistic concern about waste; we understand, for example, that substantial roof repairs may be necessary.

Landlord's concerns are driven not just by business considerations, but also by important legal issues that warrant your cooperation. By way of illustration, the identity of the members of Rock Springs Drive, LLC is essential for Landlord to comply with OFAC regulations, *see* 31 C.F.R. parts 500–599, the USA Patriot Act, Public Law 105-56, 115 Stat. 272 (2001), and various Executive Orders and other laws that place restrictions on Landlord's dealings with certain entities. *See* Ground Lease Section 5.3 (requiring Tenant to perform and comply with all laws, rules, orders, ordinances, regulations, and requirements). Given the location of this Property proximate to government facilities and across the street from a school, we trust that you will appreciate Landlord's sensitivity to this issue.

Accordingly, Landlord has asked me to follow-up with a second request for information as to Assignee's identity and intentions. Landlord also has indicated willingness to meet in person with the principals of Assignee to discuss how best to advance their mutual interests with respect to the Ground Lease and the Property. That meeting can take place in Florida if more convenient.

Thank you in advance for your cooperation and anticipated reply.

Sincerely,

William M. Bosch

Attachments

Camalier0000965

Exhibit G

| | |
|---|---|
| **Date:** | Tue, 17 Apr 2018 10:30:23 AM -0400 |
| **Subject:** | RE: 019060045 - Spring Rock II - Insurance |
| **From:** | prubin@algongroup.com |
| **To:** | 'Cyndi Kunze' <Cyndi@rsplimited.com>; |
| **Attachments:** | BI - COI.pdf |

Good morning Cyndi,

Yes you found the right person.
I believe this is what you are looking for – the insurance cert for the UST & BI. Let me know.


Paul F. Rubin
Longshore Ventures LLC
Cell: 215-570-8716


**From:** Cyndi Kunze <Cyndi@rsplimited.com>
**Sent:** Tuesday, April 17, 2018 9:13 AM
**To:** prubin@algongroup.com
**Subject:** FW: 019060045 - Spring Rock II - Insurance

Good morning.

We have been given your name as the new entity that will be able to help us obtain a new insurance certificate (see attached for prior year). Please let me know if someone there can help us.

Kind Regards,

Cyndi Kunze
Rock Spring Properties
6500 Rock Spring Drive, Suite Five
Bethesda, MD 20817
Office: (301) 564-1500



**From:** Christine Hines [mailto:christine.hines@essexfs.com]
**Sent:** Monday, April 16, 2018 6:11 PM
**To:** Cyndi Kunze <Cyndi@rsplimited.com>; Shona Parker <shona@rsplimited.com>; Jody Rice <jody.rice@rsplimited.com>
**Subject:** 019060045 - Spring Rock II - Insurance

Hello,

We have been trying to get the renewed insurance for the attached on the above mentioned loan but have been unable to get a renewed certificate. Would you be able to provide a renewed certificate at your earliest convenience? Please let me know if you have any questions.

Thank you,


Christine Hines
Portfolio Manager

**Essex Financial Services LLC**

RSD-015365

621 17th Street, Suite 2405
Denver, CO 80293
Telephone  720.361.4157
Fax  303.796.0623

christine.hines@essexfs.com

RSD-015366

Exhibit H

# Arnold&Porter

William M. Bosch
+1 202.942.5501 Direct
William.Bosch@arnoldporter.com

April 25, 2018

*Via Federal Express*

Robert W. Barron, Esq.
Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL 33301

Re:   **Amended and Restated Ground Lease Indenture dated November 14,
1990 (the "Ground Lease") between Anne D. Camalier ("Landlord")
and Investors Warranty of America, LLC (formerly known as
Investors Warranty of America, Inc.), as successor-in-interest to Rock
Spring II Limited Partnership**

Dear Mr. Barron:

I write in response to your letter of March 30, 2018 regarding the above-
referenced Ground Lease. As you know, my client has been trying to arrange a meeting
with principals of your client, Rock Spring Drive, LLC (the "Assignee"), for several
months now to discuss how best to advance their mutual interests with respect to the
building located at 6560 Rock Spring Drive (the "Building"). My client has also
requested basic contact information for Assignee, including a point of contact with whom
my client can discuss day-to-day operational issues concerning the Building.

We previously provided such contact information for Landlord, at your request,
by letter dated September 29, 2017. However, as you know, Assignee has yet to provide
similar information, for reasons that are unclear to Landlord and which cause Landlord
further concern. Landlord is not presently asserting any defaults, and had no intention of
creating legal issues with your client when it made what we believed to be a reasonable
request. However, there is some appearance of furtiveness on your client's part, perhaps
unintentional, which now is raising concerns as to the legitimacy of the professed
"assignment" by the prior tenant. In this regard, we note that Montgomery County's tax
records indicate that property tax bills are still going to Investors Warranty of America
(*i.e.*, the taxpayer dating back to 2013). Kindly confirm that the Assignee is affiliated

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW  |  Washington, DC  20001-3743  |  www.arnoldporter.com

Camalier0000984

# Arnold & Porter

Robert W. Barron, Esq.
April 25, 2018
Page 2

with Investors Warranty of America.  We trust you will endeavor to clear this up in short order.

In anticipation of receiving a more fulsome and forthcoming reply to Landlord's reasonable request, I would like to correct some of the insinuations raised in your recent letter.  Specifically, you state that Assignee is reluctant to provide "additional information regarding the [Assignee's] strategic and proprietary commercial activity and business plans with respect to the property demised by the Ground Lease," but this misunderstands Landlord's request.  Landlord is not asking Assignee to provide information regarding its "strategic and proprietary commercial activity"; it is simply asking Assignee to provide basic identifying information, including the name of a principal of Rock Spring Drive, LLC who understands what is happening operationally at the Building.  We do not understand why Assignee is unwilling to provide this basic contact information, which is not proprietary, to Landlord.

You also note Landlord's "other commercial office buildings in the market area" and the importance to Assignee of "keep[ing] confidential its proprietary business information and its business plans with respect to the Building," but I can assure you that Landlord has no interest in learning Assignee's proprietary information to gain some competitive advantage over Assignee.  Landlord's sole interest is in seeing that the Building on the land that Landlord owns is put to a productive use and does not continue to lie vacant, an interest that Assignee presumably shares.

To that end, it strikes us as unreasonable that your client would refuse a friendly invitation to meet.  If it is forced to seek information and other reporting to which Landlord is entitled under the Ground Lease, it will do so—but standard practice is for landlords and tenants to establish less formal communications to address operational issues.  It certainly is unusual for a tenant to insist that all such inquiries be directed through outside legal counsel located hundreds of miles away from the property.  Furthermore, as an owner of other commercial office buildings in the area, Landlord regularly receives requests for proposals from potential subtenants, including subtenants who are seeking to occupy several office buildings.  Assuming your client is legitimately engaged in commercial activity at the Building, it would be in both parties' interests to be able to discuss these potential opportunities as they arise.  Indeed, given that your client admittedly has not engaged a broker, it is even more disconcerting that your client would be unwilling to meet to discuss potential business opportunities for a vacant Building.

