# EXHIBIT 2

558.52B

## CERTIFICATION

The undersigned hereby certifies to COMMONWEALTH LIFE INSURANCE COMPANY that the attached is a true, complete and correct copy of the Amended and Restated Ground Lease Indenture dated as of November 14, 1990, between Anne D. Camelier, as landlord, and the undersigned, as tenant, for premises located in the County of Montgomery, State of Maryland, more fully described therein. The attached agreement amends and restates in its entirety that certain Ground Lease Indenture dated November 14, 1990.

With the intent to be legally bound hereby, the undersigned has executed this Certification this November 25, 1991.

BORROWER:

ROCK SPRING II LIMITED PARTNERSHIP,
a Maryland limited partnership

By:   Fernwood Two Corp., a Maryland
      corporation, General Partner

      By: _Anne D. Camelier_
      Name: ANNE D. CAMALIER
      Title: President

      (CORPORATE SEAL)

By:   Bethesda Real Property, Inc., a
      Delaware corporation, General Partner

      By: _Raymond M Westfall_
      Name: RAYMOND M. WESTFALL
      Title: VICE PRESIDENT

      (CORPORATE SEAL)

<u>AMENDED AND RESTATED</u>
<u>GROUND LEASE INDENTURE</u>


ANNE D. CAMALIER,
Landlord,


and


ROCK SPRING II LIMITED PARTNERSHIP,
Tenant


Dated as of:  November 14, 1990

IWA0014296

TABLE OF CONTENTS

                                                                 **Page**

ARTICLE I
  PREMISES......................................................2
        1.1  Premises; Demise.................................2
ARTICLE II
  TERM OF LEASE................................................2
        2.1  Term............................................2
ARTICLE III
  RENT........................................................3
        3.1  Annual Rent.....................................3
        3.2  Definitions.....................................3
        3.3  Fixed Rent......................................5
        3.4  Appraisal of Fair Rental Value..................9
        3.5  Additional Rent................................11
            3.5.1  Real Estate Impositions.................12
            3.5.2  Utilities...............................15
            3.5.3  Insurance...............................15
            3.5.4  Ride Share Program......................16
        3.6  Deferred Rent Payment..........................16
        3.7  Net Lease......................................17
        3.8  Environmental Conditions.......................17
ARTICLE IV
  INSURANCE AND INDEMNITY.....................................17
        4.1  Risks to be Insured............................17
        4.2  Policy Provisions..............................19
        4.3  Delivery of Policies...........................20
        4.4  Depositary.....................................20
        4.5  Indemnity......................................21
ARTICLE V
  USE........................................................22
        5.1  Use............................................22
        5.2  Assignment and Subletting......................23
        5.3  Compliance with Law............................24
        5.4  Mechanics' Liens...............................25
ARTICLE VI
  CASUALTY AND TAKING.........................................26
        6.1  Casualty.......................................26
        6.2  Notice of Taking...............................28
        6.3  Entire Taking..................................29
        6.4  Partial Taking.................................29
        6.5  Award If Lease Terminates......................31
        6.6  Taking for Temporary Use.......................33
ARTICLE VII
  IMPROVEMENTS................................................34
        7.1  Construction of New Buildings..................34
        7.2  Repairs and Alterations........................36
        7.3  Demolition, Etc................................37
        7.4  Title to Buildings.............................38

-i-

IWA0014297

Page

ARTICLE VIII
    NON-DISTURBANCE........................................40
        8.1  Non-Disturbance...............................40
ARTICLE IX
    LANDLORD'S COVENANTS....................................40
        9.1  Title.........................................40
        9.2  Quiet Enjoyment...............................41
ARTICLE X
    DEFAULTS................................................41
       10.1  Events of Default............................41
       10.2  Termination; Repossession....................41
       10.3  Interest; Late Fees..........................42
       10.4  Escrow for Real Estate Impositions and
             Insurance...................................43
       10.5  Additional Remedies..........................44
       10.6  Attorneys' Fees..............................44
ARTICLE XI
    LEASEHOLD MORTGAGEE'S RIGHTS............................45
       11.1  Right to Mortgage; Notice to Leasehold
             Mortgagee...................................45
       11.2  Leasehold Mortgagee's Opportunity to Foreclose.45
       11.3  Leasehold Mortgagee's Right to New Lease.......47
       11.4  No Modification Without Leasehold Mortgagee's
             Consent.....................................48
       11.5  Notice.......................................48
ARTICLE XII
    LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS...........49
       12.1  Landlord's Right to Perform..................49
ARTICLE XIII
    LANDLORD'S RIGHT TO SELL, ASSIGN OR MORTGAGE.............50
       13.1  Right to Sell, Assign or Mortgage............50
       13.2  Release of Liability.........................50
       13.3  Limitations on Landlord's Liability..........51
       13.4  Notice to Fee Mortgagee......................51
ARTICLE XIV
    MISCELLANEOUS...........................................51
       14.1  Construction; Governing Law..................51
       14.2  No Waiver....................................51
       14.3  Headings.....................................52
       14.4  Partial Invalidity...........................52
       14.5  Bind and Inure...............................53
       14.6  Estoppel Certificate.........................53
       14.7  Notice.......................................54
       14.8  Entire Agreement; No Oral Modifications.......54
       14.9  No Merger of Title...........................54
       14.10  Force Majeure...............................55
       14.11  Payment of Landlord's Costs and Expenses......55

IWA0014298

                                                                   Page

     14.12  Litigation Expenses..........................56
     14.13  Memorandum of Lease..........................56
     14.14  Performance Under Protest....................56
     14.15  Release of Memorandum of Lease...............57
     14.16  Records, Plans, Etc..........................57
ARTICLE XV
     RIDE SHARING PROGRAM....................................57
     15.1   Compliance With Ride Sharing Agreement........57

Exhibits

A   -- Description of Landlord's Land
B   -- Description of Premises
C   -- Permitted Exceptions
D   -- Memorandum of Ground Lease Indenture

IWA0014299

PHASE II

## AMENDED AND RESTATED
## GROUND LEASE INDENTURE

This Amended and Restated Ground Lease Indenture (this "Lease") is made as of the 14th day of November, 1990, by and between ANNE D. CAMALIER ("Landlord") and ROCK SPRING II LIMITED PARTNERSHIP, a Maryland limited partnership ("Tenant").

## RECITALS

WHEREAS, by Ground Lease Indenture dated as of November 14, 1990 (the "Original Ground Lease"), Landlord leased to Tenant and Tenant leased from Landlord a portion of a certain parcel of land situated in Bethesda, Maryland and more particularly described in Exhibit A attached hereto and made a part hereof (said land and all easements and rights to be leased therewith being herein referred to as "Landlord's Land"), for development by Tenant as more fully herein set forth;

WHEREAS, the portion of Landlord's Land to be leased and developed hereunder is described in Exhibit B hereto and is herein referred to as the Premises, as such term is further defined in Section 1.1;

WHEREAS, Landlord has leased the remainder of Landlord's Land (hereinafter referred to as "Phase I") to One Fernwood Associates Limited Partnership by a separate and distinct ground lease indenture dated September 14, 1985, as amended (the "Phase I Lease"); and

WHEREAS, the parties desire to amend the Original Ground Lease and to restate in its entirety the Original Ground Lease as amended.

NOW THEREFORE, Landlord and Tenant do hereby agree as follows:

IWA0014300

ARTICLE I

PREMISES

1.1  Premises; Demise.  In consideration of the rents
and covenants herein set forth and contained, on the part of
Tenant to be paid, performed, and observed, Landlord does hereby
demise and lease unto Tenant, and Tenant does hereby lease and
take from Landlord, for the Term (as hereinafter defined), upon
and subject to the terms and provisions of this Lease, the por-
tion of the Landlord's Land situated in Bethesda, Maryland and
more particularly described in Exhibit B attached hereto and made
a part hereof, together with certain depreciable improvements
(the "Depreciable Improvements") to be constructed on the Prem-
ises (as defined below) by Landlord on or before the Half Rent
Commencement Date (as defined in Section 3.2(g)) (which Deprecia-
ble Improvements shall be subject to Tenant's prior written
approval, which shall not be unreasonably withheld or delayed,
and shall have a value of not less than twenty thousand dollars
($20,000) and not greater than fifty thousand dollars ($50,000))
and all easements, development and other rights, and appurte-
nances belonging unto Landlord's Land (said land, Depreciable
Improvements, easements, development and other rights, and appur-
tenances being hereinafter collectively referred to as the "Prem-
ises").  The Premises are also sometimes herein referred to as
Phase II.  References herein to approved development for the
Premises as shown on any site plan or preliminary plan shall be
deemed to refer only to that portion of such site plan or prelim-
inary plan for Phase I and Phase II which is applicable to
Phase II.

ARTICLE II

TERM OF LEASE

2.1  Term.  The Premises are hereby leased unto Tenant
for a term (the "Term") beginning as of the date hereof and

-2-

IWA0014301

ending on the day before the date which is ninety-nine (99) years after the date of this Lease, unless sooner terminated in accordance with the provisions herein contained.

ARTICLE III

RENT

3.1   Annual Rent.   Tenant covenants and agrees to pay throughout the Term of this Lease, by bank wire transfer of funds or in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the address set forth in Section 14.7, or at such other place as Landlord may from time to time designate in writing, the "Annual Rent."  The "Annual Rent" shall be the Fixed Rent, the Additional Rent, and the Deferred Rent, collectively, as such terms are hereinafter defined.

3.2   Definitions.   As used in this Lease:

(a)   "Anniversary Month" shall mean the penultimate calendar month in the Base Lease Year, and each successive identical month of each Lease Year thereafter during the Term.

(b)   "Base Index" shall mean the Index published for September 1990.

(c)   "Base Lease Year" shall mean September 1, 1990 through August 31, 1991.

(d)   "Index" shall mean the consumer price index now known as the Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items (1982-84=100), relating to Washington, D.C., Maryland, and Virginia and issued by the Bureau of Labor Statistics of the United States Department of Labor.  In the event the Index shall hereafter be converted to a different standard reference base or otherwise revised, all calculations

-3-

IWA0014302

herein using the Index shall be made with the use of such conver-
sion factor, formula or table for converting the revised standard
reference base index as may be published by the Bureau of Labor
Statistics or, if said Bureau shall not publish the same, then
with the use of such conversion factor, formula or table as may
be published by Prentice Hall, Inc., or, failing such publica-
tion, by any other nationally recognized publisher of similar
statistical information.  In the event no such conversion factor,
formula or table is available, Landlord and Tenant shall agree
upon a comparable replacement or successor index, and, if they
are unable to agree within ninety (90) days after the Index
ceases to be published, such matter shall be determined in
Washington, D.C. by arbitration in accordance with the Rules of
the American Arbitration Association.

     (e)  "Fee Period" shall mean the period commencing
on September 1, 1990 and continuing until the Half Rent Commence-
ment Date.

     (f)  "Full Rent Commencement Date" shall mean the
earlier to occur of (i) the Lease Commencement Date, as defined
in that certain Lease Agreement (the "Office Lease") dated as of
the date hereof between Tenant, as landlord, and Communications
Satellite Corporation, as tenant, or (ii) the date that is sixty
(60) days after the date set forth as the projected date for sub-
stantial completion of the improvements in the "General Con-
tract."  The "General Contract" shall mean the contract to be
executed by Tenant and its general contractor.

     (g)  "Half Rent Commencement Date" shall mean the
date on which Tenant obtains a permit from the appropriate Mont-
gomery County authorities enabling Tenant to commence excavation
on the Premises.

-4-

(h)  "Leasehold Mortgagee" shall mean the mort-
gagee under any leasehold mortgage of first priority or the bene-
ficiary of any leasehold deed of trust of first priority upon
Tenant's leasehold estate hereunder.

(i)  "Lease Year" shall mean each successive
twelve (12) calendar month period following the Base Lease Year
or any Subsequent Base Lease Year, whichever is applicable,
except that the Lease Year immediately prior to the initial Sub-
sequent Base Lease Year shall terminate on the day before the
first day of the initial Subsequent Base Lease Year and the last
Lease Year shall terminate on the date on which this Lease ter-
minates.

(j)  "Percentage Increase" shall mean the percent-
age increase of the Index published for the Anniversary Month in
the relevant Lease Year over the Base Index.

