# EXHIBIT 11

**OPERATING AGREEMENT FOR**

**ROCK SPRINGS DRIVE, LLC**

**A MARYLAND LIMITED LIABILITY COMPANY**

{00095295.11}

RSD-005516

## OPERATING AGREEMENT
## FOR
## ROCK SPRINGS DRIVE, LLC
## A MARYLAND LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of August 31 , 2017 (the "Effective Date"), by and among Investors Warranty of America, LLC ("IWA Member") and Longshore Ventures LLC, a Delaware limited liability company ("Algon Member"), (collectively referred to as "Members" and individually as "Member"), with reference to the following facts:

### RECITALS

A.    On August ___, 2017, Articles of Organization for Rock Springs Drive, LLC (the "Company"), a limited liability company organized under the laws of the State of Maryland, were filed with the Maryland Department of Taxation and Assessments.

B.    The Members desire to adopt and approve this written operating agreement for the Company.

### AGREEMENT

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company under the laws of the State of Maryland upon the terms and subject to the conditions of this Agreement.

### ARTICLE 1

### DEFINITIONS

When used in this Agreement, the following terms shall have the meanings set forth below (all terms used in this Agreement that are not defined in this Article 1 shall have the meanings set forth elsewhere in this Agreement):

1.1    "Act" shall mean the Maryland Limited Liability Company Act, codified in the Maryland Corporations and Associations Code, Title 4A, et. seq., as the same may be amended from time to time.

1.2    "Additional Capital Contributions" shall have the meaning ascribed to it in Section 3.2.

1.3    "Affiliate" of a Member or Managing Member shall mean any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member or Managing Member, as applicable. The term "control," as used in the immediately preceding sentence, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

1.4    "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time.

[00095295.11]    1

RSD-005517

1.5    "Algon Member" shall have the meaning ascribed to it in the opening paragraph of this Agreement.

1.6    "Annual Budget" shall have the meaning ascribed to it in Section 5.5.1.

1.7    "Articles" shall mean the Articles of Organization of the Company filed with the Maryland Office of Taxation and Assessments, as may be amended from time to time in accordance with this Agreement.

1.8    "Assignee" shall mean the owner of an Economic Interest who has not been admitted as a substitute Member in accordance with Article 7.

1.9    "Assigning Event" shall mean one or more of the following with respect to any Member: death, insanity, withdrawal, resignation, retirement, expulsion, Bankruptcy, dissolution, permanent disability, an event causing such Member to become a Wrongfully Withdrawing Member, Bankruptcy, or Incapacitating Event of such Member.

1.10    "Available Cash" shall mean the amount of cash generated or received by the Company from any source including, but not limited to, any proceeds from the sale of Property, financings or re-financings, operating income, insurance proceeds, or condemnation proceeds, which the Managing Member deems available for distribution to the Members, taking into account all debts, liabilities, and obligations of the Company then due, and working capital and other amounts which the Managing Member deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business.

1.11    "Bankruptcy" shall mean: (a) the filing of an application by a Member for, or his consent to, the appointment of a trustee, receiver, or custodian of his other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his inability to pay his debts as they become due.

1.12    "Capital Account" shall mean with respect to any Member the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

1.13    "Capital Contribution" or "Contribution" shall mean the total amount of cash and fair market value of property contributed to the Company by Members.

1.14    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

1.15    "Company" shall mean Rock Springs Drive, LLC, a Maryland limited liability company.

{00095295.11}                                    2

RSD-005518

1.16    "Company Minimum Gain" shall have the meaning ascribed to the term "Company Minimum Gain" in Regulations Section 1.704-2(d).

1.17    "Confidential Information" shall have the meaning ascribed to it in Section 14.20.3.

1.18    "Corporations Code" shall mean the Maryland Corporations and Associations Code, as amended from time to time, and the provisions of succeeding law.

1.19    "Diligence Materials" shall have the meaning ascribed to it in Section 5.7.

1.20    "Dissolution Events" shall have the meaning ascribed to it in Section 10.1.

1.21    "Draft Budget" shall have the meaning ascribed to it in Section 5.5.1.

1.22    "Economic Interest" shall mean the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management of the Company, or except as provided by the Act, any right to information concerning the business and affairs of the Company.

1.23    "Emergency Amount" shall have the meaning ascribed to it in Section 5.5.1.

1.24    "Effective Date" shall have the meaning set forth in the opening paragraph of this Agreement.

1.25    "Expenses" shall have the meaning ascribed to it in Section 11.1.1.

1.26    "Fiscal Year" shall mean the Company's fiscal year.

1.27    "Former Member" shall have the meaning ascribed to it in Section 8.1.

1.28    "Former Member's Interest" shall have the meaning ascribed to it in Section 8.1.

1.29    "Incapacitating Event" shall have the meaning ascribed to it in Section 7.6.

1.30    "Independent Member" shall have the meaning ascribed to it in Section 5.2.1.

1.31    "Initial Capital Contribution" shall have the meaning ascribed to it in Section 3.1.

1.32    "IWA Member" shall have the meaning set forth in the opening paragraph of this Agreement.

1.33    "Landlord" shall have the meaning set forth below in Section 1.34, and any successor or assign.

1.34    "Lease" shall have that certain Amended and Restated Ground Lease Indenture, by and between Anne D. Camalier, as landlord and Rock Spring II Limited Partnership, as

{00095295.11}                    3

tenant, dated as of November 14, 1990, as amended by First Amendment to Amended and Restated Ground Lease Indenture, dated as of September 1, 2002 by and between Rock Spring Plaza II, LLC, a Maryland limited liability company, successor in interest to Anne D. Camalier ("Landlord") and Rock Spring II Limited Partnership, as tenant.

1.35    "Majority Interest" shall mean the vote or written consent of Members holding more than fifty percent (50%) of the outstanding Percentage Interests in the Company.

1.36    "Management Agreement" shall have the meaning ascribed to it in Section 5.1.1.

1.37    "Management Committee" shall have the meaning ascribed to it in Section 5.2.

1.38    "Managing Member" shall mean Algon Member or any other Person that succeeds it as the Managing Member of the Company pursuant to the terms of this Agreement.

1.39    "Material Transaction" shall have the meaning ascribed to it in Section 5.7.

1.40    "Member" shall mean each Person who is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles and this Agreement or is an Assignee who has become a Member in accordance with Article 7, and has not become the subject of a Dissolution Event or ceased to be a Member in accordance with Article 8 or for any other reason.

1.41    "Member Nonrecourse Debt" shall have the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

1.42    "Member Nonrecourse Deductions" shall mean items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

1.43    "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote on or participate in the management, and the right to receive information concerning the business and affairs, of the Company.

1.44    "Net Profits" and "Net Losses" shall mean the income, gain, loss and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

1.45    "Ninety Percent (90%)-in-Interest" shall mean approval of Members holding at least 90% of the Percentage Interest of the Company.

1.46    Operating Costs and Expenses" shall mean any and all costs incurred by or on behalf of the Company to operate the Company and to own, operate, and maintain the Property including, but not limited to, real estate taxes, insurance premiums, utility charges, property management fees, landscaping costs, and maintenance charges.

{00095295.11}                                                    4

1.47    "Organization Costs" shall mean all costs and expenses incurred in connection with the formation and organization of the Company including out-of-pocket legal and accounting costs and expenses and filing fees.

1.48    "Partnership Representative" shall have the meaning ascribed to it in Section 9.7.

1.49    "Percentage Interest" shall mean the percentage ownership interest of the Company owned by a Member as set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit A hereto.

1.50    "Person" shall mean an individual, company, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

1.51    "Proceeding" shall have the meaning ascribed to it in Section 11.1.2.

1.52    "Property" shall mean the leasehold interest in that certain office building known as 6560 Rock Springs Drive, Bethesda, Maryland, as represented by the Lease.

1.53    "Regulations" shall, unless the context clearly indicates otherwise, mean the regulations in force as final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

1.54    "Regulatory Allocations" shall have the meaning ascribed to it in Section 6.2.7.

1.55    "75%-in-Interest" shall have the meaning ascribed to it in Section 5.1.1.

1.56    "Special Purpose Entity" shall have the meaning ascribed to it in Section 12.2.

1.57    "Remaining Members" shall have the meaning ascribed to it in Section 8.1.

1.58    "Revised Annual Budget" shall have the meaning ascribed to it in Section 5.5.2.

1.59    "Suspended Distribution" shall have the meaning ascribed to it in Section 6.4.3.

1.60    "Tax Matters Partner" (as defined in Code Section 6231) shall be the Managing Member, or any successor or replacement appointed in accordance with this Agreement.

1.61    "Taylor" shall mean Troy T. Taylor.

1.62    "Transfer" shall have the meaning ascribed to it in Section 7.1.

1.63    "Unreturned Capital Contributions" means an amount (not below zero) equal to the aggregate Initial Capital Contribution and Additional Capital Contribution made by a Member to the Company in accordance with the terms of this Agreement, less distributions received by that Member pursuant to Section 6.4.A(i).

1.64    "Variance Amount" shall have the meaning ascribed to it in Section 5.5.1.

{00095295.11}                          5

RSD-005521

1.65 "Wrongfully Withdrawing Member" shall have the meaning ascribed to it in in Section 4.3.

## ARTICLE 2

## ORGANIZATIONAL MATTERS

2.1 Formation. The Members have formed a Maryland limited liability company by filing the Articles and entering into this Agreement, which Agreement shall be deemed effective as of the Effective Date. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2 Name. The name of the Company shall be "Rock Springs Drive, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managing Member deems appropriate or advisable. The Managing Member shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managing Member considers appropriate or advisable.

2.3 Term. The term of this Agreement commenced on the filing of the Articles and shall be terminated as provided in Section 10.1.

2.4 Office and Agent. The Company shall continuously maintain an office or registered agent in the State of Maryland. The principal office of, and mailing address for, the Company shall be 2457 Collins Avenue, PH2, Miami Beach, Florida 33140 or as the Managing Member may determine. The Company may also have such offices, anywhere within or outside of the State of Maryland, as the Managing Member determines from time to time, or the business of the Company may require. The registered agent shall be as stated in the Articles or as otherwise determined by the Managing Member.

2.5 Addresses of the Members and the Managing Member. The respective addresses of the Members are set forth on Exhibit A. A Member may change his address upon notice thereof to the Managing Member in accordance with Section 14.13.

2.6 Purpose and Business of the Company. The primary purpose of the Company is to acquire, operate, manage, entitle, maintain and hold the Property and any other Company assets for investment, and to engage in any and all other purposes necessary, convenient or incidental thereto. Although such specification of purpose shall not constitute a limitation on the powers of the Company, the Company shall not undertake or carry out any other purpose or business unless specifically otherwise approved by a vote of the Majority of the Members.

## ARTICLE 3

## CAPITAL CONTRIBUTIONS

3.1 Initial Capital Contributions. Each Member has made an Initial Capital Contribution to the Company as of the Effective Date as set forth on Exhibit A ("Initial Capital

{00095295.11} 6

RSD-005522

Contribution"), which Initial Capital Contributions will include the IWA Member's contribution of the Property.

    3.2     Additional Capital and Funds.

            3.2.1    Operating Capital Contributions. Subject to the terms and conditions of this Agreement, the IWA Member shall periodically during the term of this Agreement, make additional Capital Contributions ("Additional Capital Contributions") to pay Operating Costs and Expenses, all as identified in the Annual Budget approved by the IWA Member. The amount to be contributed by the IWA Member pursuant to this Section 3.2.1 or otherwise shall not exceed $3,900,000, which shall include the amount contributed to the Company by the IWA Member as its initial Capital Contribution as specified on Exhibit A. The Independent Member shall approve any such request for Additional Capital Contribution, and the amount of any such Additional Capital Contribution shall not exceed the anticipated costs and expenses (net of anticipated revenue) of the Company for the next succeeding fiscal quarter as set forth in the Annual Budget. For the period commencing on the Effective Date through December 31, 2017, it is not anticipated that the Company will have an approved Annual Budget, and the IWA Member shall make Capital Contributions to fund Operating Costs and Expenses, based upon those Operating Costs and Expenses as approved by the IWA Member. From and after January 1, 2018, Additional Capital Contributions shall be made based upon an Approved Annual Budget as described above in this Section 3.2.1. The Managing Member shall call for such Additional Capital Contributions no more than thirty (30) days and no less than ten (10) days prior to the date any such Additional Capital Contribution is due and payable. Any such request for an Additional Capital Contribution shall be made on a form approved by the IWA Member. The Algon Member, whether in its capacity as a Member or as the Managing Member or otherwise, shall not be required to make any Additional Capital Contributions to the Company or to use its own funds to pay any Operating Costs and Expenses. All contributions made pursuant to this Section 3.2.1 shall be deemed Additional Capital Contributions credited to the Capital Account of the Member which made the Contribution.

