IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROCK SPRING PLAZA, LLC,

     *Plaintiff*,

     v.

INVESTORS WARRANTY OF
AMERICA, LLC, *et al.*,

     *Defendants*.

Civil No.: 8:20-cv-01502-JRR

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendants Investors Warranty of America, LLC and Rock Springs Drive, LLC's Motion for Directed Verdict or, in the Alternative, for a New Trial, and Motion to Amend Judgment. (ECF Nos. 593, 594; the "Motions.") For the reasons that follow, by accompanying order, Defendants' Motions will be denied.[1]

## I.    <u>BACKGROUND</u>

Plaintiff Rock Spring Plaza, LLC ("Plaza"), the landlord of an office building in Bethesda, Maryland, initiated this action on June 5, 2020. (ECF No. 1.) Plaintiff's claims arise from Defendant Investors Warranty of America, LLC's ("IWA") assignment of a Ground Lease to Rock Springs Drive, LLC ("RSD"), also a Defendant. The action was tried before a jury before the Honorable Peter J. Messitte. On September 10, 2024, the jury returned a verdict for Plaza on every claim and defense. (ECF No. 581.) The Court entered judgment on October 10, 2024. (ECF No. 592.) The Court now considers Defendants' joint post-trial Motions.

---

[1] Following the untimely passing of the Honorable Peter J. Messitte, this action was transferred to the undersigned on January 22, 2025. No party has objected to the reassignment. Pursuant to Rule 63 of the Federal Rules of Civil Procedure, the Court certifies familiarity with the record of this case, including transcripts of the trial held between August 26 and September 10, 2024, and determines that the post-judgment Motions can be adjudicated by the undersigned without prejudice to the parties.

Much of the factual background of this case is set forth in detail in the Court's Memorandum Opinion on Plaza's Motion for Partial Summary Judgment, which the court incorporates by reference here.  (ECF No. 151.)  To recap: Plaintiff Plaza owns an office building located at 6560 Rock Spring Drive in Bethesda, Maryland, as to which Defendant IWA obtained a 99-year Ground Lease set to expire in 2089.[2]  (ECF No. 136-3; the "Ground Lease.")  In 2006, in exchange for a $30 million loan, Plaza and IWA entered an Estoppel Agreement that granted IWA the right to assign the Ground Lease without Plaza's approval.  (ECF No. 13-3; the "Estoppel Agreement.")  On August 30, 2017, IWA informed Plaza (absent prior notice) that, in fact, it had assigned its interest as Ground Lease tenant to an entity known as RSD, whose representative was an attorney named Robert Barron (ECF No. 414-26; the Aug. 31, 2017 Letter to Plaza); IWA, however, refused to disclose to Plaza or its counsel, despite repeated inquiry, any meaningful information about RSD's origination, ownership, or structure.  (ECF No. 1 ¶¶ 18–23.)  The building was vacant at the time RSD acquired it and Plaza believed "they did nothing to try to fill the building."  (ECF No. 551 at p. 148).  Nevertheless, neither IWA nor RSD defaulted on the ground rent.  *Id.* at p. 32.

Section 12 of the Estoppel Agreement provides that if IWA forecloses on the property, IWA can "sell and assign the leasehold estate in the Premises" and that it can do so without Plaza's consent.[3]  Section 19 provides IWA "the absolute right to assign" the Ground Lease "to any third party":

> <u>Assignments And Subleases</u>.  Except as otherwise provided in the
> Lease, no limitation upon or condition to any assignment of the

---

[2] IWA had acquired an interest in the Ground Lease as Lender through an original tenant's default and foreclosure. The Court, in its discretion, did not allow the parties to reference the history of the transactions to avoid jury confusion. (ECF No. 550 at pp. 20–21, 25-26 "The only reference is that the tenant defaulted. That's fair. That's about as much of the history that I think is appropriate. . . .  There's no dispute that it was assignable.")  Defendants challenge this ruling.  (ECF No. 593 at pp. 60–63.)

[3] That section provides, in relevant part:

> Lease shall apply to any transfer for the Lease by foreclosure, trustee's sale, sheriff's sale or an assignment in lieu thereof. If the Lender acquires the Tenant's interest in the Lease or the Lender acquires a new lease pursuant to any provision of the Lease, the Lender shall have the absolute right to assign the same or sublease all or any portion of the Premises to any third party. So long as such third party assumes all of the Tenant's obligation under the Lease the Lender shall be automatically released from any further liability thereunder following any such assignment except for any of Lender's obligations or liabilities under the Lease arising during the Lender's period of ownership.

(ECF No. 13-3 § 19.) Defendants' position is that these contract provisions gave IWA the absolute right to make the assignment to RSD without Plaza's approval. (ECF No. 509 at pp. 4–5.)

Plaza, on the other hand, saw the assignment as a fraud scheme and requested the Court invalidate the assignment. (ECF No. 1 ¶ 44.) Specifically, Plaza contended that, as early as July 2016, IWA realized the Leasehold Estate was "worthless" and began formulating an "exit strategy" to get out from under the Ground Lease obligations. (ECF No. 509 at p. 2.) Plaza argued this "exit strategy" took the form of a new entity, RSD, created for the sole purpose of cutting off IWA's future liability under the Ground Lease. *Id.* According to Plaza, RSD was created by IWA and the Algon Group, whose principals are Troy Taylor and Paul Rubin. *Id.* IWA owns 98% of RSD; the Algon Group owns the remaining 2% through a shell company, "Longshore Ventures LLC," which conveyed nothing for the 2% interest in RSD. *Id.* A few days after RSD was formed, IWA assigned the Ground Lease to RSD. *Id.* at p. 4.

---

> Lender may, without further consent of Landlord, sell and assign the leasehold estate in the Premises. Lender shall notify Landlord in writing of such sale or assignment within ten (10) days of such sale or assignment. Provided any defaults by the Tenant have been cured to the extent required by the terms of the Lease any assignee of the leasehold estate following a foreclosure of the Deed of Trust by power of sale or judicial foreclosure (or transfer by deed in lieu thereof) shall be liable to perform the obligations imposed upon Tenant by this Lease only during the period such person has ownership of said such leasehold estate.

(ECF No. 13-3 at § 12.)

Plaza took the position that this was an invalid or "sham" assignment to "offload" the Ground Lease to a shell entity with no independent means of performing the tenant's obligations under the Ground Lease. *See id.* Indeed, Plaza argued that documentary evidence showed that IWA and Algon hatched the plan and kept it secret to evade Plaza's detection for three years after the assignment so that any claim Plaza might have had against IWA for fraudulent conveyance would be time-barred. *See id.* at pp. 2–3. Plaza sued "to invalidate the sham Assignment" as a fraudulent conveyance and also sought to void the assignment under contract theories.

Defendants countered that, following years of fruitlessly looking for a subtenant for the vacant property, IWA decided to pursue an "exit strategy to turn around this unprofitable ground lease interest." *Id.* at p. 7. That strategy was to create a "joint venture" with Algon, who IWA characterizes as experienced in turning around distressed real estate assets. *Id.* That joint venture was RSD, a "special purpose entity, which is a common structure and is consistent with prevailing industry norms and practices." (ECF No. 410 at p. 12.) Once RSD was formed, IWA informed Plaza it had assigned the Ground Lease to RSD in accordance with the Estoppel Agreement. (ECF No. 509 at p. 7.) Since that time, Defendants contend, RSD attempted to find subtenants, performed extensive maintenance on the property, paid all ground rent due Plaza, and otherwise performed its obligations under the Ground Lease. *See id.* at p. 7–8. Defendants asserted the assignment was valid, proper, and made in good faith and in accordance with their obligations under both the Ground Lease and the Estoppel Agreement. *Id.* at p. 8.

## A. Relevant Procedural History

On June 5, 2020, Plaza filed its Complaint against IWA, RSD, Transamerica Corporation, and unidentified Jane Doe defendants. (ECF No. 1.) The initial complaint sought declaratory judgment that the assignment was a fraudulent conveyance, *id.* ¶¶ 34–38, asked the Court to set

aside the fraudulent conveyance, *id.* ¶¶ 39–41, requested the Court pierce the corporate veil so that

Plaza could collect rent from IWA, *id.* ¶¶ 42–45, and sought judgment that RSD is the "alter ego"

of IWA, *id.* ¶¶ 46–50.  Soon after, Defendants filed Motions to Dismiss, which the Court denied

on December 1, 2020, following a hearing.  (ECF Nos. 29, 30.)  On January 19, 2021, Defendants

filed Amended Answers raising counterclaims for declaratory judgment that the assignment was

valid.  (ECF Nos. 42, 44.)  On February 25, 2021, Plaza filed an Amended Complaint with leave

of Court.  (ECF No. 59.)  Defendants filed Amended Answers and discovery continued.  (*See* ECF

Nos. 65, 104.)

    1.  The Court's "Basic Information" Order

On September 13, 2021, Plaza filed a Motion for Partial Summary Judgment as to

Defendants' obligation to disclose "Basic Information" about RSD to Plaza upon execution of the

assignment.  (ECF No. 127.)  On August 3, 2022, the Court granted in part and denied in part

Plaza's motion, and ordered Defendants to disclose "Basic Information" about RSD to Plaza.

(ECF No. 151.)  The Court explained:

> If assignment is permitted under a contract, is the party to the
> original contract, against whom the assignment is made, i.e., the
> obligor, entitled to know the identity of a proposed assignee and at
> least some basic information as to the proposed assignee's ability to
> perform under the contract before the assignment becomes
> effective?  This, as the Court sees it, presents a pure unambiguous
> legal question for the Court to decide, not an ambiguous clause in
> the contract deferrable for resolution to a trier of fact.  The Court
> holds that the answer must be in the affirmative.  To interpret even
> the most liberal assignment provision as permitting an assignor to
> withhold from an obligor any and all information relevant about a
> proposed assignee would be contrary to common sense as well as to
> the inherent concept of good faith and fair dealing.