In addition, as noted in my prior letter, Landlord also has obligations to ensure that it is not transacting with an entity owned or controlled by certain prohibited individuals or entities under U.S. trade-sanction laws administered by OFAC, including

Camalier0000985

# Arnold&Porter

Robert W. Barron, Esq.
April 25, 2018
Page 3

the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1707, and the
Trading with the Enemy Act, 12 U.S.C. §§ 95a–95b & 50 U.S.C. App. §§ 1–44. These
would include individuals or entities appearing on OFAC's Specially Designated
Nationals And Blocked Persons List, as well as citizens of Cuba, Iran, North Korea,
Syria, and other countries subject to comprehensive territorial sanctions. Landlord again
requests that you confirm that neither Assignee, nor its owners or investors, nor any of
their respective officers, directors, members, partners, or managers appears on any OFAC
sanctions list or is a citizen of any of the countries identified above.

Finally, you asked that Landlord provide legal authority for the proposition that
an assignment of a commercial lease be recorded in the land records of the county in
which the leasehold estate is located. Section 3-101 of Maryland's Real Property Code
provides that "no estate of inheritance or freehold, declaration or limitation of use, estate
above seven years, or deed may pass or take effect unless the deed granting it is executed
*and recorded*." Md. Code Ann., Real Prop. § 3-101(a) (emphasis added). The Maryland
Court of Appeals has long held that this language "appl[ies] with equal force to
assignments of leases of more than seven years." *Rubin v. Leosatis*, 166 A. 428, 430
(Md. 1933). The proper jurisdiction for recording the assignment is "in the county where
the land affected by the deed or instrument lies." Md. Code Ann., Real Prop. § 3-103.
Accordingly, under Maryland Code §§ 3-101 & 3-103, it is our understanding that the
assignment of the Ground Lease should have been recorded in the land records of
Montgomery County.

For the reasons explained above, Landlord repeats its request for the identity of a
point-of-contact with Assignee whom Landlord may contact to discuss, among other
things, operational issues at the Building. Landlord also remains willing to meet with
principals of Assignee in-person wherever is convenient, including in Florida. Landlord
reserves all rights.

Sincerely,

William M. Bosch

Camalier0000986

Exhibit I

# Arnold & Porter

William M. Bosch
+1 202.942.5501 Direct
William.Bosch@arnoldporter.com

June 6, 2019

_**Via Federal Express**_

Robert W. Barron, Esq.
Berger Singerman
350 East Las Olas Boulevard
Suite 1000
Fort Lauderdale, FL  33301

Re:   **Amended and Restated Ground Lease Indenture dated November 14,
1990 (the "Ground Lease") between Anne D. Camalier ("Landlord")
and Investors Warranty of America, LLC (formerly known as
Investors Warranty of America, Inc.), as successor-in-interest to Rock
Spring II Limited Partnership ("Tenant")**

Dear Mr. Barron:

I am writing on behalf of the Landlord in connection with the above-referenced
Ground Lease for the property located at 6560 Rockledge Drive, Bethesda, Maryland (the
"Property").  I have written to you three times previously, most recently on April 25,
2018, requesting basic and essential information concerning the Tenant.  You have
materially ignored Landlord's requests, including its request for innocuous information
such as the name of a contact person who can discuss day-to-day operational issues
concerning the Property.  Tenant also repeatedly has ignored Landlord's requests to meet.

In the intervening 13 months since my last correspondence, Landlord has seen no
evidence of commercial activity at the Property.  Landlord continues to have serious
concerns about deferred maintenance and waste.  Tenant's activities, or lack thereof, beg
the question of abandonment, and create uncertainty concerning Tenant's ability to
continue to meet its financial obligations under the Ground Lease during the remainder of
the Term.

Having waited patiently for any signs of commercial activity, much less some
transparency into who the Tenant is and its ability to meet its financial obligations under
the Ground Lease, Landlord's patience has run out.  We're prepared to give the Tenant
the opportunity to avoid burdening the courts, and to that end propose the following:

It has come to our attention that the GSA has expressed interest in a long term
lease that seemingly would be an excellent and appropriate commercial use. Landlord is
prepared to engage in business discussions with Tenant that would allow the parties to

Camalier0004027

# Arnold & Porter

Robert W. Barron, Esq.
June 6, 2019
Page 2

jointly pursue discussions directly with the GSA which, if successful, would provide a basis for discussing modifications to the Ground Lease.

If we cannot get Tenant to engage with us promptly (that is, within a week) in pursuing this commercially sensible approach to the GSA, we will have no choice left but to challenge the assignment. We have about a year left before we need to tee that up for the court, but we're prepared to do that sooner rather than later now that it's becoming more apparent that Transamerica is trying to hide behind you, your law firm, and what increasingly appears to be a fraudulent conveyance.

Thank you in advance for your cooperation and anticipated reply. Landlord reserves all of its rights and remedies.

Sincerely,

William M. Bosch

Camalier0004028

Exhibit J

Case 8:20-cv-01502-PJM Document 343-2 Filed 09/22/23 Page 29 of 42
30(b)(6) Rock Spring Plaza II, LLC March 21, 2023
Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC

Page 1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2                   CIVIL DIVISION
3          Civil Action No:  8:20-cv-01502-PJM
4
     ROCK SPRING PLAZA II, LLC,
5
                Plaintiff,
6
     vs.
7
     INVESTORS WARRANTY OF AMERICA, LLC,
8    et al.,
9               Defendants.
10   _____
11
12
13      VOLUME I - 30(b)(6) VIDEOTAPE DEPOSITION OF
                 ROCK SPRING PLAZA II, LLC,
14                CHARLES A. CAMALIER, III
15
16
                 Tuesday, March 21, 2023
17               8:55 a.m. to 5:48 p.m.
18
19
20
                Stenographically reported by:
21                 Shauna T. Dietel, RPR
                Registered Professional Reporter
22
23
24
25

30(b)(6) Rock Spring Plaza II, LLC                                    March 21, 2023
Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC

Page 114

1     A   I don't recall that.
2     Q   If you had done that, would it be in your
3   records?
4     A   I believe so.
5     Q   And would have produced it in this
6   litigation?
7     A   If we had it in our records, we would have
8   produced it.
9     Q   Did Plaintiff ever write a letter to IWA
10  saying that Plaintiff did not consent to the
11  assignment?
12    A   I don't recall.
13    Q   And if you -- if you had done it, it would
14  be in your records, right?
15    A   I believe so, yes.
16    Q   And you would have produced that during
17  this litigation, right?
18    A   If it was subject to discovery, we would
19  have produced it.
20    Q   Well.  That would be relevant here, right,
21  if Plaintiff had sent a letter to IWA not consenting
22  to the assignment?
23        MR. BOSCH:  Objection to form.
24    A   I would suppose so.
25    Q   (BY MS. KROPF)  All right.  Now, did you