(k)  "Subsequent Base Lease Year" shall mean (i)
the twelve (12) calendar month period commencing on the first to
occur of (x) the first day of the month in which occurs the tenth
anniversary of the issuance of the first certificate of occupancy
or non-residential use permit for the improvements to be con-
structed pursuant to Section 7.1, or (y) September 1, 2002; and
(ii) each twelve (12) calendar month period commencing on the
first day of each tenth anniversary of the initial Subsequent
Base Lease Year.

3.3  _Fixed Rent_.  Tenant covenants and agrees to pay to
Landlord, in advance on the first day of each calendar month,
without offset, in equal monthly installments, "Fixed Rent," at
the following annual rates:

(a)  The Fixed Rent for each of the Base Lease
Year and the first Lease Year thereafter shall be the sum of

-5-

IWA0014304

(i) Three Dollars and 50/100 ($3.50) per square foot of rentable area in the initial improvements to be constructed pursuant to Section 7.1, and (ii) ten percent (10%) of the initial cost of constructing the Depreciable Improvements, provided that in no event shall this element of the Fixed Rent exceed in the aggregate the total initial cost of constructing the Depreciable Improvements. The rentable area shall be determined as provided in Section 3.3(e). Commencing with the Lease Year commencing on September 1, 1992 and for each Lease Year thereafter, until the initial Subsequent Base Lease Year, the Fixed Rent shall equal one hundred three percent (103%) of the Fixed Rent payable in the immediately preceding Lease Year. If the last Lease Year prior to the initial Subsequent Base Lease Year is less than 365 days, the Fixed Rent for such Lease Year shall be prorated by multiply-ing the Fixed Rent for such Lease Year by a fraction, the numera-tor of which is the number of days in such Lease Year and the denominator of which is 365.

(b)  The Fixed Rent for the initial Subsequent Base Lease Year shall be the greater of (i) one hundred three percent (103%) of the Fixed Rent for the Lease Year immediately preceding the initial Subsequent Base Lease Year, provided that if such Lease Year is less than 365 days, for purposes of this clause (i) such Lease Year shall be deemed to contain 365 days; or (ii) the then current Fair Rental Value (as hereinafter defined) of the Premises. The Fixed Rent shall be readjusted and redetermined for each Subsequent Base Lease Year thereafter so that the Fixed Rent for each Subsequent Base Lease Year shall be the greater of (x) one hundred three percent (103%) of the Fixed Rent for the Lease Year immediately preceding such readjustment; or (y) the then current Fair Rental Value of the Premises. If the then current Fair Rental Value of the Premises has not been determined as of the first day of any Subsequent Base Lease Year, the Fixed Rent for such Subsequent Base Lease Year shall be paid

-6-

IWA0014305

at the rate of one hundred three percent (103%) of the Fixed Rent for the immediately preceding Lease Year until such time as the Fair Rental Value has been determined.  Thereafter, if the Fair Rental Value is greater than the amount of Fixed Rent then being paid, the Fixed Rent shall be increased to equal the Fair Rental Value retroactively to the first day of such Subsequent Base Lease Year and Tenant shall deliver to Landlord, with its next monthly rental payment, the difference between the amount previously delivered to Landlord with respect to such Subsequent Base Lease Year and the amount of Tenant's actual liability for such period.  For each Lease Year after a Subsequent Base Lease Year (until the next Subsequent Base Lease Year), the Fixed Rent shall equal one hundred three percent (103%) of the Fixed Rent payable in the immediately preceding Lease Year.  If the Lease Year in which this Lease terminates is less than 365 days, the Fixed Rent for such Lease Year shall be prorated by multiplying the Fixed Rent for such Lease Year by a fraction, the numerator of which is the number of days in such Lease Year and the denominator of which is 365.

(c)  Notwithstanding the foregoing provisions of this Section 3.3, no Fixed Rent shall be payable during the Fee Period.  Instead, during the Fee Period Tenant shall pay to Landlord a fee at the annual rate of Seventy-Five Thousand Dollars ($75,000).  The fee shall be payable in advance in equal monthly installments.  Concurrently with the execution of this Lease, Tenant shall pay to Landlord the accrued amount due to Landlord from the first day of the Fee Period until such date of execution, together with the first monthly installment of Six Thousand Two Hundred Fifty Dollars ($6,250).  The fee for any partial month shall be prorated based on the number of days in such month.

-7-

IWA0014306

(d)  Notwithstanding Section 3.3(a), commencing on the Half Rent Commencement Date and continuing until the Full Rent Commencement Date, fifty percent (50%) of the Fixed Rent that would otherwise be payable pursuant to Section 3.3(a) above shall be deferred.  The fifty percent (50%) of Fixed Rent not paid during such period is hereinafter referred to as the "Deferred Rent" and shall be paid pursuant to Section 3.6.

(e)  For purposes of calculating the Fixed Rent, the rentable area shall be assumed initially to be one hundred seventy-seven thousand (177,000) square feet.  After the improvements to be constructed pursuant to Section 7.1 are completed, the precise number of square feet of rentable area in such improvements shall be determined in accordance with the Washington, D.C. Association of Realtors Standard Method of Measurement dated January 1, 1989 by an architect selected by Landlord and approved by Tenant.  Thereafter, if the precise measurement is more or less than 177,000 square feet of rentable area, the Fixed Rent for the Base Lease Year and all Lease Years thereafter shall be recalculated using such precise measurement and shall be adjusted up or down, as appropriate.  If the amount of Fixed Rent paid by Tenant prior to the date of such adjustment is greater than Tenant's actual liability, Tenant shall deduct the net overpayment from its next monthly rental payment.  If the amount of Fixed Rent paid by Tenant prior to the date of such adjustment is less than Tenant's actual liability, Tenant shall pay the net amount of such deficiency to Landlord with its next monthly rental payment.  Notwithstanding anything herein contained to the contrary, in no event shall Fixed Rent be less than $595,000.00.

(f)  Notwithstanding Section 2.1, this Ground Lease shall automatically terminate upon written notice to Tenant by American Security Bank, N.A., its successors or assigns

-8-

IWA0014307

("ASB"), if (i) (a) the Half Rent Commencement Date has not occurred by March 31, 1993, and (b) ASB has succeeded to Landlord's interest hereunder as a result of foreclosure under the Fee Mortgage as hereinafter defined in Section 5.2(a) or a deed in lieu thereof, or (ii) ASB succeeds to Landlord's interest in such manner after March 31, 1993 and the Half Rent Commencement Date has not yet occurred, unless promptly thereafter Tenant agrees to pay and in fact pays Rent, as if such Half Rent Commencement Date had occurred as of the later of March 31, 1993 or the date ASB so succeeds Landlord's interest.

3.4 <u>Appraisal of Fair Rental Value</u>. (a) "Fair Rental Value" shall be determined as follows: On or before the one hundred twentieth (120th) day prior to the first day of a Subsequent Base Lease Year, Landlord shall notify Tenant in writing of its determination of the Fair Rental Value for the Premises for the Subsequent Base Lease Year. If Landlord fails to notify Tenant of its determination of the Fair Rental Value by the date set forth in the preceding sentence, Tenant shall request in writing that Landlord provide Tenant with Landlord's determination of Fair Rental Value. If Tenant fails to so notify Landlord, then, commencing on the first day of the applicable Subsequent Base Lease Year, Tenant shall pay Fixed Rent equal to one hundred three percent (103%) of the Fixed Rent payable in the immediately preceding Lease Year, subject to adjustment retroactively at the time Fair Rental Value is determined. If Landlord has not done so previously, Landlord shall notify Tenant of its determination of Fair Rental Value within thirty (30) days after receipt of a request from Tenant. If Tenant does not agree with Landlord's determination, Tenant shall so notify Landlord in writing within thirty (30) days after receipt of Landlord's notice. If Tenant does not notify Landlord that Tenant disagrees with Landlord's determination of Fair Rental Value, the Fair Rental Value shall be the amount set forth in Landlord's notice. If Tenant timely

-9-

IWA0014308

notifies Landlord that Tenant disagrees with Landlord's determi-
nation, then Tenant and Landlord shall commence negotiations con-
cerning the Fair Rental Value for the Premises for such Subse-
quent Base Lease Year.  The parties shall have thirty (30) days
after the date on which Landlord receives Tenant's notice of dis-
agreement in which to agree on such Fair Rental Value for such
Subsequent Base Lease Year.  If, during such negotiation period,
the parties do not agree in writing on such Fair Rental Value,
Landlord and Tenant shall each designate in writing, within seven
(7) days after the expiration of the aforementioned thirty (30)
day period, a real estate broker or an MAI appraiser (collec-
tively, an "appraiser") experienced in the appraisal of commer-
cial real estate in the Metropolitan Washington, D.C. area, for
purposes of determining Fair Rental Value.  Within fifteen (15)
days after the designation of the appraisers, the two appraisers
so designated shall designate a third appraiser of the same qual-
ifications.  The appraisers so designated shall, within thirty
(30) days after the date the third appraiser is designated,
determine the then current Fair Rental Value of the Premises in
accordance with Section 3.4(b).  If the three appraisers are
unable to agree upon the Fair Rental Value, then the Fair Rental
Value shall be the average of the closer appraisals.  Each
appraiser shall give written notice to the parties stating his
determination, and shall furnish to each party a copy of such
determination signed by him.  The determination of such apprais-
ers shall be final and binding upon the parties and a final judg-
ment thereon may be entered in a court of competent jurisdiction
on the petition of either party.  If either party, or the two
appraisers designated by the parties, fail to timely designate an
appraiser (or a replacement appraiser pursuant to the next sen-
tence), then either party may apply to a court of competent
jurisdiction to make such designation.  In the event of the fail-
ure, refusal or inability of any appraiser to act, a new
appraiser with the qualifications described above shall be

-10-

IWA0014309

appointed promptly in his stead.  The party who designated the
appraiser so failing, refusing or unable to act shall designate
the replacement appraiser, or, if the appraiser failing, refusing
or unable to act was the appraiser designated jointly by the par-
ties' appraisers, the parties' appraisers shall jointly designate
the replacement appraiser.  Landlord and Tenant shall each bear
the cost of its appraiser and shall share equally the cost of the
third appraiser.  If the appraisers shall fail to make the deter-
mination herein provided, then either party shall have the right
to institute such action or proceeding in such court as shall be
appropriate in the circumstances and Landlord and Tenant shall
share equally the cost of such action.

     (b)  In determining the Fair Rental Value of the
Premises, the appraisers shall evaluate the Premises as if the
Premises were (i) vacant; (ii) unimproved; (iii) unencumbered by
any mortgages or leases of any kind; and (iv) immediately avail-
able (which shall be deemed to mean that all necessary infra-
structure improvements are available) for use and/or development
for its highest and best use in accordance with then existing
governmental regulations.  Notwithstanding the preceding sen-
tence, in determining the Fair Rental Value of the Premises for
the first two (2) Subsequent Base Lease Years only, the standard
in clause (iv) of the preceding sentence shall not be applied.
Instead, the appraisers shall evaluate the Premises as if they
were immediately available for use and/or development (as such
phrase is qualified above) with a building of approximately the
same density and use as the building to be constructed on the
Premises pursuant to Section 7.1.

    3.5  <u>Additional Rent</u>.  In order that the Fixed Rent
shall be absolutely net to Landlord, Tenant covenants and agrees
to pay, commencing as of September 1, 1990 as additional rent
(hereinafter referred to as "Additional Rent"), all sums, costs,

-11-

IWA0014310

expenses, and other payments which Tenant in any of the provisions of this Lease assumes or agrees to pay or discharge, including, without limitation, taxes, betterment assessments, utilities charges, insurance premiums, and ride share costs with respect to the Premises, as set forth below in this Section 3.5, the amount of all of which items shall be prorated for any partial Lease Years.  Promptly after receipt of an invoice from Landlord, Tenant shall pay to Landlord all Additional Rent that accrued from September 1, 1990 until the date of this Lease.

3.5.1  <u>Real Estate Impositions</u>.