            3.2.2    No Other Obligation. Except as set forth above in Section 3.2.1, no Member shall be obligated to contribute additional capital to the Company.

    3.3     No Rights In Third Parties. The Managing Member's right under this Article 3 to request Additional Capital Contributions is personal to the Managing Member and the IWA Member. Nothing in this Article 3 (whether express or implied) shall be construed to entitle any third party (including, without limitation, a creditor of the Company) to (i) substitute its own judgment for the Managing Member's and the Independent Director's judgment in determining if and when the Company requires additional funds, (ii) compel the IWA Member to contribute capital or loan funds to the Company, or (iii) otherwise exercise the Managing Member's right to obtain funds for the Company pursuant to this Article 3.

    3.4     Capital Accounts. The Company shall establish and maintain an individual Capital Account for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv). If a

{00095295.11}                                      7

RSD-005523

Member transfers all or a part of its Membership Interest in accordance with this Agreement, such Member's Capital Account attributable to the transferred Membership Interest shall carry over to the new owner of such Membership Interest pursuant to Regulations Section 1.704-1(b)(2)(iv)(1).

3.5     No Interest. No Member shall be entitled to receive any interest on its Capital Contributions.

## ARTICLE 4

## MEMBERS

4.1     Limited Liability. Except as expressly set forth in this Agreement or required by law, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

4.2     Admission of Additional Members. The Managing Member, with the approval of at least 90%-in-Interest, may admit additional Members to the Company. Any additional Members shall obtain Membership Interests and will participate in the management, Net Profits, Net Losses, and distributions of the Company on such terms as are reasonably determined by the Managing Member and approved by all of the Members. Notwithstanding the foregoing, Assignees may only be admitted as substitute Members in accordance with Article 7.

4.3     Withdrawals or Resignations. No Member may voluntarily withdraw or resign or retire from the Company. If any Member withdraws, retires, or resigns in violation of this Section 4.3 (the "Wrongfully Withdrawing Member"), its Membership Interest shall terminate pursuant to Section 4.4. Such Wrongfully Withdrawing Member shall thereafter receive distributions and allocations of Net Profit and Net Loss in accordance with Article 6 as an Assignee.

4.4     Termination of Membership Interest. With respect to a Wrongfully Withdrawing Member or upon the transfer of a Member's Membership Interest in violation of Article 7, the Membership Interest of such Member shall be terminated by the Managing Member (or the other Member if the Wrongfully Withdrawing Member is the Managing Member) and thereafter that Member shall be an Assignee only unless such Membership Interest is purchased by the Company and/or remaining Members as provided in Article 8. Each Member acknowledges and agrees that such termination or purchase of a Membership Interest upon the occurrence of any of the foregoing events is not unreasonable under the circumstances existing as of the Effective Date.

4.5     Competing Activities. The Members and their officers, directors, shareholders, partners, members, managers, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Members shall not be obligated to present any investment opportunity or

{00095295.11}                                       8

RSD-005524

prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Members shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company. Each Member acknowledges that the other Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims which they may otherwise have against the other Members and their officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any of such activities.

4.6   Transactions With The Company. Except as otherwise specifically set forth herein, a Member may not transact any business with the Company.

4.7   Remuneration To Members. Except as otherwise specifically provided in this Agreement, no Member is entitled to remuneration for acting in the Company business.

4.8   Members Are Not Agents. Pursuant to Section 5.1.1 and the Articles, the management of the Company is vested in the Managing Member. The Members shall have no power to participate in the management of the Company except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act. No Member, acting solely in the capacity of a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Managing Member, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.9   Voting Rights. Except as expressly provided in this Agreement or required by the Act, Members shall have no voting, approval or consent rights. Members shall have the right to approve or disapprove matters as specifically stated in this Agreement, including the following:

4.9.1   Unanimous Approval. All Members must approve any action described herein which requires the unanimous approval of the Members before the Company or the Managing Member may take any such action.

4.9.2   Approval by Members Holding a 90%-in-Interest. Except as set forth in Section 4.9.1 or elsewhere in this Agreement requiring a different vote threshold, in all other matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of holders of at least 90%-in-Interest adopted at a duly called meeting or pursuant to a written consent containing the requisite approval shall be sufficient to authorize or approve such act.

4.9.3   Approval Standard. Except as otherwise specifically provided in this Agreement, all votes, approvals or consents of the Managing Member or 90%-in-Interest may be given or withheld, conditioned or delayed as the Managing Member or 90%-in-Interest may determine in their sole discretion.

4.10   Meetings of Members.

{00095295.11}                                    9

RSD-005525

4.10.1 Date, Time and Place of Meetings of Members; Secretary.
Meetings of Members may be held at such date, time and place within or outside the
State of Maryland as the Managing Member may fix from time to time. No annual or
regular meetings of Members are required. At any Members' meeting, the Managing
Member shall preside at the meeting and act as secretary of the meeting. The secretary
of the meeting shall prepare minutes of the meeting which shall be placed in the minute
books of the Company.

4.10.2 Power to Call Meetings. Meetings of the Members may be called
by the Managing Member, or upon written demand of Members holding more than
twenty percent (20%) of the Percentage Interests for the purpose of addressing any
matters on which the Members may vote.

4.10.3 Notice of Meeting. Written notice of a meeting of Members shall
be sent or otherwise given to each Member in accordance with Section 4.10.4 not less
than ten (10) nor more than sixty (60) days before the date of the meeting. The notice
shall specify the place, date and hour of the meeting and the general nature of the
business to be transacted. No other business may be transacted at this meeting. Upon
written request to a Managing Member by any person entitled to call a meeting of
Members, the Managing Member shall immediately cause notice to be given to the
Members entitled to vote that a meeting will be held at a time requested by the person
calling the meeting, not less than ten (10) days nor more than sixty (60) days after the
receipt of the request. If the notice is not given within twenty (20) days after the receipt
of the request, the person entitled to call the meeting may give the notice.

4.10.4 Manner of Giving Notice; Affidavit of Notice. Notice of any
meeting of Members shall be given either personally or by first-class mail, or nationally
recognized overnight delivery service, charges prepaid, addressed to the Member at the
address of that Member appearing on the books of the Company or given by the
Member to the Company for the purpose of notice. If no such address appears on the
Company's books or is given, notice shall be deemed to have been given if sent to that
Member by first-class mail or nationally recognized overnight delivery service to the
Company's principal executive office. Notice shall be deemed to have been given at the
time when delivered personally or deposited in the mail or sent by nationally recognized
overnight delivery service.

An affidavit of the mailing or other means of giving any notice of any meeting shall be
executed by the Managing Member or any secretary, assistant secretary, or any transfer agent of
the Company giving the notice, and shall be filed and maintained in the minute book of the
Company.

4.10.5 Validity of Action. Any action approved at a meeting, other than
by unanimous approval of those entitled to vote, shall be valid only if the general nature
of the proposal so approved was stated in the notice of meeting or in any written waiver
of notice.

{00095295.11}                           10

4.10.6 Quorum. The presence in person or by proxy of Members holding a 90%-in-Interest shall constitute a quorum at a meeting of Members. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the loss of a quorum, if any action taken after loss of a quorum (other than adjournment) is approved by at least Members holding a 90%-in-Interest.

4.10.7 Adjourned Meeting; Notice. Any Members' meeting, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the Membership Interests represented at that meeting, either in person or by proxy, but in the absence of a quorum, no other business may be transacted at that meeting, except as provided in Section 4.10.6. When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place are announced at a meeting at which the adjournment is taken, unless a new record date for the adjourned meeting is subsequently fixed, or unless the adjournment is for more than forty-five (45) days from the date set for the original meeting, in which case the Managing Member shall set a new record date. At any adjourned meeting the Company may transact any business which might have been transacted at the original meeting.

4.10.8 Waiver of Notice or Consent. The actions taken at any meeting of Members however called and noticed, and wherever held, have the same validity as if taken at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, who was not present in person or by proxy, signs a written waiver of notice or consents to the holding of the meeting or approves the minutes of the meeting. All such waivers, consents or approvals shall be filed with the Company records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the meeting. Neither the business to be transacted nor the purpose of any meeting of Members need be specified in any written waiver of notice.

4.10.9 Action by Written Consent without a Meeting. Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is signed and delivered to the Company by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted. All such consents shall be filed with the Managing Member or the secretary, if any, of the Company and shall be maintained in the Company records. Any Member giving a written consent, or the Member's proxy holders, may revoke the consent by a writing received by the Managing Member or

{00095295.11}                                          11

secretary, if any, of the Company before written consents of the number of votes required to authorize the proposed action have been filed.

4.10.10 Telephonic Participation by Member at Meetings. Members may participate in any Members' meeting through the use of any means of conference telephones or similar communications equipment as long as all Members participating can hear one another. A Member so participating is deemed to be present in person at the meeting.

4.10.11 Record Date. In order that the Company may determine the Members of record entitled to notices of any meeting or to vote, or entitled to receive any distribution or to exercise any rights in respect of any distribution or to exercise any rights in respect of any other lawful action, a Managing Member, or Members representing more than ten percent (10%) of the Percentage Interests may fix, in advance, a record date, that is not more than sixty (60) days nor less than ten (10) days prior to the date of the meeting and not more than sixty (60) days prior to any other action. If no record date is fixed:

(a)     The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b)     The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

(c)     The record date for determining Members for any other purpose shall be at the close of business on the day next proceeding the day on which the Managing Member adopts the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later.

(d)     The determination of Members of record who are entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless a Managing Member or the Members who called the meeting fix a new record date for the adjourned meeting, but the Managing Member or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

4.10.12 Proxies. Every Member entitled to vote for the Managing Member or on any other matter shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Managing Member or secretary, if any, of the Company. A proxy shall be deemed signed if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, electronic transmission or otherwise) by the Member or the Member's attorney in fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless revoked by the

{00095295.11}                                    12

person executing it, before the vote pursuant to that proxy, by a writing delivered to the Company stating that the proxy is revoked, or by a subsequent proxy executed by, or attendance at the meeting and voting in person by, the person executing the proxy; or written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date of the proxy, unless otherwise provided in the proxy. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the Act.

4.11 Certificate of Membership Interest.

4.11.1 Certificate. A Membership Interest may be represented by a certificate of membership. The exact contents of a certificate of membership may be determined by the Managing Member.

4.11.2 Cancellation of Certificate. Except as herein provided with respect to lost, stolen, or destroyed certificates, no new certificates of membership shall be issued in lieu of previously issued certificates of membership until former certificates for a like number of Membership Interests shall have been surrendered and canceled. All certificates of membership surrendered to the Company for transfer shall be canceled.

4.11.3 Replacement of Lost, Stolen, or Destroyed Certificate. Any Member claiming that his certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate. Upon the giving of a satisfactory indemnity to the Company as reasonably required by the Managing Member, a new certificate may be issued of the same tenor and representing the same Percentage Interest of membership as was represented by the certificate alleged to be lost, stolen, or destroyed.