*Id.* at 10.

In so holding, the Court recognized that was no Maryland case—or a case from any other

jurisdiction—that addressed this issue, but held that "Maryland courts have often applied the

principles of contract law embodied in the Restatement (Second) of Contracts." *Id.* at p. 11 (citing *Pub. Serv. Comm'n of Md. v. Panda-Brandywine, L.P.*, 375 Md. 185, 197 (2003)).  Accordingly, the Court applied section 317(2) of the Restatement (Second) of Contracts, *Assignment of a Right*, to the parties' dispute to hold that where an assignment "'materially change[s] the duty of the obligor, or materially increase[s] the burden or risk imposed on him by his contract' . . . the obligor, in good faith, may seek appropriate information as to whether its duties, burdens, or risk might in fact be materially impacted by the assignment of its contract to a proposed assignee."[4] *Id.* at 15.

This "basic information" was necessary "so that Plaintiff may determine whether RSD has the ability to satisfy IWA's ongoing obligations under the Ground Lease." *Id.* at p. 17.  The Court determined that Defendants had not satisfied their obligation during discovery in the case and ordered them to resolve it:

> The Court returns to the guiding principle: If "the substitution of the right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his change of obtaining return performance, or materially reduce its value to him," an assignment may be at least voidable.  Restatement (Second) of Contracts § 317.  Clearly Plaintiff has continuously expressed its concern that the assignment by IWA to RSD would

---

[4] Section 317 provides, in full, as follows:

> (1)  An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.

> (2)  A contractual right can be assigned unless

>> (a)  the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

>> (b)  the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

>> (c) assignment is validly precluded by contract.

> Comment d. explains that "a material variation, an increase in burden or risk, or an impairment of the obligor's expectation of counter-performance . . . depends on the nature of the contract and on the circumstances."

materially increase its risk and/or impair its change of obtaining
return performance and/or materially reduce the value of the Ground
Lease to it.  That may or may not be so.  But in its communications
with RSD's counsel, Plaintiff's counsel has explained the
circumstances that gave rise to Plaintiff's doubt.  The fact that RSD
may have paid the monthly rent does not suffice to provide Plaintiff
with adequate assurance of due performance, especially given
Plaintiff's claims that the Property continues to languish in vacancy.

In sum, Defendants have not, consistent with the requirements of
§ 317 of the Restatement (Second) of Contracts, met their obligation
to provide information sufficient to give Plaintiff adequate
assurance that RSD can fulfill IWA's obligations under the Ground
Lease and Estoppel Agreement.  It is unclear to the Court why
Defendants want to withhold information as seemingly
straightforward as the names and contact information of the
proposed assignee's principals.  But, for whatever reason, they may
do so no longer.

*Id.* at 19–20.

### 2.  The Summary Judgment Phase

On December 8, 2022, Plaza filed a Second Amended Complaint with leave of Court, the
operative complaint through trial.  (ECF No. 196.)  At a previous hearing, the Court instructed
Plaintiff, based on its Basic Information Order, to file a "contract-based theory . . . questioning the
legitimacy of assignment."  (ECF No. 165 at p. 28.)  Thus, the Second Amended Complaint
contained, for the first time, the claim for declaratory judgment that IWA made a "Wrongful,
Invalid Assignment."  *Id.* ¶¶ 42–52.  Plaza's Second Amended Complaint raised five claims in
total: Wrongful, Invalid Assignment (against IWA only) (Count I); Declaratory Judgment that
Assignment Was a Fraudulent Conveyance (Count II); Set Aside the Fraudulent Conveyance
(Count III); Pierce the Corporate Veil to Enter Judgment that Landlord May Collect Rent From

Tenant for the Remainder of the Lease (Count IV);[5] and Judgment That Tenant is Alter Ego of Assignee and Transamerica is the Alter Ego of Tenant (Count V). *Id.*

IWA filed a Motion to Dismiss Count I of Plaza's Second Amended Complaint (ECF No. 208), which the Court denied without prejudice on January 27, 2023, and directed that IWA's arguments be addressed in (scheduled) summary judgment briefing. (ECF No. 251.) In the interim, RSD filed a Motion to Intervene as Defendant as to Count I, which the Court also denied on January 27, 2023. *Id.*

While briefing on these Motions was occurring, Plaza filed a Motion to Compel documents that it contended fell within the crime-fraud exception to the attorney-client privilege. (ECF No. 238.) Plaza had previously alleged that IWA "engaged outside counsel to explore an exit" to the Ground Lease. *Id.* at 6. This set in motion a protracted series of events, including *in camera* inspection of the subject documents (ECF No. 318), which resulted in the Court agreeing that the documents satisfied the "fraud" element of the crime-fraud exception. (ECF Nos. 339, 340, 341). On August 17, 2023, the Court ordered IWA to produce those documents to Plaza under threat of possible contempt and sanctions. (ECF No. 341.) In response, IWA filed a Petition for a Writ of Mandamus with the Fourth Circuit. *In re: Invs. Warranty of Am., LLC*, No. 23-1928 (4th Cir.).

The Fourth Circuit granted in part and denied in part IWA's petition; the Fourth Circuit's order prevented the production of the allegedly privileged documents to Plaza but did not order this Court to keep certain other, ancillary documents related to the privileged documents under seal. After a conference with the parties, the Court invited Plaza to brief whether those ancillary materials should be disclosed; the parties briefed the issue, and the Court ordered IWA to produce those materials. (ECF No. 405.) IWA then filed a second Petition for a Writ of Mandamus with

---

[5] At trial, Plaza withdrew Count IV to pierce the corporate veil. (ECF No. 496 at p. 11 n.1.)

the Fourth Circuit, which again was granted in part and denied in part. *In re: Invs. Warranty of Am., LLC*, No. 24-1434 (4th Cir.). The Fourth Circuit's order on IWA's Second Petition directed that that none of the allegedly privileged documents or their ancillary materials may be used, directly or indirectly, by Plaza for any reason.[6]

As this saga unfolded, the parties filed a flood of discovery motions just before and shortly after the September 1, 2023, discovery deadline, which the Court resolved by Memorandum Opinion on November 2, 2023. (ECF Nos. 380, 381.)

On May 23, 2024, the parties filed their respective Motions for Summary Judgment. (ECF Nos. 409–11, 414, 417.) Defendants argued that no case or controversy exists because Plaza's claims are premised on speculation that RSD may, at some indeterminate point in the future, default on its obligations under the Ground Lease. (*See* ECF No. 410 at pp. 8–9.) They further argued that any declaration about the parties' respective rights and obligations would therefore be an impermissible advisory opinion as to the parties' future rights and obligations based on a prediction that RSD may, at some point, default. (*See* ECF No. 430 at pp. 30–33.)

On July 18, 2024, the Court held a hearing on the summary judgment motions. (ECF No. 466.) At the conclusion of the hearing, the Court denied Defendants' Motions for Summary Judgment, denied Plaza's Motion for Partial Summary Judgment as to IWA's Release, and granted in part and denied in part Plaza's Motion for Partial Summary Judgment as to Certain Affirmative Defenses. (*Id.*; ECF Nos. 486, 511.) The Court held that numerous genuine disputes of material fact existed, but held that summary judgment in favor of Plaza was appropriate as to a number of Defendants' affirmative defenses, regarding subject matter jurisdiction, statute of limitations,

---

[6] On August 14, 2024, RSD filed a third Petition for Writ of Mandamus in the Fourth Circuit, again pertaining to RSD's attorney-client privilege. That Petition was denied on the eve of trial on August 22, 2024. *In re: Rock Springs Drive, LLC*, No. 24-1761 (4th Cir.).

adequate remedy at law, laches, unconscionability, unclean hands, and fraud. (ECF 486 at p. 2.) The Court decided to allow Defendants "to argue and present evidence about Plaza's supposed lack of diligence in bringing this case," which the Court found "speaks more to the defenses of waiver[,] estoppel[,] and ratification." (ECF No. 511 at p. 139.)

The Court determined it had subject matter jurisdiction over Plaza's claims, because "at the very least this is a declaratory judgment proceeding." *Id.* at p. 137. The Court held that all three elements of a declaratory judgment action were met: (i) an actual dispute existed between the parties as to their legal rights and obligations under the Ground Lease and Estoppel Agreement; (ii) a declaratory judgment would clarify those rights; and (iii) the Court exercised its discretion to hear these claims. *Id.* Also, the Court decided that Plaza had presented sufficient evidence to suggest that RSD was only making good on its rent payments because Plaza initiated this action. *Id.*

The Court considered Defendants' argument that Plaza lacked standing because it produced no evidence to demonstrate that it currently held an interest in the subject property. (ECF 410 at p. 15.) At the hearing, Plaza argued there was "no dispute" as to its interest in the property, and urged that "ample evidence [was] produced to IWA in discovery that Plaza owns the leased fee interest in the property and as landlord under the ground lease." (ECF No. 511 at p. 101.) The 2006 Estoppel Agreement was entered into by Plaza and was recorded in the land records of Montgomery County. *Id.* The Court declined to resolve the issue at that time, because Plaza could put on evidence at trial as to its ownership interest in the property. *Id.* at p. 104.

Defendants argued that Count I is "manufactured" and not a valid claim under Maryland law. (ECF No. 410 at pp. 16–32.) The Court denied the motion:

> It is not merely a manufactured claim. It is part of the basis for saying that declaratory relief is appropriate. There is an actual

controversy between parties, the resolution of which will clarify their legal rights and obligations; and the Court otherwise possesses the subject matter jurisdiction over the case and will ex[er]cise its discretion in that regard.