Page 115

1   call -- did you personally call Mr. Barron?
2     A   No.
3     Q   Why not?
4     A   I don't know why I didn't, but I didn't.
5     Q   Did anyone else from Plaintiff call
6   Mr. Barron?
7     A   No.
8     Q   Did your counsel call Mr. Barron?
9     A   I believe so.
10    Q   When -- and is that Mr. Bosch?
11    A   Yes, I believe so.
12    Q   Okay.  And when Mr. Bosch called
13  Mr. Barron, was he acting as Plaintiff's lawyer
14  during that phone call?
15        MR. BOSCH:  Objection to form.
16    A   Mr. Bosch had been our attorney -- ongoing
17  attorney, so I don't know what your question means.
18  He is a lawyer that we had retained prior to this
19  matter.  So he was the lawyer we were speaking with.
20    Q   (BY MS. KROPF)  Had Plaintiff already
21  retained Mr. Bosch with respect to 6560 before he
22  called Mr. Barron?
23    A   I don't recall the timing on that.  He had
24  been retained prior to all of this assignment.
25    Q   Okay.  So my question was, when he called

Page 116

1   Mr. Barron, was Mr. Bosch acting as Plaintiff's
2   lawyer during that call?
3         MR. BOSCH:  Objection to form.
4     A   Again, he was trying to get information
5   from Mr. Barron of who RSD was.  So, again, he was
6   acting on our behalf.
7     Q   (BY MS. KROPF)  As Plaintiff's lawyer, or
8   as Plaintiff's corporate representative?
9         MR. BOSCH:  Objection to form.
10    A   I -- again, I -- I -- you'll have to ask
11  Mr. Bosch what -- what his position was.  But we
12  asked him to call Mr. Barron.
13    Q   (BY MS. KROPF)  Okay.  We can do that.
14        All right.  Do you know when Mr. Bosch
15  asked -- or talked to Mr. Barron?
16    A   I believe it was a couple -- within a
17  couple weeks of the date of this letter.
18    Q   Okay.  Do you know about how long their
19  conversation lasted?
20    A   No.
21    Q   What did they talk about?
22    A   Mr. Barron wanted to know the contact
23  person at our shop, and Mr. Bosch asked who RSD was.
24    Q   Okay.  How did --
25    A   We gave them the information they

Page 117

1   requested.  They never gave us the information we
2   requested.
3     Q   So you said Mr. Barron wanted a contact
4   person at "our shop."  What do you mean by "our
5   shop"?
6     A   At the Rock Spring -- Rock Spring Plaza II.
7     Q   Okay.  And you said Mr. Barron asked what
8   RSD was.  What was -- what information --
9     A   No.
10    Q   Oh, I'm sorry.  Did I get that wrong?
11    A   Yes.
12    Q   What did -- what did Mr. -- I'm sorry.  I
13  said that wrong.
14        That Mr. Bosch asked Mr. Barron what Rock
15  Springs Drive was?
16    A   Who the parties were.
17    Q   So he asked who the parties were?
18    A   Who were the members of RSD, he asked.
19    Q   Okay.  And what was Mr. Barron's response?
20    A   No response.
21    Q   Just silence?
22    A   I -- I wasn't privy to the conversation,
23  but I know we've never gotten, from Mr. Barron, any
24  information who RSD was.
25    Q   And by "who RSD was," you mean who the

30 (Pages 114 - 117)

30(b)(6) Rock Spring Plaza II, LLC                                    March 21, 2023
Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC

Page 182

1       MS. KROPF:  All right.
2       (Deposition Exhibit 12 was marked.)
3    Q   (BY MS. KROPF)  All right.  Mr. Camalier,
4   I'm showing you what's been marked as Exhibit 12.
5       Do you recognize this?
6    A   Yes.
7    Q   Okay.  And this is a letter dated February
8   22nd, 2018, from Arnold & Porter to Robert Barron; is
9   that right?
10   A   Correct.
11   Q   Were there any letters from Mr. Bosch to
12  Mr. Barron other than the one we already looked at
13  with the -- the contact names for the -- for the
14  plaintiff?  Or is this the -- the -- the first letter
15  that you were referencing?
16   A   I don't know if this is the first letter or
17  not.
18   Q   Okay.  Did you prepare today by looking at
19  the communications between Plaintiff and Rock Springs
20  Drive?
21   A   Yes.
22   Q   Okay.  And do you remember looking at any
23  letters from Mr. Bosch, other than the one we looked
24  at and then this one dated February 22nd, 2018?
25       MR. BOSCH:  And "by the one we looked at,"

Page 183

1   you're referring to?
2       MS. KROPF:  Exhibit 5 -- no, sorry.
3   Exhibit 8.
4    A   Yes.
5    Q   (BY MS. KROPF)  Okay.  All right.
6       Now, this is a letter from Mr. Bosch,
7   right?
8    A   Correct.
9    Q   And is he acting as Plaintiff's lawyer when
10  he writes this letter?
11       MR. BOSCH:  Objection to form.
12   A   We asked him to contact Mr. Barron.
13   Q   (BY MS. KROPF)  Well, I understand that.
14  I'm asking, was he acting as Plaintiff's
15  lawyer in sending this letter?
16       MR. BOSCH:  Objection to form.
17   A   Yeah.  I don't know what you mean by
18  "lawyer."  We asked him to -- to contact Mr. Barron,
19  and he was nice enough to do that for us.
20   Q   (BY MS. KROPF)  Was he doing it
21  voluntarily?
22   A   I don't believe so.
23   Q   Did you pay him to do it?
24   A   Absolutely.
25   Q   Okay.  Did you retain Arnold & Porter to

Page 184

1   represent Plaintiff with respect to the assignment?
2    A   As -- again, Arnold & Porter was -- had
3   been retained to us prior to all this activity.  So
4   again, their representation was ongoing.
5    Q   Was it all the same representation, in your
6   view?
7       MR. BOSCH:  Objection to form.
8    A   We -- we -- they worked on different
9   matters for us.  So, again, I don't -- they
10  represented the family, so I don't -- I don't know.
11   Q   (BY MS. KROPF)  Okay.  So the -- the letter
12  doesn't say he's -- he's writing as Plaintiff's
13  lawyer.
14       And so I was just trying to find out, is he
15  writing as Plaintiff's lawyer or as Plaintiff's
16  representative?
17       MR. BOSCH:  Objection to form.
18   A   Again, I -- I don't understand the
19  conclusion you want me to draw.  So, again, we asked
20  him to write the letter.
21   Q   (BY MS. KROPF)  There's no conclusion.  I'm
22  just asking you a question and get -- trying to get
23  you to answer it.  It's a fact question.
24       Was Mr. Bosch writing as Plaintiff's
25  lawyer?