(a)  Tenant shall pay, directly to the authority charged with the collection thereof, all taxes (whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character, including all interest and penalties thereon) and each installment of all public, special or betterment assessments and charges, vault space rents, gross receipts taxes (which are in the nature of or in substitution for real estate taxes), excise taxes or imposts, surcharges, municipal liens, levies, license and permit fees, and other governmental charges (whether general or special, ordinary or extraordinary, foreseen or unforeseen, of every character, including all interest and penalties thereon) levied or assessed by or becoming payable to the municipality or any governmental authority having jurisdiction over the Premises, for or in respect of the Premises (such taxes and installments of assessments being hereinafter together referred to as "Real Estate Impositions") for each tax or installment period wholly included in the Term, all such payments to be made not less than five (5) days prior to the last date on which the same may be paid without interest or penalty (subject to Section 3.5.1(b) below).  For any Real Estate Imposition relating to any fraction of a tax or installment period included in the Term at the beginning or end thereof, Tenant

-12-

IWA0014311

shall pay to Landlord, within ten (10) days after receipt of invoice therefor, the fraction of such taxes or installment which is allocable to such included period; provided, in the case of each respective assessment Landlord shall elect to pay such assessment in installments over the longest period permitted by law, or ten (10) years, if less.

(b)  If, by law, any Real Estate Imposition, at the option of the taxpayer, may be paid in installments (whether or not interest shall accrue on the unpaid balance of such Real Estate Imposition), Tenant may exercise the option to pay the same (and any accrued interest on the unpaid balance of such Real Estate Imposition) in installments and, in such event, shall pay such installments as may become due during the Term as the same respectively become due.

(c)  Tenant shall, promptly after payment of a Real Estate Imposition, furnish Landlord reasonable evidence of such payment.  If Tenant shall deem itself aggrieved by any Real Estate Imposition and shall elect to contest the payment thereof, Tenant may make such payment under protest or, if postponement of such payment will not jeopardize Landlord's title to the Premises, Tenant may postpone the same provided that it shall secure such payment and the interest and penalties thereon and the costs of the contest on the determination of the proceedings or suit in which such contest may be had, by causing to be delivered to Landlord cash or other security reasonably satisfactory to Landlord, or a bond of indemnity of a good and solvent surety company, in form and amount reasonably satisfactory to Landlord. Either party paying any Real Estate Imposition shall be entitled to recover, receive, and retain for its own benefit all abatements and refunds of such Real Estate Imposition, unless it has previously been reimbursed by the other party.  Tenant agrees to save Landlord harmless from all costs and expenses incurred on

-13-

IWA0014312

account of Tenant's participation in such proceedings.  Landlord, without obligating itself to incur any costs or expenses in connection with such proceedings, shall cooperate with Tenant with respect to such proceedings so far as reasonably necessary.  Neither party shall discontinue any abatement proceedings begun by it without first giving the other party written notice of its intent so to do and reasonable opportunity to be substituted in such proceedings.  If, pursuant to the preceding sentence, Landlord is substituted in a proceeding begun by Tenant, Landlord must continue such proceeding at its own expense and, if any Real Estate Imposition is increased as a result of continuing such proceeding, Landlord shall be solely responsible for such increase.  Subject to the preceding sentence, upon the termination of any such proceedings, (i) Tenant shall pay the amount of any such Real Estate Imposition or part thereof as is finally determined in such proceedings, the payment of which, pursuant to the foregoing provisions of this Section 3.1.5(c), shall have been deferred during the prosecution of such proceedings, together with all costs, fees, interest, penalties or other liabilities in connection therewith, and (ii) any security delivered pursuant to this Section 3.1.5(c) shall be released following payment as required in clause (i).

(d)   Landlord shall promptly furnish to Tenant a copy of any notice of any Real Estate Imposition received by Landlord, but Tenant's nonreceipt thereof shall not excuse Tenant from the timely payment of any Real Estate Imposition which Tenant is obligated to pay hereunder or otherwise relieve Tenant of Tenant's liabilities and duties hereunder. Tenant, with Landlord's cooperation to the extent necessary, shall make suitable arrangements with the taxing authorities for the mailing or sending of bills and notices directly to Tenant.

-14-

IWA0014313

(e)  Nothing contained in this Lease shall, however, require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, or transfer tax on Landlord's transfer of its interest in the Premises subsequent to the recording hereof, or any net income tax upon the rent payable by Tenant under this Lease.  Tenant shall, however, pay all recording fees arising out of the recording of this Lease and transfer taxes on Landlord's transfer of its interest in the Premises by reason of the execution and delivery of this Lease.  Notwithstanding the first sentence of this Section 3.5.1(e), if, subsequent to the date hereof, any other taxes or governmental charges shall be levied or assessed against the building and/or the Land or imposed on Landlord, which are in the nature of or in substitution for real estate taxes, including any tax levied on or measured by the rents payable by Tenant or any sub-tenants, or if Landlord shall be required to pay any such additional tax with respect to Landlord's ownership of the Premises, the execution and delivery of this Lease, the use and enjoyment of the Premises, or the receipt or accrual of any Annual Rent payable to Landlord under this Lease, Landlord shall notify Tenant and the same shall be deemed to be a Real Estate Imposition payable by Tenant under this Lease.

3.5.2  Utilities.  Tenant shall pay or cause to be paid all charges, prorated for partial periods at the beginning and end of the Term, for water, gas, sewer, electricity, light, heat or power, telephone or other service used, rendered or supplied to Tenant in connection with the Premises, and shall not contract for the same in Landlord's name.

3.5.3  Insurance.  Tenant shall pay or cause to be paid all premiums, prorated for partial periods at the beginning and end of the Term, for insurance required pursuant to Article IV hereof.

-15-

IWA0014314

3.5.4  <u>Ride Share Program</u>.  Tenant shall pay all costs incurred in connection with the Davis Tract Ride Sharing Program (as defined in Section 15.1), prorated for partial periods at the beginning and end of the Term, as required pursuant to Article XV.

3.6  <u>Deferred Rent Payment</u>.  Tenant covenants and agrees to pay to Landlord the Deferred Rent, without interest, as follows:

(a)  Tenant shall pay to Landlord any positive difference (up to the total amount of the Deferred Rent) between (i) $30,556,000 plus any amounts that the tenant under the Office Lease expends in connection with the construction of the improvements to be constructed pursuant to Section 7.1 (through substantial completion), and (ii) the actual costs incurred in connection with the construction of the improvements, including the base building improvements, tenant improvements, and all other project related costs incurred through substantial completion. Tenant shall pay to Landlord such amount no later than twenty (20) days after substantial completion.  For purposes of this subsection, substantial completion shall have the meaning ascribed to such term in the General Contract.

(b)  To the extent that Landlord does not receive the total amount of the Deferred Rent pursuant to subsection (a), then, notwithstanding anything in the Agreement of Limited Partnership of Tenant (the "Partnership Agreement") to the contrary, whenever Tenant has any Net Cash Flow or Capital Proceeds (as defined in the Partnership Agreement) available for distribution, Tenant shall immediately pay to Landlord all such amounts until Landlord has received the total amount of the Deferred Rent. Tenant shall not make any distributions of Net Cash Flow or Capital Proceeds to the partners of Tenant until Landlord has received all Deferred Rent.

-16-

IWA0014315

3.7  <u>Net Lease</u>.  This is an absolutely net lease and
Landlord shall not be required to provide any services or do any
act or thing with respect to the Premises, or the buildings and
improvements thereon, or the appurtenances thereto, except as may
be specifically provided herein, and the rent reserved herein and
any other sums payable hereunder shall be paid to Landlord with-
out any claim on the part of Tenant for diminution, set-off or
abatement, and nothing shall suspend, abate or reduce any rent or
other sums to be paid hereunder, except as otherwise specifically
provided in this Lease.

3.8  <u>Environmental Conditions</u>.  Notwithstanding any-
thing herein to the contrary, promptly after receipt of invoices
detailing the expenses incurred, Landlord shall reimburse Tenant
for the first fifty thousand dollars ($50,000.00) of expenses
incurred by Tenant in connection with the construction of the
initial improvements to be constructed by Tenant pursuant to
Section 7.1 (or site work (e.g., excavation) in connection with
such construction) to remediate any environmental conditions (but
only if and to the extent such expenses would not have been
incurred if such conditions had not existed).

ARTICLE IV

<u>INSURANCE AND INDEMNITY</u>

4.1  <u>Risks to be Insured</u>.  At all times during the
Term, Tenant shall, at Tenant's cost and expense:  (a) effect and
maintain all risk property insurance for all buildings which may
hereafter be erected on the Premises, in the name of Landlord and
Tenant, as their interests may appear, insuring against any loss
or damage by fire, lightning, windstorm, hail, explosion, riot,
civil commotion, smoke, hurricane, and tornado, and damage from
aircraft and vehicles, and such other risks as Landlord may rea-
sonably designate, to the extent insurance against such risks is
available in Montgomery County, Maryland under an extended

-17-

IWA0014316

coverage endorsement, in an amount representing not less than one
hundred percent (100%) of the full insurable value (the term
"full insurable value" shall mean the actual replacement cost
(excluding foundation and excavation cost and cost of underground
flues, pipes, and drains) of any improvements on the Premises, as
such replacement cost may be reasonably estimated by Landlord)
without co-insurance, and against war risks, as, when and so long
as insurance against such risks is reasonably obtainable from the
United States of America or an agency thereof, in an amount rep-
resenting not less than one hundred percent (100%) of the full
insurable value; (b) effect and maintain boiler and machinery
equipment insurance, if the same shall be appropriate, in an
amount reasonably designated by Landlord; (c) effect and maintain
comprehensive general liability insurance, including property
damage, on the Premises for the benefit of Landlord and Tenant,
as their interests may appear, and covering any liability (sub-
ject to ordinarily accepted exclusions) that Landlord may have
with respect to the Property for injury to persons or property,
on an "occurrence" basis with a limit of not less than Three Mil-
lion Dollars ($3,000,000) per occurrence; (d) effect and maintain
insurance protecting Landlord against abatement or loss of rent
in an amount equal to at least all the Fixed Rent and the Addi-
tional Rent payable for one (1) year under Article III hereof;
(e) during the construction required pursuant to Section 7.1, and
thereafter in the event of any demolition, construction, restora-
tion, alterations or changes in the Premises that may be made by
Tenant in excess of Five Hundred Thousand Dollars ($500,000) per
job, provide and keep in force for the benefit of Landlord and
Tenant, as their interests may appear, liability and all-risk
builder's risk insurance, written on a completed value basis, for
an amount not less than one hundred percent (100%) of the insur-
able value of any improvements being constructed; (f) effect and
maintain workers' compensation insurance providing benefits for
all persons employed by Tenant at or in connection with the

-18-

Premises; and (g) effect and maintain such other insurance as
Landlord may reasonably require insuring against such additional
hazards, risks, contingencies, and perils as are commonly insured
against by Landlord and other office building owners in Rock
Spring Park.   The form and content of each policy required pursu-
ant to this Section 4.1 shall be reasonably satisfactory to Land-
lord and shall be generally in accordance with what is customary
for similar properties located in Montgomery County, Maryland.
The limits of insurance set forth above in this Section 4.1 shall
be subject to increase from time to time, but not more often than
once in any two year period, to amounts reasonably determined by
Landlord to reflect the amounts of coverage then being obtained
to protect owners of similar buildings in Rock Spring Park.

    4.2   Policy Provisions.   All insurance policies
required to be maintained by Tenant pursuant to Section 4.1 shall
be issued by insurance companies of recognized responsibility
that are qualified to do business in Maryland and reasonably
acceptable to Landlord and shall:   (a) name Landlord, any mort-
gagee of Landlord's fee interest, Tenant, and Leasehold Mortgagee
as additional insureds, as their respective interests may appear,
and shall include an effective waiver by the issuer of all rights
of subrogation against any insured or such insured's interest in
the Premises or any income derived therefrom; (b) provide that
all claims for losses shall be adjusted by Tenant, subject to the
reasonable approval of Landlord and Leasehold Mortgagee; (c) pro-
vide that, except in the case of public liability insurance,
insurance proceeds in amounts exceeding Five Hundred Thousand
Dollars ($500,000) shall be payable to Depositary (as hereinafter
defined) to be held and disbursed as set forth in Section 6.1
hereof for the benefit of Landlord, Tenant, and Leasehold Mort-
gagee; (d) provide that any losses shall be payable notwithstand-
ing any act or failure to act or negligence of Landlord or Tenant
or any other person; and (e) provide that no cancellation,

-19-

IWA0014318

reduction in amount or a material change in coverage thereof with respect to the Premises shall be effective until at least thirty (30) days after receipt by Landlord, Tenant, and Leasehold Mortgagee of written notice thereof.