## ARTICLE 5

## MANAGEMENT AND CONTROL OF THE COMPANY

5.1.1 Management. Subject to the restrictions in this Article 5, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction and control of, the Managing Member. The Algon Member is hereby designated as the Managing Member. The Managing Member may exercise on behalf of the Company, and may delegate to a Manager, the rights set forth in this Article 5 (and subject to the limitations as set forth in this Article 5). The Managing Member shall operate the Company in compliance with the terms of the Lease. If the Managing Member delegates its duties and responsibilities hereunder, the Managing Member shall remain responsible for the actions and omissions of a Manager. Except for situations in which the approval of the Members is expressly required by this Agreement or by the Act, the Managing Member shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions

{00095295.11}                                      13

RSD-005529

regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.   The Members hereby approve the selection of Longshore Ventures LLC, a Delaware limited liability company (the "Manager"), as the Manager pursuant to the terms of that certain Management Agreement, attached hereto as Exhibit B ("Management Agreement"). Any Managing Member may resign at any time by giving written notice to the Members without prejudice to the rights, if any, of the Company under any contract to which the Managing Member is a party. The resignation of any Managing Member shall take effect upon receipt of that notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Managing Member who is also a Member shall not affect the Managing Member's rights as a Member and shall not constitute a withdrawal of a Member, except as otherwise provided herein. Any Managing Member may be removed at any time with or without cause, for any reason or no reason, by the affirmative vote of Members holding at least 75% of the outstanding Percentage Interests in the Company ("75%-in-Interest") at a meeting called expressly for that purpose, or by the written consent of a 75%-in-Interest. Any removal shall, except as set forth in Section 7.8, be without prejudice to the Managing Member's rights as a Member or constitute a withdrawal of a Member. Any vacancy in the position of Managing Member occurring for any reason may be filled by the affirmative vote or written consent of 90%-in-Interest.

5.2   Management Committee.

5.2.1   There shall be a committee formed of representatives of the Members (the "Management Committee") consisting of three (3) members. The Management Committee shall be comprised of two (2) Persons designated by the IWA Member and one Person designated by Members holding at least 75%-in-Interest ("Independent Member"). The Members hereby appoint David Feltman, Blaine Shaffer, and Greg Dryden as the initial members of the Management Committee, with Greg Dryden designated as the Independent Member.

5.2.2   The IWA Member shall have the exclusive right to remove, with or without cause, any and all members and alternates that it appoints to the Management Committee and to fill any vacancy created by the death, disability, removal or resignation of any such representative.

5.2.3   Each member on the Management Committee shall hold office until his or her successor shall have been appointed and qualified or until his or her earlier resignation, removal, death or disability.

(a)   Any Management Committee member may call a special meeting of the Management Committee for any matter that the member determines in good faith is appropriate for consideration at this meeting. Meetings of the Management Committee may be held at the principal office of the Company or by conference call or at such reasonable time and place as shall be designated in the notice of such meeting. Each member of the Management Committee shall be given at least three (3) days' notice of any meeting of the Management

{00095295.11}                                  14

Committee (and notice of the agenda to be discussed at such meeting); provided that notice of a meeting of the Management Committee may be delivered by electronic mail, provided, further that (i) attendance at such meeting shall be deemed a waiver of such notice (unless a specific objection regarding inadequate notice is raised) and (ii) notice to any member may be waived in writing or by electronic mail by such representative at any time.

(b)    Subject to the delivery of proper notification of a meeting (or waiver of such notice), attendance by a majority of the members in office at any time shall constitute a quorum. An action shall be deemed approved by the Management Committee if it has been approved by a majority of the members present at any meeting of the Management Committee at which a quorum is present. Any member may be present at any meeting in person or by means of telephone or similar communication equipment allowing all persons participating in the meeting to hear and speak to each other.

(c)    Any action required or permitted to be taken at any meeting of the Management Committee may be taken without a meeting if a majority of the members consent to such action in writing.

5.3    Powers of Managing Member.

5.3.1    Powers of Managing Member.  Without limiting the generality of Section 5.1.1, but subject to Section 5.3.2 and to the express limitations set forth elsewhere in this Agreement, the Managing Member (and the Manager if the Managing Member delegates its duties hereunder to a Manager) shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act including, without limitation, the power to:

(a)    Manage, lease, and operate the Property;

(b)    Sue on, defend, or compromise any and all claims or liabilities in favor of or against the Company; submit any or all such claims or liabilities to arbitration; and confess a judgment against the Company in connection with any litigation in which the Company is involved up to Fifty Thousand Dollars ($50,000);  and

(c)    Retain legal counsel, accountants, engineers, consultants, auditors, and other professionals in connection with the Company business and to pay such remuneration as the Managing Member may determine.

5.3.2    Limitations on Power of Managing Member.  The Managing Member (and the Manager) shall not have authority hereunder to cause the Company to engage in the following transactions without first obtaining the affirmative vote or written consent of 90%-in-Interest of the Members:

(a)    The sale, exchange or other disposition of all, or any portion, of the Property;

{00095295.11}                                      15

RSD-005531

(b)    The merger of the Company with another limited liability company or limited partnership; provided in no event shall a Member be required to become a general partner in a merger with a limited partnership without its express written consent or unless the agreement of merger provides each Member with the dissenter's rights described in the Act;

(c)    Incur any indebtedness unless identified and approved in the Annual Budget;

(d)    The merger of the Company with a corporation or a general partnership or other Person;

(e)    The establishment of different classes of Members;

(f)    The filing of any bankruptcy petition, assignment for the benefit of creditors, or initiating any other insolvency proceeding, soliciting or consenting to the filing of an involuntary bankruptcy, or pursuing similar actions pursuant to any insolvency laws, or providing any consent, approval, or acquiescence to the entry of an order, decree, or agreement for any of the foregoing matters;

(g)    Any material change related to the Property, or the proposed usage or entitlement of the Property;

(h)    Any act which would make it impossible to carry on the ordinary business of the Company;

       (i)    Amendment of this Agreement or the Articles;

       (j)    Approval of the Annual Budget, and any Revised Annual Budget;

       (k)    Admission of a new Member;

(l)    Initiate negotiations or re-negotiations for any contract or agreement involving the receipt or payment by the Company of $50,000 or more, including such contract with the Landlord under the Lease (other than communication related to the payment or performance under the Lease); provided that the Managing Member (or Manager) may discuss leasing terms with any potential new tenant for the Property;

       (m)    Conducting any construction on the Property;

(n)    Entry into any lease or sublease of all or any portion of the Property; or

(o)    Any other transaction described in this Agreement as requiring the vote, consent, or approval of the Members.

    5.4    Performance of Duties; Liability of Managing Member. A Managing Member shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit,

{00095295.11}           16

RSD-005532

gross negligence, reckless or intentional misconduct, or a knowing violation of law by the Managing Member. The Managing Member shall perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company and its Members, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. For the avoidance of doubt, any action taken or decision not to act by Managing Member pursuant to, or in accordance with, the vote of any two members of the Management Committee at a duly held meeting of the Management Committee where the members of the Management Committee either have actual (not constructive) knowledge of, or have been provided with all material facts related to the subject matter of the particular matter that is the subject of the vote with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question, shall not constitute a breach by Managing Member of any term or provision of this Agreement.

In performing its duties, the Managing Member shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or groups unless the Managing Member has actual (not constructive) knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Managing Member acts in good faith and after reasonable inquiry when the need therefor is indicated by the circumstances:

5.4.1   One or more officers, employees or other agents of the Company whom the Managing Member reasonably believes to be reliable and competent in the matters presented;

5.4.2   Any attorney, independent accountant, or other person as to matters which the Managing Member reasonably believes to be within such person's professional or expert competence;

5.4.3   A committee upon which the Managing Member does not serve, as to matters within its designated authority, which committee the Managing Member reasonably believes to be competent; or

5.4.4   Any vote of any two members of the Management Committee at a duly held meeting of the Management Committee where the members of the Management Committee either have actual (not constructive) knowledge of, or have been provided with all material facts related to the subject matter of the particular matter that is the subject of the vote with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question, with respect to any action or decision not to take action with respect to the Company or the Property.

5.5   Annual Budgets. The Managing Member shall deliver to the Members for approval the following at the times indicated below:

5.5.1   Commencing on November 1, 2017, not later than November 1st of each year, the Managing Member will prepare and present to the Members a draft budget (an "Draft Budget") for the operation of the Company for the ensuing year beginning as of January 1st of such ensuing year, setting forth the anticipated income,

{00095295.11}   17

operating expenses, and capital expenditures of the Company for such ensuing year, including a projected balance sheet giving effect to the Draft Budget. The Draft Budget shall specifically identify costs and expenses, if any, to be paid to the Managing Member (and any Affiliate of the Managing Member, which Affiliate shall be specifically identified in the Draft Budget). The Draft Budget's projection of cash receipts and disbursements shall include projections and recommendations as to the use of projected cash flow in excess of short-term operating requirements and recommendations as to the sources and amounts of additional cash that may be required to meet operating and capital requirements for such ensuing year. The Managing Member shall call a meeting of all of the Members for the purpose of discussing, approving or rejecting the Draft Budget as proposed or as modified within fourteen (14) days after the delivery of the Draft Budget (or such other time as may be agreed to by the Members). The Draft Budget shall become effective only when approved by 90%-in-Interest and shall become the "Annual Budget." Except as set forth in Section 3.2.1, the Managing Member is authorized to pay, or commit the Company to pay, any amount that is included within the Annual Budget, but only up to the dollar amount specified in the Annual Budget; provided however, that the Managing Member shall be permitted to pay, or commit the Company to pay, (a) a commercially reasonable amount to pay for bona fide emergency expenses in the emergency situation in which human life or property is in danger, provided that Managing Member communicates as soon as reasonably possible with the IWA Member with respect to such situation and the amount of such expenditure (the "Emergency Amount") plus (b) an amount up to the lesser of: (i) $20,000, or (ii) 10% of the aggregate costs and expenses identified in the Annual Budget ("Variance Amount"). This Emergency Amount and the Variance Amount may be used by the Managing Member to pay costs and expenses, on behalf of the Company, regardless of whether the particular item is included or not included within the Annual Budget, except that the Emergency Amount and the Variance Amount shall not be used to make any payment to the Managing Member or any of its Affiliates. Notwithstanding the foregoing, prior to the approval of the Annual Budget for calendar year 2018, the Managing Member is authorized to pay, or commit the Company to pay, the Operating Costs and Expenses which are funded by the IWA Member by an Additional Capital Contribution to the Company pursuant to Section 3.2.1.

5.5.2  If the Managing Member anticipates that it will pay costs and expenses exceeding the costs and expenses (including the Emergency Amount and the Variance Amount) set forth in the Annual Budget for the year; and (ii) the Managing Member promptly (and in all cases within 30 days) shall submit a revised budget (a "Revised Annual Budget"), for the operation of the Business for the current fiscal year, setting forth (A) actual income, operating expenses, and capital expenditures for the period from the start of such then current year until the date of such Revised Annual Budget, and (B) anticipated income, operating expenses, and capital expenditures for the remainder of such then current year, including a projected balance sheet giving effect to the Revised Annual Budget. Any Member may call a meeting of the Members for the purpose of discussing, approving or rejecting the Revised Annual Budget as proposed or as modified within fourteen (14) days after the delivery of the Annual Revised Budget (or such other time as may be agreed to by the Members). The Revised Budget shall be

{00095295.11}                                      18

RSD-005534

approved only once it is unanimously approved by the Members and then shall become the then-current "Annual Budget".

5.6     Payment of Organization Costs. The Company shall pay directly, or reimburse Members for, any payments by them of any Organization Costs. Organization Costs shall include all reasonable fees and expenses incurred or paid by a Member for outside legal and accounting services and all fees and expenses in connection with preparing and filing all certificates and other instruments necessary to form the Company. The Company shall pay the actual out of pocket Organization Costs of the Algon Member, up to a maximum of Fifty Thousand Dollars ($50,000).

5.7     Material Transaction. At least fourteen (14) days prior to committing the Company to: (a) funding any capital expenditures with respect to the Property, (b) selling, leasing, exchanging, or otherwise disposing of any Property or portion thereof, (c) acquiring any new investments, properties, leases, drilling rights, interest in a joint venture, acquisitions, or add-on acquisitions, or (d) conducting any bid or auction in connection with any disposition of any Property (each such activity in sections (a) through (d) are referred to as a "Material Transaction"), the Managing Member shall notify the IWA Member of any such proposed Material Transactions, and provide the IWA Member (and its agents or representatives) with any reports, studies, comparable transaction information, analysis, consultant reports, budgets, and other reports and information in the possession or control of the Managing Member, or otherwise considered by the Managing Member in determining whether to commit the Company to undertake any such Material Transaction (the "Diligence Material"). At the request of the IWA Member, Managing Member shall initiate a call with the IWA Member (including its agents and representatives) to discuss the proposed Material Transaction at least two (2) Business Days prior to committing the Company to any such Material Transaction.