Count One sounds in contract, in effect, even though defendants say it doesn't, because it's Section 317 -- this is now on defendant's arguments. Section 317 doesn't apply, say defendants, when Plaza agrees to the absolute right. But that's the issue that has to be decided. Was that, in fact, what was agreed upon in this case? Do the defendants, in fact, does RSD and IWA have the absolute right to assign, notwithstanding Section 317 of the restatement (2d) of contracts?

* * *

[A]s the Court has said, essentially a breach of contract or anticipatory breach of contract claim informed by this implied covenant of good faith and fair dealing. . . . Plaza has presented substantial evidence from which a reasonable jury could find that defendant's conduct was inconsistent with its obligations under the agreement and not made in good faith.

(ECF No. 511 at pp. 144, 149.)

Defendants also argued that Plaza's fraud counts (Counts II and II) were not covered by the Maryland Uniform Fraudulent Conveyance Act because the assignment of IWA's obligation to pay ground rent is not "property" within the meaning of the statute, and once the assignment occurred, Plaza was no longer a "creditor" to IWA. (ECF No. 409.) The Court rejected this argument, holding that Plaza presented evidence to call into question the validity of the Assignment. (ECF No. 511 at p. 149.) The Court further concluded that the conveyed lease interest was "property" within the meaning of the Maryland Uniform Fraudulent Conveyance Act, and "reject[ed] the defendant[s'] argument that plaintiff was not a creditor within the meaning of the Act at the time of the assignment." *Id.*

3.  <u>The Court's Rulings on Motions in Limine</u>

The parties thereafter filed their Motions in Limine, which were resolved during the Pretrial Conference held on August 8, 2024.  (ECF Nos. 528, 529.)

      *a.  Scope of Attorney-Client Privilege & Making Witnesses Available to Testify*

One pre-trial ruling involved the scope of Defendants' attorney-client privilege and Robert Barron's, counsel for RSD who is based in Florida and outside the Court's subpoena power, possible trial testimony.  (*See* ECF No. 480.)  Defendants requested an order prohibiting reference to IWA's privileged information or attorney work product, or "asking questions reasonably expected to draw" such an objection.  *Id.* at 5.  Defendants averred that Plaza wanted to "put Mr. Barron on the stand, ask him questions, and have [Defendants] stand up and object on privilege so that they can make their improper argument that we are hiding behind the privilege."  (ECF No. 531 at p. 30.)

At the pretrial conference, counsel for RSD explained RSD planned to call Barron as a witness, but did not want to allow Plaza to call him as a witness during its case-in-chief.  *See id.* at 55.  Plaza argued that if Defendants "have the ability to voluntarily bring Mr. Barron, he should come once live for both parties."  *Id.* at 58.  The Court, concerned about fairness, denied the motion in limine as "overly broad":

> The Court denies the motion.  The Court does find that the motion is overly broad and is, frankly, deniable on those grounds alone.
>
> The Court does intend to follow the Fourth Circuit's mandamus order, and the plaintiff is warned and understands that it may not inquire, directly or indirectly, [into] the three communications at issue in the Fourth Circuit's mandamus order or the ancillary documents covered by the order.
>
> But the Court cannot say – and this is why an in limine motion is sort of tricky – to say you cannot ask any defense witness any

question that they may have to assert privilege or they wish to assert privilege.

\* \* \*

I don't know whether you're saying that Mr. Barron, for example, can stand on privilege, this same privilege. And he can be your witness and say what he wants to but he can't answer anything that they ask. You can use it as a sword, but you can't use it as a shield.

*Id.* at 27–28.

The Court held that Federal Rule of Evidence 611(a) permitted the Court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."  (*See* ECF No. 62.)  Further, the Court explained there is:

> [n]o rule or case law suggesting that a witness can be considered unavailable for part of the trial but available or potentially available for another part of the trial. For that reason, the courts frequently order that all parties are free to call any witnesses listed by any other party, any opposing party. The party listing the witness guarantees his or her presence in the trial unless it is indicated otherwise on the witness list.

*Id.* at 63 (citing *Truckstop.Net, LLC v. Sprint Communs. Co., LP*, 2009 U.S. Dist. LEXIS 118541 (D. Idaho, Dec. 18, 2009)).  The Court ordered Defendants to make their witnesses "available for plaintiff during plaintiff's case-in-chief" or not call them and "go on deposition."  *Id.* at 65–66.

### b.  IWA's Excluded Expert Testimony

Plaza filed motions to exclude expert testimony of Ian Ratner (ECF Nos. 481, 490) and Douglas Bregman (ECF No. 471), both of whom offered opinions that "the decision to form a joint venture was reasonable and commonplace, as was RSD's decision to wait for an appropriate

subtenant opportunity, rather than bind itself to an unprofitable long-term lease." (ECF No. 410 at pp. 13–14.)

The Court excluded Ratner from testifying, explaining "Ratner's conclusions are inappropriate expert testimony":

> [THE COURT:] Plaza does not dispute Ratner's qualification but, instead, disputes the relevance and reliability of his opinions.
>
> The Court would agree that . . . Ratner's conclusions are inappropriate expert testimony.
>
> There are a number of opinions that are given that I need to recite that I'll say something specifically about that.
>
> First of all, Opinion 1 is that RSD has paid all of its rent, which is apparently stipulated. I'm not sure why that's an issue in the case. But don't need an expert to say that. Isn't plaintiff stipulating that, [Plaza's counsel,] Mr. Bosch?
>
> MR. BOSCH: We stipulate.
>
> THE COURT: All right. That's not really an issue that goes to his expertise.
>
> Determining whether an entity's books show that it's paid all its obligations, as I said, is within the common understanding of the jury.
>
> As to Opinion 5, that RSD has attempted to or attempts to sublease the property is simply a summary of what steps RSD has taken to sublease the property after the assignment, but the proposed opinion on this question doesn't say anything more than what the jury can infer from just looking at the documents that Ratner has reviewed.
>
> As to the second opinion that the ground rent is above market, that's irrelevant. Not based on any particular expertise and not particularly relevant whether it's above, at, or below market.
>
> Ratner, in the Court's view, has simply summarized the conclusions of earlier appraisals of the property. He did not perform an independent analysis of the relevant real estate market for the period of the ground lease. And, again, a factfinder would be able to draw a similar conclusion simply by reviewing the earlier appraisals. His opinion doesn't add anything to those documents. And those opinions would be excluded because there is a risk the jury would put undue weight on Ratner's conclusions, particularly where the

> quote/unquote opinions reflect, in the Court's view, a little more
> than re-packaged facts.
>
> Other conclusions drawn by Ratner, in the Court's view, are
> impermissible because the Court finds them to be either irrelevant
> or being legal conclusions, simply telling the jury what it should
> decide in this case.

(ECF No. 531 at pp. 77–79; *see also id.* at 109–13 (stating that Ratner's testimony is "not a province for quote/unquote expert testimony. It's merely Ratner saying that this is so. There are data that otherwise would indicate what RSD has or has not done").)

Similarly, the Court found that Bregman's "report" and opinions simply repackaged legal arguments that Defendants asserted throughout the litigation. *Id.* at 114–15. Setting aside whether Bregman's opinions satisfy the requirements of Rule 702, the Court concluded it would be unduly prejudicial to Plaza under Rule 403 to permit Bregman take the stand as an "expert" opining on the topics he proposes, such as "standard industry practice" not to disclose information about a special purpose entity that has been assigned a leasehold estate interest. *Id.* at 116. The Court agreed to reconsider the issue "with a proffer in advance" of what Mr. Bregman might say as to how ground leases operate. (*Id.* at 131; ECF No. 530.)

### c. *Non-Advisory Jury Trial*

Another motion in limine was Defendants' Motion for a Non-Advisory Jury Trial on Count I and All Common Issues of Fact, despite the equitable issues in the case. (ECF No. 477.) Defendants argued they were entitled to a jury trial on Count I and issues of fact common to all counts, because Count I (Wrongful, Invalid Assignment) sounds in contract and, in any event, Plaza's allegations about fraud required factfinding by a jury. *Id.* at 2–3. Defendants further argued that, even though Plaza styled its Second Amended Complaint for equitable relief only, the factual predicates for any judgment in Plaza's favor necessitated a fraud finding, a jury issue under the Seventh Amendment to the U.S. Constitution. *Id.* at 4. Plaza countered that Defendants were

not entitled to a jury trial as of right because the determining factor of whether a trial by jury is constitutionally required is "the remedy sought," not the "subject matter or substantive rules" used to describe a claim. (ECF No. 524.)

The Court granted Defendants' motion for a jury trial. (ECF No. 528.) In so doing, the Court was, once again, prompted to "examine[] the nature of the claims at issue":

> Count I of Plaza's Second Amended Complaint, "Wrongful, Invalid Assignment," seeks a declaratory judgment that IWA's "purported assignment to [RSD] was wrongful and invalid," as well as a judgment that "void[s] the assignment," or, in the alternative "declare[s] that IWA remains in privity of contract with" Plaza "under the Ground Lease and therefore is jointly and severally liable with RSD for the satisfaction of the tenant's obligations under the Ground Lease." ECF No. 196 at 11. In a word, Count I is a declaratory judgment action based, in part, on what appear to be contract-like theories of liability.
>
> Whether a party proceeding in declaratory judgment action has a right to a jury depends on whether that party would have a right to a jury trial had the party not sued under the declaratory judgment vehicle. *See In re Lockheed Martin Corp.*, 503 F.3d 351, 355 (4th 2007) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959)).

*Id.* at 3–4. The Court noted that while the Second Amended Complaint sought relief traditionally sounding in equity (*id.* at 4), "[t]he existence or nonexistence of fraud in the creation of RSD and the Assignment is the question at the heart of each of Plaza's claims and Defendants' counterclaims;" and so the Court found the case "presents legal issues that will need to be determined by a jury at trial before the Court weighs the propriety of rescission, the equitable relief Plaza seeks." *Id.* at 5.