Page 185

1       MR. BOSCH:  He's answered that question
2   several times now.  Objection to form.
3    Q   (BY MS. KROPF)  Is your answer you don't
4   know?
5    A   I -- I think I've -- I've given you the
6   best explanation I can.  I'm sorry.
7    Q   I'm not sure I understand it, though.  So
8   is --
9    A   Well, I'm sorry.
10   Q   Okay.  So could we try one more time?
11       Was Mr. Bosch acting as Plaintiff's lawyer
12  when he sent the letter dated February 22nd, 2018?
13   A   We asked him to prepare a letter to find
14  out this information from Mr. Barron.  Again, your
15  classification, whether he was a lawyer or was
16  writing this on our behalf, I don't understand the
17  distinction.
18   Q   Well, he -- he does say, "I'm writing on
19  behalf of the landlord," right?
20   A   Yes.
21   Q   Okay.  He was writing it on behalf of the
22  landlord?
23   A   Correct.  Yeah.
24   Q   Okay.
25   A   Right.

47 (Pages 182 - 185)

Page 186

1    Q.  Okay.  There's no dispute about that,
2  right?
3    A.  No.
4    Q.  And Mr. Bosch is a lawyer, right?
5    A.  Correct.
6    Q.  And he put this on his law firm's
7  letterhead, right?
8    A.  Yes.
9    Q.  Okay.  And I assume you hired him to send
10  this letter because he is a lawyer, right?
11       MR. BOSCH:  Objection to form.  And you
12  don't need to answer that question.
13       MS. KROPF:  You're instructing him not to
14  answer?
15       MR. BOSCH:  Yes.
16       MS. KROPF:  Okay.
17    Q.  (BY MS. KROPF)  All right.  So in this
18  letter, Mr. Bosch does not actually say he's a
19  lawyer.
20       Did that surprise you?
21    A.  No.
22    Q.  Okay.  Because it's not unusual for a
23  lawyer writing an e-mail or a law -- or a letter on
24  law firm letterhead to -- they don't have to identify
25  themselves as a lawyer, do they?

Page 187

1       MR. BOSCH:  Objection to form.
2    A.  Is there -- is there a question?  I'm
3  sorry.
4    Q.  (BY MS. KROPF)  Yeah.  My question was --
5  you said you weren't surprised that Mr. Bosch didn't
6  iden -- specifically identify himself as a lawyer.
7  And I was asking whether or not that's unusual when a
8  lawyer writes a letter on their letterhead, that they
9  don't specifically identify themselves as a lawyer?
10       MR. BOSCH:  Objection to form.
11       And may I ask, what's the -- the scope?
12  Where is this within the scope.
13       MS. KROPF:  Communications with Rock
14  Springs Drive.  The same one we just looked at, Topic 13.
15       MR. BOSCH:  Right.  But this -- now you're
16  asking him what do lawyers typically do in connection
17  with writing on their letterhead.
18       MS. KROPF:  If you'd like to instruct him
19  not to answer, go ahead.
20       MR. BOSCH:  Yeah, I will.  I'll instruct
21  you not to answer.  It's beyond the scope.  It's also
22  abusive.
23       MS. KROPF:  How is it abusive?
24       MR. BOSCH:  Because you're asking him what
25  do lawyers typically do on their letterhead outside

Page 188

1  of the context of this case.  And you know very --
2       MS. KROPF:  And that's -- that's abusive?
3       MR. BOSCH:  When you know -- when you know
4  very well that there have been prior communications
5  between myself and Mr. Barron.  I don't understand
6  why you're asking him, "What do lawyers typically do
7  when they write on their letterhead?"  What does that
8  have to do with this case?  How does that have to do
9  with any of defendant's defenses to whether they
10  engaged in a fraudulent conveyance, Ms. Kropf?
11       MS. KROPF:  And it's abusive?
12       MR. BOSCH:  It's abusive, Yeah.
13       MS. KROPF:  Okay.
14       MR. BOSCH:  You've had this witness here
15  for quite a few hours, and you're asking him
16  questions about what do lawyers typically do when
17  they write on their letterhead?  What does that have
18  to do with this case?  Can you -- can you -- can
19  proffer for me what, if any, bearing that has on this
20  case.
21       MS. KROPF:  Well, you-all have asserted to
22  the Court that it was fraud -- an evidence of fraud
23  that in IWA's notice of the assignment that the fact
24  that Mr. Barron was not specifically identified as a
25  lawyer was evidence of fraud.

Page 189

1       And so I was just pointing out that you,
2  when you wrote your letter, did not spe- -- did not
3  specifically identify yourself as a -- as a lawyer.
4       MR. BOSCH:  And -- and how does that bear
5  on whether IWA, when it sent a notice and identified
6  the point of contact and did not identify that he's a
7  lawyer -- how does the fact that when I communicated
8  with Mr. Barron, having prior communications with him
9  on my own letterhead and indicating I'm writing on
10  behalf of the landlord -- how does that bear on
11  defendant's defenses in this lawsuit, Ms. Kropf?
12       MS. KROPF:  I just explained it.  So why
13  don't we move on?
14       MR. BOSCH:  Okay.
15       MS. KROPF:  You disagree with it, and
16  that's fine.  You went to the Court and tried to make
17  a big deal out of it, And so I'm countering it with
18  Mr. Camalier's testimony.  I've gotten everything I
19  need.
20       Do you need to make more argument on the
21  record?
22       MR. BOSCH:  No, I -- I don't.  I asked you
23  to proffer, and --
24       MS. KROPF:  I did.
25       MR. BOSCH:  -- and you -- you purport to

48 (Pages 186 - 189)

30(b)(6) Rock Spring Plaza II, LLC                                    March 21, 2023
Rock Spring Plaza II, LLC v. Investors Warranty of America, LLC

Page 190

1  you have, and I've given my explanation. And
2  whatever you explained --
3      MS. KROPF:  Purported to, I guess.  If
4  that's the word we're using.
5      All right.
6      MR. BOSCH:  Well, I don't need to engage in
7  further colloquy.  The record will -- will -- will
8  stand on its own.
9      Q  (BY MS. KROPF)  All right.  So
10 Mr. Camalier, we're looking at Exhibit 12.
11     You still have that in front of you?
12     A  Yes, ma'am.
13     Q  Okay.  And he says, in that first
14 paragraph, "It's been almost six months since we last
15 communicated."
16     Do you see that?
17     A  Yes.
18     Q  Okay.  Why did Plaintiff wait six -- almost
19 six months to reach back out to Rock Springs Drive?
20     A  We thought the information would be
21 forthcoming, and it wasn't.  So we had to follow up.
22     Q  And you were -- you were willing to wait
23 five months to follow up; is that right?
24     A  We did.
25     Q  Yes, you waited -- you waited almost six

Page 191

1  months to follow up on that information, right?
2      A  I don't know.  I didn't count the months,
3  but it was a period of time.
4      Q  Okay.  We can count them, if you'd like?
5  It --
6      A  No.  I don't need to.
7      Q  Okay.  Okay.  All right.  In this letter
8  that Mr. -- Mr. Barron -- Mr. Bosch sent, was sent to
9  Mr. Barron, right?
10     A  Correct.
11     Q  And it's sent to Mr. Robert W. Barron,
12 Esquire, right?
13     A  Correct.
14     Q  And "esquire" means lawyer, right?
15     A  Yes.
16     Q  Okay.  So by the time he wrote this letter,
17 everyone on Plaintiff's side was clear that
18 Mr. Barron was a lawyer, right?
19     A  By --
20     MR. BOSCH:  Objection to form.
21     A  By that time, yes.
22     Q  (BY MS. KROPF)  Okay.  All right.  And the
23 letter's sent only to Mr. Barron and not to anyone at
24 IWA, right?
25     A  The letter was sent to Mr. Barron.