4.3   Delivery of Policies.

(a)   Upon the execution of this Lease and thereafter not less than sixty (60) days prior to the expiration date of any policy delivered pursuant to this Article IV, Tenant shall deliver to Landlord a copy of any policy or renewal policy, as the case may be, required by this Lease, and an original certificate thereof bearing notations evidencing the payment of premiums due thereon.

(b)   Landlord shall not be limited in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force general liability policies as aforesaid to the amount of the insurance premium or premiums not paid or incurred by Tenant which would have been payable upon such insurance, but shall also be entitled to recover, as damages for such breach, the uninsured amount of any loss, liability, damages, claims, costs and expenses of suit, judgments and interest, suffered or incurred by Landlord by reason of any occurrence on the Premises which was not insured because of Tenant's failure to comply with the insurance requirements hereunder.   Tenant shall not violate or permit to be violated any condition of any of said policies, and Tenant shall so perform and satisfy the requirements of the companies writing such policies.

4.4   Depositary.   As used in this Lease, "Depositary" shall be Leasehold Mortgagee, if any, or if there is no Leasehold Mortgagee, a bank or trust company designated by Tenant and reasonably acceptable to Landlord, and having its principal office

-20-

IWA0014319

in the Washington, D.C. area.  Depositary shall be entitled to
rely upon any certificate believed by it to be genuine and to
have been signed by the proper party as conclusive evidence of
any fact or as to any matter therein set forth.  Such certificate
shall be a full warrant, authority, and protection to Depositary
in acting thereon.

    4.5  <u>Indemnity</u>.  Tenant shall indemnify and save harm-
less Landlord from and against any and all liability, loss, dam-
ages, expenses, costs of action, suits, interest, fines, penal-
ties, claims, and judgments (to the extent that the same are not
paid out of the proceeds of any policies of insurance furnished
by Tenant to Landlord pursuant to Article IV hereof) arising from
any occurrence during the Term involving person or property of
any and every nature, and from any matter or thing, growing out
of the occupation, possession, use, management, improvement, con-
struction, alteration, repair, maintenance or control of the
Premises, the buildings and improvements hereafter located
thereon, the facilities and equipment therein, the sidewalks,
vaults, vault spaces, curbs, and gutters adjoining the Premises,
the appurtenances thereto or the franchises and privileges con-
nected therewith, or arising out of Tenant's failure to perform,
fully and promptly, or Tenant's postponement of compliance with,
each and every term, covenant, condition and agreement herein
provided to be performed by Tenant.  Tenant, at Tenant's cost and
expense, shall defend by counsel reasonably acceptable to Land-
lord (provided that if the matter is covered by insurance and
Tenant's insurance carrier selects counsel, Landlord shall accept
such counsel) any and all suits that may be brought, and claims
which may be made, against Landlord, or in which Landlord may be
impleaded with others, whether Landlord shall be liable or not,
upon any liabilities, losses, damages, expenses, costs of action,
suits, interest, fines, penalties, claims, and judgments and
shall satisfy, pay, and discharge any and all judgments that may

-21-

IWA0014320

be imposed against Landlord in any such action or actions in which Landlord may be a party defendant, or that may be filed against the Premises, the buildings and improvements thereon or the appurtenances thereto, or any interest therein, and in the event of the failure of Tenant, within fifteen (15) days after notice from Landlord, to pay the sum or sums for which Tenant shall become liable as aforesaid, then Landlord may pay such sum or sums, with all interest and charges which may have accrued thereon, and the amount so paid by Landlord shall be payable by Tenant to Landlord upon demand; provided, however, that Tenant shall not be liable to Landlord if the loss or damage was caused by the negligent acts or omissions of Landlord, its agents or employees.  Notwithstanding the preceding sentence, if within fifteen (15) days after receipt of Landlord's notice, Tenant notifies Landlord that Tenant is continuing in good faith to defend the action through an appeal or other appropriate legal process, then Landlord shall not be entitled to reimbursement for any sum or sums Landlord pays unless Landlord reasonably believes that the payment of such amount is necessary to preserve the Premises or Landlord's interest therein.  In addition, Landlord shall not negotiate any settlement of any suit or claim during the pendency of Tenant's defense thereof without providing Tenant with fifteen (15) days' prior written notice and an opportunity to participate in such negotiations and settlement.

ARTICLE V

USE; ASSIGNMENT

5.1 <u>Use</u>.  Except as otherwise provided in Article VII below, Tenant shall have the right to use the Premises or any part thereof for any and all lawful purposes, to build and rebuild thereupon, to erect such building or buildings on the Premises as it may elect, and to make such alterations, improvements, and betterments to the Premises as it may desire.

-22-

5.2  <u>Assignment and Subletting</u>.

(a)  Tenant may assign this Lease and may mortgage its leasehold estate.  Notwithstanding the foregoing and the provisions of Section 13.1 below, so long as the lien of that certain Deed of Trust (the "Fee Mortgage") from Anne D. Camalier to Junuis S. Morgan and Joseph B. Tockarshewsky, Trustees for the benefit of American Security Bank, N.A. ("ASB") dated October 27, 1989 and recorded among the land records of the Circuit Court for Montgomery County, Maryland, in Liber 9055 folio 084 remains unreleased of record, Tenant may not assign this Lease in a manner which would release Tenant from liability hereunder prior to the substantial completion of the office building described in Section 7.1 below; provided, however, upon completion of said office building and for the first five years thereafter, Tenant may assign this Lease without ASB's consent provided the Office Lease remains in full force and effect and provided that the tenant under the Office Lease (or a "successor corporation" to the tenant as defined in Section 7.1(b) of the Office Lease) remains liable thereunder for the tenant's obligation under the Office Lease.  Thereafter Tenant may assign this Lease without ASB's consent.  ASB's consent shall not be required for any assignment of this Lease following foreclosure or a deed in lieu under any Leasehold Mortgage.

(b)  Tenant shall have the right, without Landlord's consent (except as set forth below in this subsection), to sublease the Premises, or any part thereof.  At Landlord's request, Tenant shall deliver to Landlord notice of such subleasing and an executed counterpart of the sublease agreement.  All subleases shall be in writing and shall provide that (i) they are subject and subordinate to this Lease, (ii) the subtenants will not pay rent or other sums under the sublease for more than one (1) month in advance, and (iii) at Landlord's option, on the

-23-

IWA0014322

termination of this Lease, the subtenants will attorn to, or
enter into a direct sublease on identical terms with, Landlord
for the balance of the unexpired term of the sublease.  Notwith-
standing the first sentence of this subsection (b), without Land-
lord's prior written consent, Tenant shall not sublease the Prem-
ises for a term that extends beyond the Term and, in the last ten
(10) Lease Years of the Term, Tenant shall not sublease the Prem-
ises, or any part thereof, without Landlord's prior written con-
sent, which shall not be unreasonably withheld.  Landlord agrees,
subject to the conditions set forth in Section 8.1, to enter into
non-disturbance agreements with subtenants.  Landlord hereby spe-
cifically consents to the Office Lease.

    5.3  <u>Compliance with Law</u>.  Tenant shall at all times
during the Term, at Tenant's cost and expense, perform and comply
with all laws, rules, orders, ordinances, regulations, and
requirements now or hereafter enacted or promulgated, of any gov-
ernmental agency or authority having jurisdiction over the Prem-
ises, or the buildings and improvements hereafter located
thereon, or the facilities or equipment therein, or the streets,
sidewalks, vaults and vault spaces, if any, curbs, and gutters
adjoining the Premises or the appurtenances thereto, or the fran-
chises and privileges connected therewith, whether or not such
laws, rules, orders, ordinances, regulations or requirements so
involved shall necessitate structural changes, improvements,
interference with use and enjoyment of the Premises, replacements
or repairs, extraordinary as well as ordinary, and Tenant shall
so perform and comply, whether or not such laws, rules, orders,
ordinances, regulations or requirements shall now exist or shall
hereafter be enacted or promulgated, and whether or not such
laws, rules, orders, ordinances, regulations or requirements can
be said to be within the present contemplation of the parties
hereto.  Notwithstanding the foregoing, Tenant, at Tenant's

-24-

IWA0014323

expense, after prior written notice to Landlord, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the application to Tenant or the Premises of any laws, rules, orders, ordinances, regulations or requirements, provided that (i) neither the Premises nor any part thereof would be in danger of being forfeited or lost, and (ii) Tenant shall have furnished such security as Landlord may reasonably require. Landlord shall, at Tenant's reasonable request and at Tenant's expense, cooperate with Tenant with respect to any contest pursuant to the preceding sentence.

5.4   Mechanics' Liens.

(a)   Notice is hereby given that Landlord shall not be liable for any work performed or to be performed on the Premises, for Tenant or any subtenant, or for any materials furnished or to be furnished at the Premises for Tenant or any subtenant, and that no mechanic's or other lien for such work or materials shall attach to the reversionary or other interest of Landlord.  If, in connection with any work being performed by Tenant or any subtenant, or in connection with any materials being furnished to Tenant or any subtenant, any mechanic's lien or other lien or charge shall be filed or made against the Premises or any part thereof, or if any such lien or charge shall be filed or made against Landlord as owner, then Tenant, at Tenant's cost and expense, within sixty (60) days after such lien or charge shall have been filed or made, shall cause the same to be cancelled and discharged of record by payment thereof or filing of a bond or otherwise, and shall also defend, at Tenant's cost and expense, any action, suit or proceeding which may be brought for the enforcement of such lien or charge, and shall pay any damages, costs, and expenses (including reasonable attorneys' fees) suffered or incurred therein by Landlord, and shall satisfy and discharge any judgment entered therein.

-25-

IWA0014324

(b)   Notwithstanding the foregoing, Tenant, at its expense, may contest, after prior written notice to Landlord, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any mechanics' lien or other charge of the nature referred to above, provided that (i) neither the Premises nor any part thereof would be in any danger of being forfeited or lost, and (ii) Tenant shall have furnished such security as Landlord may reasonably require.

(c)   Tenant shall not commence any work on the Premises the cost of which exceeds Five Hundred Thousand Dollars ($500,000), except the initial development and construction of improvements pursuant to Article VII and thereafter work required by fire or other casualty, which could give rise to a mechanic's lien without giving Landlord at least thirty (30) days' prior written notice so that Landlord may file, at Landlord's expense, notice of non-responsibility for such work under any applicable statute.   For every Lease Year following the first Lease Year, the aforesaid Five Hundred Thousand Dollars ($500,000) limit upon the cost of work which may be performed by Tenant without notice to Landlord shall be increased by the Percentage Increase in the Index for the relevant Lease Year over the Base Index.

ARTICLE VI

CASUALTY AND TAKING

6.1   Casualty.

(a)   If any buildings from time to time con-structed on the Premises are damaged or destroyed by fire or other casualty, this Lease shall in no way be affected and shall continue in full force and effect, provided that if during the last nine (9) years of the Term there is a total destruction of a building or such substantial damage to the Premises, that in the

-26-

IWA0014325

exercise of good faith Tenant determines that restoration is not economically feasible, Tenant may by written notice given to Landlord within ninety (90) days after the date of such destruction or damage terminate this Lease.

      (b)   All money paid under policies of insurance referred to in Article IV of this Lease and delivered to Depositary pursuant to Section 4.2(c) shall be held by Depositary and such money, together with any and all interest thereon, shall be disposed of as follows:

      (i)   If this Lease is not terminated, Tenant shall restore, or cause the restoration of, all buildings then existing on the Premises, and:

      (A)   The Depositary shall pay to Tenant from such moneys such part thereof as shall equal the cost to Tenant of restoring any existing buildings, or any part thereof, or of erecting a new building.

      (B)   Payments pursuant to subdivision (A) of this subparagraph (i) shall be made to Tenant from time to time as the work progresses, in amounts equal to ninety percent (90%) of the cost of the labor and materials used in connection with such work, plus builders', architects', and engineers' fees and other charges incurred in connection therewith, upon delivery to Depositary, with a copy to Landlord, of lien waivers from all mechanics and materialmen who performed work, waiving any liens to the date of the previous draw request, and a certificate of Tenant, stating:  (I) the amounts so to be paid to Tenant are properly payable hereunder, (II) such amounts are then due and payable by Tenant or have theretofore been paid by Tenant, (III) no part of such cost has previously been made the basis of any request for the withdrawal of insurance proceeds under this Article VI, (IV) the amount previously disbursed and applied to the

-27-

IWA0014326

cost of the restoration, and (V) that the amount required to complete such restoration is less than or equal to ninety percent (90%) of the amount which will be held by Depositary after such disbursement.  If the amount then held is not sufficient to complete such restoration, Depositary shall not be obligated to disburse any payment to Tenant until Tenant has deposited such insufficiency with Depositary.  All such work undertaken by Tenant shall be completed by Tenant free of all liens.  After the completion of such restoration any proceeds remaining after the making of the payments to Tenant referred to in this subparagraph (B) shall be disbursed to Tenant, provided that Tenant has first delivered to Depositary, with copies to Landlord, a certificate of completion from Tenant's architect or engineer and final lien waivers from all mechanics and materialmen who performed work in connection with the restoration.