5.8     Devotion of Time. The Managing Member is not obligated to devote all of its time or business efforts to the affairs of the Company. The Managing Member shall devote whatever time as it deems appropriate for the operation of the Company.

5.9     Competing Activities. The Managing Member and its officers, directors, shareholders, partners, members, Managing Members, agents, employees and Affiliates may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Managing Member shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Managing Member shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company. The Members acknowledge that the Managing Member and its Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Managing Member's time. The Members hereby waive any and all rights and claims which they may otherwise have against the Managing Member and

RSD-005535

its officers, directors, shareholders, partners, members, Managing Members, agents, employees, and Affiliates as a result of any of such activities.

5.10   Transactions between the Company and the Managing Member.  Subject to the terms set forth in Sections 5.1.1 and 5.3, the Managing Member shall be entitled to hire and retain its Affiliates to perform such services as the Managing Member deem necessary and desirable with respect to the Company's purpose, and to pay compensation to such Affiliates at competitive rates for similar services provided by non-Affiliates, except that the Managing Member shall not pay any compensation to an Affiliate for brokerage services provided by the Affiliate in connection with a sale or financing of the Company or any of its assets or a lease of any of the Company's assets (including the Property).

5.11   Liability of Managing Member Limited to Managing Member's Assets.  Except as set forth in Section 11.3.1, under no circumstances will any director, officer, shareholder, member, managing member, partner, employee, agent or Affiliate of any Managing Member have any personal responsibility for any liability or obligation of the Managing Member (whether on a theory of alter ego, piercing the corporate veil, or otherwise), and any recourse permitted under this Agreement or otherwise of the Members, any former Member or the Company against a Managing Member will be limited to the assets of the Managing Member as they may exist from time to time.  In no event shall the Managing Member be obligated to use any of its own funds (or to loan any funds to the Company), in each case, to pay any Operating Costs and Expenses of the Company or any other Expenses of the Company.

5.12   Payments to Managing Member.  Except as specified in Management Agreement approved by the Members, no Managing Member or Affiliate of a Managing Member is entitled to remuneration for services rendered or goods provided to the Company.

5.13   Officers.  The Managing Member, with the approval of a Majority Interest of the Members, may appoint officers at any time.

5.14   Limited Liability.  Except as set forth in Section 11.3.1, no person who is a Managing Member or officer or both a Managing Member and officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Managing Member or officer or both a Managing Member and officer of the Company.

5.15   Membership Interests of Managing Member.  Except as otherwise provided in this Agreement, a Membership Interest held by the Managing Member shall entitle the Managing Member, as a Member, to all the rights of a Member, including without limitation the economic, voting, information and inspection rights of a Member.

# ARTICLE 6

## ALLOCATIONS OF PROFITS AND LOSSES; DISTRIBUTIONS

6.1   Allocations of Net Profits and Net Losses.

{00095295.11}                    20

6.1.1 <u>Allocation of Net Profit</u>. Except as otherwise provided in <u>Section 6.2</u>, Net Profits shall be allocated to the Members in the following order of priority:

(a) First, to the IWA Member in an amount equal to its Unreturned Capital Contribution; then

(b) Second, to the IWA Member until the IWA Member receives a Ten Percent (10%) annual rate of return on its Capital Contributions, compounded on an annual basis; then

(c) Third, 90% to the IWA Member and 10% to the Algon Member until the IWA Member receives a Fifteen Percent (15%) annual rate of return on the IWA Member Capital Contribution, compounded on an annual basis; then

(d) Fourth, 80% to the IWA Member and 20% to the Algon Member.

6.1.2 <u>Losses</u>. Except as provided in <u>Section 6.2</u>, Net Losses shall be allocated to the Members in the following order of priority:

(a) First, to the Members in the amount of and in proportion to any Net Profits previously allocated to them under <u>Section 6.1.1(a)</u> through <u>(b)</u> above (to the extent such Net Profits have not been offset by prior Net Loss allocations under this subsection (a));

(b) Thereafter, to the Members in proportion to their respective Percentage Interests.

6.1.3 <u>Adjustment</u>. If, due to differences between Net Profit and Net Loss in the aggregate on the one hand, and distributions under <u>Section 6.4</u> or <u>Section 10.5</u> on the other hand, there is a difference between the two calculations in the aggregate at the time of Company dissolution, then subject to any mandatory tax allocations, the Net Profit or Net Loss and all other items of Company income, gain, loss, deduction, or credit for that final year shall be allocated to the Members in accordance with their respective percentages of such items in aggregate distributions.

6.2 Special Allocations.

6.2.1 <u>Limited Negative Capital Accounts From Loss Allocations</u>. Notwithstanding <u>Sections 6.1.1</u> and <u>6.1.2</u> immediately above, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of "Membership Minimum Gain" (which term shall have the meaning set forth in Treasury Regulations Section 1.704-2(d)) that would be realized on a foreclosure of the Membership's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this Section 6.2.1).

{00095295.11}                                           21

RSD-005537

6.2.2   Minimum Gain Chargeback.  If there is a net decrease in Membership Minimum Gain during any Membership fiscal year, each Member shall be specially allocated items of Membership income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Membership Minimum Gain that is allocable to the disposition of Membership property subject to a "Nonrecourse Liability" (which term shall have the meaning set forth in Treasury Regulations Section 1.752-1(a)(2)), which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  Allocations pursuant to this Section 6.2.2 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 6.2.2.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This Section 6.2.2 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

6.2.3   Chargeback of Minimum Gain Attributable To Member Nonrecourse Debt.  If there is a net decrease in Membership Minimum Gain attributable to a "Member Nonrecourse Debt" (which term shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(4)) during any Membership fiscal year, each Member who has a share of the Membership Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Membership income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in Membership Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Membership property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)).  Allocations pursuant to this Section 6.2.3 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 6.2.3.  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4).  This Section 6.2.3 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

6.2.4   Nonrecourse Deductions.  Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1) for any fiscal year or other period shall be specially allocated to the Members in accordance with their respective Percentage Interests.

6.2.5   Member Nonrecourse Deductions.  Those items of Membership loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

{00095295.11}                               22

RSD-005538

6.2.6   Qualified Income Offset.  If a Member receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), whether or not expected or unexpected, or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Membership Minimum Gain, items of Membership income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible.  Any special allocations of items of income and gain pursuant to this Section 6.2.6 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Section 6 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Section 6 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6 if such unexpected adjustments, allocations, or distributions had not occurred.

6.2.7   Curative Allocations.  The special allocations set forth in Section 6.2.1 through Section 6.2.6 above ("Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the Members' intent that, to the extent possible, all Regulatory Allocations be offset with either (i) other Regulatory Allocations, or (ii) special allocations of other items of Membership income, gain, loss or deduction pursuant to this Section 6.2.7.  Therefore, notwithstanding any other provision of this Section 6.2.7 to the contrary (other than the Regulatory Allocations), the Managing Member shall make such offsetting special allocations in whatever manner the Managing Member determines reasonably appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all tax items were allocated pursuant to Section 6.1 above.  In exercising its discretion under this Section 6.2.7, the Managing Member shall take into account future Regulatory Allocations under Sections 6.2.1 through 6.2.6 above, although not yet made, are likely to offset other Regulatory Allocations previously made in accordance with the provisions of this Section 6.2.7.

6.3     Allocation Rules.

6.3.1   Notwithstanding any other provision in this Section 6, in accordance with Code Section 704(c) and the Treasury Regulations promulgated there under, income, gain, loss, and deduction with respect to any property contributed to the capital of the Membership shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Membership for federal income tax purposes and its fair market value on the date of contribution, as determined by the Managing Member.  Allocations pursuant to this Section 6.3.1 are solely for purposes of federal, state, and local taxes.  As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any Property contributed to the capital of the Company shall, solely for tax purposes, be allocated

{00095295.11}                          23

among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using the allocation method selected by the Tax Matter Member.

6.3.2  For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Code Section 706 and the Regulations thereunder.

6.3.3  The Members are aware of the income tax consequences of the allocations made by this Section 6 and hereby agree to be bound by the provisions of this Section 6 in reporting their shares of Company income and loss for income tax purposes.

6.3.4  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulations Section 1.752 3(a) (3), the Members' interests in Company profits are in proportion to their Percentage Interests.

6.3.5  In the event the value of any Company asset is adjusted pursuant to the Regulations, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its new value in the same manner as under Code Section 704(c) and the Regulations thereunder.

6.3.6  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement.

6.3.7  In the event of the assignment or transfer of all or any part of the Membership Interest of a Member, the allocable share, with respect to the Membership Interest so assigned, of Net Profits, Net Losses and distributions shall be allocated between the assignor and the assignee using the closing of the books method of allocation.

6.3.8  The Company shall elect to deduct expenses incurred in connection with organizing the Company ratably over a sixty (60) month period as provided in Section 709 of the Code.

6.3.9  This Agreement has been drafted in a manner which is intended to comply with the principles of Sections 704 (based on the Member's interests in the Company with respect to allocations under Section 704(b)), 706 and 752 of the Code. Therefore, if the Company is advised that the allocations provided in this Section 6 are unlikely to be respected for federal income tax purposes, the Managing Member is hereby granted the power to amend the allocation provisions of this Agreement, including making any special allocations of items of gross income of deduction on advice of accountants and legal counsel, to the minimum extent necessary to achieve the

{00095295.11}                    24

RSD-005540

foregoing results; provided, however, that no such amendment shall have any materially adverse effect upon any Member and no such amendment shall change the manner of making distributions under Section 6.4 or Section 10.5.

6.3.10   No election shall be made by the Company or any Member or Managing Member for the Company to be excluded from the application of any provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

6.4     Distributions.

6.4.1   Distributions of Available Cash. Except as provided in Section 10.5, all distributions of Available Cash shall be made to the Members as follows:

(a)     First, to the IWA Member until its Unreturned Capital Contribution is Zero Dollars ($0); then

(b)     Second, to the IWA Member until the IWA Member receives a Ten Percent (10%) annual rate of return on its Capital Contributions, compounded on an annual basis; and

(c)     Third, 90% to the IWA Member and 10% to the Algon Member until the IWA Member receives a Fifteen Percent (15%) annual rate of return on the IWA Member Capital Contribution, compounded on an annual basis; and

(d)     Fourth, 80% to the IWA Member and 20% to the Algon Member. For purposes of clarification, the distribution to the Algon Member includes any distribution otherwise payable to the Algon Member in connection with its ownership of the Membership Interest held by the Algon Member.

6.4.2   In-Kind Distributions. Company property (other than cash) shall not be distributed in-kind to the Members without the prior written approval of the Managing Member and all of the Members. If any Company property is distributed to the Members in-kind, any Member entitled to receive any interest in such property shall receive such interest as a tenant-in-common with such other Member or Members so entitled. The amount of such Distribution shall be the fair market value of such property as of the date of the Distribution, which fair market value shall be determined either by unanimous agreement of the Members. The Capital Accounts of the Members shall be adjusted to reflect the amount of Net Profits or Net Losses that would have been realized by the Company pursuant to the terms of this Agreement had the Company sold the property being distributed for the agreed fair market value immediately prior to such Distribution.

6.4.3   Limitation on Certain Distributions. Notwithstanding Sections 6.4.1 and 6.4.2 hereof, the aggregate Distributions to a Member pursuant to such Sections during any Fiscal Year shall be limited to the maximum amount that can be distributed to a Member without creating a deficit balance in its Capital Account that is in excess of the amount its deemed obligated to restore pursuant to the penultimate

{00095295.11}                              25

sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations. For purposes of the previous sentence, the deficit balance in a Member's Capital Account created by a distribution shall be equal to its Capital Account as of the end of the prior Fiscal Year, increased by its Capital Contributions, if any, during the current Fiscal Year, without giving effect to any allocations of Profit or Losses or any items thereof for the current Fiscal Year. Any distribution prevented by this Section 6.4.3 (a "Suspended Distribution") shall be set aside by the Company and shall reduce Available Cash. However, for purposes of distributions to the other Member pursuant to Sections 6.4.1 and 6.4.2 hereof, Suspended Distributions which would otherwise have been made to the Member with the negative Capital Account shall be treated as actually having been made. All or a portion of any Suspended Distribution shall be made to the Member (or the successor-in-interest of the Member) to whom, but for this Section 6.4.3, the Suspended Distribution would have been made at the earliest possible time that such Distribution can be made without violating the provisions of this Section 6.4.3, at which time such distribution (a) shall increase Available Cash, and (b) except to the extent already taken into account pursuant to the previous sentence, shall be treated as a distribution pursuant to Section 6.4.1 or Section 6.4.2 hereof, as the case may be.