## B. The Trial

The case was tried between August 26 and September 10, 2024. In its case-in-chief, Plaza called its principal, Charles ("Chris") Camalier, and IWA's and RSD's principals, David Feltman and Troy Taylor, as hostile witnesses. (ECF Nos. 551 at p. 16; 552 at p. 32; 553 at p. 106.) Plaza

also introduced deposition testimony from IWA employees Matt Pithan, Nicholas Koluch, Blaine Shaffer, (ECF No. 553), and RSD's lawyer and so-called "mouthpiece," Robert Barron (ECF No. 606 at p. 54). Defendants also offered deposition testimony from Robert Barron and live testimony from Paul Rubin, the other RSD/Algon principal. *Id.* at 80, 81.

At the conclusion of the evidence, Defendants moved for a judgment as a matter of law under Rule 50. (ECF Nos. 572; 607 at p. 50.) Defendants argued that Plaza failed to present "any evidence to support its claim" under Count I. (ECF No. 572 at p. 3.) Defendants argued further that, as a matter of law, Restatement (Second) of Contracts § 323 vitiates any duty to provide "Basic Information" under § 317.[7] *Id.* Defendants also argued there was "no evidence presented of impairment, risk, burden, or reduction in value beyond Mr. Camalier's speculative concern" that Defendants would default after the three-year statute of limitation expired (as to the fraudulent conveyance claim). *Id.* at 3–4. Defendants reasserted their argument that "Count 1 is not a legally cognizable claim." *Id.* at 6–8. As to the fraud counts, Defendants argued Plaza failed to present sufficient evidence to meet the clear and convincing evidentiary standard. *Id.* at 8–12. Finally, as to Plaza's alter ego claim, Defendants argued Plaza did not present sufficient evidence that would meet the clear and convincing standard that "IWA exercises complete domination of RSD's

---

[7] Section 323, *Obligor's Assent to Assignment or Delegation*, provides:

> (1) A term of a contract manifesting an obligor's assent to the future assignment of a right or an obligee's assent to the future assignment of a right or an obligee's assent to the future delegation of the performance of a duty or condition is effective despite any subsequent objection.

> (2) A manifestation of such assent after the formation of a contract is similarly effective if made for consideration or in circumstances in which a promise would be binding without consideration, or if a material change of position takes place in reliance on the manifestation.

Comment a. has permissive language regarding § 323(1)'s overriding of § 317, stating that "assent *may* operate to preclude objection based on a change in his duty, burden or risk or in his chance of obtaining return performance. See § 317. . . Which of these effects is produced depends on the circumstances and the scope of the assent manifested." (Emphasis added.)

finances, policy, and business practices." *Id.* at pp. 13–17. The Court took the motion under advisement. (ECF No. 607 at p. 70.)

Following the close of evidence and motions, the Court conducted a charge conference, which spanned three days and during which the Court heard and decided myriad disputes on jury instructions and proposed verdict forms. (ECF Nos. 607–609.)

## C. The Verdict & Final Judgment

The jury returned a verdict form answering special interrogatories, and finding for Plaza on all three of its Claims (I – Wrongful, Invalid Assignment, II – Fraudulent Conveyance, and III – Alter Ego). (ECF No. 581.) Specifically, the jury answered "yes" to each of the following questions:

> 1.      Did Plaintiff Plaza prove by a preponderance of the evidence that IWA's Assignment of the Ground Lease to RSD was wrongful and invalid?
>
> 5.      Did Plaintiff Plaza prove by clear and convincing evidence that IWA conveyed its interest in the Ground Lease to RSD with the intention to hinder, delay, or defraud Plaintiff Plaza?
>
> 8.      Did Plaintiff Plaza prove by a preponderance of the evidence that RSD is the alter ego of IWA?

*Id.* The jury also found that Defendants IWA and RSD failed to prove by a preponderance of the evidence each of their affirmative defenses (waiver, estoppel, and release). *Id.*

Following the jury's verdict, the parties, at the Court's request, submitted proposed final judgments, as well as briefing on the parties' respective objections and positions. (ECF Nos. 587-1, 588, 589, 590.) The Court entered final judgment in favor of Plaza on October 11, 2024 as follows:

> 1.      Defendant IWA's assignment of its interest as the ground tenant of the property located at 6560 Rockledge Drive in Bethesda, Maryland (the "Property") pursuant to the Amended and Restated Ground Lease Indenture dated November 14, 1990, (the "Ground

Lease"), as modified by the Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006 (the "Estoppel Agreement"), to Defendant RSD on or around August 31, 2017, was wrongful and invalid.

2.　　Defendant IWA's assignment of its interest in the Property to Defendant RSD on or around August 31, 2017, was a fraudulent conveyance as to Plaintiff Plaza. Defendant RSD　participated in the fraud by virtue of its constructive knowledge of Defendant IWA's intent to hinder, delay, or defraud Plaintiff Plaza by assigning its interest in the Property to RSD.

3.　　Defendant RSD is the alter ego of Defendant IWA.

4.　　Judgment is entered in favor of Plaintiff Plaza on Defendants' counterclaims.

(ECF No. 592 at p. 2.)

Further, the Court "annulled and set aside" the assignment, finding:

6.　　The Ground Lease, as modified by the Estoppel Agreement, restricts the assignment of the tenant's interest under the Ground Lease to a bona fide third party that is independently capable of assuming and performing the tenant's obligations under the Ground Lease.

7.　　The assignment of the tenant's interest under the Ground Lease to any person or entity that lacks the independent capacity to assume and perform the tenant's obligations under the Ground Lease shall not operate to release the assignor from its obligations under the Ground Lease.

8.　　In the event of an assignment of the tenant's interest under the Ground Lease, Plaintiff Plaza (or its successors or assigns as landlord under the Ground Lease) is entitled to request and obtain basic information sufficient to provide adequate assurance that any putative assignee is a bona fide third party with the independent capacity to assume and perform tenant's obligations under the Ground Lease.

*Id.*

Defendants filed their Post-Judgment Motions on November 7, 2024, seeking a directed verdict or, alternatively, a new trial; and to alter or amend the judgment. (ECF Nos. 593, 594.)

19

Plaza filed oppositions and Defendants replied.  (ECF Nos. 595, 596, 599, 600.)  A hearing is not necessary.  Loc. R. 105.6 (D. Md. 2023).

## II.    <u>LEGAL STANDARD</u>

Under Rule 50(b), a motion for directed verdict should be granted only when there is no legally sufficient evidentiary basis for a jury to find for a party on an issue.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000); *see also Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 155 (4th Cir.), *as amended* (May 9, 2012) (explaining that on a Rule 50 motion, the court "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim").  In assessing a Rule 50 motion, the Court does not weigh the evidence or consider the credibility of the witnesses.  *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).  The court should "assume that testimony in favor of the non-moving party is credible, 'unless totally incredible on its face,' and ignore the substantive weight of any evidence supporting the moving party."  *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991)).

Under Rule 59(a), the court is "permitted to weigh the evidence and consider the credibility of the witnesses," evaluating the evidence as a whole to ensure a just result.  *Id.*  If the verdict is "against the clear weight of the evidence" or "will result in a miscarriage of justice," the court may set aside the verdict, even if it was supported by substantial evidence.  *Id.* (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  Ultimately, "[t]he decision to grant or deny a new trial is within the sound discretion of the district court."  *Id.*

Under Rule 59(e), the district court enjoys "considerable discretion in deciding whether to modify or amend a judgment."  *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 241 n.8 (4th Cir. 2008).  "While it is true that it is a remedy to be used sparingly," the Fourth Circuit

has found its use "appropriate on three different grounds: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Id.* Rule 59(e) "permits a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate rulings." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998 (quotation omitted). Importantly, "Rule 59(e) motions may not be used . . . to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Id.* And a previous decision does not qualify as a clear error of law or manifestly unjust "by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018) (cleaned up) (interpreting the clear error of law or manifest injustice standard in the context of Rule 54(b)).

Relevant here, although the Court enjoys discretion under Rule 59, there is a Rule 63 gloss—the rulings of the prior judge are presumed correct. Federal Rule of Civil Procedure 63 provides:

> If a judge conducting a hearing or trial is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the case may be completed without prejudice to the parties. In a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

As noted above, the Court has certified familiarity with the record and has determined that the Motions can be completed by the undersigned without prejudice to the parties. The Court, however, will "start with the premise that rulings of the trial judge are presumed to be correct, and

. . . the burden is on the defeated party to demonstrate the contrary." *Miller v. Pa. R. Co.*, 161 F. Supp. 633, 636 (D.D.C. 1958); *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2922 n.15 (3d ed. 2024) ("When the trial takes place before a judge and jury and the judge dies between the time of trial and the hearing of a motion for judgment notwithstanding the verdict or for a new trial, the rulings of the trial judge are presumed to be correct and the burden is on the defeated party to demonstrate the contrary.").

III.    **ANALYSIS**

   A. **Motion for Directed Verdict or, in the Alternative, New Trial.**

      Pursuant to Federal Rule of Civil Procedure 50, Defendants request a directed verdict on all five counts of Plaza's Second Amended Complaint.  In the alternative, pursuant to Rule 59(a), they request a new trial on all counts.  (ECF No. 593.)

      *1. Count I (Invalid, Wrongful Assignment)*

            a.  Duty of Good Faith and Fair Dealing

      Defendants primarily argue that "Invalid, Wrongful Assignment" is not a cause of action under Maryland law.  *Id.* at 11.  Defendants contend that Plaza manufactured an independent cause of action for the implied duty of good faith and fair dealing, which is merely an element of a claim for breach of contract.  The jury, they contend, was therefore impermissibly charged with rendering a verdict on a "standalone cause of action for breach of good faith and fair dealing." *Id.* at 11–12. Second, Defendants argue that, even if Plaza had asserted a breach of contract claim, the covenant is still inapplicable because it "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* at 12 (citing *Kim v. Cedar Realty Tr., Inc.*, 116 F.4th 252, 265 n.15 (4th Cir. 2024)).  Third, they say the implied duty of good faith and fair dealing cannot be used to override or modify existing

explicit contractual terms: here, the Defendants' ability to assign the lease to any third party and reject demands for adequate assurance. *Id.* at 13–15.