Page 192

1      Q  Was it copied to anyone at IWA?
2      A  I don't see anywhere on here.
3      Q  Did Plaintiff instruct Mr. Bosch to also
4  send the letter to IWA?
5      A  We didn't instruct Mr. Bosch to send copies
6  to anybody.
7      Q  Did Plaintiff review the letter before
8  Mr. Bosch sent it?
9      A  I don't believe so.
10     Q  You didn't review it?
11     A  I don't believe so.
12     Q  Okay.  All right.  And Mr. Bosch says, at
13 the end of that first paragraph, "Landlord is growing
14 increasingly concerned about the financial and
15 structural viability of the property, given that
16 there evidently is and has been no commercial
17 activity there."
18     Do you see that?
19     A  Yes.
20     Q  Okay.  By February 22nd, 2018, had
21 Plaintiff received all the ground rent payments from
22 Rock Springs Drive?
23     A  Yes.
24     Q  And that would be, by that point, five or
25 six months of payments?

Page 193

1      A  I -- I think four months.
2      Q  Between September and February?  Okay.  So
3  four months, let's say.
4      So somewhere north of $600,000 in ground
5  rent payments by that point?
6      A  That sounds approximately correct.
7      Q  Okay.  But you -- but you're -- but
8  Plaintiff says they are concerned about the financial
9  viability of the Property.
10     Do you see that?
11     A  Yes.
12     MR. BOSCH:  Objection.  It says,
13 financial and structural viability of the Property.
14     Q  (BY MS. KROPF)  Well, do you understand
15 that phrase to mean financial viability and
16 structural viability of the property?
17     A  That's what it says.
18     Q  Okay.  So I want to ask you about financial
19 viability first.
20     All right?
21     A  Correct.
22     Q  Okay.  And the plaintiff says it's
23 "growing increasingly concerned about the financial
24 viability of the property."
25     Do you see that?

49 (Pages 190 - 193)

Exhibit K



# Planet Depos®

We Make It *Happen*™

# Transcript of Robert W. Barron

**Date:** April 14, 2023
**Case:** Rock Spring Plaza II LLC -v- Investors Warranty of America LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

265

1  landlord, but another Camalier-affiliated entity
2  and IWA had been in litigation, involving another
3  ground lease; right?
4      **A.    Yes, sir.**
5      Q.    But you didn't know the facts of that
6  litigation?
7      **A.    No, sir.**
8      Q.    You're unaware, for example, that that
9  tenant walked away from the ground lease?
10        MS. KROPF: Objection as to form.
11        THE WITNESS: Yeah. I honestly don't
12    know the facts.
13 BY MR. BOSCH:
14    Q.    Right. And so -- but your view is it
15 was unreasonable for the Camaliers, when they
16 received notice from the entity or an affiliate of
17 the entity that walked away from one ground lease
18 to have its litigator reach out to the lawyer
19 identified as the point of contact for the
20 assignee. That's your testimony?
21    **A.    Yes, sir. Especially ─ I didn't know**
22 **what the other document said, but I've got a**

266

1  **document that says I had the absolute right of the**
2  **tenant to the lender to assign and be**
3  **automatically released. I mean, to, you know,**
4  **it's incredibly clear language, and first person**
5  **out of the box is the head of litigation for a big**
6  **law firm.**
7      Q.    Well, I have a question for you,
8  Mr. Barron. And if it was such a clear right of
9  assignment, wasn't the first -- why wasn't the
10 first person out of the box for the assignee,
11 Mr. Troy Taylor, the managing member?
12        MS. KROPF: Objection as to form.
13        THE WITNESS: I don't know.
14 BY MR. BOSCH:
15    Q.    Why a lawyer?
16    **A.    Well, because we thought, and sure**
17 **enough, pretty good thinking that the landlord**
18 **would renege and sue.**
19    Q.    Well, you know, we had a series of
20 discussions, right? It went on for months.
21    **A.    Yes, sir.**
22    Q.    And so at any point, between August 30,

267

1  2017, to the date of the lawsuit, did you disclose
2  that IWA is a member in RSD?
3      **A.    To who?**
4      Q.    To me.
5      **A.    No, sir.**
6      Q.    But I was asking.
7        MS. KROPF: Is that a question?
8        Objection to the form.
9  BY MR. BOSCH:
10    Q.    Was I asking, Mr. Barron?
11    **A.    With respect, sir, you've practiced law**
12 **for probably 40 years. It's embarrassing for you**
13 **to suggest that I'm obligated to answer a question**
14 **you ask me.**
15    Q.    I'm not asking whether you were
16 obligated. I'm asking whether you did.
17    **A.    I did not. I chose ─ I used my**
18 **discretion not to answer a question, because as my**
19 **children used to say to me, You're not the boss of**
20 **me. I don't have to do what you say.**
21    Q.    All right. So the first contact from
22 anyone about this assignment was IWA; correct?

268

1  That was the notice of assignment, IWA III?
2      **A.    Yes, sir. There was a notice of**
3  **assignment.**
4      Q.    And it says talk to the -- talk to
5  Robert Barron; right? And it doesn't say
6  Robert Barron is the entities' lawyer, does it?
7      **A.    Well, it says that I work at**
8  **Berger Singerman, and if you look it up, that's a**
9  **law firm.**
10    Q.    Yes. But it doesn't say you're a
11 lawyer.
12        MS. KROPF: Objection as to form.
13        THE WITNESS: It says that I work at
14    Berger Singerman, and it gives my street
15    address and my phone number and that I'm a
16    lawyer at a law firm.
17 BY MR. BOSCH:
18    Q.    Right. Does it say you were the lawyer
19 for RSD?
20    **A.    It says to contact me if you have**
21 **questions.**
22    Q.    It doesn't say that you're the lawyer

Case 8:20-cv-01502-PJM   Document 343-2   Filed 08/22/23   Page 37 of 42
Transcript of Robert W. Barron
Conducted on April 14, 2023

68 (269 to 272)

269

1  for RSD, does it?
2      A.    In this letter, it says that I'm with
3  Berger Singerman, a law firm.
4      Q.    Right.  So it doesn't say you're the
5  lawyer for RSD?
6      A.    This letter does not say that.
7      Q.    And, Mr. Barron, at the time that you
8  were identified as the person to whom questions
9  should be directed, the tenant here, RSD, they
10 certainly knew who to contact on behalf of the
11 landlord; isn't that right?
12     A.    There is a notice section in the lease.
13     Q.    But they also knew they could contact
14 Mr. Camalier; isn't that right?
15     MS. KROPF:  Objection as to form.
16     THE WITNESS:  I don't know, sir.  I
17     don't know if we had -- they had the contact
18     information for Mr. Camalier.
19 BY MR. BOSCH:
20     Q.    Well, the IWA member, they certainly
21 did.  Do you dispute that?
22     MS. KROPF:  Objection as to form.