(ii)  If this Lease is terminated pursuant to Section 6.1(a), then all of Tenant's rights in said insurance proceeds, plus interest, if any, shall first be paid over or assigned to Leasehold Mortgagee to the extent required under the terms of the leasehold mortgage and the balance, if any, shall be allocated to Landlord and Tenant in proportion to their relative interests in the Premises as of the date of the casualty.  If Landlord and Tenant are unable to agree on such values within thirty (30) days following the distribution of insurance proceeds to Leasehold Mortgagee as stated in the preceding sentence, such values shall be determined by appraisal in the procedural manner set forth in Section 3.4 hereof.

6.2  <u>Notice of Taking</u>.  Forthwith, upon receipt by either Landlord or by Tenant of notice of the institution of any proceedings for the taking of all or any part of the Premises by the exercise of any power of condemnation or eminent domain, or by agreement of Landlord, Tenant, and those authorized to

-28-

exercise the power of eminent domain, or for any street widening
or change of grade, the party receiving such notice shall
promptly give written notice thereof to the other, and such other
party may also appear in such proceeding and be represented by
counsel, who may be counsel for the party receiving such notice.

      6.3  <u>Entire Taking</u>.  If, at any time during the Term,
the whole or any significant portion (as hereinafter defined) of
the Premises shall be taken for any public or quasi-public pur-
pose by any lawful power or authority by the exercise of the
right of condemnation or eminent domain, or by agreement between
Landlord, Tenant, and those authorized to exercise such right,
this Lease and the Term shall terminate and expire on the date of
such taking and the Fixed Rent and Additional Rent and other sums
of money and other charges herein provided to be paid by Tenant
shall be apportioned and paid to the date of such taking and any
unearned charges and all deposits shall be refunded to Tenant.
For purposes of this Article VI, a "significant portion" of the
Premises shall be deemed to mean such portion of the Premises as,
when taken, would leave remaining a balance of the Premises
which, whether because of the area so taken or the location of
the part so taken in relation to the part not so taken, would be
commercially unreasonable for Tenant to use.  The determination
as to whether it would be commercially unreasonable for Tenant to
use the Premises after a condemnation shall be made by an indi-
vidual who is unrelated to either Landlord or Tenant and who is
selected in writing by Tenant and approved in writing by
Landlord.

      6.4  <u>Partial Taking</u>.

      (a)  If twenty-five percent (25%) or more of the
total floor area of the building or buildings on the Premises,
but less than the whole or any significant portion of the Prem-
ises, shall be taken for any public or quasi-public purpose by

-29-

IWA0014328

any lawful power or authority by the exercise of the right of condemnation or eminent domain, or by agreement between Landlord, Tenant, and those authorized to exercise such right, then in such event Tenant shall have the right to cancel and terminate this Lease as of the date of such taking, upon giving to Landlord notice in writing of such election within ninety (90) days after receipt by Tenant from Landlord of written notice that such portion of the Premises has been taken.  In the event of such cancellation, any rent theretofore paid or then payable shall be apportioned as of the date of taking, any unearned charges and all deposits shall be refunded to Tenant, and Tenant shall thereupon be released from any further liability under this Lease.

        (b)  If less than twenty-five percent (25%) of the total floor area of the building or buildings on the Premises shall be taken, or if twenty-five percent (25%) or more of the total floor area of the building or buildings on the Premises shall be so taken and Tenant shall not elect to so terminate this Lease, but shall remain in that portion of the Premises which shall not have been taken as herein provided, then in either such event, commencing at the date of taking, the Fixed Rent shall be reduced in the ratio that the total floor area of the part of the building or buildings which were taken bears to the total floor area of the building or buildings which were included within the Premises before such taking.  The entire Award (as defined in Section 6.5(a)) received in either of the events described in the first sentence of this Section 6.5(b) shall be paid to Depositary and Depositary shall disburse the Net Award (as defined in Section 6.5(a)) in the following manner:

        (i)  First, for the restoration of the building or buildings as provided in the case of insurance proceeds in Section 6.1(b)(i) hereof.

-30-

IWA0014329

(ii)   Second, to Landlord in an amount equal to the value of the Land taken, as determined pursuant to Section 6.5(b).

(iii) Third, to the first Leasehold Mortgagee, in an amount equal to any decrease in its security resulting from the taking.

(iv)   Fourth, if any balance shall remain, Landlord and Tenant shall determine pursuant to the methods set forth in Section 6.5(b) the value of Landlord's interest in the portion of the building or buildings taken and the value of Tenant's interest in the portion of the building or buildings taken, both of which values to be determined as of the date on which title vests in the taking authority.  Depositary shall pay such balance to Landlord and Tenant in proportion to the values of Landlord's and Tenant's respective interests in the portion of the building or buildings as so determined.

6.5   <u>Award If Lease Terminates</u>.

(a)   In the event of a termination of this Lease, pursuant to either Section 6.3 or Section 6.4(a), the total proceeds of the award paid or payable in any condemnation or eminent domain proceeding or the consideration or settlement paid or payable pursuant to any agreement between Landlord, Tenant, and those authorized to exercise the right of condemnation or eminent domain (hereinafter any such award, consideration or settlement is referred to as the "Award"), shall be held by Depositary and distributed, paid, and applied as in this Section 6.5 provided. The term "Net Award" shall mean the total Award less all costs, expenses, and attorneys' fees incurred in the collection thereof. With respect to any Award, Depositary shall disburse the Net Award in the following manner:

-31-

IWA0014330

(i)   First, to Landlord in an amount equal to the value of the Land, as determined pursuant to Section 6.5(b).

(ii)   Second, to the first Leasehold Mortgagee, up to an amount equal to the balance due it of unpaid principal and interest under its mortgage, deed of trust or other security instrument.

(iii)   Third, if any balance shall remain, Landlord and Tenant shall determine pursuant to the methods set forth in Section 6.5(b) the value of Landlord's interest in the building or the buildings and the value of Tenant's interest in the building or the buildings, both of which values to be determined as of the date on which title vests in the taking authority.  The Depositary shall pay such balance to Landlord and Tenant in proportion to the values of Landlord's and Tenant's respective interests in the building or buildings as so determined.

(b)   The parties hereto shall request that in any condemnation proceeding there be a separate determination of: (i) the value of the Land (or the portion of the Land that is taken) considered as vacant, unimproved, unencumbered by any mortgages or leases of any kind, and immediately available (which shall be deemed to mean that all necessary infrastructure improvements are available) for use and/or development for its highest and best use in accordance with the existing governmental regulations; (ii) the value of Landlord's interest in the building or buildings (or the portion thereof that is taken); and (iii) the value of Tenant's interest in the building or buildings (or the portion thereof that is taken).  Notwithstanding the preceding sentence, with respect to any condemnation occurring prior to the third Subsequent Base Lease Year, in determining the value of the Land pursuant to clause (i) above, the Land shall not be valued as if it were immediately available for use and/or

-32-

IWA0014331

development in accordance with its highest and best use but
rather shall be valued as if it were immediately available for
use and/or development with a building of approximately the same
density and use as the building to be constructed pursuant to
Section 7.1.  Any determination made in accordance with the
preceding sentences shall be binding and conclusive upon the par-
ties.  If for any reason such values are not separately deter-
mined in the proceeding, then such values shall be fixed by
agreement between Landlord and Tenant or, if the parties are
unable to agree within thirty (30) days after the proceedings
have terminated, by appraisal in the procedural manner set forth
in Section 3.4. hereof.

    6.6  <u>Taking for Temporary Use</u>.  If the temporary use of
the whole or any part of the Premises or any building or build-
ings thereon shall be taken at any time during the Term for any
public or quasi-public purpose by any lawful power or authority,
by the exercise of the right of condemnation or eminent domain,
or by agreement between Landlord, Tenant, and those authorized to
exercise such right, the Term shall not be reduced or affected in
any way.  In such case, Tenant shall continue to pay in full the
Annual Rent, and any other sum of money herein provided to be
paid by Tenant.  Tenant shall be entitled to the entire Award for
such taking (whether paid by way of damages, rent or otherwise)
unless the period of occupation and use by the condemning author-
ity shall extend beyond the date of expiration of this Lease, in
which case the Award made for such taking shall be apportioned
between Landlord and Tenant as of the date of such expiration.
In any proceeding for such taking or condemnation, the Landlord
shall have the right to intervene and participate; provided that
if such intervention shall not be permitted, Tenant shall, at
Tenant's expense, consult with Landlord, its attorneys, and
experts, and make all reasonable efforts to cooperate with Land-
lord in the prosecution or defense of such proceeding.  At the

-33-

IWA0014332

termination of any such use or occupation of the Premises or any
building or buildings thereon, Tenant shall, at its sole cost and
expense, repair and restore the building or buildings and
improvements then upon the Premises to the condition, as nearly
as may be reasonably possible, in which such buildings and
improvements were at the time of such taking.  Tenant shall not
be required to make such repairs and restoration if the Term
shall expire prior to the date of termination of the temporary
use so taken, and in any such event Landlord shall be entitled to
recover all damages and Awards arising out of the failure of the
condemning authority to repair and restore the buildings and
improvements at the expiration of such temporary taking.  In the
event the temporary taking expires prior to the expiration of the
Term, any recovery or sum received by Landlord or Tenant as an
Award for physical damage to the Premises or any building or
buildings thereon caused by and during the temporary taking shall
be deemed a trust fund for the purpose of repairing or restoring
such damage.

ARTICLE VII

<u>IMPROVEMENTS</u>

7.1  <u>Construction of New Buildings</u>.

(a)  Tenant shall at its own cost and expense con-
struct on the Premises a first class office building substan-
tially in accordance with preliminary plans (the "Preliminary
Plans"), approved by Landlord as to location, configuration and
exterior appearance of all buildings, which approval shall not be
unreasonably withheld or delayed.  Within twenty (20) days after
receipt by Landlord of the Preliminary Plans, Landlord shall
either approve them or disapprove them and indicate with reason-
able specificity the areas of such disapproval and the modifica-
tions which it proposes in order to approve the same.  If Land-
lord fails to so approve or disapprove the Preliminary Plans they

-34-

IWA0014333

shall be deemed to have been approved.  If Landlord so disapproves the Preliminary Plans, Tenant shall cause its architects to resubmit the same with modifications and the same procedures for approval or disapproval and resubmission shall apply until Landlord shall have approved the Preliminary Plans.  Landlord agrees that the Preliminary Plan dated December 26, 1984 prepared by Patton Harris Rust and Associates, approved by the Montgomery County Planning Board and numbered Preliminary Plan No. 1-84285, including all conditions imposed by the County with respect thereto, is approved by Landlord.

(b)  Tenant shall cause its architect to prepare working drawings and specifications (collectively, the "Working Drawings") for such building in a manner consistent with the Preliminary Plans and to submit the Working Drawings to Landlord for its confirmation that they are substantially consistent in terms of location, configuration, and exterior appearance with the Preliminary Plans for such buildings.  Within twenty (20) days after receipt of the Working Drawings, Landlord shall either confirm such consistency or disapprove them as being inconsistent and indicate with reasonable specificity the areas of such inconsistency and the modifications which it proposes in order to make the same consistent.  If Landlord fails to so confirm or disapprove the Working Drawings they shall be deemed to have been approved.  If Landlord so disapproves the Working Drawings, Tenant shall cause its architect to resubmit the same with modifications and the same procedures for confirmation or disapproval and resubmission shall apply until Landlord shall have confirmed the Working Drawings.  Landlord agrees not to unreasonably withhold or delay such confirmation.

(c)  Tenant shall construct the building and improvements on the Premises in accordance with the approved Working Drawings.  Tenant shall commence such construction

-35-

IWA0014334

promptly following approval of the Working Drawings and shall continue construction diligently and expeditiously until completion, subject with respect to both commencement and completion to delays for Force Majeure, as hereinafter defined.