6.4.4   Limitations on Distributions. Notwithstanding any provisions to the contrary in this Section 6.4, no Distributions may be made by the Company if, after giving effect to the Distribution: (a) the Company has previously incurred any expenses which have not been paid or satisfied in full and/or the Members reasonably determine that the Company will incur expenses in the foreseeable future; (b) the Company would not be able to pay its secured and unsecured debt obligations as they become due in the usual course of business; and/or (c) the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the Distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the Distribution.

6.4.5   Excess Distributions. A Member or Managing Member who approves a Distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the Distribution that exceeds what could have been distributed without violating this Agreement or the Act, if it is established that the Member or Managing Member did not act in compliance with this Section 6.4.5. Any Member or Managing Member who is so liable shall be entitled to compel contribution from: (a) each other Member or Managing Member who also is so liable; and (b) each Member for the amount the Member received with knowledge of facts indicating that the Distribution was made in violation of this Agreement or the Act.

6.4.6   Amounts Withheld. All amounts withheld pursuant to any provision of any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 6.4.6 for all purposes under this Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and

{00095295.11}                                              26

RSD-005542

local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

          6.4.7   Limitations on Distributions. Except as otherwise provided in Sections 6 and 10 hereof, no Member shall demand or receive a return on or of its Capital Contributions or withdraw from the Company.

## ARTICLE 7

### TRANSFER AND ASSIGNMENT OF INTERESTS

      7.1   Transfer and Assignment of Interests. Except as otherwise provided in this Article 7, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his Membership Interest (collectively, "transfer") except with the prior written consent of all of the Members, which consent may be given in the sole discretion of each Member. Transfers in violation of this Article 7 shall only be effective to the extent set forth in Section 7.7. After the consummation of any transfer of any part of a Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

      7.2   Intentionally Omitted.

      7.3   Substitution of Members. An Assignee of a Membership Interest shall have the right to become a substitute Member only if the requirements of Sections 7.1 and 7.2, the Assignee executes an instrument satisfactory to the Managing Member accepting and adopting the terms and provisions of this Agreement, and the Assignee pays any reasonable expenses in connection with his admission as a new Member. The admission of an Assignee as a substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

      7.4   Permitted Transfers. Notwithstanding anything contained in this Article 7, a Member may transfer, in its sole and absolute discretion, its Membership Interest to any of its Affiliates; provided that any such transfer shall not release the Member from its obligations in this Agreement including, but not limited to, the obligation to make Additional Capital Contributions.

      7.5   Effective Date of Permitted Transfers. Any permitted transfer of all or any portion of a Membership Interest or an Economic Interest shall be effective as of the date upon which the requirements of Sections 7.1, 7.2 and 7.3 have been met. The Managing Member shall provide the Members with written notice of such transfer as promptly as possible after the requirements of Sections 7.1, 7.2 and 7.3 have been met. Any transferee of a Membership Interest shall take subject to the restrictions on transfer imposed by this Agreement.

      7.6   Rights of Legal Representatives. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person

{00095295.11}          27

RSD-005543

or property ("Incapacitating Event"), the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a corporation, trust, or other entity and is dissolved or terminated, the powers of that Member may be exercised by his legal representative or successor.

7.7     No Effect to Transfers in Violation of Agreement. Upon an Assignment Event or any transfer of a Membership Interest in violation of this Article 7, the Member or the transferee (as applicable) shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Assignee and thereafter shall only receive the share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

Upon and contemporaneously with any transfer (whether arising out of an attempted charge upon that Member's Economic Interest by judicial process, a foreclosure by a creditor of the Member or otherwise) of a Member's Economic Interest which does not at the same time transfer the balance of the rights associated with the Membership Interest transferred by the Member (including, without limitation, the rights of the Member to vote or participate in the management of the business, property and affairs of the Company), the Company shall purchase from the Member, and the Member shall sell to Company for a purchase price of $100, all remaining rights and interests retained by the Member that immediately before the transfer were associated with the transferred Economic Interest. Such purchase and sale shall not, however, result in the release of the Member from any liability to the Company as a Member.

Each Member acknowledges and agrees that the right of the Company to purchase such remaining rights and interests from a Member who transfers a Membership Interest in violation of this Article 7 is not unreasonable under the circumstances existing as of the date hereof.

7.8     Call Rights. In the event that either: (a) the Management Agreement is terminated in accordance with the terms of such Management Agreement for any reason, or (b) the Managing Member is terminated as the Managing Member pursuant to this Agreement, then, the IWA Member shall have the right, but not the obligation, to purchase the Membership Interest owned or held by the Algon Member (or by any assignee or transferee), for a purchase price of One Thousand Dollars ($1,000).

## ARTICLE 8

## TERMINATION OF MEMBERSHIP INTEREST

8.1     Withdrawal. Upon an Assigning Event of a Member, such Member shall be treated as a "Former Member", and the Company and/or the other Members ("Remaining Members") shall have the right to purchase, and if such right is exercised, the Former Member shall sell all of its Membership Interest, the "Former Member's Interest" as provided in this Article 8.

{00095295.11}                                28

8.2     Purchase Price. Except as otherwise provided in Section 7.8 which should prevail over the terms of this Article 8, the purchase price for the Former Member's Interest shall be the Capital Account balance of the Former Member as adjusted pursuant to Section 3.4. Notwithstanding the foregoing, if the event causing the Member to become a Former Member results from a material breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such material breach.

8.3     Notice of Intent to Purchase. Within thirty (30) days after the Managing Member has notified the Remaining Members as to the purchase price of the Former Member's Interest determined in accordance with Section 8.2, each Remaining Member shall notify the Managing Member in writing of his desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Percentage Interest of the Remaining Member bears to the aggregate of the Percentage Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

8.4     Election to Purchase Less Than All of the Former Member's Interest. If any Remaining Member elects to purchase none or less than all of his pro rata share of the Former Member's Interest, then the Remaining Members may elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire Interest of the Former Member, the Company may purchase any remaining share of the Former Member's Interest. If the Remaining Members and the Company do not elect to purchase all of the Former Member's Interest, such Interest shall be that of an Economic Interest only.

8.5     Payment of Purchase Price. The purchase price shall be paid by the Company or the Remaining Members in cash at the closing of the purchase and sale of the Former Member's Interest.

8.6     Closing of Purchase of Former Member's Interest. The closing for the sale of a Former Member's Interest pursuant to this Article 8 shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or Maryland legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member or such Former Member's legal representative shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member or such Former Member's legal representative, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

8.7     Purchase Terms Varied by Agreement. Nothing contained herein is intended to prohibit Members from agreeing upon other terms and conditions for the purchase by the Company or any Member of the Membership Interest of any Member in the Company desiring to retire, withdraw or resign, in whole or in part, as a Member.

RSD-005545

## ARTICLE 9

### ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1     Books and Records. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with generally accepted accounting principles in the United States. The books and records of the Company shall fairly present the financial condition and operations of the Company, shall reflect all the Company transactions, and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office in Maryland all of the following:

9.1.1     A current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Account and Percentage Interest of each Member and Assignee;

9.1.2     A current list of the full name and business or residence address of the Managing Member;

9.1.3     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

9.1.4     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

9.1.5     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

9.1.6     Copies of the financial statements of the Company, if any, for the six (6) most recent Fiscal Years; and

9.1.7     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) Fiscal Years.

9.2     Delivery to Members and Inspection.

9.2.1     Upon the request of any Member or Assignee, the Managing Member shall promptly deliver to the requesting Member or Assignee, at the expense of the Company, a copy of the information required to be maintained under Sections 9.1.1, 9.1.2 and 9.1.3, and a copy of this Agreement.

9.2.2     Each Member, Managing Member and Assignee has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, Managing Member or Assignee, to:

{00095295.11}                    30

RSD-005546

       (a)     inspect and copy during normal business hours any of the Company records described in Sections 9.1.1 through 9.1.7; and

       (b)     obtain from the Managing Member, promptly after their becoming available, a copy of the Company's federal, state, and local income tax or information returns for each Fiscal Year.

       9.2.3   Members representing at least five percent (5%) of the Percentage Interests, or three or more Members, may make a written request to the Managing Member for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current Fiscal Year and a balance sheet of the Company as of the end of that period. Such statement shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Managing Member that the statement that the financial statements were prepared from the books and records of the Company and fairly and accurately reflect the business and operations of the Company for the period covered. If so requested, the statement shall be delivered or mailed to the Members within thirty (30) days after the date of the request.

       9.2.4   Any request, inspection or copying by a Member or Assignee under this Section 9.2 may be made by that Person or that Person's agent or attorney.

       9.2.5   The Managing Member shall promptly furnish to a Member a copy of any amendment to the Articles or this Agreement executed by a Managing Member pursuant to a power of attorney from the Member.

       9.2.6   The Managing Member shall, within forty-five (45) calendar days after the end of each fiscal quarter during the Company's fiscal year, furnish unaudited financial statements of the Company consisting of (i) a consolidated statement of income of the Company and its subsidiaries (if any) for such quarterly period and for the period from the beginning of the fiscal year to the end of such quarter, (ii) a consolidated statement of cash flows for such period, (iii) a consolidated balance sheet as of the end of such quarterly period, (iv) a statement of each member's equity, and (v) a breakdown of actual revenues and costs compared to budgeted revenues and costs for the quarter and year to date;

       9.2.7   The Managing Member shall, within ninety (90) calendar days after the end of each fiscal year, furnish financial statements of the Company consisting of (i) a consolidated statement of income and cash flows of the Company and its subsidiaries (if any) for such fiscal year; (ii) a consolidated statement of cash flows for such period; (iii) a consolidated balance sheet as of the end of such fiscal year; (iv) a statement of each member's equity, (v) a breakdown of actual revenues and costs compared to actual revenues and costs for the year, (vi) a breakdown of payments made to the Managing Member (or any Affiliate); and (vii) any other information as is reasonably necessary to complete the tax returns of the Members. These financial statements shall be reviewed financial statements and prepared by an independent certified public accountant and shall be audited; and

RSD-005547

9.2.8   Such other reports and financial statements as the Managing Member shall determine, or as the IWA Member, Members or the Management Committee shall reasonably request from time to time.

9.3   Financial and Other Information. The Managing Member shall provide such financial and other information relating to the Company or any other Person in which the Company owns, directly or indirectly, an equity interest, as a Member may reasonably request. The Managing Member shall distribute to the Members, promptly after the preparation or receipt thereof by the Managing Member, any financial or other information relating to any Person in which the Company owns, directly or indirectly, an equity interest, including any filings by such Person under the Securities Exchange Act of 1934, as amended, that is received by the Company with respect to any equity interest of the Company in such Person.

9.4   Filings. The Managing Member, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Managing Member, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Articles and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Managing Member is required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Maryland Department of Taxation and Assessments.  The Managing Member shall deliver K-1 Statements to the Members within ninety (90) days from the end of the fiscal year end of the Company.