As developed and explained throughout the nearly five years of the record in this case, Count I is a declaratory judgment cause of action, which hinged on interpretation of the parties' contracts: Plaza sought a declaration that the assignment to RSD was invalid. Plaza filed Count I pursuant to 28 U.S.C. § 2201, which provides:

> any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201; *see* ECF No. 196 ¶ 10 (citing 28 U.S.C. § 2201). District courts have developed three elements of a declaratory judgment action: "(1) the complaint alleges an 'actual controversy' between the parties 'of sufficient immediacy and reality to warrant issuance of a declaratory judgment'; (2) the court has subject matter jurisdiction over the parties, independent of the request for declaratory relief; and (3) the court does not abuse its discretion in exercising jurisdiction." *Metro. Dev. Grp. at Cool Spring, LLC v. Cool Spring Rd., LLC*, No. GJH-20-3237, 2022 WL 951995, at *10 (D. Md. Mar. 30, 2022), *aff'd*, No. 22-1403, 2023 WL 8665999 (4th Cir. Dec. 15, 2023) (quoting *Al-Sabah v. Agbodjogbe*, No. 17-cv-730-SAG, 2020 WL 1063003, at *3 (D. Md. Mar. 4, 2020)).

Defendants' argument that Count I was effectively a "standalone cause of action for breach of good faith and fair dealing" was raised and decided many times throughout these proceedings. For example, at the summary judgment hearing on July 18, 2024, the Court denied Defendants' motion for summary judgment on this issue and explained its reasoning:

It is not merely a manufactured claim. . . . There is an actual controversy between the parties, the resolution of which will clarify their legal rights and obligations . . . .

Count One sounds in contract, in effect, even though defendants say it doesn't, because it's Section 317 -- this is now on defendant's arguments. Section 317 doesn't apply, say defendants, when Plaza agrees to the absolute right. But that's the issue that has to be decided. Was that, in fact, what was agreed upon in this case? Do the defendants, in fact, does RSD and IWA have the absolute right to assign, notwithstanding Section 317 of the restatement (2d) of contracts?

\* \* \*

[A]s the Court has said, essentially a breach of contract or anticipatory breach of contract claim informed by this implied covenant of good faith and fair dealing. . . . Plaza has presented substantial evidence from which a reasonable jury could find that defendant's conduct was inconsistent with its obligations under the agreement and not made in good faith.

(ECF No. 511 at pp. 144, 149.)

As counsel for IWA acknowledged at the pretrial conference, "There is a fraud count, and . . . there's a contractual count." (ECF No. 531 at p. 158.) Count I went to the "contractual validity of the assignment" (*id.*), whereas Counts II and III dealt with fraud. (*See id.* at 157–58; ECF No. 550 at pp. 15–16 (where the Court stated, "This case is about what the word absolute means. Does absolute mean no good faith? Does absolute mean no obligation to give reasonable assurances? That's the essence of it. It's the language of the contract.").

Even as late as the charge conference, the Court gave the parties the opportunity to be heard on application of the duty of good faith and fair dealing to the issues in the case. They discussed *Kim v. Cedar Realty Trust, Inc.*, 116 F.4th 252 (4th Cir. 2024), issued by the Fourth Circuit during trial. (*See* ECF No. 608 at p. 2.) In *Kim*, the plaintiffs alleged Cedar structured a transaction in bad faith intentionally to deprive plaintiffs the benefit of their ownership of preferred stock. 116 F.4th at 252. The Fourth Circuit rejected this argument because Cedar did not breach any term of

the agreement, and had not prevented the plaintiffs from "performing" because the plaintiffs had no further performance obligations. *Id.* at 265–66.

In a footnote, the Fourth Circuit (in *Kim*) recognized an alternative "flavor" of the implied duty of good faith and fair dealing under Maryland law – one that holds that a party with discretion is limited to exercising that discretion in good faith. *Id.* at 265 n.12 (citing *Clancy v. King*, 405 Md. 541 (2008) ("In matters of personal discretion in contract, the party with the discretion is limited to exercising that discretion in good faith."); *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241 (2009) ("Th[e] implied obligation governs the manner in which a party may exercise the discretion accorded to it by the terms of the agreement."); *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244 (2018)). Plaza advanced this "flavor" of a breach of the implied covenant, that "[w]hen IWA exercised its discretion and assigned its interest in the Ground Lease to a shell entity . . . , it did so in a manner that vitiated the benefits of the bargain to Plaza and breached the covenant of good faith and fair dealing." (ECF No. 596 at p. 30.)

This Court agreed with Plaza:

> I tend to agree with the plaintiff still, notwithstanding the *Kim* case, which is admittedly problematic. And I think it's the kind of thing which just has to be assessed in the context of a particular case because here there are arguments given the facts that can be developed that really don't – that need to be addressed. There needs to be a vehicle to address it.
>
> * * *
>
> But I don't think it really address[es] the facts, potential facts, or equities of this case to cabin this in such a way, since you're going to argue there's no performance in any way impeded, that somehow blocks the assignment. . . . [T]his is not the proper place to apply the language of *Kim*. It's a proper place to apply the language that talks about . . . good faith and fair dealing and exercising discretion. And that's the way I see it.

(ECF No. 608 at pp. 137–38.)  The Court ultimately instructed the jury that such a breach could be a basis for invalidating the assignment of the Ground Lease, incorporating language directly from *Kim*.  (ECF No. 610 at pp. 34–36.)[8]

Count I sought a declaration that "IWA [wa]s not released from its obligation to fulfill the tenant's obligations under the Ground Lease."  (ECF No. 432 at p. 28.)  It is not a standalone claim for breach of the implied duty of good faith and fair dealing.  The jury instructions incorporated the Court's prior ruling that IWA's discretion to assign its interest in the lease is cabined by § 317

---

[8] The Court instructed the jury on Defendants' duty of good faith and fair dealing as follows:

> Breach of the covenant of good faith and fair dealing is not a separate cause of action, but is part of every contract in Maryland.  Even if the contract is silent about the covenant, the law imposes an implied promise of good faith on the part of all parties.  The covenant may not be waived; thus, Maryland contract law generally implies an obligation to act in good faith and deal fairly with the other party or parties to a contract.

> This implied obligation governs the ma[nn]er in which a party may exercise the discretion accorded to it by the terms of the agreement.  Thus, a party with discretion is limited to exercising that discretion in good faith and in accordance with fair dealing.

> Under the covenant of good faith and fair dealing, a party exercising discretion must refrain from doing anything that will have the effect of frustrating the right of the other party to receive the fruits of the contract between them.  This means that each party must do nothing to destroy the rights of the other party to enjoy the fruits of the contract and do everything that the contract presupposes they will do to accomplish its purpose.

> As to Plaintiff Plaza's contention that defendants did not respond to Plaintiff Plaza's post-assignment inquiries about RSD, you may decide whether requiring a response to such requests either created a new obligation on the part of IWA or constituted a request for adequate assurances, a concept about RSD, a concept to which I will say more a moment.

> The implied covenant of good faith and fair dealing cannot create a new obligation on a party.  You should, therefore, consider whether Plaintiff Plaza's request for information from defendants, as to who RSD was and is and RSD's ability to perform under the ground lease, created a new obligation on the part of defendants under the agreement of the parties to provide information or -- but you should also consider whether Plaintiff Plaza, in fact, had the right to request and receive such information from defendants.

> The fact that a party complies with the literal and technical terms of a contract does not absolve it of liability when it fails to perform in accordance with the covenant of good faith and fair dealing.

(ECF No. 610 at pp. 34–36.)

26

of the Restatement and the implied covenant of good faith and fair dealing. (*See* ECF No. 151.) The Court did not "us[e] good faith and fair dealing to add to or change the contracts." (ECF No. 593 at p. 14.)

b.  <u>Section 317 of the Restatement (Second) of Contracts</u>

In a related argument, with respect to adequate assurance and § 317 of the Restatement (Second) of Contracts, Defendants argue that Maryland has not adopted the assignment provisions in § 317; nor has it recognized a cause of action premised on § 317. (ECF No. 593 at pp. 16–19.) Defendants also re-raise an argument regarding § 323 of the Restatement vitiating § 317's provisions. *Id.* at 18. Further, Defendants say that the concept of adequate assurance is a UCC concept that applies to the sale of goods. *Id.* at 16.

Defendants' contention that Maryland courts have not adopted § 317 is misplaced; and the Court considered and rejected this argument at least twice—during the pretrial conference and the charge conference. (ECF Nos. 531 at p. 140; 607 at pp. 187–89.) Defendants' position is that in *In re Featherfall Restoration LLC*, 251 Md. App. 105, 137, *cert. granted*, 487 Md. 264 (2024), the Maryland Appellate Court rejected § 317 of the Restatement. The Court disagreed and said as much. (ECF No. 531 at p. 140) ("The *Featherfall* decision does not consider the applicability of restatements of contracts. . . . [It] did not change the state of the law that the Court concluded was applicable when it issued its August 3, 2022, opinion."). It was the Court's view that § 317 was "applicable unless and until the jury finds that the language of the agreement itself . . . trumps" the Restatement. *Id.* at p. 146.