270

1      And to the extent you can only answer
2      that question based on your communications
3      with your --
4      THE WITNESS:  I don't know -- I have
5      no --
6      (Reporter clarifies.)
7      MS. KROPF:  To the extent it would come
8      from -- only from communications with your
9      client, I instruct you not to answer.
10     THE WITNESS:  I have no information
11     about what they had.
12 BY MR. BOSCH:
13     Q.    So it's your testimony, Mr. Barron,
14 that the Algon member had no information about the
15 identity of the principals of the landlord?
16     MS. KROPF:  Objection.
17     If you can answer that question without
18     revealing your communications with your
19     client, you can answer.  Otherwise --
20     THE WITNESS:  We have the information
21     that's in the lease.  But otherwise, you can
22     ask Troy Taylor or Paul Rubin what they had.

271

1      I don't know.
2  BY MR. BOSCH:
3      Q.    Do you know whether anyone from RSD
4  ever reached out under the notice provision of the
5  ground lease?
6      A.    I don't know.
7      Q.    Do you know whether anyone on behalf of
8  RSD, other than yourself, communicated with anyone
9  on behalf of the landlord?
10     A.    Say that -- on behalf of the landlord?
11     Q.    Acting on behalf of the landlord.  Let
12 me say that again, Mr. Barron.
13     A.    Yes, sir.
14     Q.    Do you know whether anyone acting on
15 behalf of RSD, communicated in any way with any of
16 the principals of the landlord after the date of
17 the assignment?
18     A.    I don't know.  Not to my knowledge.
19 But I don't know.
20     Q.    All right.  So after the date of the
21 assignment, do you recall receiving a telephone
22 call from me?

272

1      A.    I do.
2      Q.    Do you recall when that was?
3      A.    I don't remember the date, but I
4  remember you called.
5      Q.    Do you recall was it in or around
6  September of 2017?
7      A.    I -- I -- that could be accurate.
8  Honestly, I just don't know the exact date.
9      Q.    What do you recall was discussed?
10     A.    I think you introduced yourself and --
11 as the counsel for the landlord, and I think you
12 asked your client would like more information
13 about the assignee.  And I told them -- I told you
14 I would get back to you.
15     Q.    Do you recall that I asked you who you
16 were and what role you played?
17     A.    I -- no, I don't have conscious memory
18 of that.  But that sounds right.
19     Q.    I gather you don't recall what you
20 said?
21     A.    I don't.  Honestly, I don't recall.
22     Q.    Do you recall that I asked you to

273

1  identify the principals in RSD and what their
2  intentions are?
3      A.   I -- I think you may have asked that.
4      Q.   Do you recall what you said in
5  response?
6      A.   I don't.  I did not give you the
7  information, but I don't recall what I said in
8  response.
9      Q.   Was I threatening a lawsuit?
10     A.   You're the head of a big law firm, the
11 head of litigation.
12     Q.   Was I threatening a lawsuit in our
13 telephone conversation, Mr. Barron?
14     A.   No, sir.  You were asking a question.
15     Q.   Was I threatening in any way?
16     A.   No, sir.  You were asking a question.
17     Q.   And you asked me for wiring
18 instructions and for a point of contact, did you
19 not?
20     A.   Oh, yeah, I did.  Because we wanted to
21 pay rent.
22     Q.   What did you do do after I called you?

274

1      A.   I called and communicated that you had
2  called to my client.
3      Q.   To whom in particular?
4      A.   That, I think is privileged, isn't it?
5          MS. KROPF:  You can say who you talked
6      to.
7          THE WITNESS:  Yeah, I -- I -- I
8      informed Troy and -- Troy Taylor and Paul
9      Rubin.
10 BY MR. BOSCH:
11     Q.   So at the time that I called, you
12 didn't anticipate that I would be the person
13 calling, did you?
14     A.   We didn't know.
15     Q.   And at that time, you understood you
16 were not to answer my question about who the
17 principals in RSD were and what their intentions
18 were?
19         MS. KROPF:  Objection to form.  And it
20     misstates his prior testimony.
21 BY MR. BOSCH:
22     Q.   You can answer.

275

1          MS. KROPF:  You can answer -- you can
2      answer.  Are you -- well, you can answer.
3          THE WITNESS:  We talked about you
4      didn't have the right -- so what you were
5      asking for, I wasn't obligated to tell you.
6      So I was cordial and got what you wanted --
7      the questions you asked and spoke to my
8      client.
9  BY MR. BOSCH:
10     Q.   You didn't say, hey, RSD is a joint
11 venture between Algon and IWA?
12         MS. KROPF:  Objection to form.
13     Misstates the testimony.  Misstates the
14     evidence.
15 BY MR. BOSCH:
16     Q.   Well, you didn't say that; isn't that
17 right?
18     A.   That's correct.
19     Q.   You didn't say that there was an LLC --
20 this RSD is an LLC in which IWA is a member;
21 correct?
22     A.   We're going to be here a long day if

276

1  you're going to then repeat everything that I
2  didn't say.
3      Q.   I know.  I know.
4          But, Mr. Barron, if this is a good
5  faith assignment, where there's an absolute right,
6  as you say, why not come right out and say, this
7  is an assignment from IWA to RSD, which is a
8  limited liability company, where the two members
9  are IWA and Longshore Ventures?  Why not say that?
10         MS. KROPF:  Objection.  And I'll
11     instruct him not to answer.  You're getting
12     into his legal work that he did for his
13     client, decision-making and his reasoning, so
14     I will instruct him not to answer.
15 BY MR. BOSCH:
16     Q.   So you understood, as the person to
17 whom questions were to be directed, that any
18 questions about who RSD is were not to be
19 answered?
20         MS. KROPF:  Objection.  And I instruct
21     you not to answer.  This goes to the time
22     period after the assignment.