(d) After completion of the building, Tenant shall furnish Landlord with (i) a set of "as built" drawings, (ii) a copy of the final plans and specifications for the construction of the building, and (iii) a certified copy of the certificate or certificates of occupancy for the building.

(e) Landlord hereby consents to the signage rights granted to the tenant under the Office Lease. Any other exterior signs shall be subject to Landlord's approval.

7.2  Repairs and Alterations.

(a) Except as otherwise expressly provided herein, Tenant shall at all times during the Term, at Tenant's cost and expense, keep the Premises and all buildings and improvements hereafter located thereon, and all facilities and equipment therein, and all sidewalks, curbs, vaults, and vault spaces, if any, adjoining the Premises, and all appurtenances thereto, in first class operating condition and repair, and in such condition as may be required by law and by the terms of the insurance policies furnished pursuant to this Lease, whether or not such repair shall be interior or exterior, extraordinary as well as ordinary, and whether or not such repair shall be of a structural nature or can be said to be within the present contemplation of the parties hereto.

(b) Tenant shall at all times during the Term, at Tenant's cost and expense, keep the sidewalks, curbs, vaults, and vault spaces, if any, adjoining the Premises, free from snow, ice, and any other obstructions.

-36-

IWA0014335

(c)   Tenant may from time to time during the Term make alterations to the Premises, provided that said alterations shall not materially and adversely affect the value thereof and provided further that if any alteration is of a structural nature or shall cost more than Five Hundred Thousand Dollars ($500,000), then Tenant shall request in writing Landlord's prior written consent thereto, which consent shall not be unreasonably withheld, and which consent may be conditioned on the furnishing by Tenant of a bond of a surety company reasonably acceptable to Landlord assuring Landlord of the completion of such alteration and payment in full of the cost thereof.  If Landlord fails to respond to Tenant's written request for consent within ten (10) days after receipt of such request, Landlord shall be deemed to have approved Tenant's proposed alterations.  For every Lease Year following the first Lease Year, the aforesaid Five Hundred Thousand Dollar ($500,000) limit upon alterations that Tenant may make without Landlord's prior approval shall be increased by the Percentage Increase in the Index for the relevant Lease Year over the Base Index.

(d)   Notwithstanding the provisions of Section 7.3(c), Tenant shall not be required to obtain Landlord's consent for the making of decorations in or to the Premises, provided such decorations are not of a structural nature.  For purposes of this subsection (d), decorations shall include painting, carpeting, and similar improvements.

7.3   _Demolition, Etc_.  In connection with any construction activity of Tenant at any time during the Term, Tenant may destroy, demolish, and remove any buildings, fixtures or other improvements at any time placed in or upon the Premises, and may remove, regrade, and rearrange such land and the contents thereof as may be incidental to any such construction or demolition activities, and in all such activities may deal with the Premises

IWA0014336

as if Tenant were the sole owner thereof, provided however, that
(a) in no event shall Tenant demolish all or any part of the
buildings to be constructed pursuant to Section 7.1 hereof, or
any replacement thereto, unless and until Tenant shall have fur-
nished Landlord with a bond or other security reasonably adequate
to assure Tenant's completion of a replacement for the building
or portion to be demolished which shall have at least the same
income producing value and which shall be the highest and best
use of the Premises then permitted by law; and (b) in connection
with the replacement of any removed or demolished building,
Tenant shall again comply with all the provisions of Section 7.1.
Notwithstanding clause (a) of the preceding sentence, if at the
time of any demolition or reconstruction the applicable zoning
regulations have changed so that the highest and best use of the
Premises is inconsistent with the contractual rights of any sub-
lessees of Tenant, the building to be reconstructed shall be of
the highest and best use permitted by law which is also in accord
with the contractual rights of any sublessee.  All salvage from
any demolition activities and all soil and earth severed from the
Premises in connection therewith shall be the property of Tenant.

    7.4  Title to Buildings.  Tenant covenants and agrees
that its title to the buildings to be constructed on the Premises
and any replacement or additional buildings thereof are subject
to the terms and conditions of this Lease and that all grantees
or assignees of its title to such buildings or this Lease shall
take subject to and be bound by the terms and conditions of this
Lease, expressly including the following provisions of this Sec-
tion 7.4.  Any and all buildings, fixtures, and improvements
placed in, on, or upon the Premises shall remain the sole and
exclusive property of Tenant and its subtenants, notwithstanding
their affixation to, annexation to, or incorporation into the
Premises, until the termination of this Lease, at which time all
right, title, and interest to any such buildings, fixtures, and

-38-

IWA0014337

improvements as belong to Tenant shall vest in Landlord, subject to the rights of all subtenants to remove from the Premises such personal property and trade fixtures as belongs to them.  Upon termination of this Lease by expiration of the Term or prior termination by default, assignment to Landlord or otherwise, Landlord shall be the sole and absolute owner of such buildings free of any right, title, interest or estate of Tenant therein. Tenant hereby grants, releases, transfers, sets over, and assigns and conveys to Landlord all of its right, title, and interest in and to the buildings effective upon the termination hereof.  So long as this Lease shall continue in force and effect and there shall be no Event of Default hereunder, nothing herein contained shall adversely affect any right that Tenant may have to quiet enjoyment and possession, nor shall anything herein contained adversely affect Tenant's right to insurance proceeds and Awards as set forth in Article VI hereof.  Tenant covenants and agrees that it will execute such further assurances of title and conveyance as may be reasonably requested by Landlord upon termination in order to fully vest fee simple title to such buildings in Landlord in accordance with the requirements of local law then applicable and in such manner as to permit Landlord to obtain an owner's full coverage title insurance policy in the standard ALTA form then in use, fully insuring Landlord's fee simple ownership in the land and such buildings without any exception arising out of or by reason of the existence of this Lease, and at a premium charge not in excess of the premium charge normally made by title insurance companies for such owner's full coverage title insurance policy.  Without limiting the generality of the foregoing, should Landlord so request upon the termination of this Lease, Tenant shall execute a fee simple deed in the standard form then in use in land transactions in the State of Maryland fully sufficient to convey such buildings to Landlord.

IWA0014338

## ARTICLE VIII
### NON-DISTURBANCE

8.1   Non-Disturbance.  Landlord agrees, from time to time, to execute and deliver at Tenant's request a non-disturbance agreement, in form reasonably satisfactory to Landlord, between Landlord and sublessees of portions of the Premises for the purpose of providing that, in the event of the termination of this Lease, so long as such sublessee is not in default under its sublease beyond the period given therein to cure, Landlord shall not disturb the possession of such sublessee and shall recognize its rights under such sublease, and that notwithstanding such termination, such sublease shall continue in full force and effect, provided that (a) such sublease has been approved by an institutional lender which holds a first mortgage on Tenant's leasehold interest in the Premises, (b) such sublessee agrees to attorn to Landlord in such event, and (c) all of the conditions set forth in Section 5.2 have been satisfied.

## ARTICLE IX
### LANDLORD'S COVENANTS

9.1   Title.  Landlord covenants that Landlord has full right and lawful authority to enter into this Lease in accordance with the terms hereof and to grant the estate demised hereby and that Landlord has good and clear record and marketable title to the Premises in fee simple absolute and subject to no leases, tenancies, agreements, restrictions, encumbrances, liens or defects in title other than:

(a)   Zoning laws and ordinances;

(b)   Unpaid real estate taxes for the current year which are not yet due and payable; and

-40-

IWA0014339

(c) Easements and restrictions set forth as the permitted exceptions in Exhibit C hereof.

9.2 <u>Quiet Enjoyment</u>. Landlord covenants and agrees with Tenant that upon Tenant paying the Annual Rent, and performing and fulfilling all covenants, agreements, and conditions herein, Tenant shall and may, at all times during the Term hereby granted, peaceably and quietly have, hold, and enjoy the Premises and all rights, appurtenances, and privileges belonging or in any way appertaining thereto without hindrance or molestation.

ARTICLE X
<u>DEFAULTS</u>

10.1 <u>Events of Default</u>. Each of the following shall constitute an "Event of Default": (a) if Tenant shall default in the performance of any of its obligations to pay the Annual Rent, including Fixed Rent, Additional Rent or Deferred Rent, and if such default shall continue for twenty (20) days after written notice from Landlord to Tenant designating such default, or (b) if Tenant has defaulted in performing any other of Tenant's obligations hereunder and if such default shall continue for forty five (45) days after written notice from Landlord to Tenant designating such other default or defaults, provided that if the default is of such a character as cannot reasonably be cured within said period, and if Tenant commenced diligently to correct the default or defaults so designated after receipt of such notice and thereafter diligently pursues such correction, then said forty-five (45) day period shall be extended for such further time as may be reasonably necessary to enable Tenant, by proceeding with diligence, to complete performance.

10.2 <u>Termination; Repossession</u>. If any Event of Default occurs, Landlord, at Landlord's option, may give written notice to Tenant stating that this Lease and the Term shall

-41-

IWA0014340

expire and terminate, effective on the date specified in such
notice, and then this Lease and the Term and all rights of Tenant
hereunder shall expire and terminate as if the date specified in
such notice were the date herein fixed for the expiration of the
Term.  In addition, following any Event of Default, Landlord and
the agents and servants of Landlord lawfully may, in addition to
and not in derogation of any remedies for any preceding breach of
covenant, immediately or at any time thereafter and without
demand or notice and with or without process of law enter into
and upon the Premises or any part thereof and repossess the same
as of Landlord's former estate and expel Tenant and those claim-
ing through or under Tenant, subject to the rights of the tenant
under the Office Lease and the rights of any other subtenants
pursuant to any non-disturbance agreement executed by Landlord
(with or without the institution of legal proceedings to evict)
and remove its and their effects without being deemed guilty of
any manner of trespass and without prejudice to any remedies
which might otherwise be used for arrears of rent or prior breach
of covenant, and Landlord, without notice to Tenant, may store
Tenant's effects, and those of any person claiming through or
under Tenant (subject to the rights of the tenant under the
Office Lease and the rights of any other subtenants pursuant to
any non-disturbance agreements executed by Landlord) at the
expense and risk of Tenant, and, if Landlord so elects, may sell
such effects at public auction or private sale and apply the net
proceeds to the payment of all sums due to Landlord from Tenant
if any, and pay over the balance, if any, to Tenant.

    10.3   <u>Interest; Late Fees</u>.  If Tenant fails to make any
payment of Annual Rent on or before the date such payment is due
and payable, such payment shall bear interest at the rate of two
(2) percentage points in excess of the prime or base rate (the
"Prime Rate") established from time to time by The Riggs National
Bank of Washington, D.C. (or, if such prime rate is discontinued,

-42-

at a comparable rate selected by Landlord); provided, however, that if the default shall continue for more than ten (10) days after Tenant has received written notice thereof from Landlord, then, commencing on the eleventh (11th) day after Tenant's receipt of such notice, such payment shall bear interest at the rate of five (5) percentage points in excess of the Prime Rate. In addition, Tenant shall be liable for a late charge equal to five percent (5%) of any payment hereunder, whether it be Annual Rent or otherwise, which is not paid on its due date. Notwithstanding the foregoing provisions of this Section 10.3, twice in each Lease Year Tenant shall not be charged any interest or late fee under this Section 10.3 unless and until Tenant's failure to pay any Annual Rent becomes an Event of Default pursuant to Section 10.1.

10.4   Escrow for Real Estate Impositions and Insurance. Upon Landlord's request, following any default by Tenant in the payment of any Annual Rent payable hereunder, until such default is cured and all payments of Annual Rent have been made on or before the due date thereof for at least one (1) year, Tenant will pay to Depositary, at the same time as each monthly installment of Fixed Rent is due, an amount equal to 1/12 of the aggregate amount of (a) the Real Estate Impositions and (b) the insurance premiums referred to in Article IV, all as estimated by Landlord. Depositary shall hold such amounts in escrow and shall apply such amounts on account of the Real Estate Impositions and the insurance premiums, as and when payments therefor are due. Any amounts held by Depositary pursuant to this Section 10.4 shall bear interest or be invested in interest bearing obligations, provided that Landlord shall not be responsible for payment of any interest, and any amounts remaining in said escrow, including interest earned on such amounts, if any, shall be paid to Tenant upon termination of said escrow.