9.5   Bank Accounts. The Managing Member shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.6   Accounting Decisions and Reliance on Others. All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managing Member. The Managing Member may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

9.7   Tax Matters for the Company Handled by Managing Member and Tax Matters Partner. The Tax Matters Partner shall from time to time cause the Company to make such tax elections and to oversee the tax affairs of the Company as it deems to be in the best interest of the Company and its Members. The Managing Member shall prepare tax returns and statements, K-1 Statements, and similar documents which are to be filed with any taxing authorities on behalf of the Company, or used by the Members to prepare their respective tax returns. Notwithstanding the foregoing, the Managing Member and the Tax Matters Partner shall obtain the prior approval of all of the Members before taking any of the following actions: (a) filing any tax return or statement with any taxing authority on behalf of the Company or any Member, (b) issuing a final K-1 Statement to the Members, (c) granting an extension, waiver, suspension, or tolling of any statute of limitations, (d) consenting to a settlement, consent decree, or similar document with any taxing authority, or (e) making an agreement or election with any taxing

RSD-005548

authority which is reasonably likely to affect the rights of the Company or any Member. The Tax Matters Partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Member or Managing Member, as the case may be, a Majority Interest may designate another to be Tax Matters Partner. Beginning on January 1, 2018, the Managing Member shall constitute the "partnership representative" under Section 6223 of Chapter 63 of the Code (as in effect pursuant to the Bipartisan Budget Act), and the Managing Member shall take any and all action required under the Code or Treasury Regulations, as in effect from time to time, to designate itself the "partnership representative." To the extent permitted by the Code and the Treasury Regulations, the Managing Member, in its capacity as "partnership representative" shall be bound by the obligations and restrictions imposed on the Tax Matters Partner pursuant to this Section 9.7. Upon the promulgation of Treasury Regulations implementing subchapter C of Chapter 63 of the Code (as revised by the Bipartisan Budget Act), the Managing Member will evaluate and consider options available with respect to preserving the allocation of responsibility and authority described in this Section 9.7, while conforming with the applicable provisions of the revised partnership audit procedures. Any action taken by the Managing Member pursuant to this Section 9.7, including an election permitted under the Bipartisan Budget Act, shall be made only with the consent of a Majority in Interest of the Members. The Managing Member and the Members agree to work together in good faith to amend this Agreement if either party determines than an amendment is required to maintain the intent of the parties with respect to the obligations and limitations of the Tax Matters Partner.

## ARTICLE 10

### DISSOLUTION AND WINDING UP

10.1    Dissolution. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following ("Dissolution Events"):

10.1.1 August 1, 2026; or

10.1.2 The entry of a decree of judicial dissolution pursuant to the Act;

or

10.1.3 The vote or written consent of 90%-in-Interest of the Members.

10.2    Certificate of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 10.1, the Managing Member who has not wrongfully dissolved the Company or, if none, the Members, shall execute a Certificate of Dissolution in such form as shall be prescribed by the Maryland Department of Taxation and Assessments and file the Certificate as required by the Act.

10.3    Winding Up. Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Managing Member who have

{00095295.11}                    33

RSD-005549

not wrongfully dissolved the Company or, if none, the Members, shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 10.5. The Person winding up the affairs of the Company shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Person winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

10.4   Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article 6, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to). The fair market value of such asset shall be determined by the Managing Member and as approved by the Majority Interest of Members.

10.5   Order of Payment Upon Dissolution. After determining that all the known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with the distribution provisions set forth in Section 6.4. Such liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or, if later, within ninety (90) days after the date of such liquidation.

10.6   Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of his positive Capital Account balance and shall have no recourse for his Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Managing Member or any other Member.

10.7   Certificate of Cancellation. The Managing Member or Members who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the Maryland Department of Taxation and Assessments, a Certificate of Cancellation of the Certificate upon the completion of the winding up of the affairs of the Company.

10.8   No Action for Dissolution. Except as expressly permitted in this Agreement, a Member shall not take any voluntary action that directly causes a Dissolution Event. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 10.1. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Economic Interests. Accordingly, except where the Managing Member has failed to liquidate the Company as required by this Article 10, each Member hereby waives and renounces

{00095295.11}                                34

RSD-005550

his right to initiate legal action to seek the appointment of a receiver or trustee to liquidate the Company or to seek a decree of judicial dissolution of the Company on the ground that (a) it is not reasonably practicable to carry on the business of the Company in conformity with the Articles or this Agreement, or (b) dissolution is reasonably necessary for the protection of the rights or interests of the complaining Member. Damages for breach of this Section 10.8 shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which such Member would otherwise be entitled.

## ARTICLE 11

### INDEMNIFICATION AND INSURANCE

11.1    Definitions. For purposes of this Article 11, the following definitions shall apply:

11.1.1  "Expenses" shall include, without limitation, attorneys' fees, disbursements and retainers, court costs, transcript costs, fees of accountants, experts and witnesses, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, or being or preparing to be a witness or other participant in a Proceeding.

11.1.2  "Proceeding" includes any action, suit, arbitration, alternative dispute resolution mechanism, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative or investigative in nature, except a proceeding initiated by a Person pursuant to Section 11.12 of this Agreement to enforce such Person's rights under this Agreement.

11.2    Indemnification of the Managing Member and Officers.

11.2.1  The Company and the IWA Member, jointly and severally, shall indemnify, defend, and hold harmless, the Managing Member, the Manager, any member, manager, officer or employee of the Managing Member or the Manager, and any officer of the Company (collectively, the "Algon Indemnified Parties") and IWA Member and any member, manager, officer or employee of IWA Member (collectively, the "IWA Member Indemnified Parties") who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (other than a Proceeding by or in the right of the Company or a Proceeding where any Algon Indemnified Party or the IWA Member Indemnified Party is the indemnifying party pursuant to this Article 11) by reason of the fact that such Algon Indemnified Party is the Managing Member of the Company, or is the Manager or is or was an agent of the Company including, without limitation, any claims brought by the Landlord or its successors and assigns under, or with respect to, the Lease arising out of any action by the IWA Member, the Company, Managing Member and/or the Manager ("Landlord-Initiated Action"), or that any IWA Indemnified Party is a member of the Company or an agent of the Company, against all Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by or levied against an Algon Indemnified Party or an IWA Member Indemnified Party in connection with such

{00095295.11}                        35

Proceeding. The termination of any Proceeding, whether by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such Algon Indemnified Party or such IWA Member Indemnified Party did not act in good faith and in a manner which he or it reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that the Algon Indemnified Party or the IWA Member Indemnified Party had reasonable cause to believe that his or its conduct was unlawful. Without limiting the foregoing, each Algon Indemnified Party shall be deemed to have acted in good faith and in the best interests of the Company if such Algon Indemnified Party takes action or fails to take action and such action or inaction (i) is approved by a vote of the Management Committee as set forth in Section 5.4, or (ii) is approved by IWA Member where the IWA Member has actual (not constructive) knowledge of, or has been provided with all material facts related to the subject matter of the approval with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question. Notwithstanding anything to the contrary in this Section 11.2.1, the Company's obligation to indemnify any IWA Member Indemnified Party shall not be limited, restricted, or terminated by the fact that the IWA Member is providing indemnification pursuant to this Section 11.2.1.

(a)     Notwithstanding anything to the contrary in this Section 11.2.1, in the event a court of competent jurisdiction determines in a Final Order (hereinafter defined) that any Algon Indemnified Party or any IWA Member Indemnified Party engaged in fraud, gross negligence or willful misconduct and such determination is not subject to appeal (each, "Judicially Determined Misconduct"), then, neither the Company nor the IWA Member shall have any obligation to provide indemnification to any Algon Indemnified Parties or IWA Member Indemnified Parties for Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to such Judicially Determined Misconduct by such Algon Indemnified Party.

(b)     Prior to the Final Order stating that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, the Company and IWA Member shall indemnify and defend the Algon Indemnified Parties or IWA Member Indemnified Parties as set forth in this Article 11. In particular, from and after the Final Order that determines that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, such Algon Indemnified Party and such IWA Member Indemnified Party, as the case may be, shall reimburse the actual out-of-pocket Expenses, amounts paid in settlement, judgements, fines, penalties, and interest incurred by the Company and/or the IWA Member defending such Algon Indemnified Party and such IWA Member Indemnified Party for such Judicially Determined Misconduct.

11.2.2  The Company and the IWA Member, jointly and severally, shall indemnify, defend, and hold harmless, Algon Indemnified Party and IWA Member Indemnified Party, who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding by or in the right of the Company to procure a judgment in his or its favor by reason of the fact that such Algon Indemnified Party is the Managing Member of the Company, or is the Manager or is or was an agent of the Company or such IWA Member Indemnified Party is a member of the Company

{00095295.11}                              36

or an agent of the Company, against any Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by such Algon Indemnified Party and such IWA Member Indemnified Party in connection with such Proceeding, except that no indemnification shall be made with respect to any claim, issue or matter as to which such Algon Indemnified Party or IWA Member Indemnified Party shall have been adjudged liable to the Company unless and only to the extent that the court in which such Proceeding was brought or other court of competent jurisdiction shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Algon Indemnified Party or such IWA Member Indemnified Party, as the case may be, is fairly and reasonably entitled to indemnification for such Expenses which such court shall deem proper. Without limiting the foregoing, each Algon Indemnified Party shall be deemed to have acted in good faith and in the best interests of the Company if such Algon Indemnified Party takes action or fails to take action and such action or inaction (i) is approved by a vote of the Management Committee as set forth in Section 5.2 and Section 5.4.4, or (ii) is approved by IWA Member where the IWA Member has actual (not constructive) knowledge of, or has been provided with all material facts related to the subject matter of the approval with respect to which the Managing Member has actual (not constructive) knowledge concerning the matter in question.

(a) Notwithstanding anything to the contrary in this Section 11.2.2, in the event a court of competent jurisdiction determines in a Final Order that any Algon Indemnified Party or any IWA Member Indemnified Party engaged in Judicially Determined Misconduct, then, neither the Company nor the IWA Member shall have any obligation to provide indemnification to any Algon Indemnified Parties or any IWA Member Indemnified Party for Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to such Judicially Determined Misconduct by such Algon Indemnified Party.

(b) In connection with any indemnification initiated pursuant to this Section 11.2, prior to the Final Order stating that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, the Company and Investors Warranty of America shall indemnify and defend the Algon Indemnified Parties and the IWA Member Indemnified Parties as set forth in this Article 11. In particular, from and after the Final Order that determines that any Algon Indemnified Party or any IWA Member Indemnified Party has engaged in Judicially Determined Misconduct, such Algon Indemnified Party and such IWA Member Indemnified Party, as the case may be, shall reimburse the actual out-of-pocket Expenses, amounts paid in settlement, judgements, fines, penalties, and interest incurred by the Company and/or the IWA Member defending such Algon Indemnified Party and such IWA Member Indemnified Party for such Judicially Determined Misconduct.

11.3    Indemnification by Managing Member and Taylor.

11.3.1 The Managing Member and Taylor shall, jointly and severally, indemnify, defend, and hold harmless the Company (including any officer, employee, member, agent, or representative) and the IWA Member Indemnified Parties (collectively, the "Company Indemnified Parties") who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding arising out of,

{00095295.11}                          37

related to, or in connection with and any Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to (i) the Managing Member causing the Company to voluntarily commence any case or proceeding under title 11 of the United States Code without the consent of the Management Committee, (ii) the Managing Member's filing, on behalf of the Company, of an answer consenting to or otherwise acquiescing or joining in any involuntary petition filed against it by any other Person under title 11 of the United States Code or any other federal or state bankruptcy or insolvency law without the prior written consent of the Management Committee, (iii) the Managing Member causing the Company to directly or indirectly solicit the filing of an involuntary petition against it by any other Person under title 11 of the United States Code or any other Federal or state bankruptcy or insolvency law; (iv) the intentional violation by the Manager or the Managing Member of <u>Section 14.20</u> of this Agreement; and (v) the fraud, gross negligence or willful misconduct of Taylor, Manager or the Managing Member in connection with the performance of his or its obligations under this Agreement or the Management Agreement.

11.3.2  The Managing Member shall indemnify, defend, and hold harmless the Company Indemnified Parties who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding arising out of, related to, or in connection with and any Expenses, amounts paid in settlement, judgments, fines, penalties and interest arising out of or related to (i) any actions taken or not taken by the Managing Member (or any Affiliate or agent of the Managing Member) which constitute a material breach of this Agreement which is not cured by the Managing Member as set forth in this Agreement and (ii) any actions taken or not taken by the Manager (or any Affiliate or agent of the Manager) which constitute a material breach of the Management Agreement which is not cured by the Manager as set forth in this Agreement.