*Public Service Commission of Maryland v. Panda-Brandywine, L.P.*, 375 Md. 185, 197 (2003), a Supreme Court of Maryland case, is the only Maryland case that references § 323 of the Restatement (Second) of Contracts at all. There, the Supreme Court of Maryland, in a general

27

discussion of the transfer of contractual rights and duties, explained that the "basic rules" of such transfers are "well-stated in the RESTATEMENT (SECOND) OF CONTRACTS §§ 317–323 (1981)." *Id.* at 198. The Court went on to hold that §§ 317 and 318 have been adopted in Maryland, but did not adopt the remaining sections, including §§ 322 and 323. *Id.* (applying §§ 317(2)(c) and 318 and principles outlined in *Macke Co. v. Pizza of Gaithersburg*, 259 Md. 479, 482 (1970), to hold that an assignment was invalid and unenforceable because it conflicted with an anti-assignment clause in an earlier agreement between the parties); *see also id.* at 188–89 ("These general statements, both in §§ 317 and 318 and in *Macke* regarding the extent to which rights may be assigned and duties of performance may be delegated are, as noted, subject to any valid contractual provision prohibiting assignment or delegation.").

In *Featherfall Restoration*, the Appellate Court of Maryland rejected a party's contention that Maryland had adopted § 322 by virtue of the language in *Panda-Brandywine*. 261 Md. App. 138. The Appellate Court wrote that "'a Restatement provision is not binding on a court unless it has been officially adopted as the law by the jurisdiction's highest court.'" *Id.* (quoting Black's Law Dictionary (11th ed. 2019)), and mere "mention" of § 322 was not adoption). In *Featherfall Restoration*, however, Maryland caselaw was identified that directly conflicted with § 322's rule on post-loss assignments; the Court relied on those cases to enforce the subject contract's anti-assignment clause. *Id.* at 139 (citing *Dwayne Clay, M.D., P.C. v. Gov't Empls. Ins. Co.*, 356 Md. 257 (1999); *Michaelson v. Sokolove*, 169 Md. 529 (1936)); *see also id.* at 147.

To the Court's knowledge, no Maryland case conflicts with § 317 or § 323(1) like the § 322 cases discussed in *Featherfall Restoration*. Accordingly, the Court declines to conclude that *Panda-Brandywine*'s adoption of § 317 does not remain good law. Similarly, to the Court's awareness, no Maryland case evaluates an objection to an assignment made in conjunction with a

free-assignment provision like the one at issue here.  Rather, the general rule on assignments is that "[i]n the absence of a contrary provision . . . rights and duties under an executory bilateral contract may be assigned and delegated, subject to the exception that duties under a contract to provide personal services may never be delegated, nor rights be assigned under a contract where *delectus personae* was an ingredient of the bargain." *Macke Co. v. Pizza of Gaithersburg*, 259 Md. 479, 482 (1970); *see also Panda-Brandywine*, 375 Md. at 203 (adopting §§ 317 and 318, and providing that "the extent to which rights may be assigned and duties of performance may be delegated are . . . subject to any valid contractual provision prohibiting the assignment or delegation"). And as the Court recognized in its Memorandum Opinion of August 3, 2022, read broadly, the Maryland Supreme Court has recognized—and rejected—the transfer of rights and duties under a contract that places "significant burdens upon the obligor under a contract," (ECF No. 151 at p. 15) (citing *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588 (1925)), when such an assignment "altered the conditions and obligations of the undertaking." *Crane Ice Cream Co.*, 147 Md. at 599.

Defendants also argue that the Court "cherry-pick[ed]" § 317 and ignored § 323.  (ECF No. 593 at p. 18.)  Of course, § 323 has not been expressly adopted in Maryland, while § 317 has. *Panda-Brandywine*, 375 Md. at 198.  Nevertheless, upon reviewing § 323(1) and the free-assignment provision in the Ground Lease, the Court did not err in holding that § 323(1) did not give IWA the "absolute right" to assign its interest in the lease in any manner, as it contends.

Other jurisdictions have adopted § 323(1) and applied it strictly where parties have agreed to free-assignment provisions, with the exception of *Auto Electric & Service Corp. v. Rockwell International Corp.*, 314 N.W.2d 592, 593 (Mich. App. Ct. 1981), which will be discussed below.

In *Dennard v. Freeport Minerals Co.*, 297 S.E.2d 222, 226 (Ga. 1982), the Georgia Supreme Court held that parties can effectively contract out of § 317's protections, but supported its reasoning by consideration of the parties' conduct.  It explained: "Although a duty is generally not delegable where performance by the delegate would vary materially from performance by the original obligor, the parties may nonetheless agree to such an assignment or delegation." *Id.*  The *Dennard* court found "clear assent to the assignability and delegability of all the contract terms" when "[t]he language of the contract clearly contemplates the free assignment and delegation of all rights and duties under the contract." *Id.*  There, the contract provided: "'The rights, powers, privileges, interests and title herein granted shall be held, owned, used and enjoyed by the parties hereto and their heirs, executors, administrators, successors and assigns; and all obligations herein created shall be binding against them in like manner and to the same extent that they bind the parties hereto.'" *Id.*

The *Dennard* court reasoned that "[t]he conduct of the parties subsequent to the lease agreement" supports the view that the parties assented to the assignment at issue. *Id.* at 226.  There were no "particular circumstances[] which indicate that this assent to assignability was intended to be limited" and the court noted that the "conduct of the parties has manifested an assent to all assignments and delegations" such that "[n]either party will now be permitted to object." *Id.*

Likewise, in *Abalene Pest Control Serv., Inc. v. Hall*, 220 A.2d 717, 720–21 (Vt. 1966), which the Restatement cites as an example in Comment a., the court considered the conduct of the parties to determine whether the contract was assignable notwithstanding a free-assignment clause. There, a pest control company sought to enjoin a former employee from operating a competing pest control company in violation of his employment contract. *Id.* at 719–20.  The contract had a free-assignment provision and the contract was assigned to a new pest control company. *Id.*  The

former employee was never consulted and he never consented to the assignment. *Id.* at 720. The court considered, however, that the former employee "was fully aware of the changes in the corporate name and continued to work in the same capacity for a period of twelve years" and "freely accepted the benefits of the contract" after the assignment." *Id.* at 721. The court explained, "[t]his demonstrates to our satisfaction that the parties intended the contract to be assignable, not only because it so provided, but also by reason of the conduct of the parties. The restrictive covenants, agreed to by the defendant, were designed to protect 'All-Vermont' and its successors against competition by the defendant as expressed in the agreement." *Id.*

Notably, the Court of Appeals of Michigan disregarded § 323(1) when a snowmobile distributor "expressed his dissatisfaction with the assignment" of his supplier contract immediately. *Auto Elec. & Serv. Corp.*, 314 N.W.2d at 593. There, the contract stated that it "shall be personal to the Distributor (plaintiff) and nonassignable by it but may be assigned by Rockwell," the supplier. *Id.* Despite the supplier's right to assign set forth in the contract, the court considered testimony by the distributor that "the operation of the business was altered substantially" by the supplier's assignment such that it "effectively prohibited plaintiff from maintaining its business." *Id.* at 594–95. The dissent raised § 323(1), believing that the majority mistakenly "overlook[ed]" § 323 to "decide[] this case on its facts." *Id.* at 596 (Riley, J., dissenting).

Upon review of Maryland law and cases from other jurisdictions, the Court was permitted to hold that the parties did not assent to assignability if it (1) would frustrate the purpose of the contract altogether or (2) the parties' conduct shows a contrary intention. The jury was instructed accordingly. (ECF No. 610 at p. 38, instructing the jury: "if you find that Plaintiff Plaza agreed or consented to the assignment under the circumstances of this case, then Plaintiff Plaza may not

object" to the assignment for lack of adequate assurances).  In addition, at trial, Plaza presented evidence that assignment materially impaired Plaza's return performance on the Ground Lease; the jury found for Plaza on this claim.  Camalier testified that he feared RSD may not be able to perform for the life of the Ground Lease (ECF No. 552 at pp. 22–23).  Defendants' witnesses buttressed this opinion with testimony that RSD defaulted on the Ground Lease whenever IWA stopped funding it, leaving Plaza with no recourse.  For example, RSD's principal, Taylor, testified, "IWA committed up to 38 months of financing . . . .  They could have stopped funding after two months."  (ECF No. 553 at p. 110, ll. 12-14.)  The jury was properly instructed to deliberate whether these circumstances materially increased the risk that RSD, the assignee, would default, triggering § 317.

Further, Defendants' argument to the contrary notwithstanding, the concept of "adequate assurances" is not applicable solely to the sale of goods under the UCC, as the Court explained during the charge conference.  (ECF No. 607 at p. 180, stating § 317 applies "across-the-board to all contracts.")  A close reading of the Restatement supports the Court's conclusion.  It is true that Comment d. to § 317 mentions adequate assurances in the context of the implications of an assignment governed by the UCC, but that Comment cross-references § 251.  Section 251 is titled "When a Failure to Give Assurance May Be Treated as a Repudiation," and Comment a to that section expressly provides that the requirement that a party give adequate assurances to the other party is a "generalization" that is "applicable without regard to the subject matter of the contract." The Comment continues to explain that although "adequate assurances" appears under that precise portion of the UCC, "the principle is closely related to the duty of good faith and fair dealing in the performance of the contract."  Indeed, courts have found the concept of adequate assurances applicable to contracts other than for the sale of goods, as in *Ranger Construction Co. v. Dixie*

*Floor Co.*, 433 F. Supp. 442 (D.S.C. 1977), where the court applied § 251 to hold that one party was obligated to give the other adequate assurances under a contract that predominantly concerned the provision of services, and the provision of goods was merely an incident of the contract. *Id*. at 446.

In sum, Defendants' instant Motion repeats arguments presented and rejected earlier. They do not present a valid basis to revisit the Court's previous rulings; the Court will therefore deny Defendants' Motion with respect to Count I.

### 2. *Counts II and III (Fraudulent Conveyance)*

Defendants' arguments with respect to Counts II and III purport to be factual, asserting that the evidence was insufficient for a reasonable jury to find in favor of Plaza. (ECF No. 593 at pp. 19–29.) As explained in detail below, here again, Defendants recycle challenges previously made and rejected by the Court. No Rule 50(a) basis exists to revisit the rulings.