285

1 privilege grounds. So I'll instruct him not
2 to answer. We all know that the funds were
3 paid.
4     THE WITNESS: Did they get the money?
5     MS. KROPF: I'm going to instruct you
6 not to answer.
7     I'm not going to -- I'm not going to --
8 we're not going to let you crack the door
9 open. So I'm going to be consistent with my
10 objections. We all know this is going to end
11 up in front of the court. I'm going to be
12 consistent with my objections. But I
13 understand you're going to ask a lot of
14 questions, and I will interpose my
15 objections.
16     (Reporter clarifies.)
17 BY MR. BOSCH:
18     Q.   In response to my letter, was any
19 consideration given to identifying a business
20 person as a point of contact for the tenant?
21     MS. KROPF: Objection on privileged
22     grounds, and I instruct you not to answer.

286

1 BY MR. BOSCH:
2     Q.   Did you provide the name of any
3 business person who could be a point of contact
4 for the landlord?
5     MS. KROPF: Again --
6     THE WITNESS: No.
7 BY MR. BOSCH:
8     Q.   And you can't disclose why without
9 divulging privileged communications?
10     MS. KROPF: We would object on
11     privileged grounds.
12     I instruct him not to answer.
13 BY MR. BOSCH:
14     Q.   Did you respond in any way to my
15 letter?
16     A.   I don't recall.
17     Q.   Who were the business people who were
18 handling this on a day-to-day basis at that time?
19     MS. KROPF: You can answer that if you
20     know the answer.
21     THE WITNESS: Troy Taylor and
22     Paul Rubin.

287

1 BY MR. BOSCH:
2     Q.   Were you aware that Mr. Rubin and
3 Mr. Taylor after the assignment talked to brokers
4 as part of their investigation into the ground
5 lease interest in which they just took a 2 percent
6 interest?
7     MS. KROPF: So objection on privileged
8     grounds.
9     And I instruct you not to answer.
10 BY MR. BOSCH:
11     Q.   Do you know what was discussed?
12     MS. KROPF: Objection, to the extent it
13     would disclose your communications with your
14     client.
15 BY MR. BOSCH:
16     Q.   Did they communicate with you about
17 their discussions with the brokers?
18     MS. KROPF: Objection.
19     And I instruct you not to answer.
20 BY MR. BOSCH:
21     Q.   Were you involved in of any discussions
22 about what not to discuss with the brokers?

288

1     MS. KROPF: Objection.
2     And I instruct you not to answer.
3 BY MR. BOSCH:
4     Q.   Let me ask you to look at tab J, which
5 is IWA Exhibit 4.
6     Do you recall receiving this letter
7 dated February 22nd, 2018, from me?
8     A.   Yes, sir.
9     Q.   Did you review this letter upon
10 receipt?
11     A.   I did. I read it.
12     Q.   Did you send it to anyone?
13     MS. KROPF: Objection to the extent --
14     to the extent it goes to your communications
15     with your client.
16     If you sent it to anyone not your
17     client, you can answer.
18 BY MR. BOSCH:
19     Q.   Were you authorized to respond to this
20 letter without conferring with your client?
21     MS. KROPF: Objection.
22     I'll instruct you not to answer.

Transcript of Robert W. Barron

Conducted on April 14, 2023

---

**289**

1 BY MR. BOSCH:
2    Q.    Mr. Barron, did you, in fact, seek
3 counsel or instruction from your client as to how
4 you should respond to this letter?
5        MS. KROPF:  Objection.
6        And I instruct you not to answer.
7 BY MR. BOSCH:
8    Q.    Did you send this letter to anybody at
9 IWA?
10        MS. KROPF:  So objection.
11        And I will instruct you not to answer.
12 BY MR. BOSCH:
13    Q.    Were you involved in preparing a
14 response?
15        MS. KROPF:  You can answer that.
16        THE WITNESS:  Yes, I drafted a letter
17    in response.
18 BY MR. BOSCH:
19    Q.    Did you draft that letter on your own?
20        MS. KROPF:  So objection.
21        And I'll instruct you not to answer.
22

**290**

1 BY MR. BOSCH:
2    Q.    Does your response letter incorporate
3 any input from your clients?
4        MS. KROPF:  Objection.
5        And I'll instruct you not to answer.
6 BY MR. BOSCH:
7    Q.    Is there any information in your
8 response letter that originated from you?
9        MS. KROPF:  Objection.
10        And I instruct you not to answer.
11 BY MR. BOSCH:
12    Q.    If you look at the second paragraph on
13 the first page.
14    **A.    (Document review.)**
15    Q.    And I relate a call we were just
16 discussing where I reached out to you by telephone
17 in September of 2017.
18        Did I mischaracterize?  Read that
19 paragraph.  Did I mischaracterize the substance of
20 that in this letter?
21    **A.    I believe so.  I don't remember if you**
22 **said point of contact.  I don't remember what the**

**291**

1 **terminology was used on the phone.  But that's the**
2 **gist of the conversation.**
3    Q.    Did you say I believe so or I don't
4 believe so?
5    **A.    I do not -- I believe it describes the**
6 **gist of the conversation.  I do not recall if the**
7 **phrase "point of contact" was used, but the gist**
8 **of our conversation, I believe, is accurately**
9 **reflected.**
10    Q.    So this letter, February 22nd, 2018, it
11 states in the letter, indicates that you had not
12 responded in the intervening six months to my
13 request for information.  Isn't that right?
14    **A.    That's — what the letter says?**
15    Q.    And it's factually correct.  You had
16 not responded --
17    **A.    Where are you reading?**
18    Q.    -- in the intervening six months from
19 my call with information about your client's
20 identity or intentions for the property?
21    **A.    Right.  Correct.**
22    Q.    But you knew your client's identity at

**292**

1 the time?
2        MS. KROPF:  You can answer that.
3        THE WITNESS:  Yes.
4 BY MR. BOSCH:
5    Q.    You knew who the principals were?
6    **A.    Sir, once again, you're not the boss of**
7 **me.  I don't have to answer questions you ask.**
8        **You're not in control of someone else's**
9 **life.**
10    Q.    Do you have any evidence that landlord,
11 at that time, February 2nd, 2018, knew who the
12 principals were behind RSD?
13        MS. KROPF:  Objection to the extent
14    that would go to communications with your
15    client.
16        If you otherwise know, you can answer.
17        THE WITNESS:  I don't know.
18 BY MR. BOSCH:
19    Q.    You're unaware of any?
20    **A.    I'm not aware of any.**
21    Q.    You see on the second page, the top
22 paragraph, where I write to you, "The lack of

Case 8:20-cv-01502-PJM   Document 343-2   Filed 08/22/23   Page 41 of 42
Transcript of Robert W. Barron
Conducted on April 14, 2023

74 (293 to 296)