-43-

10.5   Additional Remedies.

(a)   If this Lease shall terminate as a result of or while there exists any Event of Default, any funds (including the interest, if any, accrued thereon) in which Tenant has an interest then held by Depositary may be applied by Landlord to any damages payable by Tenant (whether provided for herein or by law or in equity) as a result of such termination or Event of Default, and the balance remaining, if any, shall be paid to Tenant, subject to the rights of Leasehold Mortgagee, if Tenant would be entitled to receive such funds but for such termination or Event of Default.

(b)   Subject to Section 14.5, in addition to any other remedies specifically provided herein, if this Lease is terminated pursuant to Section 10.2 Landlord shall have the right to invoke any rights or remedies allowed at law or in equity or by statute or otherwise, including the right to seek damages in the amount of Annual Rent that would have been payable for the remainder of the Lease Term, as though the right of repossession were not provided in this Lease.  In any suit for damages, it is agreed that in calculating the amount of damages to which Landlord is entitled, the value, as of the date on which title to the improvements vests in Landlord as a result of a default hereunder, of Tenant's interest in any improvements on the Premises shall be subtracted from the amount of damages to which Landlord is entitled, to the extent that Tenant is able to establish such value in any such proceeding.

10.6   Attorneys' Fees.  Landlord shall be entitled to reasonable attorneys' fees and all other costs and expenses actually incurred by Landlord in attempting to collect Annual Rent and any interest thereon or late charges payable in connection therewith.

-44-

ARTICLE XI

LEASEHOLD MORTGAGEE'S RIGHTS

11.1  Right to Mortgage; Notice to Leasehold Mortgagee.
(a)  Tenant shall have the right at any time and from time to
time during the Term to make a leasehold mortgage upon Tenant's
interest in the Premises and the leasehold estate hereunder.  No
Leasehold Mortgagee, nor any entity claiming by, through or under
Leasehold Mortgagee by virtue thereof, shall acquire any greater
rights than Tenant has under this Lease, other than as expressly
set forth in this Article XI.  Tenant shall ensure that the pro-
visions of any loan documents with any leasehold mortgagee
require that such leasehold mortgagee send to Landlord copies of
all notices of default sent to Tenant in connection with any doc-
uments evidencing or securing repayment of the loan related
thereto.

(b)  So long as any leasehold mortgage shall
remain a lien on Tenant's leasehold estate hereunder, Landlord
agrees, simultaneously with the giving of each notice hereunder,
to give a duplicate copy thereof, in the manner required for
notices pursuant to Section 14.7 hereof, to Leasehold Mortgagee
and no such notice to Tenant shall be effective unless a copy of
such notice is so given to Leasehold Mortgagee.  The Leasehold
Mortgagee will have the same period after the giving of the
notice aforesaid to it for remedying the default or causing the
same to be remedied as is given Tenant after notice to it plus an
additional thirty (30) days and Landlord agrees to accept such
performance on the part of Leasehold Mortgagee as though the same
had been done or performed by Tenant.

11.2  Leasehold Mortgagee's Opportunity to Foreclose.
As to any Event of Default that may not be cured by the payment
of money and which may or may not be susceptible of curing by
entry upon the Premises, Landlord agrees to grant to Leasehold

-45-

IWA0014344

Mortgagee (provided that Leasehold Mortgagee has complied with the provisions of Section 11.5) the right to extend the period of time within which to cure such Event of Default for such additional period (not in excess of thirty (30) days) as, with due diligence and in good faith, will enable Leasehold Mortgagee to institute foreclosure proceedings or otherwise acquire possession of the Premises, provided that Leasehold Mortgagee shall, within the initial notice and curative period provided in Section 11.1(b):

   (a)   notify Landlord in writing of its election to proceed with due diligence to foreclose or otherwise to proceed promptly to acquire possession of the Premises;

   (b)   cure any Event of Default that can be cured by the payment of money by paying the sums then due and owing; and

   (c)   deliver to Landlord an instrument in writing duly executed and acknowledged wherein Leasehold Mortgagee agrees that:

      (i)   during the period that Leasehold Mortgagee shall be in possession of the Premises and during the pendency of any such foreclosure or other proceedings and until the interest of the then Tenant under this Lease shall terminate, as the case may be, it will pay or cause to be paid to Landlord all sums from time to time becoming due under this Lease for Annual Rent; and

      (ii)   if delivery of possession of the Premises shall be made to Leasehold Mortgagee or to its nominee, whether voluntarily or pursuant to any foreclosure or other proceedings or otherwise, Leasehold Mortgagee shall, promptly following such delivery of possession, perform or cause such nominee

-46-

IWA0014345

to perform, as the case may be, all the covenants and agreements
herein contained on Tenant's part to be performed to the extent
that Tenant shall have failed to perform the same to the date of
delivery of possession, as aforesaid.

11.3  <u>Leasehold Mortgagee's Right to New Lease</u>.

(a)  In the event of the termination of this Lease
prior to its stated expiration date (except pursuant to Article
VI hereof) Landlord agrees that it will enter into a new lease of
the Premises with Leasehold Mortgagee or, at the request of
Leasehold Mortgagee, with a corporation or other entity formed by
or on behalf of Leasehold Mortgagee, for the remainder of the
Term of this Lease effective as of the date of such termination,
at the Annual Rent and upon the covenants, agreements, terms,
provisions, and limitations herein contained, provided (i) Lease-
hold Mortgagee makes written request upon Landlord for such new
lease within thirty (30) days from the date Landlord notifies
Leasehold Mortgagee of such termination and such written request
is accompanied by payment to Landlord of all amounts then due to
Landlord but 'for such termination, (ii) Leasehold Mortgagee pays
or causes to be paid to Landlord at the time of the execution and
delivery of such new lease any and all sums which would at the
time of the execution and delivery thereof be due under this
Lease but for such termination and pays or causes to be paid any
and all expenses, including reasonable counsel fees, court costs,
and costs and disbursements incurred by Landlord in connection
with any such termination and in connection with the execution
and delivery of such new lease.

(b)  Any new lease made pursuant to this Section
11.3 shall have the same priority as this Lease and shall be
prior to any mortgage or any lien, charge or encumbrance of the
fee of the Premises created by Landlord, for a term of years

-47-

IWA0014346

equal to the balance of the Term of this Lease, as the same may be extended pursuant to the provisions of this Lease.

(c)  Any mortgage or deed of trust upon Landlord's interest in the Premises and any action by such mortgagee or trustee or beneficiary of such deed of trust by way of foreclosure, exercise of power of sale, or deed in lieu thereof shall be subject to this Lease and to the new lease to be given pursuant to this Section 11.3 and any mortgagee or holder of such mortgage or the beneficiary and trustee of any such deed of trust must recognize this Lease and all rights of Tenant and Leasehold Mortgagee hereunder, including, without limitation, their rights with respect to insurance proceeds and Awards.

(d)  The provisions of this Section 11.3 shall be self-operative and require no further action by the holder of any mortgage of Landlord's interest in the Premises, but upon request by Tenant or Leasehold Mortgagee, Landlord agrees to obtain from such holder an instrument duly executed and acknowledged confirming the priority of such new lease.

11.4  No Modification Without Leasehold Mortgagee's Consent.  This Lease shall not be modified or surrendered to Landlord or cancelled by Tenant, nor shall Landlord accept a surrender of this Lease, without the prior written consent of Leasehold Mortgagee, provided that the conditions of Section 11.5 shall have previously been complied with.

11.5  Notice.  The foregoing provisions of this Article XI shall not apply in favor of Leasehold Mortgagee unless, before Landlord has mailed a notice of default under Article X, Leasehold Mortgagee has duly recorded its mortgage or notice thereof in any public office where such recording may be required in order to charge third persons with knowledge thereof and has given written notice to Landlord accompanied by a certified copy

-48-

IWA0014347

of such mortgage and stating the name of Leasehold Mortgagee and the address to which notices to Leasehold Mortgagee are to be mailed by Landlord.

ARTICLE XII

LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS

12.1  Landlord's Right to Perform.  Tenant agrees that if it shall at any time fail, after such default has become an Event of Default (except it shall not be necessary for a default to become an Event of Default in case of emergency), to pay any Real Estate Imposition or utility bill in accordance with the provisions of Sections 3.5.1 or 3.5.2, or to take out, pay for, maintain or deliver any of the insurance policies provided in Article IV, or to cause any lien of the character referred to in Section 5.4 to be discharged as therein provided, or to pay the costs of the Davis Tract Ride Sharing Program, as provided in Section 15.1, or to perform any other act on its part to be performed as provided in this Lease, then, with notice to Tenant (except in the case of emergency), but without waiving or releasing Tenant from any obligations of Tenant contained in this Lease or waiving any other right or remedy of Landlord, Landlord may, but shall not be obligated to, (a) pay any Real Estate Imposition or utility bill payable by Tenant pursuant to the provisions of Sections 3.5.1 or 3.5.2; (b) take out, pay for, and maintain any of the insurance policies provided for in Article IV; (c) discharge any lien of the character referred to in Section 5.4 as therein provided; (d) pay the costs of the Davis Tract Ride Sharing Program; or (e) perform any other act on Tenant's part to be performed as provided in this Lease.  All sums paid by Landlord and all reasonable incidental costs and expenses paid or incurred by Landlord in connection with Landlord's performance of any act described in the first sentence of this Section 12.1, together with all reasonable attorneys' fees and together with interest

-49-

IWA0014348

thereon from the date of making of such expenditures by Landlord, at the rate described in Section 10.3, shall be payable to Landlord on demand and Tenant covenants to pay any such sum or sums with interest as aforesaid. All sums which may become payable to Landlord by Tenant as provided in this Article XII, and all sums payable by Tenant for Real Estate Impositions and utilities pursuant to Sections 3.5.1 and 3.5.2, insurance premiums pursuant to Article IV, costs of the Davis Tract Ride Sharing Program, and all other charges and expenses of whatsoever nature which Tenant assumes or agrees to pay pursuant to this Lease, shall be deemed Additional Rent hereunder and be payable as aforesaid, and Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the non-payment of any such sums as in the case of Tenant's default in the payment of Annual Rent.

ARTICLE XIII

LANDLORD'S RIGHT TO SELL, ASSIGN OR MORTGAGE

13.1  Right to Sell, Assign or Mortgage.  Landlord shall have the right at all times to sell, assign or mortgage its fee interest under this Lease without restriction, provided that no such mortgage or deed of trust shall create any lien, charge or other encumbrance upon the improvements or the estate of Tenant or of any interest of Tenant in the Premises, but shall be subordinate to this Lease.  Landlord shall notify Tenant in writing if Landlord sells, assigns or mortgages its fee interest hereunder and shall specify in such notice the name of the new landlord hereunder or the fee mortgagee.

13.2  Release of Liability.  In the event that at any time Landlord sells or transfers any of its interest in the Premises or this Lease, then provided the purchaser or transferee assumes in writing the obligations of Landlord hereunder, Landlord named herein shall not be liable to Tenant under this Lease

-50-

IWA0014349

for any obligations or liabilities based on or arising out of
events or conditions occurring after such sale or transfer, but
shall remain liable for any events or conditions occurring prior
to such sale or transfer.

13.3  <u>Limitations on Landlord's Liability</u>.  Landlord
shall be under no personal liability with respect to any of the
provisions of this Lease, and if Landlord is in breach or default
with respect to its or her obligations or otherwise under this
Lease, Tenant shall look solely to the estate of Landlord in the
Land for the satisfaction of Tenant's remedies.

13.4  <u>Notice to Fee Mortgagee</u>.  After Tenant receives
notice from any person, firm or other entity that it holds a
mortgage on Landlord's fee estate and receives the name and
address of such fee mortgagee, Tenant shall, simultaneously with
the giving of each notice to Landlord of any breach or default by
Landlord hereunder, give a duplicate copy thereof, in the manner
required for notices pursuant to Section 14.7 hereof, to the fee
mortgagee.  The fee mortgagee will have a reasonable period of
time after receipt of such notice during which time the fee mort-
gagee will have the right to cure the breach or default.

ARTICLE XIV
<u>MISCELLANEOUS</u>

14.1  <u>Construction; Governing Law</u>.  Landlord and Tenant
agree that all the provisions hereof are to be construed as cove-
nants and agreements as though the words importing such covenants
and agreements were used in each separate paragraph hereof.  This
Lease shall be construed according to and be governed by the laws
of the State of Maryland.