11.3.3  In the event there is a conflict between the provisions in this <u>Section 11.3</u> and the provisions in <u>Section 11.2</u>, (i) the provisions in this <u>Section 11.3</u> shall prevail and control in connection with any dispute between IWA Member and Algon Member which does not involve a third party claim against any Member, the Managing Member, Manager, Taylor or the Company or any of their respective members, managers, officers or employees and (ii) the provisions in <u>Section 11.2</u> shall prevail and control in connection with any Landlord-Initiated Action, and (iii) the Parties shall use the dispute resolution provisions in <u>Section 14.22</u> to resolve any other conflict between the provisions in <u>Section 11.2</u> and <u>Section 11.3</u> involving any third party claim against any Member, the Managing Member, the Manager, Taylor or the Company or any of their respective members, managers, officers or employees.

11.4  <u>Successful Defense</u>.  Notwithstanding any other provision of this Agreement, to the extent that any Algon Indemnified Party or any Company Indemnified Party has been successful on the merits or otherwise in defense of any Proceeding referred to in <u>Section 11.2</u>, or in defense of any claim, issue or matter therein, such Algon Indemnified Party or such Company Indemnified Party shall be indemnified against Expenses actually and reasonably incurred in connection therewith.

{00095295.11}                                38

RSD-005554

11.5   Intentionally deleted.

11.6   Payment of Expenses in Advance. Notwithstanding anything to the contrary set forth in this Agreement, Expenses incurred by any Algon Indemnified Party, any IWA Member Indemnified Party or any Company Indemnified Party in connection with a Proceeding shall be paid by the Company in advance of the final disposition of such Proceeding upon receipt of a written undertaking by or on behalf of such Algon Indemnified Party, such IWA Member Indemnified Party or Company Indemnified Party to repay such amount if it shall ultimately be determined that such Algon Indemnified Party, such IWA Member Indemnified Party or such Company Indemnified Party is not entitled to be indemnified by the Company as authorized in this Article 11; provided however that this Section 11.6 shall not apply to the indemnification obligations set forth in Section 11.3.1.

11.7   Indemnification of Other Agents. Subject to Section 11.6, the Company may, but shall not be obligated to, indemnify any Person (other than any Algon Indemnified Party or any Company Indemnified Party) who was or is a party or is threatened to be made a party to, or otherwise becomes involved in, any Proceeding (including any Proceeding by or in the right of the Company) by reason of the fact that such Person is or was an agent of the Company (including Members who are not an Algon Indemnified Party, an IWA Member Indemnified Party or Company Indemnified Party), against all Expenses, amounts paid in settlement, judgments, fines, penalties and interest actually and reasonably incurred by such Person in connection with such Proceeding under the same circumstances and to the same extent as is provided for or permitted in this Article 11 with respect to an Algon Indemnified Party, an IWA Member Indemnified Party and a Company Indemnified Party.

11.8   Indemnity Not Exclusive. The indemnification and advancement of Expenses provided by, or granted pursuant to, the provisions of this Article 11, shall not be deemed exclusive of any other rights to which any Person seeking indemnification or advancement of Expenses may be entitled under any agreement, vote of Managing Member or Members, or otherwise, both as to action in such Person's capacity as an agent of the Company and as to action in another capacity while serving as an agent. All rights to indemnification under this Article 11 shall be deemed to be provided by a contract between the Company and each Algon Indemnified Party, IWA Member Indemnified Party and Company Indemnified Party who serves in such capacity at any time while this Agreement and relevant provisions of the Act and other applicable law, if any, are in effect. Any repeal or modification hereof or thereof shall not affect any such rights then existing.

11.9   Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of this Article 11 or of the Act. The Managing Member shall obtain and maintain any insurance, for and on behalf of the Company, which is required by the Lease. In the event a Person shall receive payment from any insurance carrier or from the plaintiff in any action against such Person with respect to indemnified amounts after payment on account of all or part of such indemnified amounts having been made by the Company pursuant to this Article 11, such Person shall reimburse the

{00095295.11}                                39

RSD-005555

Company for the amount, if any, by which the sum of such payment by such insurance carrier or such plaintiff and payments by the Company to such Person exceeds such indemnified amounts; provided, however, that such portions, if any, of such insurance proceeds that are required to be reimbursed to the insurance carrier under the terms of its insurance policy shall not be deemed to be payments to such Person hereunder. In addition, upon payment of indemnified amounts under the terms and conditions of this Agreement, the Company shall be subrogated to such Person's rights against any insurance carrier with respect to such indemnified amounts (to the extent permitted under such insurance policies). Such right of subrogation shall be terminated upon receipt by the Company of the amount to be reimbursed by such Person pursuant to the first sentence of this Section 11.9.

11.10   Heirs, Executors and Administrators. The indemnification and advancement of Expenses provided by, or granted pursuant to, this Article 11 shall continue as to a Person who has ceased to be a Managing Member, Member, Manager or an agent of the Company and shall inure to the benefit of such Person's heirs, executors and administrators.

11.11   Right to Indemnification Upon Application.

11.11.1   Any indemnification or advance under this Article 11 shall be made promptly, and in no event later than sixty (60) days, after the Company's receipt of the written request of the Algon Indemnified Party, IWA Member Indemnified Party or Company Indemnified Party therefor, until, in the case of an indemnification, a court by Final Order has determined that such Algon Indemnified Party, IWA Member Indemnified Party or Company Indemnified Party has not met the relevant standard for indemnification set forth in Section 11.2.

11.11.2   The right of a Person to indemnification or an advance of Expenses as provided by this Article 11 shall be enforceable in any court of competent jurisdiction. Neither the failure by the Managing Member or Members of the Company or its independent legal counsel to have made a determination that indemnification or an advance is proper in the circumstances, nor any actual determination by the Managing Member or Members of the Company or its independent legal counsel that indemnification or an advance is not proper, shall be a defense to the action or create a presumption that the relevant standard of conduct has not been met. The burden of proving that indemnification or an advance is not proper shall be on the Company. In any such action, the Person seeking indemnification or advancement of Expenses shall be entitled to recover from the Company any and all expenses of the types described in the definition of Expenses in Section 11.1.1 of this Agreement actually and reasonably incurred by such Person in such action, but only if he prevails therein.

11.12   Limitations on Indemnification. No payments pursuant to this Agreement shall be made by the Company:

11.12.1   To indemnify or advance funds to any Person with respect to a Proceeding initiated or brought voluntarily by such Person and not by way of defense, except as provided in Section 11.11.2 with respect to a Proceeding brought to establish or enforce a right to indemnification under this Agreement, otherwise than as required

RSD-005556

under Maryland law, but indemnification or advancement of Expenses shall be provided by the Company as set forth in this Article 11; or

11.12.2 If a court of competent jurisdiction determines by Final Order that any indemnification or advance of Expenses hereunder is unlawful.

11.13 Partial Indemnification. If a Person is entitled under any provision of this Article 11 to indemnification by the Company for a portion of any Expenses incurred by such Person in any Proceeding but not, however, for the total amount thereof, the Company shall nevertheless indemnify such Person for the portion of such Expenses, amounts paid in settlement, judgments, fines, penalties or interest to which such Person is entitled.

11.14 Waivers. The IWA Member and Taylor each hereby unconditionally and irrevocably waives as a condition to the performance by the IWA Member or Taylor, as the case may be, of the indemnification obligations set forth in this Article 11: (a) all notices which may be required by statute or otherwise, including notices of acceptance, default, presentment or demand, (b) all indemnification, suretyship and guaranty defenses of every nature available under the laws of any state, and (c) any defense based on an election of remedies by the indemnified party. The IWA Member and Taylor each individually waive any right to require Algon Member or Taylor, or the IWA Member, as the case may be, to first proceed against any other indemnitor, guarantor or person liable on the indemnification obligations set forth herein or exhaust any other remedies available.

11.15 Personal Liability of Taylor. Notwithstanding anything to the contrary set forth in this Agreement or otherwise, the personal liability of Taylor under this Agreement, under the Management Agreement or with respect to the Managing Member, the Manager or the Company shall be limited to the terms and provisions of Section 11.3.1 of this Agreement.

11.16 Mutual Waiver. Each of the parties to this Agreement hereby mutually waive any claim for consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, arising out of, or relating to, and/or in connection with any breach of this Agreement, the Management Agreement, the management of the Company, the management of the Property or otherwise.

11.17 Notice and Cure Period for Breach of this Agreement and Management Agreement. Prior to making any demand for indemnification under this Agreement with respect to an alleged breach of this Agreement, written notice and opportunity to cure shall be provided to such breaching party as follows: Any Member that believes that the Managing Member, the Manager (under the Management Agreement), Taylor or any other Member or Person has breached the terms of this Agreement or the Management Agreement, as the case may be, then, such Member shall send written notice of such alleged breach to such party, with a copy to the Managing Member. The breaching party shall have thirty days from the date of such notice to cure such alleged breach and, if the nature of such breach or alleged breach may not reasonably be cured in a thirty day time period, then, such breaching party shall have a reasonable time to cure such breach, provided that such party is diligently and in good faith pursuing such cure. Notwithstanding the foregoing, the notice and cure set forth in this Section 11 shall not apply in the case of any claim arising out of or related to any claim made by any third party.

{00095295.11}                                41

## ARTICLE 12

### SPECIAL PURPOSE ENTITY

12.1    Special Purpose Entity/Separateness.  The Managing Member shall operate the Company such that the Company shall, at all times, be a Special Purpose Entity.

12.2    "Special Purpose Entity" shall mean a limited liability company which at all times on and after the date hereof:

12.2.1  was, is and will be organized solely for the purpose of holding, selling, leasing, transferring, exchanging, managing and operating the Property (and no other property) and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

12.2.2  has not been, is not, and will not be engaged, in any business unrelated to ownership, management or operation of the Property;

12.2.3  has not had, does not have, and will not have, any assets other than those related to the Property;

12.2.4  subject to the obligation of the IWA Member to make Additional Capital Contributions as required herein, has paid and shall pay its debts and liabilities from its then available assets, as the same shall become due (provided, however, the forgoing shall not require Managing Member or the Manager, to make Additional Capital Contributions to the Company);

12.2.5  has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns;

12.2.6  has maintained and will maintain its own records, books, resolutions and agreements;

12.2.7  has not commingled, and will not commingle, its funds or assets with those of any other Person and has not participated and will not participate in any cash management system with any other Person;

12.2.8  has held and will hold its assets in its name;

12.2.9  has conducted and shall conduct its business in its name, except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Company;

12.2.10  has maintained and will maintain its books, bank accounts, balance sheets, financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP;

{00095295.11}                                    42

RSD-005558

12.2.11  has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations; provided, that in each case, the IWA Member makes Additional Capital Contributions to the Company as required herein (provided, however, the foregoing shall not require the Managing Member or Manager, to make Additional Capital Contributions to the Company);

12.2.12  has observed and will observe all limited liability company formalities, as applicable;

12.2.13  has had no and will have no indebtedness (including loans, whether or not such loans are evidenced by a written agreement) other than related to the Lease and unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of the Company;

12.2.14  has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted or required pursuant to this Agreement;

12.2.15  has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

12.2.16  has not pledged and will not pledge its assets for the benefit of any other Person;

12.2.17  has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name and not as a division or part of any other Person;

12.2.18  has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

12.2.19  has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

12.2.20  has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

12.2.21  other than capital contributions and distributions permitted under the terms of this Agreement, has not entered into or been a party to, and shall not enter into or be a party to, any transaction with any of its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party; and

RSD-005559

12.2.22 does not and will not have any of its obligations guaranteed by any
Affiliate.

## ARTICLE 13

### INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Managing
Member, the other Members, and the Company as follows:

13.1 Preexisting Relationship or Experience. (i) It has a preexisting personal or
business relationship with the Company or one or more of its officers or control persons, or (ii)
by reason of its business or financial experience, or by reason of the business or financial
experience of its financial advisor who is unaffiliated with and who is not compensated, directly
or indirectly, by the Company or any affiliate or selling agent of the Company, it is capable of
evaluating the risks and merits of an investment in the Membership Interest and of protecting its
own interests in connection with this investment.

13.2 No Advertising. It has not seen, received, been presented with, or been solicited
by any leaflet, public promotional meeting, newspaper or magazine article or advertisement,
radio or television advertisement, or any other form of advertising or general solicitation with
respect to the sale of the Membership Interest.

13.3 Investment Intent. It is acquiring the Membership Interest for investment
purposes for its own account only and not with a view to or for sale in connection with any
distribution of all or any part of the Membership Interest. No other person will have any direct
or indirect beneficial interest in or right to the Membership Interest.