Defendants first argue there was insufficient trial evidence to find that the Assignment was a conveyance of "assets" or "property" under Maryland fraudulent conveyance law, the Maryland Uniform Fraudulent Conveyances Act (MUFCA), MD. CODE ANN., COM. LAW § 15-201 *et seq.* (ECF No. 593 at pp. 20–21.) They assert that if the Ground Lease had no value to IWA when IWA assigned it, it cannot legally be a fraudulent conveyance; the only evidence of the Ground Lease's value was that it was a liability, and no Maryland or Fourth Circuit precedent permits a fraudulent conveyance claim based on the transfer of a financial obligation or leasehold interest operating at a net loss. *Id.* at 21-22. Defendants also contend there was no evidence that Plaza was a "creditor" of IWA, and, thus, it cannot sue under MUFCA. MUFCA § 15-201 (defining "creditor" as "a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent"). *Id.* at 23.

Defendants raised these same arguments at summary judgment; the Court rejected them. (ECF No. 409 at pp. 11–12; ECF No. 511 at pp. 146–49.)  The Court held that the assignment is covered by MUFCA because "IWA conveyed its leasehold estate to RSD, not just the obligation to pay rent," which is a property interest.  (ECF No. 511 at p. 146.)  Plaza remained a creditor of IWA under MUFCA because, at the time of the assignment, IWA had long-term financial liabilities to Plaza, which it sought to fraudulently offload to RSD through the assignment.  *Id.*  MUFCA permits the Court to "set aside" the assignment and to declare that IWA remains on the hook for its obligations to Plaza, which "did not result from a foreclosure sale."  *Id.* at p. 147.  The Court explained that Plaza was not seeking "reformation" of the Ground Lease or Estoppel Agreement, but rather to set aside the assignment and obtain declaratory judgment that IWA cannot be released from its obligations to Plaza.  *Id.*

Trial evidence supports the Court's summary judgment ruling—the assignment transferred IWA's leasehold estate to RSD, not just the financial obligation to pay ground rent.  The assumption and assignment of Ground Lease from IWA to RSD assigned "all of [IWA's] right, title and interest" in the Ground Lease.  (ECF No. 414-24 at p. 2.)  Rubin, RSD's principal, characterized the Ground Lease as an "asset."  (ECF No. 606 at p. 94.)  Both Taylor and Rubin testified that they thought the leasehold estate had value, which is was why they agreed to manage RSD.  (*See, e.g.*, ECF No. 605 at p. 25; ECF No. 606 at p. 94.)

Defendants also argue there was insufficient evidence for the jury to find Defendants acted with fraudulent intent.  (ECF No. 593 at p. 27.)  Defendants offer for the Court's consideration the "badges of fraud" from *Wellcraft Marine Corp. v. Roeder*, 314 Md. 186, 189–90 (1988).  *Id.* at 27–29.  At summary judgment, the Court determined that Plaza had identified sufficient "badges

of fraud" and indicia of IWA's total control over RSD to merit allowing these Counts to proceed

to a jury:

> There are a number of salient facts here that, taken together, amount
> to more than mere "sharp dealings," a term the Court once used:
> IWA assigned the Ground Lease to an entity (RSD) whose primary,
> if not sole, source of capitalization apparently was (and to a
> considerable extent, may still be) IWA, and an entity whose funding
> IWA apparently can revoke at any time (in a sense, IWA seems to
> have been attempting to make an assignment to itself); further, RSD
> was formed very shortly before the assignment (the Court has heard
> different answers at different times, but certainly no more than a few
> days beforehand); IWA and RSD repeatedly refused to disclose any
> "basic information" about the latter to Plaza or its counsel until the
> Court ordered them to do so; the Ground Lease assignment was
> never recorded; and it is apparent from evidence developed by the
> parties during discovery that the three-year statute of limitations for
> a fraudulent conveyance loomed large in the minds of IWA and RSD
> and their counsel at the time the assignment was orchestrated. Some
> of the most compelling evidence supporting the Court's conclusion
> that a potential fraud was in the offing comes from openly taken
> deposition    testimony    of    IWA's    and    RSD's    corporate
> representatives, which implied that the real purpose of the
> assignment was for IWA to obtain a more favorable position to
> renegotiate the Ground Lease, given that the threat of default by
> RSD would be hanging over Plaza.

(ECF No. 339 at pp. 8–9.)

Moreover, Plaza elicited such evidence at trial. Indeed, the record is plain that Plaza

offered ample trial evidence on which a reasonable jury could rely to find the requisite fraudulent

intent. By way of example, IWA's principal witness and corporate representative, Feltman,

testified he knew there was a risk of fraudulent transfer litigation when RSD was created. (ECF

No. 552 at p. 137.) And before RSD was created, Defendants had already contemplated and

discussed "burying the entity" (ECF No. 553 at p. 150); Taylor was instructed not to communicate

with Plaza (*id.* 109, 161); and according to Barron (via video deposition), RSD was created to

enable IWA to "walk[] away" from the Ground Lease and "turn over the keys." (*See* ECF No. 606

at pp. 154–55.) Plaza also admitted evidence of RSD Term Sheets that showed the statute of

limitations for fraudulent conveyances were on the brain during negotiations of the RSD operating agreement.  (ECF No. 552 at pp. 125–27; ECF No. 605 at p. 122.)  In fact, RSD, by the terms of its Operating Agreement, would not exist beyond August 1, 2026.  (ECF No. 414-21.)

The Court sees no reason to revisit these issues post-trial.  For the foregoing reasons, the Court will deny Defendants' Motion as to Counts II and III.

### 3. Alter Ego Claim

Defendants contend that the Court should have directed a verdict in their favor on the alter ego claim for two reasons:  First, Defendants argue, there was no evidence that IWA controlled RSD in all areas, that RSD was inadequately capitalized, failed to observe corporate formalities, commingled corporate assets, had non-functioning officers or directors, was insolvent at the time of the transaction, or that RSD failed to maintain corporate records.  (ECF No. 593 at pp. 29–30.)  Second, Defendants urge, pursuant to a paramount equities theory, there was no proof of common law fraud to pierce the corporate veil.  *Id.* at 30–31.

Under Maryland law, courts are permitted to pierce the corporate veil only upon a showing of fraud or to enforce a paramount equity.  *Qun Lin v. Cruz*, 247 Md. App. 606, 640 (2020).  In practice, Maryland courts exercise considerable restraint in piercing the corporate veil to enforce a paramount equity.  *Id.* at 641.  In effect, this means the surest (or surer) way to pierce the corporate veil is through a showing of fraud.

The jury was instructed on a paramount equities theory of alter ego:

> When a company is used as a mere shield for a wrongful or dishonest act, the fiction of the separate corporate entity may be disregarded. The alter ego doctrine applies where the corporate entity has been used as a subterfuge and to observe that it would work an injustice; the rationale being that if members of the -- or the companies themselves disregard the proper formalities of a company, then the law will do likewise, as necessary, to protect individual and corporate creditors.

The doctrine applies when the plaintiff shows by a preponderance of the evidence:

One, complete domination, not only of finances but of policy and business practice in respect of a transaction so that the corporate entity, as to this transaction, had at the time no separate mind, will, or existence of its own;

And, second, that such control was used by the defendant to commit fraud or wrong, to perpetrate a violation of the statutory or other positive legal duty, or to act dishonestly and unjustly in contravention of the plaintiff's rights;

And, finally, that such control and a breach of duty proximately caused injury or unjust loss to the plaintiff.

No fraud must be shown when we're speaking of alter ego, but the plaintiff must show that an inequitable result involving fundamental unfairness will result from a failure to disregard the corporate form.

The factors that are commonly considered in determining whether to apply the alter ego doctrine to companies include:

One, whether the company is inadequately capitalized, fails to observe corporate formalities, or operates without a profit;

Second, whether there is a commingling of company and personal assets;

Third, whether there are nonfunctioning officers;

Fourth, whether the company is insolvent at the time of the transaction;

And, fifth, the absence of corporate records.

(ECF No. 610 at pp. 40–41.)

Importantly, both theories favor Plaza, because the jury found Plaza proved both that "IWA conveyed its interest in the Ground Lease to RSD with the intention to hinder, delay, or defraud" Plaza and that "RSD is the alter ego of IWA." (ECF No. 581 at pp. 3–4.) Ample evidence supports the jury's alter ego findings, including RSD's operating agreement, a joint trial exhibit, showing that IWA owned 98% of RSD, controlled its major decisions by appointing all members of RSD's

management committee, had the unilateral right to dissolve RSD at any time for any reason, and retained the right to purchase Taylor/Rubin's interest in RSD for $1,000.  (ECF No. 414-21.)

Moreover, Taylor testified that "IWA controls the major decisions of RSD," including whether RSD was permitted to contact Plaza.  (ECF No. 605 at pp. 50, 100.)  IWA trial witnesses testified they held RSD "management committee" roles, but they were unable to answer questions about their responsibilities.  Taylor identified Koluch as the decision-maker for RSD.  *Id.* at 59. Koluch, property asset manager at the time of the assignment, testified he "did not know what [IWA's] role is here" and could not answer questions about the source of RSD's money.  (ECF No. 553 at p. 91; ECF No. 584-1 at pp. 7-8.)  Shaffer, who at one time acted as the sole member of RSD's management committee, appeared similarly reticent; he was unable to answer questions about Algon's role in RSD or how he came to serve on the management committee.  (ECF No. 553 at pp. 104–05; ECF No. 584-3 at pp. 6–8.)  Feltman confirmed that IWA is RSD's only source of funding and had no obligation to keep funding it.  (ECF No. 552 at pp. 34–36.)  Rubin, who prepared RSD's financial statements, testified he did not account for any liabilities associated with the ground lease obligation (ECF No. 607 at p. 18), supporting Plaza's theory that Defendants used RSD to get the Ground Lease off its books.  (ECF No. 596 at pp. 53–54.)