293

1  communication and activity from assignee is giving
2  landlord reasonable insecurity with respect to
3  assignee's ability to perform under the ground
4  lease, including without limitation its financial
5  ability to pay rent, taxes, insurance, utilities,
6  and to maintain the property in first-class
7  operating condition and repair."
8      **A.   Yes, sir.  This is what's called a**
9  **litigation preparation letter, very**
10 **self-serving -- very self-serving, written by the**
11 **head of litigation for a big law law firm.  And**
12 **you're starting to litigate in a letter.  It's so**
13 **obvious it's -- it's, you know, it's -- it's sad.**
14 **I don't live in this world.  I'm a**
15 **transaction lawyer.  But I see what you're trying**
16 **to do, and it was -- it was disappointing to see**
17 **it.**
18     Q.   Six months after I asked the question
19 and you refused to provide any response, I write
20 you, explaining that the lack of communication is
21 giving the landlord reasonable insecurity.
22         And at the time, you knew that IWA was

294

1  the sole source of funding for RSD, did you not?
2      **A.   I knew that -- from general knowledge,**
3  **that you were getting -- your client was getting**
4  **paid rent every month.  It was not --**
5          (Simultaneous speakers.)
6  BY MR. BOSCH:
7      Q.   Mr. Barron, my question:  You knew that
8  IWA was the sole source of funding at this time?
9          MS. KROPF:  So to the extent you only
10         knew that through conversations with your
11         client, I'll instruct you not to answer.
12         THE WITNESS:  Well, I knew the
13         operating agreement.  The operating agreement
14         says that's the terms.
15 BY MR. BOSCH:
16     Q.   Right.  And the only source of funding
17 is capital contributed by the IWA member?
18     **A.   Pursuant to the operating agreement.**
19     Q.   And you knew that RSD had no ability to
20 perform tenant's obligations without the capital
21 contributions of the IWA member, did you not?
22         MS. KROPF:  Objection.

295

1          And I'll instruct you not to answer
2  unless you have knowledge other than through
3  communications with your client.
4          THE WITNESS:  I know the terms of the
5  operating agreement.
6  BY MR. BOSCH:
7      Q.   Did you have discussions with anyone
8  about whether to give landlord comfort that RSD
9  could meet its financial obligations?
10         MS. KROPF:  Objection.
11         And I'll instruct you not to answer to
12         the extent it would disclose communications
13         with your client.
14         THE WITNESS:  But we did respond to the
15         letter in writing.
16 BY MR. BOSCH:
17     Q.   But did you have any discussions about
18 how to give landlord comfort?
19         MS. KROPF:  Objection.
20         And I'll instruct you not to answer.
21 BY MR. BOSCH:
22     Q.   If RSD intended to continue to meet the

296

1  obligations of the ground lease for as long as RSD
2  held the ground lease interest, why not say so?
3          MS. KROPF:  Objection.
4          And I instruct you not to answer.
5  BY MR. BOSCH:
6      Q.   You see at the bottom of this letter,
7  "Landlord has also indicated willingness to meet
8  in person with the principals of assignee to
9  discuss how best to address their mutual interests
10 with respect to the ground lease and the property.
11 That meeting can take place in Florida if more
12 convenient."
13         Do you recall discussing this with
14 anyone?
15         MS. KROPF:  Objection.
16         And I'll instruct you not to answer
17         unless you discussed it with someone other
18         than your client.
19 BY MR. BOSCH:
20     Q.   So you can't answer that question
21 without divulging attorney-client communications?
22     **A.   Correct.**

Transcript of Robert W. Barron
Conducted on April 14, 2023

75 (297 to 300)

297

1        MR. BOSCH:  And, Ms. Kropf, you're
2    taking the position that that's a privileged
3    communication?
4        MS. KROPF:  Whether or not he discussed
5    that letter with his clients, yes.  I take
6    the position that that is an attorney-client
7    communication.
8   BY MR. BOSCH:
9    Q.   So when landlord reaches out to you,
10  the sole point of contact, the lawyer for RSD, and
11  asks -- it indicates it's willing to sit down with
12  the principals, meet in Florida, you can't tell me
13  what was discussed in response without divulging
14  privileged communications?
15       MS. KROPF:  Objection.  He can't tell
16   you consistent with the rules of professional
17   conduct and the law in every jurisdiction
18   across the United States.
19       So I instruct him not to answer.
20       MR. BOSCH:  That's because RSD has put
21   a lawyer out in front for any communications
22   from the landlord to the tenant?

298

1        MS. KROPF:  Objection.
2        And I instruct him not to answer.
3   BY MR. BOSCH:
4    Q.   So is RSD hiding behind a lawyer?
5        MS. KROPF:  Objection.
6        And I instruct him not to answer.
7   BY MR. BOSCH:
8    Q.   Is RSD not responding in good faith,
9   Mr. Barron?
10       MS. KROPF:  You can answer that.
11       THE WITNESS:  Sir, with respect, the
12   landlord sued the tenant after the tenant
13   relied on the covenant of the landlord in the
14   estoppel that said you'd have the absolute
15   right to assign the lease to a third party
16   and be automatically released.
17       So I would say in big, bright letters,
18   the very fact that I am here is evidence of
19   the bad faith of the landlord not to stand
20   behind the covenant they made in order to
21   induce the lender to make the loan.
22       So bad faith, there's a concept of

299

1    unclean hands.  Bad faith is deep, deep in
2    the room.  And so with all due respect, sir,
3    I disagree heartily with your position.
4   BY MR. BOSCH:
5    Q.   Well, Mr. Barron, we talked about my
6   phone call to you in September where I asked you
7   to identify the principals of IWA.  And then we
8   talked about how six months later, that you had
9   not provided any information, and I wrote the
10  letter that is Exhibit IWA 4.
11       So as of February 22nd, 2018, had there
12  been a lawsuit filed or threatened by the
13  landlord?
14   A.   I believe you threatened in the next
15  letter.
16   Q.   Fine.  Thank you.
17       But as of February 22nd, 2018, six
18  months after our first request for information,
19  did I threaten a lawsuit?
20   A.   Not yet.  But you wrote it, and you're
21  the head of litigation of big law firms.
22       I would tell you in my experience with

300

1    Weil Gotshal -- before that, I was with
2    Thompson & Knight and now with Berger Singerman,
3    the head of our litigation department does not
4    send letters on ground leases or any other kind of
5    lease unless they're in litigation mode.  They
6    just don't.
7    Q.   So assuming that you're correct, that
8   the landlord and its litigator was in litigation
9   mode, you understand, as it's right there up on
10  the screen, that as of February 22nd, 2018, they
11  were just requesting information about who the
12  members of RSD are, what its financial ability to
13  satisfy the terms ground lease are, and wanted to
14  sit down with the principals; isn't that all that
15  the landlord was asking through you, the sole
16  point of contact for RSD?
17       MS. KROPF:  Objection as to form.
18       THE WITNESS:  Sir, if this was the only
19   transaction that they were involved in, I
20   would agree with you.  The problem is is
21   this -- this letter comes with a history.
22       And it's -- as we know, we talked about