14.2  <u>No Waiver</u>.  Failure of either party to complain
of any act or omission on the part of the other party, no matter

-51-

IWA0014350

how long the same may continue, shall not be deemed to be a
waiver by said party of any of its rights hereunder.  No waiver
by either party at any time, express or implied, of any breach of
any provision of this Lease shall be deemed a waiver of a breach
of any other provision of this Lease or a consent to any subse-
quent breach of the same or any other provision.  If any action
by either party shall require the consent or approval of the
other party, the other party's consent to or approval of such
action on any one occasion shall not be deemed a consent to or
approval of said action on any subsequent occasion or a consent
to or approval of any other action on the cause of any subsequent
occasion.  Any and all rights and remedies which either party may
have under this Lease or by operation of law, either at law or in
equity, upon any breach, shall be distinct, separate, and cumula-
tive and shall not be deemed inconsistent with each other; no one
of them, whether exercised by said party or not, shall be deemed
to be in exclusion of any other, and any two or more or all of
such rights and remedies may be exercised at the same time.

14.3  Headings.  The headings used for the various
articles and sections of this Lease are used only as a matter of
convenience for reference, and are not to be construed as part of
this Lease or to be used in determining the intent of the parties
of this Lease.

14.4  Partial Invalidity.  If any of the terms, provi-
sions or conditions of this Lease or the application thereof to
any person or circumstances shall, to any extent, be invalid or
unenforceable, the remainder of this Lease and the application of
such term, provisions or conditions to persons or circumstances
other than those to which it is held invalid or unenforceable
shall not be affected thereby and each of the other terms, provi-
sions, and conditions of this Lease shall be valid and enforce-
able to the fullest extent permitted by law.

IWA0014351

14.5  <u>Bind and Inure</u>.  Unless repugnant to the context, the words "Landlord" and "Tenant" shall be construed to mean the original parties, their respective successors and assigns, and those claiming through or under them, respectively.  Subject to the provisions of the next sentence, the agreements and conditions in this Lease contained on the part of Tenant to be performed and observed shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns, and the agreements and conditions in this Lease contained on the part of Landlord to be performed and observed shall be binding upon Landlord and its successors and assigns and shall inure to the benefit of Tenant and its successors and assigns.  Notwithstanding anything else contained in this Lease, Landlord agrees that Tenant and its successors and assigns shall be liable only for obligations accruing while it holds the leasehold estate created hereunder and that no partner of Tenant shall be personally liable for the performance or observance of Tenant's obligations hereunder, all such liability being limited to Tenant's partnership assets.  No Leasehold Mortgagee shall be deemed to be the holder of said leasehold estate until Leasehold Mortgagee shall have acquired indefeasible title to said leasehold estate.

14.6  <u>Estoppel Certificate</u>.  Each party agrees from time to time, upon no less than fifteen (15) days' prior written request of the other, to execute, acknowledge, and deliver to the other a statement in writing certifying that this Lease is unmodified and in full force and effect (or, if there have been any modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent has been paid and whether there exists any uncured default by the other party and, if so, the nature of such default.  Any such statement delivered pursuant to this Section 14.6 may be relied upon by any prospective purchaser or mortgagee

-53-

IWA0014352

or any prospective holder of a sublease from Tenant or any pro-
spective assignee of any such holder of a mortgage or sublease.

14.7  Notice.  Every notice and demand required or per-
mitted to be given under this Lease shall be in writing and
deemed to have been duly given (a) when mailed postage prepaid by
certified or registered mail, with or without return receipt
requested, or (b) when delivered, if delivered by hand or over
night courier, addressed in the case of notice to or demand upon
Landlord to it c/o Charles A. Camalier, Jr., Suite 1200, 1629 K
Street, N.W., Washington, D.C. 20006, with copies to Anne D.
Camalier, 9019 Belmart Road, Potomac, Maryland 20854, Charles A.
Camalier, III, Esq., 1666 K Street, N.W., Washington, D.C. 20006,
and to Martin D. Krall, Esq., 2300 N Street, N.W., Washington,
D.C. 20037, and in the case of notice to or demand upon Tenant to
it at Suite 1200, 1629 K Street, N.W., Washington, D.C. 20006,
Attn: Anne D. Camalier and to Charles A. Camalier, III, Esq.,
1666 K Street, N.W., Washington, D.C. 20006 with copies to Martin
D. Krall, Esq., 2300 N Street, N.W., Washington, 20037 and, Com-
munications Satellite Corporation, 950 L'Enfant Plaza, S.W.,
Washington, D.C. 20004, Attn:  Chief Financial Officer Corporate
Services, General Manager, and General Counsel, or, in the case
of either party, to such other address as that party shall from
time to time have designated by written notice given to the other
party as herein provided.

14.8  Entire Agreement; No Oral Modifications.  This
instrument contains all the agreements made between the parties
hereto and may not be modified in any other manner than by an
instrument in writing executed by the parties or their respective
successors in interest.

14.9  No Merger of Title.  There shall be no merger of
the leasehold estate created by this Lease with the fee estate in
the land by reason of the fact that the same person may own or

-54-

IWA0014353

hold (a) the leasehold estate created by this Lease or any inter-
est in such leasehold estate, and (b) any interest in the fee
estate of the land; and no such merger shall occur unless and
until all persons, including any mortgagee, having any interest
in (x) the leasehold estate created by this Lease, and (y) the
fee estate in the land, shall join in a written instrument
effecting such merger and shall duly record the same.

14.10  <u>Force Majeure</u>.  For purposes of this Lease,
<u>Force Majeure</u> shall mean acts of God, war, riot, strike, shortage
or unavailability of labor or materials, injunction or moratorium
imposed upon the issuance of necessary licenses, permits, utility
hook-ups or upon construction by any governmental or quasi-gov-
ernmental entity or body, unusually adverse weather conditions,
or if the general contractor for the improvements is delayed at
any time in the progress of its work pursuant to the general con-
tract for construction of the improvements upon the Premises by
any act or neglect of the architect for the improvements or by
any employee thereof, or by any separate contractor, or by
changes ordered in said work, or by fire, unusual delay in trans-
portation, unavoidable casualties, latent subsurface conditions,
or any causes beyond the general contractor's control or by any
other cause which the parties hereto reasonably determine may
justify the delay.

14.11  <u>Payment of Landlord's Costs and Expenses</u>.
Tenant shall reimburse Landlord for all costs and expenses,
including reasonable attorneys' fees, that Landlord incurs in
connection with the review of any plans and specifications, con-
tracts, drawings, agreements, policies or other items that Tenant
submits to Landlord for Landlord's approval pursuant to any pro-
vision of this Lease.  Tenant shall reimburse Landlord for such
costs and expenses upon demand, and, if such costs and expenses
are not reimbursed upon demand they shall be deemed Additional

-55-

IWA0014354

Rent and Landlord shall have the same rights and remedies in the event of the nonpayment of such sums as in the case of Tenant's default in the payment of Annual Rent. Notwithstanding the first sentence of this Section 14.11, Landlord shall not be entitled to reimbursement for any expenses it incurs in connection with the original preparation of this Lease or in connection with Landlord's review and approval of the plans, specifications, and drawings for the initial improvements to be constructed pursuant to Section 7.1.

14.12 <u>Litigation Expenses</u>. In the event of any litigation brought by either party to enforce any of the provisions of this Lease, the losing party shall pay the prevailing party's costs and expenses, including reasonable attorneys' fees.

14.13 <u>Memorandum of Lease</u>. Either party may record a memorandum of this Lease in the form of Exhibit D hereto. Any tax attendant upon such recordation shall be the sole expense of Tenant.

14.14 <u>Performance Under Protest</u>. In the event of a dispute or difference between Landlord and Tenant as to any obligation which either may assert the other is obligated to perform or do, then the party against whom such obligation is asserted shall have the right and privilege to carry out and perform the obligation so asserted against it without being considered a volunteer or deemed to have admitted the correctness of the claim, and shall have the right to bring an appropriate action at law, equity or otherwise against the other for the recovering of any sums expended in the performance thereof and in any such action, the successful party shall be entitled to recover, in addition to all other recoveries, such reasonable attorneys' fees as may be awarded by the court.

IWA0014355

14.15   <u>Release of Memorandum of Lease</u>.  Landlord cove-
nants to record a release of the Memorandum of Lease between
Landlord and Two Fernwood Associates Limited Partnership, which
Memorandum is recorded among the land records of Montgomery
County, Maryland.

14.16   <u>Records, Plans, Etc.</u>  Upon the termination of
this Lease, whether at the expiration of the Term or earlier,
Tenant shall provide to Landlord copies of all records, studies,
reports, plans and specifications, and other documents relating
to the development of the Property and the construction of any
improvements thereon, to the extent that Tenant has any of such
documents in its records or has access to such documents.

ARTICLE XV
RIDE SHARING PROGRAM

15.1   <u>Compliance With Ride Sharing Agreement</u>.  Tenant
shall at Tenant's expense comply with all obligations (with
respect to the Land) pursuant to the ride sharing agreement
entered by and among Montgomery County, Maryland, the Maryland
National Capital Park and Planning Commission, and the Artery
Organization, Inc., as the same may be amended (the "Ride Sharing
Agreement").  The Ride Sharing Agreement sets forth the ride
sharing program imposed by Montgomery County, Maryland for the
Landlord's Land (such program is herein referred to as the "Davis
Tract Ride Sharing Program").  Landlord shall not agree to any
amendments to the Ride Sharing Agreement without the prior writ-
ten consent of Tenant, which consent shall not be unreasonably
withheld or delayed.

-57-

IWA0014356

EXECUTED as a sealed instrument on the day and year first above written.

WITNESS:                          LANDLORD:

_____           _____
                                  ANNE D. CAMALIER

                                  TENANT:

                                  ROCK SPRING II LIMITED PARTNERSHIP,
                                  a Maryland limited partnership

                                  By:  Fernwood Two Corp.,
                                       General Partner

_____           By: _____
                                       Anne D. Camalier
                                       President

                                  By:  Bethesda Real Property, Inc.,
                                       General Partner

_____           By: _____
                                  Title: Vice President


        I, being an attorney admitted to practice in the State of
Maryland, hereby certify that this Amended and Restated Ground
Lease Indenture was prepared by me or under my supervision.

                                  _____
                                  Name: Robert L. Graham
                                  Attorney

B:168SMB8198.91

-58-

IWA0014357

~~COUNTY OF~~ District of Columbia )
                                  )   ss:
STATE OF _____ )

    I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, do certify that Anne D. Camalier, whose name is signed to the Amended and Restated Ground Lease Indenture bearing date as of November 14, 1990, has acknowledged the same before me in my jurisdiction aforesaid.

    Given under my hand and seal this 25th day of November, 1991.


[Notarial Seal]

                    Kerry M. Turner
                            Notary Public

                    My Commission expires:
                    My Commission Expires June 14, 1992

-59-

IWA0014358

COUNTY OF *District of Columbia* )
                                  ) ss:
STATE OF _____ )

      I, the undersigned, a Notary Public in and for the jurisdic-
tion aforesaid, do certify that Anne D. Camalier, the President
of Fernwood Two Corp., general partner of Rock Spring II Limited
Partnership, a Maryland limited partnership, whose name is signed
to the Amended and Restated Ground Lease Indenture bearing date
as of November 14, 1990, has acknowledged the same before me in
my jurisdiction aforesaid.

      Given under my hand and seal this 25th day of *November*,
1991.


[Notarial Seal]                    *Kerry M. Turner*
                                   _____
                                        Notary Public

                                   My Commission expires:
                                   My Commission Expires June 14, 1992


                              -60-

IWA0014359

~~COUNTY OF~~ *District of Columbia* )
                                      ) ss:
STATE OF _____ )

    I, the undersigned, a Notary Public in and for the jurisdiction aforesaid, do certify that *Raymond M. Westfall*, the *Vice President* of Bethesda Real Property, Inc., general partner of Rock Spring II Limited Partnership, a Maryland limited partnership, whose name is signed to the Amended and Restated Ground Lease Indenture bearing date as of November 14, 1990, has acknowledged the same before me in my jurisdiction aforesaid.

    Given under my hand and seal this 25th day of *November*, 1991.


[Notarial Seal]
                          *Kerry M. Turner*
                                Notary Public

                           My Commission expires:

                           My Commission Expires June 14, 1992

-61-

IWA0014360