13.4 Purpose of Entity. If the Member is a corporation, partnership, limited liability
company, trust, or other entity, it was not organized for the specific purpose of acquiring the
Membership Interest.

13.5 Economic Risk. It is financially able to bear the economic risk of an investment
in the Membership Interest, including the total loss thereof.

13.6 No Registration of Membership Interest. It acknowledges that the Membership
Interest has not been registered under the Securities Act of 1933, as amended (the "Securities
Act"), or qualified under any applicable blue sky laws in reliance, in part, on his representations,
warranties, and agreements herein.

13.7 Membership Interest in Restricted Security. It understands that the Membership
Interest is a "restricted security" under the Securities Act in that the Membership Interest will be
acquired from the Company in a transaction not involving a public offering, and that the
Membership Interest may be resold without registration under the Securities Act only in certain
limited circumstances and that otherwise the Membership Interest must be held indefinitely. In
this connection, it understands the resale limitations imposed by the Securities Act and is
familiar with SEC Rule 144, as presently in effect, and the conditions which must be met in
order for that Rule to be available for resale of "restricted securities," including the requirement

{00095295.11}                          44

RSD-005560

that the securities must be held for at least two years after purchase thereof from the Company prior to resale (three years in the absence of publicly available information about the Company) and the condition that there be available to the public current information about the Company under certain circumstances. It understands that the Company has not made such information available to the public and has no present plans to do so.

13.8    No Obligation to Register. It represents, warrants, and agrees that the Company and the Managing Member are under no obligation to register or qualify the Membership Interest under the Securities Act or under any state securities law, or to assist him in complying with any exemption from registration and qualification.

13.9    No Disposition in Violation of Law. Without limiting the representations set forth above, and without limiting Article 7 of this Agreement, it will not make any disposition of all or any part of the Membership Interest which will result in the violation of the Securities Act, or any other applicable securities laws.

13.10   Investment Risk. It acknowledges that the Membership Interest is a speculative investment which involves a substantial degree of risk of loss by him of its entire investment in the Company, that it understands and takes full cognizance of the risk factors related to the purchase of the Membership Interest, and that the Company is newly organized and has no financial or operating history.

13.11   Investment Experience. It is an experienced investor in unregistered and restricted securities of limited liability companies or limited Memberships constituting speculative and high-risk ventures.

13.12   Restrictions on Transferability. It acknowledges that there are substantial restrictions on the transferability of the Membership Interest pursuant to this Agreement, that there is no public market for the Membership Interest and none is expected to develop, and that, accordingly, it may not be possible to liquidate its investment in the Company.

13.13   Information Reviewed. It has received and reviewed all information, it considers necessary or appropriate for deciding whether to purchase the Membership Interest, including, without limitation, the Lease. It has had an opportunity to ask questions and receive answers from the Company and its Managing Member and employees regarding the terms and conditions of purchase of the Membership Interest and regarding the business, financial affairs, and other aspects of the Company and has further had the opportunity to obtain all information (to the extent the Company possesses or can acquire such information without unreasonable effort or expense) which it deems necessary to evaluate the investment and to verify the accuracy of information otherwise provided to it.

13.14   Consultation with Attorney. It has been advised to consult with its own attorney regarding all legal matters concerning an investment in the Company and the tax consequences of participating in the Company, and has done so, to the extent it considers necessary.

13.15   Tax Consequences. It acknowledges that the tax consequences to its investing in the Company will depend on his particular circumstances, and neither the Company, the Managing Member, the Members, nor the Members, shareholders, members, Managing

{00095295.11}                          45

Members, agents, officers, directors, employees, Affiliates, or consultants of any of them will be responsible or liable for the tax consequences to it of an investment in the Company. It will look solely to, and rely upon, its, its own advisers with respect to the tax consequences of this investment.

13.16  No Assurance of Tax Benefits.  It acknowledges that there can be no assurance that the Code or the Regulations will not be amended or interpreted in the future in such a manner so as to deprive the Company and the Members of some or all of the tax benefits they might now receive, nor that some of the deductions claimed by the Company or the allocations of items of income, gain, loss, deduction, or credit among the Members may not be challenged by the Internal Revenue Service.

13.17  Indemnity.  It shall defend, indemnify and hold harmless the Company, the Managing Member, each and every other Member, and any officers, directors, shareholders, Managing Members, members, employees, Members, agents, attorneys, registered representatives, and control persons of any such entity who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of or arising from any misrepresentation or misstatement of facts or omission to represent or state facts made by him including, without limitation, the information in this Agreement, against losses, liabilities, and expenses of the Company, each and every Managing Member, each and every other Member, and any officers, directors, shareholders, Managing Members, members, employees, Members, attorneys, accountants, agents, registered representatives, and control persons of any such Person (including attorneys' fees, judgments, fines, and amounts paid in settlement, payable as incurred) incurred by such Person in connection with such action, suit, proceeding, or the like.

## ARTICLE 14

## MISCELLANEOUS

14.1  Counsel to the Company.  Counsel to the Company may also be counsel to any Managing Member or any Affiliate of the Managing Member. The Managing Member may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the applicable Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). Each Member acknowledges that Company Counsel selected by the Managing Member does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel, and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.

14.2  Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members and Managing Member with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members and Managing Member or any of them. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or the Managing Member or have any force or effect whatsoever.

{00095295.11}                    46

RSD-005562

14.3   Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

14.4   Parties in Interest. Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and the Managing Member and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement. The Members agree that Taylor is an express third party beneficiary of Articles 11 and 14 of this Agreement.

14.5   Pronouns; Statutory References. All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require. Any reference any statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.6   Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.7   Interpretation. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his counsel.

14.8   References to this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

14.9   Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in Maryland in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 14.13 of this Agreement, and that when so made shall be as if served upon it, him personally within the State of Maryland.

14.10   Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

14.11   Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

14.12   Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be

{00095295.11}                    47

RSD-005563

necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.13 Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include electronic mail or facsimile or overnight courier, if such notice is either (a) confirmed to be received by the recipient via electronic mail or facsimile sent to such sender or (b) sent via overnight courier to arrive on the following business day) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member or the Managing Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other parties, designate any other address in substitution of the foregoing address to which such notice will be given.

14.14 Amendments. All amendments to this Agreement will be in writing and signed by the IWA Member, provided however that (i) Article 11 and Article 14 shall not be amended without the prior written consent of all of the Members, (ii) no amendment of this Agreement shall impose any additional obligations upon Managing Member, Manager or Taylor without their prior written consent and (iii) in the event Algon Member ceases to be a Member of the Company, then, Article 11 and Article 13 shall not be amended in any manner which adversely affects the rights of Algon Member, Managing Member, Manager and Taylor under such Articles. In the absence of any opinion of counsel as to the effect thereof, no amendment to this Agreement or the Articles shall be made which violates the Act or is likely to cause the Company to be taxed as a corporation.

14.15 Reliance on Authority of Person Signing Agreement. If a Member is not a natural person, neither the Company nor any Member will be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual or be responsible for the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.16 No Interest in Company Property; Waiver of Action for Partition. No Member has any interest in specific property of the Company. Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to the property of the Company.

14.17 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

14.18 Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision

RSD-005564

providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law. For the purposes of this Section: attorney fees shall include, without limitation, fees incurred in the following: (1) post-judgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

14.19  Time is of the Essence.  All dates and times in this Agreement are of the essence.

14.20  Confidential Information.

14.20.1  Except as reasonably necessary for the Algon Member, Managing Member, or the Manager to perform the services hereunder or under the Management Agreement, the Algon Member, Managing Member and the Manager will not use or disclose to others (other than to the Management Committee or IWA Member, its members, officers, employees and its Affiliates) any Confidential Information (hereinafter defined) without the prior written consent of either (i) the IWA Member or (ii) the Management Committee.

14.20.2  Notwithstanding the foregoing, the Algon Member, Managing Member, and Manager may disclose such Confidential Information in accordance with a judicial or other governmental order, provided the Algon Member shall give the IWA Member reasonable notice prior to such disclosure. Whether or not a protective order or other remedy is requested or obtained by IWA Member or the Company, the Algon Member, Managing Member, and Manager will disclose only that portion of the Confidential Information which the Algon Member, Managing Member, or Manager, as the case may be, is legally required to disclose. For the avoidance of doubt, neither the Algon Member, Managing Member nor Manager shall be required to request or obtain a protective order with respect to any such disclosure order.

14.20.3  For purposes of this Agreement, the term "Confidential Information" shall mean any and all information which is proprietary to the Company and which is not generally available to the public including, without limitation, the Company's financial condition, existing and potential business relationships, marketing plans, sales and development plans, profit margins, financial information, financial statements, prospective tenant information, employment information or agreements, potential product offerings, any and all proprietary information, trade secrets, programs and opportunities, strategies, contracts and licenses, and any copies, reproductions, summaries, extracts, analysis, studies or other derivative works prepared by, or on behalf of, the Company incorporating, or developed from, the Confidential Information so disclosed.

14.20.4  The term "Confidential Information" does not include any information that (a) was disclosed by the Management Committee or by IWA Member or any of its members, officers, employees or Affiliates to a third party recipient in question, or (ii) has been disclosed to the third party recipient in question from any Person other than

{00095295.11}                                    49

the Algon Member, Managing Member or Manager without a breach of an obligation of confidentiality running directly or indirectly to the disclosing party; or (iii) has been disclosed pursuant to a requirement of a governmental agency, law or court order.

14.21  Remedies Cumulative.  The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

14.22  Arbitration.  Any dispute under Section 11.3.3 (a "Dispute"), shall be settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitration shall be held in New York, New York and shall be conducted before a single arbitrator, independent of the parties hereto and appointed from AAA's National Roster in accordance with AAA's Commercial Arbitration Rules.  The law applicable to the arbitration, including the administration and enforcement thereof, shall be the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and the law governing this Agreement.  The non-prevailing party in any arbitration shall bear the cost of the arbitration, including the fees and expenses of the arbitrator and shall be responsible for its own and the prevailing party's out-of-pocket costs and expenses incurred in connection with the arbitration. Each party shall bear the cost of preparing and presenting its case.  Limited discovery shall be permitted prior to the arbitration hearing as follows:  (i) exchange of witness lists; (ii) exchange of documentary evidence and documents relating to or arising out of the issues to be arbitrated; (iii) depositions of party witnesses; and (iv) such other depositions as may be allowed by the arbitrator upon a showing of good cause.  Depositions shall be conducted in accordance with the Federal Code of Civil Procedure.  The arbitration award (the "Award") shall be presented to the parties in writing, and upon request of any party, shall specify the factual and legal bases for the Award.  The judgment upon any Award rendered in such arbitration shall be binding on the parties and may be entered in any court having jurisdiction.  The Award may be confirmed and enforced in any court of competent jurisdiction.  Any post-Award proceedings shall be governed by the Federal Arbitration Act.  Notwithstanding any of the foregoing, (a) each party may, without inconsistency with this arbitration provision, apply to any court having jurisdiction with respect to any interim provisional, injunctive or other equitable relief until the Award is rendered or the controversy is otherwise resolved, or (b) if the claim that is the subject of Section 11.3.3 is being litigated or arbitrated in a formal legal proceeding, either party may, but shall not be obligated, to present the dispute under Section 11.3.3 to the court or arbitrator(s), as the case may be, to resolve any such dispute pursuant to Section 11.3.3.

{00095295.11}                    50

RSD-005566

All of the Members of the Company have executed this Agreement, effective as of the Effective Date.

INVESTORS WARRANTY OF AMERICA, LLC

By:

Title:

**David Feltman**
**Authorized Signatory**

LONGSHORE VENTURES LLC

By:

Title:

**Agreed to as to <u>Section 11.3.1</u>, <u>Section 11.15</u>, <u>Section 11.16</u>, and <u>Section 14.22</u> only:**

Troy T. Taylor, an individual

{00095295.11}                       51

RSD-005567

**EXHIBIT A**
**CAPITAL CONTRIBUTION OF MEMBERS AND ADDRESSES OF MEMBERS**
**AND THE MANAGING MEMBER AS OF THE EFFECTIVE DATE**

| | | |
|---|---|---|
| 1. | | 98% |
| 2. | $0 | 2% |

RSD-005568