Based on the evidence, the jury reasonably found that IWA acted with fraudulent intent and that RSD was IWA's alter ego – implemented as a "subterfuge" to avoid its Ground Lease obligation.  (ECF No. 610 at p. 40.)  The Court will not disturb the jury's findings.  For the foregoing reasons, the Court denies Defendants' Motion with respect to the alter ego claim.

### 4.  *Motion for New Trial*

Defendants raise eight reasons why they should be granted a new trial.  (ECF No. 593 at p. 2.)  They argue they did not have notice of the elements of Count I prior to trial, *id.* at 31–32; the

jury instructions on Count I lacked guidance on what Plaza needed to be proven, *id.* at 32–33; and the jury instructions on (a) good faith and fair dealing, *id.* at pp. 34–39, and (b) alter ego, *id.* at pp. 39–41, were erroneous. Defendants assert the Court erred by refusing to instruct the jury on Defendants' ratification defense. *Id.* at p. 41. They also take issue with the Court's exclusion of the testimony of its experts, Ian Ratner and Douglas Bregman, *id.* at pp. 42–54, and by effectively excluding Barron from testifying "by (1) informing Defendants that it would find a waiver of the privilege if he did; and (2) excluding key deposition testimony designated by Defendants," *id.* at p. 54, among other discretionary rulings regarding the exclusion of testimony, *id.* at pp. 54–72.

All of Defendants' arguments were previously raised, heard, and rejected, as already summarized. Most of these rulings were discretionary and the Court declines to engage with each and every one of them, because Defendants fail to meet their burden to show the Court's rulings were incorrect. *See* Federal Practice & Procedure § 2922 n.15 ("When the trial takes place before a judge and jury and the judge dies between the time of trial and the hearing of a motion for judgment notwithstanding the verdict or for a new trial, the rulings of the trial judge are presumed to be correct and the burden is on the defeated party to demonstrate the contrary."). The Court finds that the verdict is not "against the clear weight of the evidence," and does not "result in a miscarriage of justice." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quotation omitted). The Court denies Defendants' Motion for a new trial.

### 5. *Standing*

Defendants re-raise their argument that Plaza never confirmed its ongoing ownership interest in the Ground Lease to ensure its stake in the outcome of the controversy. (ECF No. 593 at p. 64.) Defendants contend they raised this issue repeatedly over the course of litigation but were never given discovery to confirm Plaza's interest in the property. As set forth above, the

Court did not decide the issue pre-trial, reasoning that trial would include evidence of Plaza's ownership interest in the property. (ECF No. 511 at p. 104.)

"Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999). "Article III gives federal courts jurisdiction only over 'cases and controversies,' U.S. Const. art. III, § 2, cl. 1, and the doctrine of standing identifies disputes appropriate for judicial resolution." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–76 (1982)). There is no case or controversy unless the plaintiff has standing to assert its claim. *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Thus, the issue of standing may be raised at any time or *sua sponte* by the Court. *Buscemi v. Bell*, 964 F.3d 252, 258 (4th Cir. 2020) (citing *Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011)).

Plaza factually established its standing through evidence of its interest in the Ground Lease at trial. First, Camalier testified Plaza is the landowner and landlord under the Ground Lease. (ECF No. 551 at p. 22.) Second, the 2006 Estoppel Agreement (offered as a joint exhibit) establishes Plaza was the landlord. (ECF No. 13-3; ECF No. 551 at pp. 26–27.) Camalier further testified he executed the Estoppel Agreement "on behalf of the landowner," Plaza. (ECF No. 551 at pp. 26–27.) Defendants are not entitled to a directed verdict on the issue of standing.

## B. Motion to Amend Judgment

Defendants argue the Court's judgment violates Rule 52(a) and must be amended because it re-interprets the parties' contract. (ECF No. 594.) The relevant portions of the Judgment are as follows:

> [T]he Court hereby **ENTERS JUDGMENT** in favor of Plaza and against Defendants, as follows:

1.      Defendant IWA's assignment of its interest as the ground tenant of the property located at 6560 Rockledge Drive in Bethesda, Maryland (the "Property") pursuant to the Amended and Restated Ground Lease Indenture dated November 14, 1990, (the "Ground Lease"), as modified by the Ground Lessor Estoppel and Non-Disturbance Agreement dated June 2, 2006 (the "Estoppel Agreement"), to Defendant RSD on or around August 31, 2017, was wrongful and invalid.

Defendant IWA's assignment of its interest in the Property to Defendant RSD on or around August 31, 2017, was a fraudulent conveyance as to Plaintiff Plaza. Defendant RSD  participated in the fraud by virtue of its constructive knowledge of Defendant IWA's intent to hinder, delay, or defraud Plaintiff Plaza by assigning its interest in the Property to RSD.

3.      Defendant RSD is the alter ego of Defendant IWA.

4.      Judgment is entered in favor of Plaintiff Plaza on Defendants' counterclaims.

Accordingly, it is hereby **DECLARED**:

5.      Defendant IWA's assignment of its interest in the Property to Defendant RSD on or around August 31, 2017, is hereby **ANNULLED and SET ASIDE**, and Defendant IWA shall remain in all respects the tenant under the Ground Lease, responsible for all of the tenant's obligations thereunder, as if such assignment had not occurred.

6.      The Ground Lease, as modified by the Estoppel Agreement, restricts the assignment of the tenant's interest under the Ground Lease to a bona fide third party that is independently capable of assuming and performing the tenant's obligations under the Ground Lease.

7.      The assignment of the tenant's interest under the Ground Lease to any person or entity that lacks the independent capacity to assume and perform the tenant's obligations under the Ground Lease shall not operate to release the assignor from its obligations under the Ground Lease.

8.      In the event of an assignment of the tenant's interest under the Ground Lease, Plaintiff Plaza (or its successors or assigns as landlord under the Ground Lease) is entitled to request and obtain basic information sufficient to provide adequate assurance that any putative assignee is a bona fide third party with the independent

capacity to assume and perform tenant's obligations under the
Ground Lease.

(ECF No. 592 at pp. 1–2.)

> Defendants point to seven errors in the two-and-a-half-page Final Judgment:
>
> > 1. The Court entered judgment as to the meaning of the contracts and the tenant's obligations thereunder in violation of Rule 52(a)(1).
> > 2. The Court improperly declared the existence of new assignment provisions as a matter of law after the jury reached its verdict and without notice to Defendants of this procedure.
> > 3. The Court erred when it entered judgment to declare the existence of new assignment provisions.
> > 4. The final judgment nullifies the assignment provisions and instead imposes an obligation on IWA to guarantee future performance of any possible assignee.
> > 5. The Court entered judgment to declare the existence of new assignment provisions even though Plaintiff did not demand this remedy in its complaint or before trial.
> > 6. The Court improperly reformed the Ground Lease and Estoppel Agreement even though reformation is not permitted under the MUFCA nor under Maryland law.
> > 7. The Court entered judgment requiring disclosure of "basic information" that goes beyond its prior ruling on this matter.

(ECF No. 594 at p. 2) (page numbers omitted).

Defendants' first claim is that the Judgment contains "errors of law" and paragraphs 6 through 8 "should be removed." (ECF No. 599 at p. 4.) Rule 52 provides: "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." FED. R. CIV. P. 52. Defendants' contend that because paragraphs 6, 7, and 8 "were not submitted to the jury or part of its verdict," and the Court had to "find facts in support of the final judgment [and] state any conclusions of law supported by Maryland or Fourth Circuit precedent." (ECF No. 594 at p. 5.) Plaintiffs correctly point out that, at Defendants' insistence, the case was tried to a

non-advisory jury (ECF No. 595 at p. 2.); Defendants argued (as recited above) they were entitled to a jury trial on Count I, and all common issues of fact, because Count I (Wrongful, Invalid Assignment) sounds in contract and allegations of fraud require factfinding by a jury. (ECF No. 477 at pp. 2–3.) The Court granted Defendants' motion. (ECF No. 528.) As such, Rule 52 does not apply.

In essence, Defendants argue the Final Judgment is manifestly unjust because the Court was never asked to "interpret" the contracts. (ECF No. 599, at 4.) The record demonstrates otherwise. At the summary judgment hearing, the Court explained:

> Count One sounds in contract, in effect, even though defendants say it doesn't, because it's Section 317 -- this is now on defendant's arguments. Section 317 doesn't apply, say defendants, when Plaza agrees to the absolute right. *But that's the issue that has to be decided. Was that, in fact, what was agreed upon in this case?* Do the defendants, in fact, does RSD and IWA have the absolute right to assign, notwithstanding Section 317 of the restatement (2d) of contracts?

(ECF No. 511 at p. 144) (emphasis added). At the pretrial conference, IWA argued otherwise as well, seeking to raise "contractual defenses to [Plaza's] contract count." (ECF No. 531 at p. 158.) The jury was asked to determine,[9] and did determine, what was agreed to in the contracts.

The Judgment comports with the jury's verdict, which interpreted the agreements and rejected Defendants' position that the assignment provisions meant "any third party" without notice to Plaza. The Court, exercising its discretion under Rules 59 and 63, will not amend the Judgment.

---

[9] After the jury was instructed on the "objective theory of contract interpretation" (ECF No. 610 at p. 36), Defendants asked the jury to "construe these contracts using your common sense and the commonly understood use of the words as they appear on the page," and to interpret Sections 12 and 19 of the Estoppel Agreement as giving them the "absolute right to assign [the Ground Lease] to any third party." *Id.* at 95, 93.

## IV.    CONCLUSION

For the reasons set forth herein, the Motions (ECF Nos. 593, 594) shall be denied.

Defendants' related Motion for Judgment as a Matter of Law (ECF No. 572) shall also be denied.


May 27, 2025                                    /S/
                                    _____
                                    Julie R. Rubin
                                    United States District Judge